<pre>
1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                         PECOS DIVISION

3   UNITED STATES OF AMERICA ) Docket No. PE 20-CR-388(1) DC
                             )
4   vs.                     ) Pecos, Texas
                             )
5   THOMAS SCOTT PERKINS     ) September 24, 2020

6

7            TRANSCRIPT OF DETENTION HEARING
          BEFORE THE HONORABLE DAVID B. FANNIN

8


9   APPEARANCES:

10  For the United States:    Mr. John Cannizzaro
                              Assistant U.S. Attorney
11                            2500 North Highway 118,
                              Suite 200
12                            Alpine, Texas 79830

13

14  For the Defendant:        Mr. Shane O'Neal
                              Assistant Federal Public Defender
15                            108 North 10th Street
                              Alpine, Texas 79830

16

17

18  Transcriber:              Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
19                            Austin, Texas 78701
                              (512)391-8792
20

21

22

23

24

25  Proceedings reported by digital sound recording,
    transcript produced by computer aided-transcription.
</pre>

**I N D E X**

|                   | Direct | Cross | Redirect | Recross |
|-------------------|--------|-------|----------|---------|
| Witnesses:        |        |       |          |         |
| David Ferg        | 6      | 14    |          |         |
| John Perkins, Sr. | 22     | 29    | 33       |         |

**E X H I B I T S**

|                 | Offered | Admitted |
|-----------------|---------|----------|
| Government's    |         |          |
| (None)          |         |          |
|                 |         |          |
| Defendant's     |         |          |
| (None)          |         |          |

1          (Proceedings commence at 10:24 a.m.)

2          THE CLERK:  Court calls:  PE-20-CR-388, The

3  United States of America vs. Thomas Scott Perkins.

4          MR. CANNIZZARO:  Good morning, your Honor.

5          John Cannizzaro on behalf of the government.

6          THE COURT:  Good morning.

7          MR. O'NEAL:  Shane O'Neal on behalf of Mr.

8  Perkins.

9          Your Honor, I believe we're here on a detention

10  hearing.

11          THE COURT:  Mr. O'Neal --

12          MR. O'NEAL:  Yes.

13          THE COURT:  -- let me just make -- put a few

14  things on the record.

15          MR. O'NEAL:  Yes, sir.

16          THE COURT:  Mr. Perkins was indicted by a federal

17  grand jury on September the 10th, 2020.  He was

18  subsequently picked up -- and this was a sealed

19  indictment.  He was subsequently picked up on, looks to me

20  like, September the -- maybe September the 15th.  And

21  then, he had a hearing -- a detention hearing before Judge

22  Parker in Abilene on September the 16th, and Judge Parker

23  made conditions of bond in this case.  And Mr. Perkins and

24  his father voluntarily came down to this court to take

25  care of this matter.  This was on this past Tuesday,

1    September the 22nd.  And because of information, that I

2    received from Pretrial Services in this case, I ordered

3    the re-detention of Mr. Perkins, not for any violation of

4    his bond.

5            And, Mr. O'Neal, would you like to add anything

6    to that?

7            MR. O'NEAL:  Yes, your Honor.  I think the Court

8    read my mind and I appreciate the summary.

9            I agree with the Court's recitation of the facts.

10   I think that an order setting conditions has been entered

11   in this case.  Mr. Perkins complied with those conditions.

12   As the Court noted, the Court took him into custody not

13   violating him.  Apparently, I think the government's --

14   the motion that the government must have made on September

15   22nd was improper.  They either should have appealed Judge

16   Parker's orders setting release to a district court judge,

17   assuming they preserve that issue by filing a motion to

18   detain in the lower court, or move to revoke the

19   conditions if they believe that he didn't meet them.

20           I think that the order setting conditions should

21   be reinstated.

22           THE COURT:  And then, your appeal would be to

23   Judge Counts if you wish to do that.  Or we can have -- or

24   we can do a detention hearing in this court and -- or a

25   re-detention hearing, I suppose, in this court.  Make your

1    choice.

2              MR. O'NEAL:  So I take it, the Court's denying my

3    request to reinstate the -- set the conditions of release.

4              THE COURT:  Right.

5              MR. O'NEAL:  We'll go forward today.  And if we

6    need to appeal, we'll do that.

7              THE COURT:  Okay.  Thank you.

8              And, Mr. Cannizzaro, this is a detention hearing.

9    Mr. Perkins has been indicted.

10             Let me ask you this, Mr. Cannizzaro:  Is there

11   any reason why this case is presently sealed?

12             MR. CANNIZZARO:  Yes, your Honor.  And I was

13   going to ask you about that because my understanding is

14   that when we did the grand jury, there was a separate

15   motion that I filed that said as to this particular

16   defendant, once he was arrested, that the case were to --

17   the case was to be unsealed.  And that should have been

18   filed with the indictment.  So I'm not sure if the clerk

19   has a copy of that motion and there should be an attached

20   order with that, as well.

21             THE COURT:  I think if the clerk had that motion,

22   they would have unsealed this.  What I would ask you to

23   do, Mr. Cannizzaro, is to file a motion to unseal this

24   case and so we can proceed with that without closing the

25   courtroom every time we talk about it.

1          MR. CANNIZZARO:  Okay.  I will file that motion,

2   Judge.

3          THE COURT:  Thank you.  You may call your

4   witness, if you'd like.

5          MR. CANNIZZARO:  Yes, your Honor.

6          At this time, the government calls Agent David

7   Ferg to the stand.

8          THE CLERK:  Mr. Ferg, if you could raise your

9   right hand.

10          Do you swear to tell the truth, the whole truth,

11   and nothing but the truth, so help you God?

12          THE WITNESS:  Yes, I do.

13          THE COURT:  You may proceed.

14      DAVID FERG, called by the Government, duly sworn.

15                      DIRECT EXAMINATION

16   BY MR. CANNIZZARO:

17   Q.  Thank you, Judge.

18          Good morning, Agent Ferg.  Can you please

19   introduce yourself to the Court and can you please spell

20   your name for the record?

21   A.  Sure.  My name is David Ferg.  And my last name is

22   F-E-R-G.

23   Q.  Thank you, Agent Ferg.

24          And can you tell us where you concurrently work

25   at?

1    A.    I'm a special agent with Homeland Security

2    Investigations in Alpine, Texas.

3    Q.    Okay.  And how long have you been working with

4    Homeland Security Investigations in Alpine, Texas port?

5    A.    In Alpine, approximately five years.

6    Q.    Okay.  And do you have prior law enforcement

7    experience?

8    A.    I was also with HSI in Deming, New Mexico for

9    approximately four years before.

10   Q.    Gotcha.  And are you the case agent in this

11   particular case against Mr. Perkins?

12   A.    Yes, I am.

13   Q.    Okay.  And do you see on one of your screens, Mr.

14   Perkins present, I guess, on your screen?

15   A.    I did see him when he walked in.  I do not see him

16   now.

17   Q.    Okay.  Can you tell the Court briefly, how did you

18   first become aware of this case involving the defendant?

19   A.    Yes, sir.

20         This case originated in September 2019.  When a

21   different HSI agent in Brownsville, Texas, assigned to

22   child exploitation federal crime passports, he was

23   conducting online investigations of BitTorrent, which is a

24   peer-to-peer network used to share files, and he

25   identified an IP itself address that was possibly sharing

1  child exploitation materials.  He was able to pull

2  downloads from that IP address, and subsequently, the

3  files were transferred to us when it was determined that

4  the IP address was located in Fort Stockton, which is

5  within our area of the Western District of Texas.

6  Q.   Okay.  And then, what did you do at that point when

7  you knew the IP address coming from your -- our area in

8  the Western District?

9  A.   When I first viewed the files that were provided to

10  us, I did confirm that they were child pornography.  And

11  then, we did a subpoena in order to determine the

12  subscriber information for that IP address.

13  Q.   Okay.  And what was the subscriber information that

14  you learned for that IP address?

15  A.   It came back to an individual named John Perkins at

16  that address, 404 Seal Street in Fort Stockton.

17  Q.   Okay.  And then, what did you do at that point when

18  you learned about the address?

19  A.   From there, I began researching who Perkins was, who

20  his family was, conducting surveillance on the location to

21  try to confirm vehicles and relevant information.

22  Q.   Okay.  And at some point, were you able to confirm

23  the address and actually go to that address?  How did that

24  process work?

25  A.   Yes, sir.  After multiple times of surveillance, we

1  eventually obtained a search warrant for the location.

2  Q.  Okay.  And did you eventually serve that search

3  warrant?

4  A.  Yes, we did.

5  Q.  Okay.  And what exactly did you get out of that

6  search warrant?  What was the nature of the items that you

7  seized pursuant to that search warrant?

8  A.  Personally, I was involved in interviews at the time,

9  but our agent, an assisting agent, he would fix the items,

10  many of which were electronics.  Desktop computers, laptop

11  computers, video game systems, thumb drive.

12  Q.  Okay.  And prior to that, I know just without

13  understanding the timeline -- I guess, before the search

14  warrant was served, you actually talked to all the people

15  that were living in the residence.  Is that true?

16  A.  It was basically simultaneous with the search

17  warrant.  Yes, sir.

18  Q.  Okay.  Can you tell the judge who exactly did you

19  speak with?

20  A.  Yes, sir.  First we spoke with John Perkins, the

21  father of -- head of the household.  We spoke with him on

22  the morning before the search warrant was executed at his

23  place of work.

24  Q.  Okay.  And what did you learn from speaking with him?

25  A.  In speaking with him, he confirmed much of the

1  information we had as far as internet provider, who lived

2  at the house, and he stated that he did have one adult

3  son, Thomas Perkins, stated that he was the person in the

4  house most involved with using the computers, that he was

5  only one that had access to the passwords or their Wi-Fi

6  network.  And he also confirmed that previously, there had

7  been some indications that his son, Thomas, had been

8  involved with child pornography materials.

9  Q.   Okay.  And did you also speak with Mrs. Perkins?

10  A.   Yes, sir.  Mr. Perkins called his wife and asked her

11  to come join him at his office.  And so, when she arrived,

12  we spoke with both her and John at the same time just to

13  explain the situation about was occurring.

14  Q.   Okay.  And what did you learn from speaking with her?

15  A.   Basically the same thing as stated that they were

16  kind of scared of him, that he sort of ruled the house,

17  that he had many, many electronic items, basically taking

18  over the house but was living in the living room, and she

19  stated, again, multiple years previously, Thomas had

20  specifically told her that he had downloaded child

21  pornography materials.

22  Q.   Okay.  Now, going back to the search when you -- the

23  items that were seized, has there been any forensic

24  searches done to those items that were seized inside of

25  the Perkins household?

1    A.   At least on some of the items, yes, sir.

2    Q.   Okay.  And can you tell the Judge briefly,

3    specifically dealing with the child exploitation, what was

4    found on those computers?

5    A.   Yes, sir.  From my understanding from the computer

6    forensics agent in El Paso who's working on this, so far,

7    he searched about ten of the items.  I believe he found

8    child exploitation materials on seven or eight of the

9    items.  So far, he's calculated and found approximately

10   100,000 possible child exploitation files, either pictures

11   or videos.  He stated some of those were probably

12   duplicates, but he believed approximately 69,000 were

13   unique.

14   Q.   Okay.  And did you have an opportunity to actually

15   speak with the defendant about the images and videos found

16   on those devices?

17   A.   Not anything about those -- the images found on those

18   devices, but we did speak to him about what files that had

19   been originally downloaded.

20   Q.   Okay.  And how did that happen?  Did you -- was he

21   under arrest?  Did you have to read him his rights?  Was

22   it a consensual encounter?  Can you tell the Court about

23   that, please?

24   A.   Yes, sir.  After we had finished speaking with his

25   parents while the other agents were executing the search

1 warrant, they transported Mr. Perkins to the DPS office in

2 Fort Stockton, and that's where we interviewed him.  We

3 assured him that he was not under arrest.  Told him

4 multiple times that hat he was not being charged.  But we

5 did read him his Miranda rights, anyway.

6          THE DEFENDANT:  I thought (indiscernible).

7 Q.  (MR. CANNIZZARO) Okay.  And even -- did he waive his

8 Miranda rights to speak with you?

9 A.  Yes, he did.

10 Q.  Okay.

11          THE DEFENDANT:  I don't remember that.  I didn't

12 waive my Miranda rights.

13          THE COURT:  Mr. Perkins, you'll have a chance to

14 speak if your lawyer calls you.  This is the witness' turn

15 to speak right now.  So please don't interrupt him.

16          You may proceed.

17          MR. CANNIZZARO:  Thank you, your Honor.

18 Q.  (BY MR. CANNIZZARO) Agent Ferg, can you tell us what,

19 did you learn from speaking with the defendant at that

20 point?

21 A.  In speaking with Mr. Perkins, he confirmed that he

22 had previously used BitTorrent software.  He stated that

23 he liked to make very broad searches, sometimes just as

24 broad as picture or image.  But he did confirm that he had

25 downloaded child pornography material.  He expressed

1   knowledge or at least that he had done research as far as

2   what was legal and what was not legal to possess.

3           THE DEFENDANT:  (Indiscernible).

4   A.   But he did tell us that frequently, things that he

5   had downloaded, he knew were illegal and he sent them

6   (indiscernible) to read but that did not (indiscernible).

7   Q.   (BY MR. CANNIZZARO) And specifically, one thing I

8   want to make sure that the Court is aware of, were there

9   certain terms that he used to search knowing that he would

10  actually download child pornography?

11  A.   When we talked to him about specific search terms, he

12  remained very vague and didn't want to provide any of the

13  exact terms.

14  Q.   Okay.  There was some mention of PTHC in either the

15  searches or what you confronted him about, I could be

16  mistaken, but I thought that was something that was

17  brought up in your interview.

18          THE DEFENDANT:  (Indiscernible).

19  A.   I didn't ask him about the PTHC.  I believe he had

20  said he knew what that frequently stood for, but he did

21  not specifically say what that term was.

22  Q.   (BY MR. CANNIZZARO) And what does that term actually

23  mean?

24  A.   Frequently stands for preteen hardcore, which is a --

25  as you said, it's a common search term to find child

1  pornography material.

2  Q.  Okay.  And did he confirm to you that he actually was

3  -- the nature of BitTorrent allowed other people to have

4  access to these files that he, in fact, would be

5  distributing these same files that he was downloading?

6  A.  When we explained to him how -- or when me asked him

7  to explain to us how BitTorrent worked, he did state that

8  he understood that the things that he downloaded were

9  frequently available for other people to download from

10  him, as well.

11  Q.  Okay.  So he acknowledged that, in fact, he was

12  distributing what he was downloading.

13  A.  Yes, sir.  He told us that he regretted leaving that

14  option on to allow other people to download.

15  Q.  Okay.  At this point, I don't have any further

16  questions for Agent Ferg.  Thank you.

17         THE COURT:  Mr. O'Neal.  And you may stay at

18  counsel table if you'd like.

19         MR. O'NEAL:  I'll take a podium so Mr. Perkins

20  can see me.

21         THE COURT:  Okay.

22                    CROSS-EXAMINATION

23  BY MR. O'NEAL:

24  Q.  Agent Ferg, the videos that you identified as

25  suspected child exploitation material, where were those

1  videos found?

2  A.   I'm sorry, sir, I can't really hear you.

3  Q.   Can you hear me now?

4  A.   That's a little bit better.

5  Q.   Here, let me -- how's this?

6  A.   That's much better.

7  Q.   Okay.  The videos that you found that you suspected

8  were child exploitation material, where did you find those

9  files?

10 A.   They were provided to us by this other HSI agent that

11 he had downloaded from a specific IP address.

12 Q.   So essentially the files that you have personally

13 reviewed are files that you noticed were being down --

14 that another HSI agent noticed were being downloaded by

15 this IP address; is that right?

16 A.   He had noticed that they were potentially being

17 available, and so, he used software in order to download

18 what that IP address had made available to share.

19 Q.   When you say potentially available, that means that

20 the BitTorrent software coming from this IP address was

21 sharing the files; is that right?

22 A.   To my understanding, yes, sir.  I know that it's not

23 always possible to download what a BitTorrent user has

24 available.  It depends on whether the computers can

25 connect.

```
1   Q.   Okay.  So the files that you've reviewed and
2   identified as child exploitation material, there's at
3   least some question as to whether the IP address in
4   question -- that we're talking about that was owned by the
5   Perkins was in possession of those files and sharing them?
6   A.   No, sir.
7   Q.   There's no --
8   A.   My understanding, the forensics agent was able to
9   specifically ensure that he was only receiving files from
10  a -- the specific IP address that was targeted there.
11  He's not receiving files or file fragments from any other
12  IP address.
13  Q.   Okay.  So you're sure that it was coming from this IP
14  address; is that right?
15  A.   Yes, sir.
16  Q.   Okay.  But you haven't -- have you been able to
17  identify those videos as being on the electronic devices
18  that Agent Yanez has been reviewing?
19  A.   I have asked the forensics agent to check that.  He
20  wasn't able to confirm -- I'm not sure the number, but he
21  did confirm that at least some of the ones that were
22  downloaded -- that the forensics agent in Brownsville had
23  downloaded were also found on some of the items that he
24  was searching, seized from Mr. Perkins.
25  Q.   Okay.  Have any of the files that were seized or
```

1   identified to the IP address, have their hash values been

2   examined?

3   A.   I'm not sure about that, sir.

4   Q.   You're aware of what I'm talking about, right?

5   A.   Yes, sir.

6   Q.   Every file has -- that anyone has on a computer has a

7   long string of letters and numbers that is referred to as

8   a hash value, right?

9   A.   That is my understanding.  Yes.

10  Q.   And the National Center For Child Exploitation, I'm

11  not -- I'm messing up the acronym, but it's NCMEC

12  maintains that a database of hash values that have been

13  identified as child exploitation materials; is that right?

14  A.   Yes, sir.  That's correct.

15  Q.   Okay.  So here, we're just going off of what you and

16  Agent Yanez believe the videos contain.  None of the

17  videos or pictures contain -- none of the files have been

18  specifically linked to material that has been identified

19  as child exploitation material by NCMEC; is that right?

20  A.   Actually, sir, now that I recall, when I was

21  reviewing the files that had been provided to me from the

22  agent in Brownsville, I did run the hash values, and

23  several of them were recognized that had cataloged as

24  known child exploitation.

25  Q.   Okay.  Now, the interview that you conducted of Mr.

1  Perkins, was that in January?

2  A.   Yes, sir.  That's correct.

3  Q.   And that was January of this year?

4  A.   Yes, sir.

5  Q.   Okay.  And he wasn't indicted and arrested until

6  September, right?

7  A.   That is correct.

8  Q.   Did y'all monitor him in any way in the intervening

9  nine months?

10  A.   Other than occasionally driving by his house.  Also,

11  the local police who were involved with the search warrant

12  knew what had happened, but no.  No one was actively

13  monitoring.

14  Q.   Okay.  Were there -- would you have been aware if he

15  had tried to obtain a computer, or log onto the internet,

16  or anything like that?

17  A.   No.  I would not have.

18  Q.   Do you have any information indicating that he has?

19  A.   I have not received any new information indicating

20  that he has one way or another.

21  Q.   Okay.  Have you any information that he has in those

22  intervening nine months viewed child exploitation material

23  or possessed it?

24  A.   I have not received any information regarding that.

25  Q.   Okay.  Now, you mentioned that there were -- when you

1  interviewed Mr. John Perkins, there were previous

2  indications that his son had been involved in child

3  pornography.  Those were letters from an internet service

4  provider; is that correct?

5  A.   No, sir.  This was separate instance where Mr.

6  Perkins stated that approximately ten years ago, he had

7  found a picture or pictures that Thomas had printed up at

8  home.

9  Q.   Okay.  And Thomas Perkins would have been what, 18,

10 17 at the time?

11 A.   Yes, sir, around there.

12 Q.   Okay.  Were there any other indications that he had

13 been involved in child pornography?

14 A.   Only statements also from his mother stating

15 approximately that same timeframe, maybe ten years prior,

16 where she said that Thomas had just specifically told her,

17 kind of out of the blue, that he was downloading child

18 pornography.

19       THE DEFENDANT:  Didn't say anything.

20       MR. O'NEAL:  Mr. Perkins, if you -- please,

21 please, just -- you and I are going to talk about this

22 later today.  And please don't provide anymore comments

23 because this is -- proceeding is being recorded and I want

24 to make sure that whatever -- what you have to say is

25 presented in the appropriate light to the Court.

1  Q.   (BY MR. O'NEAL) Agent Ferg, you wrote in -- I want to

2  clarify a couple of things in your reports.

3        When you were interviewing Mr. Thomas Perkins,

4  you discussed an incident where he had been horse playing

5  with a juvenile at a church event; is that right?

6  A.   (Indiscernible) interview Mr. Perkins and that is

7  (indiscernible).

8  Q.   I'm sorry.  Could you restate your answer there,

9  Agent Ferg?  I didn't quite get that.

10  A.   Sure.  That incident was not discussed during the

11  interview with Mr. Perkins.  Following our interview, he

12  consented to conduct an interview with a DPS CID

13  polygrapher, and it was during that interview that

14  incident was discussed.

15  Q.   Okay.  And during that interview, Mr. Perkins

16  explicitly denied that the conduct was sexual in nature;

17  is that right?

18  A.   That's my understanding, sir.

19  Q.   Okay.  And then, you also discussed with him that

20  what might happen if he encountered a 12 or a 13-year-old

21  girl; is that right?

22  A.   That also occurred with the polygrapher's interview.

23  Q.   Okay.  And in that interview with the polygrapher,

24  what he specifically said was that he would have trouble

25  stopping himself if the child initiated sexual contact; is

1  that right?

2  A.   From what I had heard, I listened to it again

3  yesterday, she posed a hypothetical situation that if she

4  was a 12 or 13-year-old girl and approached Mr. Perkins

5  wanting to have sex, he stated that if given the

6  opportunity, privacy, that he would accommodate.

7  Q.   Okay.  Now, you mentioned that on these -- on the

8  electronic devices and the computers that the parents,

9  John and Elizabeth Perkins, said that Thomas Perkins is

10  the primary one who uses them; is that right?

11  A.   For the majority of the devices, yes.

12  Q.   Okay.  And you said that Thomas is the one who has

13  the password to the Wi-Fi; is that correct?

14  A.   That is what his parents told us.  Yes.

15  Q.   Okay.  But they didn't deny that they also have

16  access to the wireless internet, right?

17  A.   That is correct.

18  Q.   And have these devices that have been searched, have

19  they been password-protected?

20  A.   I would have to ask the forensics agent on that, but

21  I believe many of them have been.

22  Q.   Okay.  And did you ask John or Elizabeth Perkins

23  during the interviews whether they had passwords to the

24  device -- whether they had the ability to access the

25  devices that y'all were seizing from the house?

1  A.   We did ask them generally if they had access to

2  Thomas' (indiscernible).

3  Q.   What did they say?

4  A.   They stated as far as they knew, they were

5  password-protected and that they did not know the

6  passwords and did not attempt to use them.

7  Q.   Okay.  You said -- you gave a frequent meaning of the

8  search term "PTHC."  I'm just curious about your words.

9  Is there any other meaning?

10  A.   I'm not aware.  That's the only phrase -- that's the

11  only explanation I've heard.

12  Q.   Okay.

13  A.   Based on my training and experience.

14  Q.   Pass the witness.

15          THE COURT:  Mr. Cannizzaro.

16          MR. CANNIZZARO:  Your Honor, we do not have any

17  other questions for this witness nor do we have any other

18  evidence or witnesses, and we rest and close.  Thank you.

19          THE COURT:  Thank you, Agent.

20          Mr. O'Neal.

21          MR. O'NEAL:  Defense calls John Perkins.

22          THE CLERK:  Do you swear to tell the truth, the

23  whole truth, and nothing but the truth, so help you God?

24          THE WITNESS:  I do.

25          THE COURT:  Please have a seat and speak into the

1   microphone.

2    JOHN PERKINS, SR., called by the Defendant, duly sworn.

3                    <u>DIRECT EXAMINATION</u>

4   BY MR. O'NEAL:

5   Q.   Mr. Perkins, could you state your name and spell your

6   last name, please?

7   A.   John Perkins, P-E-R-K-I-N-S.

8   Q.   And how do you know Thomas Perkins?

9   A.   He's my son.

10  Q.   Okay.  I want to talk to you a little bit about

11  yourself first.  Where do you live, sir?

12  A.   I live at 404 South Seals in Fort Stockton.

13  Q.   And who lives with you there?

14  A.   My wife, Elizabeth, lives with me.

15  Q.   Okay.  And up until January of this year, your son,

16  Thomas, lived with you, as well, right?

17  A.   That is correct.

18  Q.   Are you employed, sir?

19  A.   Yes.

20  Q.   Where do you work?

21  A.   I work for the USDA in Fort Stockton.

22  Q.   What do you do for them?

23  A.   I'm the area director of rural development.

24  Q.   What does that involve more or less?

25  A.   It involves making loans and grants to families,

1  businesses, communities.

2  Q.   Your son, Thomas, did he live with you continuously

3  up -- from when he was born up until January of this year?

4  A.   Yes.

5  Q.   Where did he go to school?

6  A.   Fort Stockton ISD.

7  Q.   So he's been in the Fort Stockton community most of

8  his life.

9  A.   Yes.

10  Q.   And has he ever been in any legal trouble?

11  A.   No.

12  Q.   Okay.  He does suffer from some substantial medical

13  conditions; is that right?

14  A.   Yes, he does.

15  Q.   Would you describe those for me, please?

16  A.   Well, physical conditions, he has a bone disorder

17  that's called MHE, multiple hereditary exostosis.  This

18  causes extra bone growths.  His arms are bowed.  He has

19  lots of orthopedic type issues with that.  He also has

20  several mental disorders.  He was first diagnosed with

21  ADHD.  Later, it was autism spectrum Asperger's.

22  Q.   And that -- from your understanding, that basically

23  means that he's antisocial, right?

24  A.   Yeah.  He's very antisocial.

25  Q.   Okay.  And has he been -- has he been found to be

1  disabled by the state of Texas?

2  A.    Yes.

3  Q.    Okay.  So he doesn't work; is that correct?

4  A.    He does not.  He receives SSI.

5  Q.    Okay.  Did he graduate from high school?

6  A.    He did.

7  Q.    And did he attend college at all?

8  A.    He took some classes at Midland College Extension,

9  the WRTTC in Fort Stockton.

10 Q.    Okay.  Your house -- you spoke with some federal

11 agents and your house was searched in January of this

12 year; is that right?

13 A.    That is correct.

14 Q.    And after that, you and Thomas changed your living

15 arrangement a little bit; is that right?

16 A.    That's right.

17 Q.    Could you explain that to me?

18 A.    Yeah.  So after the raid, we went and saw an attorney

19 and discussed it.  He advised us that we needed to move

20 out of the house, which we did, for a while.  It was also

21 discussed that we needed to have Thomas move out of our

22 house.  We were very concerned about his mental condition.

23 We were concerned that he was very depressed, and, you

24 know, we just -- it was decided that we needed to remove

25 him under a mental warrant.

1   Q.   And you sort of thought that that would be good for

2   him and for you to get some space and let him have some

3   level of independence; is that right?

4   A.   Yes, sir.  We thought he would, you know, get some

5   help there to -- at the mental hospital, Oceans in Odessa

6   or Midland.  And so, he -- he spent about a week there,

7   and then, we moved him to my mother's house in Taylor

8   County.  And we purchased a house in Merkel, and he moved

9   into that house and was actually doing very well there.

10  Q.   Okay.  You saw significant improvement in his mental

11  condition and his well -- and his existence.

12  A.   Yes, sir, we did.

13  Q.   Was he able to support himself and take care -- I

14  mean, I don't -- support himself, obviously he's receiving

15  SSI.  But was he able to basically take care of himself in

16  that environment?

17  A.   He was.

18  Q.   And have you -- I know that you mentioned at some

19  point that he -- there were some verbal threats between

20  him and you -- or him and your family prior to that move.

21       Did you largely reconcile between January and

22  September?

23  A.   Absolutely.

24  Q.   Okay.  Do you feel that he's a danger at all to you

25  or your wife?

1  A.   No.  I do not.

2  Q.   Do you feel he's a danger to anyone else in the

3  community at this time?

4  A.   No.  No, sir.  I do not.

5  Q.   Okay.  When you set him up in the -- since you've set

6  him up in the new house in Merkel, have you had any

7  occasion to believe that he's still viewing child

8  pornography?

9  A.   No, sir.

10 Q.   Okay.  And you've told me that in preparation for

11 today, you've taken some steps to ensure that he won't

12 have any access to electronic devices or the internet if

13 he were to be granted a bond; is that correct?

14 A.   That is correct.

15 Q.   What are those steps?

16 A.   So the first thing we did is, we disconnected the

17 modem; so there's no Wi-Fi at all.  We removed any devices

18 that was capable of accessing the internet.  He had a

19 little laptop, we took that.  We took his smartphone.  Any

20 other devices, we took them all out of the home.

21 Q.   Have you done that -- are we talking about -- when

22 you say the home, are we talking about the house in Merkel

23 or your house in Fort Stockton?

24 A.   The one in Merkel.

25 Q.   Okay.  Would you be willing to do something similar

1  in Fort Stockton?

2  A.   We would.

3  Q.   And would you -- would you be willing to allow him to

4  live at your house in Fort Stockton if the Court required

5  that as opposed to the Merkel house?

6  A.   Yes.  If that's required.

7  Q.   And you're aware that there are some very specific

8  conditions in this kind of case about him living in a

9  location that is near places where children gather; is

10  that right?

11  A.   Yes.

12  Q.   And I don't -- you and I haven't discussed this

13  before, but I'm just curious.

14       Would you be willing -- if neither of those

15  locations are found to be acceptable, would you be willing

16  to take steps to identify an apartment or perhaps a mobile

17  home or some -- park where he could live that would be

18  suitable under the law?

19  A.   Yes, sir.

20  Q.   Okay.

21  A.   I would.

22  Q.   Do you think there's any danger that he wouldn't come

23  to the Court when required?

24  A.   No.

25  Q.   And would you take steps as his father in concert

1  with your wife to -- per -- to make sure that he came to

2  court?

3  A.  Yes, absolutely.

4  Q.  And you and your wife have discussed this

5  extensively, I'm sure; is that right?

6  A.  Yes, sir.

7  Q.  And is she in agreement with everything that you've

8  told me today?

9  A.  She is.

10  Q.  Pass the witness.

11       THE COURT:  Mr. Cannizzaro.

12       MR. CANNIZZARO:  Thank you, Judge.

13                CROSS-EXAMINATION

14  BY MR. CANNIZZARO:

15  Q.  Good morning, Mr. Perkins.  Can you hear me okay?

16  A.  Yes.

17  Q.  Okay.  And I'm sorry, your father, not Jr. Perkins.

18  Mr. Perkins, Sr.

19  A.  Yes.

20  Q.  Can you hear me okay?

21  A.  Yes, I can.

22  Q.  Okay.  Thank you.  If you cannot hear me, please let

23  me know as I know we're -- I'm in a remote location.  I

24  want to make sure you're able to hear me.

25       If I heard you correctly, you said that you are

1  willing to have your son live with you if the Judge

2  orders; is that what you said?

3  A.   Yes, sir.   Yes.

4  Q.   Okay.   Now, I had a chance to review the Pretrial

5  report, and it looks like what you and your wife said in

6  the Pretrial report is that you were not willing to let

7  him live with you.   So what has changed?

8  A.   Well, my wife and I have discussed it extensively,

9  and we've decided that it would be okay just based on the

10 progress that he's made.   So we've changed our mind on

11 that.

12 Q.   Okay.   But you recent -- I mean, it sounds to me like

13 you recently changed your mind like when this pretrial

14 report was written, you said, nope.   I'll agree to be a

15 third-party custodian, but he's not living with me.   And

16 now, today, you're telling the judge, he can live with me.

17 Is that true?

18 A.   That's correct.

19 Q.   Okay.   And there was something in here that I just

20 wanted to confirm.   The house that you had in Merkel, is

21 it true that it's close to, it looks like, half a mile

22 from a school, seven-tenths of a mile from a middle

23 school?   Is it in close proximity to schools where

24 children congregate?

25 A.   I believe it's eight blocks from a elementary school.

1    But you have to understand, Merkel's a very small town.

2    So anything --

3    Q.   Yes, sir --

4    A.   -- in Merkel's going to be close to a school.

5    Q.   Gotcha.  Okay.  And I'm not disputing that it's a

6    small town.  I've never been there obviously, but I just

7    wanted to confirm with the report said that it's in close

8    proximity.  I guess the whole town is very small.  So it's

9    in close proximity to those locations.

10          The other question I wanted to ask you, I know

11   that you told Mr. O'Neal that your son has a mild form of

12   autism.  Was he also diagnosed with schizophrenia to your

13   knowledge.

14   A.   He was.

15   Q.   Okay.  And there's some indication in the report that

16   your son is reluctant to take the medication that was

17   prescribed to him.

18          Can you shed some light into that?  Does he take

19   medication?  Is he prescribed medication?

20   A.   He is not prescribed any medication right now.  He

21   hasn't gone to a doctor in a while for that.

22   Q.   And there was also --

23          THE DEFENDANT:  I only had schizophrenia for

24   insurance purposes only --

25          MR. O'NEAL:  Your Honor, I'm going to pause real

1  quick.

2          THE DEFENDANT:  I had (indiscernible) --

3          THE COURT:  Mr. Perkins, you're not testifying

4  presently, and so, you are not to make any remarks.

5  Q.  (BY MR. CANNIZZARO) The other question I had for you,

6  Mr. Perkins, Sr., was, you said there are conditions that

7  you could do to ensure that there was no internet access

8  in your house.  But you know pretty much for a fact that

9  your son wants to have internet access, right?  He's

10 expressed to you that he wants that access to either the

11 internet, his YouTube channels, something of that nature.

12 Is that true?

13 A.  He has.

14 Q.  And that, of course, even though you are his dad, you

15 know, there's no telling what he might be able to have

16 access to without you knowing; isn't that true?

17 A.  No, sir.  I don't -- I don't believe he'd be able to

18 if I disabled the modem and took his devices, which I

19 have.

20 Q.  Okay.  And it's true that you had other -- I think

21 when we were talking with Agent Ferg, there were passwords

22 only he had access to with some of his devices before they

23 were -- is that true?

24 A.  That's true.

25 Q.  Okay.  I don't have any other questions for you, Mr.

1   Perkins, Sr.   Thank you very much.

2          THE COURT:   Mr. O'Neal?

3                    RE-DIRECT EXAMINATION

4   BY MR. O'NEAL:

5   Q.   Mr. Perkins, could you just confirm your address for

6   us in Fort Stockton?

7   A.   404 South Seals.

8   Q.   Nothing further, your Honor.

9          THE COURT:   Mr. Perkins -- Mr. John Perkins, your

10  testimony is your son lived with you and your wife in Fort

11  Stockton until January of this year?   Is that correct?

12         THE WITNESS:   That's correct.

13         THE COURT:   And then, when did you buy the house

14  in Merkel?

15         THE WITNESS:   We bought it in -- we closed on it

16  in May.

17         THE COURT:   And then, your son has been living at

18  the house in Merkel since May; is that correct?

19         THE WITNESS:   Since May.

20         THE COURT:   And how far is Fort Stockton from

21  Merkel?

22         THE WITNESS:   It's about 200 miles.

23         THE COURT:   And how often do you visit with your

24  son?

25         THE WITNESS:   We go there every two to three

1  weeks.

2         THE COURT:  And do you like stay for a weekend or

3  stay for a day?  How long -- what is the typical visit

4  like?

5         THE WITNESS:  It's usually a three-day weekend.

6         THE COURT:  And then, would you stay -- where

7  would you stay?  Would you stay at that house in Merkel?

8         THE WITNESS:  We would.

9         THE COURT:  Okay.  And then, is it your testimony

10  that you would allow your son to live with you in Fort

11  Stockton?

12         THE WITNESS:  We would.

13         THE COURT:  And then, if that house, for whatever

14  reason, is too close to a school or too close to where

15  children gather -- and I'm not saying that it is or is

16  not.  I don't know -- you would find -- you would make

17  attempts to find another suitable address?  Is that

18  correct?

19         THE WITNESS:  That's correct.

20         THE COURT:  Thank you.  I don't have anything

21  else.  Thank you, sir.  You may step down.

22         MR. O'NEAL:  Defense rests, your Honor.  I have

23  brief argument for the Court.

24         THE COURT:  Yes.  You may.

25         MR. O'NEAL:  Your Honor, this case kind of

1  presents a very classical scenario with the consumption of

2  child pornography where a person -- basically, I mean,

3  without making any admissions on behalf of Mr. Perkins,

4  but taking the government's evidence for the probable

5  cause that it shows, what happens with child pornography

6  and the reason it's become so prevalent on the internet,

7  searchers refer to as the triple A engine, accessibility,

8  affordability and anonymity, is what drives people so much

9  now to consume it more what the internet than it was

10 previously available.

11         Here, we can see that once Mr. Perkins lost his

12 anonymity, once, you know, he realized that law

13 enforcement was monitoring him, there's no evidence to

14 suggest that he has consumed child pornography in any way

15 since then or had any contact with a child or attempted to

16 have any contact with a child that would create a danger

17 to the community.

18         Further, his access -- his father has testified

19 that he will ensure that there is no access here if the

20 Court sets those conditions.

21         Returning to the classic question under 3142, the

22 Court is faced with will he come to court and will he be a

23 danger to the community?  He's going to come to court.

24 He's already shown the Court that he will do that

25 voluntarily presenting himself here last Tuesday and --

1      THE COURT:  You could stop on that one.

2      MR. O'NEAL:  Yes, sir.

3      THE COURT:  I don't find -- I mean, I don't find

4  that there's -- that Mr. Perkins will be a risk of flight.

5      MR. O'NEAL:  Yes, sir.

6      Moving to the danger to the community, I think

7  the things that would trouble the Court most are the

8  statements in their presentence investigation report,

9  specifically that the defendant also said if a 12 or a

10  13-year-old girl came on to him, he would not be able to

11  stop himself.

12      My cross-examination of Agent Ferg was meant to

13  just further clarify that the question posed to him by a

14  female polygrapher was, if she were 13 years olds and hit

15  on him, would he be able to resist that if they were in a

16  sufficiently private location.  The Court can tailor

17  conditions to ensure that that sort of scenario never

18  exists.

19      Mr. Perkins largely is homebound as it is.  He's

20  disabled and unable to work.  The Court could require home

21  confinement, which would not present any risk of that

22  happening.  Further, the report notes that there was a

23  previous incident where he did touch a 12-year-old girl

24  during a horse-playing event -- a horse-playing scenario

25  at a church event, which is why I further elicited from

1   Agent Ferg that he did not at the time consider that to be

2   sexual contact.  And as I've mentioned, we can make sure

3   that he doesn't have any contact with minors.

4         So I think that the defense has met the burden to

5   persuade here.  Certainly we've rebutted the presumption

6   and met the burden to persuade that there's not a risk of

7   danger to the community, and we can ensure that he doesn't

8   access these materials through narrowly tailored

9   conditions by the Court.

10        THE COURT:  Address for me the -- when there were

11  61 devices taken from -- I guess it would be the home when

12  the search was conducted in January -- ten of them had

13  been searched, seven of them have shown child pornography

14  on them.  There have been -- there were 100,000 files

15  found on these seven devices, and 69,000 of these were

16  unique files of child pornography.

17        Tell me why I don't -- Mr. Perkins would not have

18  a -- he's almost -- I mean, I can't imagine 69,000 files.

19  That's a -- those are a lot of files, and it shows that

20  he's been doing this not only a lot but for a long time.

21        MR. O'NEAL:  I agree with the Court.  And I think

22  the evidence can see that the -- strength of the evidence

23  factor for the government here is rather strong and that

24  the case is quite grave.

25        What I will urge to the Court is that that level

1  of volume, to what the Court indicated, speaks of

2  addictive type of behavior.  And I will suggest to the

3  Court that I think that that means that pretrial -- I

4  think that argues in favor of pretrial detention here

5  because we have some evidence that since the search in

6  September that led to the discovery of this, Mr. Perkins

7  has improved -- his mental well-being has improved and his

8  behavior in this respect, there's no evidence to indicate

9  that it's continued.  The evidence shows that it's

10 stopped.

11        If he's released on pretrial detention, we can be

12 certain about that sort of thing because the Pretrial

13 Services officers will monitor him very closely, and I

14 think that that will augur, if he complies with the

15 condition, strongly in his favor at sentencing to

16 demonstrate to the district court judge, assuming we get

17 there, that he -- that this was addictive behavior and

18 that he has the ability to stop this behavior.

19        THE COURT:  You can continue if you'd like.

20        MR. O'NEAL:  That's all I have, your Honor.

21        THE COURT:  Okay.  Mr. Cannizzaro, would you like

22 to weigh in on this?

23        MR. CANNIZZARO:  Yes, your Honor.

24        The government still feels that this defendant

25 should be detained.  Mr. Perkins, Sr. is placed in a very

1  difficult position.  Basically they've kicked their son

2  out of their own home prior to him ever being indicted;

3  and the reason they did so is they were afraid of him.

4  And he says he's not afraid of him now.  In the Pretrial

5  Services report, he said, or at least his wife said, that

6  they are afraid of him.

7       In addition, speaking to the defendant's

8  potential danger to the community, there is mention in

9  that report from his own mother saying that when he gets

10 frustrated, he gets to be violent.  And we've kind of seen

11 a very teeny, tiny sliver of the defendant and how he got

12 frustrated even in today's hearing.

13      The fact of the matter is that his own parents

14 are being placed in a very difficult position.  We feel

15 that he is a danger to the community.  His parents have

16 expressed that throughout this time.  They know him best.

17 The fact that he is now under indictment and that he is

18 now facing criminal charges with minimum mandatory

19 penalties only further buttresses the argument that he is

20 a risk and he is a danger not only based on the offense,

21 but based on what we know about him.

22      And for all those reasons, your Honor, we're

23 asking for you to detain him and we stand by our original

24 position.  Thank you, Judge.

25      THE COURT:  Thank you.

1          And I would note that Count 2 of this -- Count 2

2   of this indictment, which is distribution of child

3   pornography, carries with it a minimum sentence of five

4   years, up to a maximum of 20 years.  This is clearly a

5   serious crime.  I know the parents have been -- this is a

6   difficult position for the parents because -- and they've

7   done everything -- I think they've done everything they

8   can to help their son.

9          Looks to me like they -- when he was living with

10  them through January, he was -- the parents had some

11  difficulties with a child who is autism and ADHD, which is

12  -- and which puts them in a difficult position.  Then when

13  this was -- the search was executed and the computers were

14  taken, they made attempts to move him to Merkel, and they

15  bought a house for him in Merkel.  And apparently he's

16  been living there with some degree of success.

17         But I can't get around the seriousness of this

18  case because not only has this defendant made references

19  to possibly abusing a 12 or 13-year-old child in the flesh

20  but he's had -- the low number of the evidence that I have

21  before me is that there were 69,000 files containing child

22  pornography what were located on only seven of the devices

23  that were confiscated.  That's the low end -- that will be

24  the low end number.

25         Under the guidelines, that will be a serious

1  upward adjustment and I don't think that -- I'm not

2  willing to put Mr. Perkins' parents through obtaining a

3  new house for him or new living arrangements if -- this is

4  Mr. Perkins' case, not theirs.  And therefore, I find

5  under these conditions that there are no conditions or

6  combination of conditions to assure the safety of the

7  community in this case.  And Mr. Perkins is ordered

8  detained.

9         The former -- the former order of release is

10  hereby rescinded and then -- and I would note for the

11  record that Judge Parker, at the time he set conditions in

12  this case, did not have the benefit of the information

13  that I have before me.

14         (Proceedings conclude at 11:18 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    REPORTER'S CERTIFICATE

4

5     I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING

6  WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE

7  TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT

8  TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE

9  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE

10  TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY

11  THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.

12

13  */s/Lily I. Reznik*                    October 16, 2020

14  LILY I. REZNIK, CRR, RMR              DATE
    Official Court Reporter
15  United States District Court
    Austin Division
16  501 W. 5th Street, Suite 4153
    Austin, Texas 78701
17  (512)391-8792
    SOT Certification No. 4481
18  Expires:  1-31-21

19

20

21

22

23

24

25