```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
                     PECOS DIVISION

UNITED STATES OF AMERICA,      )   Case No. 4:20-CR-000388
                               )
          Plaintiff,           )
                               )
     vs.                       )
                               )
THOMAS SCOTT PERKINS,          )
                               )
          Defendant.           )   Monday, May 23, 2022
_____)   2:48 P.M.


            TRANSCRIPT OF COMPETENCY HEARING
         BEFORE THE HONORABLE DAVID C. COUNTS
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          United States Attorney's Office
                            BY:  SCOTT GREENBAUM, ESQUIRE
                            2500 North Highway 118, Suite 200
                            Alpine, Texas 79830

For the Defendant:          Office of the Federal Public Defender
                            BY:  MICHAEL F. GORMAN, ESQUIRE
                            700 East San Antonio, Suite D401
                            El Paso, Texas 79901


Deputy Clerk:               Cristina Lerma
                            United States District Court
                            2450 North State Highway 118
                            Alpine, Texas 79830

Transcription Service By:   Dipti Patel, CET-997
                            Liberty Transcripts
                            7306 Danwood Drive
                            Austin, Texas 78759
                            (847) 848-4907
                            www.libertytranscripts.com



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

2

INDEX

                                                    PAGE
Case called                                          3
Closing Arguments
By:  Mr. Gorman                                     57
By:  Mr. Greenbaum                                  61
Court's Ruling - Under Advisement                   65
End of Proceedings                                  66
Certificate of Transcriber                          66

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| **WITNESSES**            |        |       |          |         |
| **FOR THE GOVERNMENT:**  |        |       |          |         |
| JAMES SCHUTTE, Ph.D.     | 7      | 11    | 23       | --      |
| **FOR THE DEFENDANT:**   |        |       |          |         |
| SAMUEL BROWNING, Ph.D.   | 26     | 41    | 50       | --      |

| EXHIBITS:                                         | ID  | EVD |
|---------------------------------------------------|-----|-----|
| **FOR THE GOVERNMENT:**                           |     |     |
| 1 - Report of Dr. Samuel Browning                 | 36  | 36  |
| 2 - Curriculum Vitae of Dr. Samuel Browning       | 36  | 36  |
| **FOR THE DEFENDANT:**                            |     |     |
| 1- Report of Dr. James Schutte                    | 64  | 64  |

1    <u>**Alpine, Texas - Monday, May 23, 2022**</u>                    **(2:48 p.m.)**

2                        **P R O C E E D I N G S**

3                              ---oOo---

4         THE COURT:  All right.  The Court calls U.S. versus

5    Thomas Scott Perkins, this is PE:20-CR-388, today for a

6    competency hearing.

7         For the Government?

8         MR. GREENBAUM:  Yes, Your Honor.  Scott Greenbaum on

9    behalf of the Government along with Ms. Amy Greenbaum, Your

10   Honor.  Also in the courtroom, Your Honor, we do have Dr. Samuel

11   Browning that I was going to ask to be able to sit on, and I

12   anticipate to also call him as a witness, Your Honor.  But I

13   wanted to have him sit in and review this expert's testimony, as

14   well, Your Honor.

15        THE COURT:  Thank you.

16        For the Defense?

17        MR. GORMAN:  And good afternoon, Your Honor.  Michael

18   Gorman on behalf of Thomas Perkins, ready to proceed.

19        THE COURT:  Very good.

20        MR. GORMAN:  Pleasure to meet Your Honor.

21        THE COURT:  You, as well, Mr. Gorman.  I've heard a lot

22   about you, all good, and nice to meet you finally or at least

23   place eyes on you.

24        Do you have any objection to Dr. Browning sitting in

25   during any testimony or during the hearing?

4

1          MR. GORMAN:  No, Your Honor.

2          THE COURT:  Okay.  Very good.

3          And, sir, you are Thomas Scott Perkins, right?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Yes?  Okay.  Very good.

6          Mr. Gorman, at this point, do you believe your client

7    to be competent or not?

8          MR. GORMAN:  I do not, Your Honor.

9          THE COURT:  You do not.  All right, very well.

10          All right.  So let me pull up what I have received and

11   tell y'all where I am.

12          And, Mr. Greenbaum, who do we have on the Zoom?

13          MR. GREENBAUM:  I have my only witness here --

14          THE COURT:  Okay.

15          MR. GREENBAUM:  -- as actually in the courtroom.

16          THE COURT:  Okay.  So, Mr. Gorman, this is your

17   witness.

18          MR. GORMAN:  This is Dr. James Schutte, Your Honor.

19          THE COURT:  And I've read Dr. Schutte's report, and

20   that's what I was just about to say.  I pulled it up.  I've got a

21   digital copy of that, which I'll be referring to, which I think

22   the parties should have, as well.

23          Mr. Greenbaum, do you have that?

24          MR. GREENBAUM:  Yes, Your Honor.  I do.  Thank you.

25          THE COURT:  And, Mr. Gorman, you certainly have it?

1          MR. GORMAN:  I do, Your Honor.

2          THE COURT:  All right.  Very well.

3          All right.  So let me ask the parties, the attorneys,

4    how do we want to begin?  Who wants to begin with whom?

5          MR. GREENBAUM:  Judge, it might make more sense if they

6    begin with their expert, that way my expert's also I believe

7    going to give an opinion but that way, I won't have to call him

8    back for rebuttal, Your Honor.

9          THE COURT:  Sure.

10          MR. GREENBAUM:  So if there's anything else to add, I

11   just --

12          THE COURT:  You take care of all of it?

13          MR. GREENBAUM:  Yes, sir.

14          THE COURT:  Is that satisfactory, Mr. Gorman?

15          MR. GORMAN:  Yes, Your Honor.  The Government does have

16   the burden in this case in terms of proving competence by a

17   preponderance, Your Honor.  But I believe in this case that Dr.

18   Schutte has reviewed the reports of Dr. Browning and Dr., I

19   believe it's Bieber (phonetic).

20          THE COURT:  Okay.

21          MR. GORMAN:  He's willing to talk directly to that,

22   Your Honor.

23          THE COURT:  Okay.

24          MR. GORMAN:  And then, obviously, if need, we can

25   recall.

1          THE COURT:  So you want to call him first or do you

2    want the Government to call him?

3          MR. GORMAN:  I'll call him, Your Honor.

4          THE COURT:  Okay.  You can call him, and we won't shift

5    the burden.  We realize where the burden is, Mr. Greenbaum, with

6    the Government.  And so with that then, does anybody want to make

7    any opening statements?  It doesn't matter to me.  I kind of know

8    where you all stand, but you're welcome to make a quick, very

9    quick short opening.

10          Mr. Greenbaum, you're --

11          MR. GREENBAUM:  Not from the Government, Your Honor.

12          THE COURT:  Okay.

13          Mr. Gorman?

14          MR. GORMAN:  Your Honor, I can close with it or --

15          THE COURT:  Okay.

16          MR. GORMAN:  --  I can lead with it, Your Honor.

17          THE COURT:  Just close with it in a minute.

18          MR. GORMAN:  It's brief.

19          THE COURT:  All right.  Go right ahead with your

20    witness, then.

21          MR. GORMAN:  Thank you, Your Honor.

22          And, Your Honor, by the Court's preference, does the

23    Court prefer me at the podium or here?

24          THE COURT:  I prefer you at the podium.

25          MR. GORMAN:  No problem, Your Honor.

1            THE COURT:  Thank you.  And thanks for asking.

2            MR. GORMAN:  And, Your Honor, do we wish to place him

3   under oath?

4            THE COURT:  Absolutely.  So you're calling it's Dr.

5   James W. Schutte.

6            I'm glad he said your name, sir, because I wasn't

7   exactly sure.  I was guessing Schutte, but I could have been

8   wrong, of course.

9            If you'll raise your right hand where you stand, we're

10  going to have Ms. Lerma swear you in.

11       JAMES WILLIAM SCHUTTE, Ph.D, DEFENDANT'S WITNESS, SWORN

12           THE COURT:  Thank you, sir.  You may lower your hand.

13           Mr. Gorman, you may proceed.

14           MR. GORMAN:  Thank you, Your Honor.

15                         DIRECT EXAMINATION

16  BY MR. GORMAN:

17  Q    Could you state your name for the record?

18  A    My name is James William Schutte, S-C-H-U-T-T-E, PhD.

19  Q    And could you please describe your background, your

20  profession, and the nature of your involvement in this case?

21  A    Certainly.

22       I'm a licensed psychologist with a private practice here in

23  El Paso, Texas.  I'm also licensed in the State of New Mexico.

24  In addition, I'm board certified in psychometry, which is

25  psychological testing by the Board of Certified Psychometrists.

1    And I examined the Defendant on September 4th, 2021 in Pecos,

2    Texas.

3    Q    And you did so at the request of myself and the other

4    counsel of record, Elyse Bataller?

5    A    That's correct.

6    Q    And, Dr. Schutte, I provided to the Court and to counsel for

7    the Government a copy of your curriculum vitae.  Is that an up-

8    to-date curriculum vitae for you?

9    A    Yes.

10   Q    No inaccuracies in that, correct?

11   A    No.

12   Q    And, Dr. Schutte, prior to getting to your assessment in

13   this case, in the course of your evaluation in this case, you had

14   the opportunity to review reports authored by Dr. Samuel Browning

15   and Dr. Lacey (phonetic) Bieber in this case?

16   A    That's correct.

17   Q    And those reports were specific to competency assessments

18   regarding Thomas Perkins?

19   A    And also the question of insanity.

20   Q    And in regard to the competency assessment specifically in

21   your case, please give me your assessment of Thomas Perkins?

22   A    On the question of competency based on my assessment of him

23   and my review of the available records, it is my opinion that he

24   is not competent to proceed to trial.

25   Q    And could you give some details in how you arrived at that

1    conclusion?

2    A    Certainly.

3         The Defendant has amongst other diagnoses a diagnosis of

4    schizoaffective disorder, bipolar type (audio interference).

5    With respect to that disorder, he is exhibiting hallucinations

6    and delusions.  And as a result of those hallucinations and

7    delusions, he does not have an ability at this time to understand

8    the nature and the consequences of the proceedings which are

9    against him or to assist properly in his defense.

10   Q    And specific to the reports authored by Dr. Browning and Dr.

11   Bieber, your opinion is in disagreement with them.  Is that

12   correct?

13   A    On the question of competency, yes.

14   Q    And in that regard, could you please explain why you

15   disagree with their opinions?

16   A    Well, we all agree that he has a diagnosis of autism

17   spectrum disorder.  Where we disagree is on the existence of a

18   psychotic condition, which I and other professionals in the past

19   have identified as being in this case schizoaffective disorder.

20        The Defendant is reporting hearing the voices of two angels

21   which are giving him advice no how to act.  He feels that these

22   angels are going to resolve his legal case for him by either

23   influencing the mind of His Honor or the prosecution or causing

24   evidence to disappear.

25        He's also under the understanding that if he were to agree

1    to a plea bargain that he would be in essence sentencing himself

2    or that he would be responsible for his own sentence.

3        As a result of these hallucinations and this delusional

4    thought process, he feels that he is actually not in legal

5    jeopardy and that these beings are going to resolve his case for

6    him.  Therefore, because of that irrational belief, he does not

7    have an ability to understand the consequences and the nature of

8    these proceedings.

9    Q    And in regard to essentially the spiritual component of

10   that, how does your opinion or your assessment differ from that

11   of the other doctors in this case?

12   A    Well, the other doctors have notes also that he has reported

13   hallucinations and have unusual thought processes.  They,

14   however, have attributed to simple religious beliefs.

15       And that's something that I certainly explored with the

16   Defendant, asked him if these beliefs about these angels that he

17   hears and that he feels will resolve his legal case for him would

18   be consistent with other members of the church that he was

19   attending.  And he indicated that his beliefs are more extreme

20   than those of his fellow church members.

21       So these are not simply religious beliefs that would be

22   congruent with the denomination he attends.  These are beliefs

23   that go far and beyond those of a religious nature and actually

24   enter into the realm of a psychotic condition, namely

25   schizoaffective disorder.

1    There's nothing in the diagnosis by the other doctors of

2    autism spectrum disorder which addresses these psychotic

3    symptoms.  There's nothing about delusions or hallucinations

4    which appears in the DSM-5-TR Diagnostic Manual addressing autism

5    spectrum disorder.

6         This is a separate condition, and it is because of this

7    separate condition that I believe that he is not competent to

8    stand trial at this time.

9    Q    Thank you, Dr. Schutte.

10             THE COURT:  Thank you.

11             Mr. Greenbaum, your witness.

12             MR. GREENBAUM:  Yes, Your Honor.  Thank you.

13                       CROSS-EXAMINATION

14   BY MR. GREENBAUM:

15   Q    Dr. Schutte, when is the last time that you actually

16   evaluated Mr. Perkins?

17   A    On September 4th, 2021.

18   Q    Okay.  And I think your report -- you did a report back on

19   September 16th, 2021.  Is that your findings from that review

20   that you did back on September the 4th?  Is that correct?

21   A    Yes.  That's my report of that evaluation.

22   Q    Okay.  So in that eight months' time since you met with Mr.

23   Perkins, how many times have you followed up and met with him?

24   A    As you asked, the last time I saw him was on September 4th,

25   2021.

1    Q    Okay.  Was that the only time that you saw Mr. Perkins?

2    A    That's correct.

3    Q    Okay.  And would you agree with me that sometimes people's

4    mental states can get better over time, sometimes they can get

5    worse over time?  Would that be a --

6    A    Correct.

7    Q    Would that be a correct statement?

8    A    Depending on the nature of the mental condition.

9    Q    Yes, sir.

10         And so in this eight months' time since the last time you

11   met with him on September the 4th, 2021, do you think it was

12   important to do a follow-up meeting or talk to him again?

13   A    No.

14         I'm comfortable with the opinions that I've just rendered to

15   the Court.

16   Q    Okay.  And how long did you meet with Mr. Perkins when you

17   met with him back that one time on September the 4th, 2021?

18   A    Two and a half hours.

19   Q    So for two and a half hours that gave you time to not only

20   meet with him, talk to him, but also perform tests.  Is that

21   correct?

22   A    That's correct.

23   Q    Okay.  And, sir, do you have a private practice, as well?

24   A    Yes.  I am in private practice.

25   Q    Yes, sir.

1    And so you see other clients or patients, I should say, that

2    are not accused of criminal activity, maybe just somebody that

3    needs some help, is that correct, with their mental faculties or

4    something to that nature?

5    A    Yes.  I do evaluations for a number of government agencies

6    --

7    Q    Yes, sir.

8    A    -- as well as local courts and pediatricians and other local

9    physicians.

10   Q    And so when you talk to children, do you usually typically

11   say a child that's suffering from schizophrenia, would you be

12   able to make that analysis that they're suffering from

13   schizophrenia within two hours or would you need multiple

14   sessions typically to determine if they have schizophrenia?

15   A    There's nothing on the diagnostic criteria about the amount

16   of time required to make a diagnosis.  One should make a

17   diagnosis when one is comfortable with the information that he or

18   she has received.

19   Q    And typically --

20   A    And that is the case here.

21   Q    Yes, sir.

22        And typically, when you have say a patient that walks in out

23   of the street and let's say hypothetically they say that they're

24   suffering from schizophrenia and not a patient that's accused of

25   say a criminal activity but just one that you're just seeing or

1    treating, how often do you find out within two hours and you're

2    comfortable that, yes, in fact, they have schizophrenia or do you

3    usually need more time than that?

4    A    Well, I do a number of evaluations for Social Security

5    Disability System.  And those evaluations kind of range from 45

6    minutes to several hours.

7    Q    Okay.

8    A    And certainly within that amount of time based on an

9    interview with the individual, administration of psychological

10   tests, and a review of any available records, I'm able to reach a

11   diagnosis.

12   Q    Okay.  So sometimes it takes more than just two hours to

13   come up with a diagnosis.  Is that correct?

14   A    Well, for example, you know, psychological testing we're

15   testing for memory functions requested and that can take several

16   hours.

17   Q    Yes, sir.

18   A    That is not the case for the Defendant.

19   Q    Correct.

20        And in regards to your report, how did you get this

21   information?  Was it from the Defendant or how did you get the

22   information?

23   A    I'm sorry.  Which information?

24   Q    The information of what was conveyed to you about the

25   angels, did that come from the Defendant himself?

Schutte - Cross                                        15

1   A    Yes.  And also from a review of a prior competency

2   evaluation.

3   Q    Yes, sir.

4        And what was that other prior competency evaluation?

5   A    That was the one dated May 18th, 2021.

6   Q    Okay.  And who did that competency evaluation?

7   A    It was Dr. Lacey Bieber or Bieber.

8   Q    So other than Dr. Bieber's report and the Defendant's self-

9   diagnosis that he's seeing angels, that's where you got that

10  information.  Correct?

11  A    I disagree.  The Defendant did not self-diagnose.

12  Q    Okay.  But he reported that he -- he self-reported that he

13  was seeing angels.  Correct?

14  A    Yes, which was consistent with reports that he had given to

15  personnel at FMC Fort Worth.

16  Q    Yes, sir.

17       And you said that his views -- how did you get the -- you

18  said that the Defendant's views were more extreme than other

19  church members.  Is that correct?

20  A    No, that's how he described his views.

21  Q    Okay.

22  A    It's important when looking at religious views in the

23  context of mental health to see whether a person's views are

24  similar to those of say a church or a group to which they belong.

25  Q    Yeah, absolutely.

1    And what church members are -- did you speak to in addition

2    to this Defendant to confirm if his views were more extreme than

3    his views, that being the Defendant's?

4    A    That was his description of his views, which is something

5    that he said very considerably from those of other church

6    members.

7    Q    Yes, sir.

8         But my question is what other church members did you speak

9    to to find out what the other church members' beliefs are?

10   A    I did not examine any other church members.

11   Q    Okay.  Did you examine his pastor to see if that was in line

12   to what the pastor would preach or anything like that?

13   A    No, I did not examine his pastor.

14   Q    Okay.  So you really are basing it on, one, a report from

15   Dr. Bieber or Bieber and then you're basing your analysis on what

16   this Defendant has told you.  Is that correct?

17   A    And also extensive psychological testing.

18   Q    So other than that, you have nothing to offer that would be

19   objective that we could look at.  Correct?

20   A    Well, the psychological testing is certainly objective.

21   Q    Would you agree with me that when somebody self-reports

22   conditions, that's highly problematic?

23   A    Certainly in a legal setting, we always want to be cautious

24   about accepting someone's statements as being factual.  That's

25   one of the reasons why we use psychological testing because, for

1  example, psychopathology testing often has built-in validity

2  scales or objective means of telling us whether someone is being

3  open and honest when they respond to the test questions.

4  Q    Yes, sir.

5  A    And all of the psychological testing performed by myself and

6  also by personnel at FMC Fort Worth, there's been no indication

7  that the Defendant was malingering or exaggerating any of his

8  symptoms.

9  Q    All right.  So it is problematic?  You would agree with me

10  that self-testing can be problematic.  Correct?

11  A    That self what, I'm sorry?

12  Q    Self-reporting, self-reporting to a person to tell about

13  their symptoms, that could be problematic.  Would you agree with

14  me on that?

15  A    That's certainly something we would want to consider in

16  addition to a records review and psychological testing.

17  Q    I guess, sir, and I don't mean to be -- it's just a yes or

18  no question.  Is self-reporting, could that be problematic?

19  A    It could be without external information --

20  Q    Yes, sir.

21  A    -- in a legal setting.

22  Q    And it could be highly unreliable at times.  Correct?

23  A    It could be, which is why you would rely on psychological

24  testing and other records.

25  Q    Yes, sir.

1    And other records such as case reports, did you review any

2    of the case reports in here from Homeland Security

3    Investigations?

4    A    I reviewed an insanity report, two competency reports, and

5    some medical records.

6    Q    Yes, sir.

7    A    About 50 pages' worth.

8    Q    Yes, sir.

9         And, again, my question is did you review the actual

10   criminal report in this case?

11   A    No, I did not.

12   Q    Did you even bother to request the criminal report in this

13   case?

14   A    No.  Because for the issue of competency, that was not

15   needed.

16   Q    So what he might have said to say a investigator or an agent

17   investigating this, that wouldn't be important to you?

18   A    For the issue of insanity, certainly, but not for the issue

19   of competency.

20   Q    Sir, how many times have you testified as an expert for the

21   Government like the U.S. Attorney's Office or the district

22   attorney's office or a county attorney's office?

23   A    Thirty or forty times.  I testify on a regular basis for the

24   El Paso County Attorney.

25   Q    Yes, sir.

1    And out of 30 or 40 times, how many times that you testified

2    on behalf of the Government did you find the Defendant competent?

3    A    In El Paso County, those cases are Child Protective Services

4    matters, and these involve modification or termination of

5    parental rights and access so those were not competency questions

6    --

7    Q    So you've never --

8    A    -- for the county attorney.

9    Q    Yes, sir.

10   So how many times have you testified in regards to

11   competency for the Government?

12   A    For the Government I have not testified on the issue of

13   competency.

14   Q    Okay.  And how long have you testified as an expert?  How

15   many years?

16   A    Well, I graduated with my PhD in 1996, so I've been in

17   practice for well over 20 years.

18   Q    So over this 20-year period, you never testified on behalf

19   of competency for the Government.  Is that correct?

20   A    No.  I've testified on the issue of insanity for the

21   Government.

22   Q    Okay.  And how many times when you've testified on the issue

23   of insanity for the Government did you find the defendant to be

24   sane, in other words, they could stand trial?

25   A    On the testimony on the question of insanity, my opinion was

Schutte - Cross                                    20

1    the individual was insane and was determined by a state court to

2    be insane, as well.

3    Q    Okay.  So was that the only time that you testified on

4    behalf of the Government as far as insanity?

5    A    Yes.

6    Q    Okay.  And that one time you found that the defendant was

7    insane.  Correct?

8    A    That's correct.

9    Q    Okay.  And how many times in your 20-year-plus career have

10   you testified for the Defense in regards to competency?

11   A    Probably four or five times.  It's not a very common issue

12   that comes up in trial testimony.

13   Q    Okay.  All right.

14        And during that four or five times that you've testified,

15   how many times did you find those defendants to be competent?

16   A    On those times I found those individuals to not be

17   competent.

18   Q    So every time you found them not to be competent, correct,

19   the four or five times you testified on behalf of the Defense?

20   A    Yes.  Otherwise, I would have not been called to testify.

21   Q    Okay.  And how much are you making for today's fee?

22   A    My fee is $300 per hour.

23   Q    Yes, sir.  Thank you.

24        And, sir, were you called to testify in regards to I believe

25   it was a capital murder case regarding Stephanie (phonetic)

1   Fernandez?  Is that correct?

2   A    I believe so.

3   Q    And in that case, did the judge rule that you couldn't

4   testify in regards to the capital murder case of Stephanie

5   Fernandez.  Correct?

6   A    In the case in chief, that's correct.

7   Q    Yes, sir.

8        And what was your -- what were you going to testify to in

9   regards to Ms. Stephanie Fernandez? What did you find in that

10  case?

11  A    If I'm remembering correctly the case, there was an issue of

12  a post-traumatic stress disorder, and the judge felt that that

13  was a matter of no relevance for sentencing and for guilt and

14  innocence.

15  Q    Yes, sir.

16  A    This is in state court.

17  Q    And this was back in it looks like March of 2019.  Is that

18  correct?

19  A    I don't have the case in front of me, but I'll take your

20  word for it.

21  Q    Yes, sir.

22  A    And this was in El Paso in state court.  Is that right?

23  Does that ring a bell?

24  Q    Yes.

25       And this person in that case got a life sentence.  Is that

1    correct?

2    A    Yes.  So, therefore, there was no sentence faced.

3    Q    Okay.  And then let me draw your attention to a more recent

4    case back in December of 2021.  Did you also testify in a murder

5    case, and I think this made Yahoo! News or at least that's where

6    I pulled it from, from the Odessa American Times in a Fabian

7    Polvon.  Did you testify in that case, as well?

8    A    Yes, I did.  Old one.

9    Q    Okay.  And what was your expert testimony in there?

10   A    Testimony was that the defendant was insane at the time of

11   the alleged offenses.

12   Q    Okay.  And do you recall that the state witness or the state

13   expert, I think it's Truble (phonetic), said that the defendant

14   was one of her I guess or the person that interviewed said that

15   the defendant was malingering.  Do you remember that?

16   A    Yes, I do.

17   Q    Okay.  And you testified here in Mr. Polvon's case that the

18   defendant was hearing voices in their head.  Correct?

19   A    No.

20   Q    Was hallucinating?

21   A    Yes.

22   Q    Okay.  Thank you for that clarification.

23        And the jury ultimately disagreed with your evaluation and

24   found this defendant guilty and sentenced him to life without

25   parole, as well.  Correct?

Schutte - Redirect                                          23

1    A    That's correct.

2    Q    And, sir, you also again in 2016, did you testify with a

3    person by the name -- it looks like a state case or a murder case

4    or a manslaughter case -- by the name of Alberto Antonio

5    Mendiola?

6    A    Mendiola, yes.

7    Q    Yes, sir.  Mendiola.  Thank you for that correction.

8         You testified in that case as well, correct?

9         And what was your testimony in that case?

10   A    That the defendant was insane at the time of the alleged

11   offense.

12   Q    And in this case, the jury disagreed with you again and the

13   defendant was convicted of manslaughter and got a 20-year

14   sentence.  Is that correct?

15   A    That's correct, instead of murder.

16              MR. GREENBAUM:  I pass the witness, Your Honor.

17              THE COURT:  Redirect, Mr. Gorman?

18              MR. GORMAN:  Thank you, Your Honor.

19              THE COURT:  Yes, sir.

20                        REDIRECT EXAMINATION

21   BY MR. GREENBAUM:

22   Q    Dr. Schutte, specific to the questions about competency

23   assessments performed on behalf of the Government, are you part

24   of the court's contract system in terms of assignment of cases

25   for competency review locally?

Schutte - Redirect                                    24

1    A    Yes, I am.

2    Q    Are you appointed by the court, the federal court to conduct

3    competency evaluations?

4    A    Yes, I am.

5    Q    And in answer, you have not testified or the number of

6    occasions you testified on behalf of the Government, that you

7    were court-appointed on multiple times not specific to the

8    prosecutor, correct, but by the court?

9    A    That's correct.

10   Q    Thank you.

11        And in regard to this specific case and your evaluation,

12   were you accompanied by counsel of record Elyse Bataller during

13   your evaluation --

14   A    She was --

15   Q    -- of Mr. Perkins?

16   A    She was present in my side of the room during the interview

17   but not during the testing segment.  She did not say anything or

18   intervene in any way in the interview.

19   Q    And while you may not have reviewed the actual reports of

20   investigation in regard to this competency assessment, have you

21   discussed the nature of the case and charges with Ms. Bataller or

22   myself?

23   A    Yes.

24   Q    And did we provide details in regard to the case?

25   A    Yes, you did.

1    Q    Thank you.

2            MR. GORMAN:  No further questions, Your Honor.

3            THE COURT:  Thank you.

4            Mr. Greenbaum?

5            MR. GREENBAUM:  Nothing further.  Thank you, Judge.

6            THE COURT:  Thank you very much.

7            Mr. Gorman, do you want Dr. Schutte to be excused or do

8    you want him to listen and watch the rest of the hearing?

9            MR. GORMAN:  I'd like to have him stand by, Your Honor,

10   just so he can hear.

11           THE COURT:  Absolutely.

12           MR. GORMAN:  Thank you, Your Honor.

13           THE COURT:  Absolutely.

14           Mr. Gorman, did you have anything more you wanted to

15   present?

16           MR. GORMAN:  Not on the Defense side, Your Honor.

17           THE COURT:   Mr. Greenbaum?

18           MR. GREENBAUM:  Thank you, Your Honor.

19           At this time, the Government would like to call Dr.

20   Samuel Browning to the stand.

21           THE COURT:  Sir, if you would come on up.

22           Yeah, come on up here and right before you sit down,

23   we'll have her swear you in.

24           THE CLERK:  Could you -- can we swear you in before you

25   --

1          MR. BROWNING:  Sorry.

2          THE COURT:  Oh, sorry.  Thank you.

3        SAMUEL BROWNING, Ph.D, GOVERNMENT'S WITNESS, SWORN

4          THE CLERK:  Thank you.

5          THE COURT:  You may have a seat.

6          Mr. Greenbaum, you may proceed whenever you're ready.

7          MR. GREENBAUM:  Thank you, Your Honor.

8                         DIRECT EXAMINATION

9    BY MR. GREENBAUM:

10   Q    Sir, can you tell us your name for the record?

11   A    It's Dr. Samuel Browning.

12   Q    Yes, sir.

13        And can you spell out your last name for the record?

14   A    Sure.  It's B-R-O-W-N-I-N-G.

15   Q    Yes, sir.

16        And, sir, how are you employed?

17   A    I'm a forensic psychologist, and I work for the Federal

18   Bureau of Prisons at the Federal Medical Center in Fort Worth,

19   Texas.

20   Q    Yes, sir.

21        And how long have you ben working there at the Federal

22   Medical Center in Fort Worth, Texas?

23   A    I was employed as a staff psychologist beginning in November

24   2013, and then I was promoted to forensic psychologist in January

25   of 2017.

Browning - Direct                              27

1   Q    Thank you, sir.

2        And can you tell the Court a little bit about your

3   education?

4   A    Sure.

5        I have a bachelor's degree in psychology.  I also have a

6   Ph.D. in clinical psychology.  I have a standard one year

7   internship experience which was conducted at the -- at the time

8   Federal Correctional Institute at Fort Worth, Texas that is now

9   the Federal Medical Center.

10  Q    Yes, sir.

11       And have you published any articles in this area?

12  A    I published articles in a what would be considered a broad

13  area of forensic psychology --

14  Q    Yes, sir.

15  A    -- in police psychology.

16  Q    Thank you, sir.

17       And what other articles have you published?

18  A    I have published articles relating to hostage negotiation

19  and crisis communication as well as those related to correctional

20  officer stress, law enforcement officer stress.

21  Q    Yes, sir.

22       And prior to taking this role, did you have another career?

23  A    Yes.

24       Before I went to graduate school, I was employed as a police

25  officer in the State of Georgia.

1   Q    Yes, sir.  Thank you.

2        And can you tell us any professional organizations that you

3   belong to?

4   A    I'm a member of the American Psychological Association

5   including the APLS or the American Psychology Law Society, as

6   well as the what's Division 18 or Psychologists in Public

7   Service.

8   Q    Yes, sir.

9        And have you testified as expert on -- as an expert before?

10  A    Yes, I have.

11  Q    Okay.  And have you testified as an expert on few or many

12  occasions?

13  A    I've testified as an expert in the federal courts

14  approximately 12 to 15 times.

15  Q    Okay.  And can you tell the Court some of the courts that

16  you have testified in regards to being an expert in this field?

17  A    I've been certified as an expert in New Mexico; several of

18  the jurisdictions or districts in Alabama; Tennessee; Texas,

19  including the Southern, Eastern, and Northern Districts of Texas;

20  Southern and North -- or, I'm sorry, Northern District of

21  Oklahoma; and I believe Western District of Oklahoma.

22  Q    Yes, sir.

23       And you actually testified as an expert before Judge Moses

24  here in the Western District.  Is that right?

25  A    Yes, I did.

Browning - Direct                                    29

1   Q     Okay.

2         And about how many times do you think you testified as an

3   expert in total?

4   A     In total, I would say approximately 12 to 15 times.

5   Q     Yes, sir.

6         And in regards to doing competency evaluations that are sent

7   to you, how many competency evaluations do you think you've done

8   in your career?

9   A     Approximately 175 to 200 competency evaluations.

10  Q     And this is all in the field of forensic psychology.  Is

11  that correct?

12  A     Yes, sir.

13  Q     Clinical forensic psychology?

14  A     Yes, sir.

15  Q     Okay.

16              MR. GREENBAUM:  At this time, Your Honor, the

17  Government moves to move him as an expert in the field of

18  forensic clinical psychology, Your Honor.

19              THE COURT:  Mr. Gorman?

20              MR. GORMAN:  No objection, Your Honor.

21              THE COURT:  The Court so finds that Dr. Browning is an

22  expert in the area of forensic clinical psychology.

23              MR. GREENBAUM:  Thank you, Your Honor.

24              THE COURT:  You may proceed.

25              MR. GREENBAUM:  Thank you.

Browning - Direct                                30

1    BY MR. GREENBAUM:

2    Q    And in regards to this case, did you have -- did somebody

3    ask you to evaluate the Defendant not only for competency but

4    also sanity in regards to Mr. Thomas Scott Perkins?

5    A    Yes.

6    Q    Okay.  And can you tell how did you get that request or that

7    reference to evaluate Mr. Perkins?

8    A    We received a court order in that case requesting us to

9    complete a competency and a sanity evaluation.  Those requests or

10   those court orders are sent through our Office of Medical

11   Designations and Transfers.

12   Q    Yes, sir.

13        And did that come from the Honorable Judge David Fannin?

14   A    Yes, it did.

15   Q    And in regards to doing this competency evaluation, did you

16   yourself have the opportunity to meet with Mr. Perkins?

17   A    Yes, I did.

18   Q    And how many times did you meet with Mr. Perkins?

19   A    I would say I met with him approximately three -- three

20   times.

21   Q    Yes, sir.

22        And how long do you think that you met with Mr. Perkins

23   total during those three times?

24   A    In total, I would say between three and four hours.

25   Q    Yes, sir.

1      And then one of your colleagues, Dr. Bever (phonetic), also

2   meet with Mr. Perkins?

3   A    Bieber, yes.

4   Q    Bieber.  I'm sorry.

5   A    That's okay.

6   Q    I'll probably mispronounce it a little later, as well.  But

7   Dr. Bieber also met with Mr. Perkins, as well.  Is that correct?

8   A    She did.  She completed an evaluation, as well.

9   Q    And were you privy to her reports, as well, her evaluation?

10  A    I was.  Throughout the process of her evaluation, we consult

11  regularly.

12  Q    Yes, sir.

13       And how many times did Dr. Bieber meet with Mr. Perkins?

14  A    I'm not entirely sure.  It was at least twice, but I'm not

15  sure how many total.

16  Q    Okay.  And the dates that you actually met with Mr. Perkins,

17  do you remember those dates or have something of reference into

18  those dates that you met with Mr. Perkins?

19  A    I don't have them in front of me.  We do keep I guess

20  internal records of those for our electronic medical record.

21  Q    Yes, sir.

22  A    But they occurred throughout the evaluation process.

23  Q    Yes, sir.  Okay.

24       And when you got the opportunity to examine the Defendant,

25  where did the setting occur at?

Browning - Direct                    32

1   A    It occurred in our jail unit at the Federal Medical Center

2   in Fort Worth, Texas.

3   Q    Okay.  And that time that you met with him at the jail unit,

4   that being Mr. Perkins, were you able to communicate with the

5   Defendant?

6   A    Yes, I was.

7   Q    And was he able to respond to your questions?

8   A    Yes, he was.

9   Q    And if you can tell the Court what were some of his

10  responses in regards to your questions?

11  A    Mr. Perkins responded in a pretty open manner when he was

12  discussing with me aspects of his history, mental health

13  symptoms, and competency-related issues.  For example, he was

14  able to respond about the courtroom personnel and their roles in

15  a very clear and articulable manner.

16  Q    Okay.  And when you said that he was able to articulate

17  courtroom personnel and roles, can you give us an example of what

18  he said in regards to that?

19  A    I recall that he advised that the -- the role for the judge

20  was to listen to the proceedings and to make decisions in court

21  during prompting.  According to The Evaluation Of Competency To

22  Stand Trial Revised, he was also able to provide additional

23  information about the role of the judge.

24  Q    Okay.  And what additional information did he provide in

25  regards to the role of the judge?

1  A    He was able to identify that the judge may make a verdict in

2  the case depending on the type of trial, as well as would be

3  responsible for sentencing.

4  Q    Okay.  So he knew that there was different types of verdict.

5  Did he know about, say, a jury verdict?

6  A    So he received some prompting relating to that, but he was

7  initially very aware that a jury would be the body that would

8  render a verdict.

9  Q    Okay.  So he was aware of that, as well?

10  A    Yes.

11  Q    Okay.  And in regards to the prosecutor, what role did he

12  say the prosecutor had in this case?

13  A    He was able to indicate that the prosecutor was responsible

14  for bringing charges for seeking a guilty verdict, for seeking

15  higher punishment.

16  Q    Okay.  And what role did he say that his defense counsel or

17  his lawyer had in regards to his responsibilities or as to him,

18  Mr. Perkins?

19  A    He was able to identify, again, through questions that are

20  standard on the ECST-R that his defense attorney was responsible

21  for standing up for him in court, for coming up with a defense

22  strategy, for seeking a not guilty verdict, and for seeking

23  minimal punishment.

24  Q    Yes, sir.

25       And did you actually talk to him about his criminal charges?

Browning - Direct                                                34

1    A    I did.

2    Q    Okay.  And was he able to discuss these criminal charges

3    with you?

4    A    Yes, he was.

5    Q    And did he seem to understand the nature of the criminal

6    charges that were against him?

7    A    Yes, he did.

8    Q    Okay.  And did you also talk to his -- to him about his

9    attorney?

10   A    Yes, I did.

11   Q    And at the time, did he know who his attorney was?

12   A    He did.

13   Q    Okay.  And back then, I think it may have been a different

14   attorney, but did he tell you who that attorney was or did you --

15   A    I believe it was a different attorney and, yes, he was able

16   to tell me who it was.

17   Q    Okay.  And do you know how he was communicating with is

18   attorney?

19   A    I know that he discussed ways that he might address

20   disagreements or points of conflict with his attorney through

21   what he described as through discussion.  He preferred to have a

22   mutual discussion with the attorney in order to come to a

23   resolution.

24   Q    Okay.  Did he talk about anything about attorney strategy or

25   anything of that nature?

1   A     Not specifically.

2   Q     Okay.  And in regards to courtroom procedures, did the

3   Defendant discuss or understand courtroom procedures?

4   A     Yes.

5   Q     Okay.  And can you tell the Court how did he understand

6   courtroom procedures or how did he tell you he understood them?

7   A     So some of the standard questions that appear on the ECST-R

8   revolve around the procedures or the decorum that would typically

9   be presented in court.  And he was able to -- to navigate that.

10      He did show some I guess concern related to court

11  proceedings that were done by video teleconference that those

12  were more difficult for him in order to process the information

13  as efficiently or to be able to ask questions or discuss matters

14  with is attorney directly.

15  Q     Yes, sir.

16      And in preparation for evaluating Mr. Perkins, did you

17  actually talk with jail personnel?

18  A     Yes, I did.

19  Q     And can you tell the Court some of the people that you

20  talked to in regards to Mr. Perkins?

21  A     I've spoken with jail unit officers, the correctional

22  officers that work in there, as well as health services staff and

23  unit team staff regarding Mr. Perkins all indicated that he had

24  relatively few if any problems in the jail unit regarding

25  discipline or difficulty maintaining any of his activities of

1    daily living or reporting where he needed to be at any given

2    time.

3    Q    Yes, sir.

4         And in regards to your evaluation of Mr. Perkins, did you

5    actually make a report as to competency and sanity?

6    A    Yes, I did.

7    Q    Okay.  And was that the report that was tendered over to, I

8    believe, Judge Fannin's chambers or to the Court, is that

9    correct, that report?

10   A    Yes, sir.

11   Q    Okay.

12        MR. GREENBAUM:  At this time for a record, Your Honor,

13   we'll go ahead and mark that as Government's Exhibit Number 1.  I

14   electronically filed it under seal, Your Honor, so the Government

15   would offer that.

16        In addition, Your Honor, I know that he's been

17   qualified as an expert, but the Government would also offer

18   Government's Exhibit Number 2 which would be the curriculum vitae

19   of Mr. or Dr. Browning, Your Honor.

20        THE COURT:  Mr. Gorman?

21        MR. GORMAN:  No objection, Your Honor.

22        THE COURT:  Government's Exhibits 1 and 2 are admitted

23   without objection.

24        (Government's Exhibits 1 and 2 marked for identification and

25   admitted into evidence)

1          MR. GREENBAUM:  Thank you.  Thank you, Your Honor.

2          THE COURT:  Yes, sir.

3    BY MR. GREENBAUM:

4    Q    And, Dr. Browning, are you familiar with the legal

5    definition of competency to stand trial?

6    A    Yes, I'm familiar with it regarding Dusky v. U.S. and then

7    later codified as 18 U.S.C. 4241.

8    Q    Yes, sir.

9          And would you agree to me that a person is legally

10   incompetent to stand trial only if he does not have the

11   sufficient ability to consult with his attorney with a reasonable

12   degree of rational understanding or a rational as well as a

13   factual understanding of the proceedings against him?

14   A    I would agree to that, and I would add to it that it would

15   also be required for him to have a mental disease or defect that

16   was causally linked to those deficits.

17   Q    Yes, sir.

18         And based on your examination of Defendant, do you have an

19   opinion as to whether or not the Defendant has sufficient present

20   ability to consult with his attorney with a rational degree of

21   rational understanding?

22   A    I do.

23   Q    And what is that opinion, sir?

24   A    I believe he does.

25   Q    Okay.  And based on your examination of Defendant, do you

1   have an opinion as to whether or not he has a rational as well as

2   a factual understanding of the proceedings against him?

3   A    I do.

4   Q    And what is that opinion, sir?

5   A    I believe he does.

6   Q    Okay.  And based on your examination, do you have an opinion

7   as to whether or not the Defendant is competent to stand trial at

8   this time?

9   A    I believe he would be considered competent.

10  Q    So your opinion in this case is that the Defendant would be

11  competent to stand trial.  Is that correct?

12  A    Yes, sir.

13  Q    And do you see Mr. Thomas Scott Perkins in the courtroom

14  today?

15  A    Yes, I do.

16  Q    And if you could, could you point him out and identify an

17  article of clothing that he's wearing?

18  A    Sure.

19       He's sitting here wearing a red jumpsuit and glasses.

20            MR. GREENBAUM:  Let the record reflect, Your Honor, or

21  may the record reflect, I should say, Your Honor, that the

22  witness has identified Mr. Perkins in this case.

23            THE COURT:  The record shall so reflect.

24  BY MR. GREENBAUM:

25  Q    And in regards to your evaluation, and I don't know if

Browning - Direct                              39

1    there's a way to check, but I'm looking from your evaluation

2    report that was done, it says October 22nd -- I'm sorry, October

3    26th through December the 10th, 2021.  Would that have been the

4    time that you evaluated this Defendant?

5    A    Yes, it would.

6    Q    Okay.

7              THE COURT:  Can you say that again?  October 26th?

8              MR. GREENBAUM:  October 26th through December the 10th,

9    2021 is --

10             THE COURT:  Thank you.

11             THE WITNESS:  Yes, sir.

12   BY MR. GREENBAUM:

13   Q    And prior to that evaluation, Dr. Bever [sic] also evaluated

14   this Defendant, as well.  Is that correct?

15   A    She did.

16   Q    Okay.  And just so the record's clear, you made your report

17   back on March the 2nd, 2022.  Is that right?

18   A    Yes, that's right.

19   Q    Now as part of preparation for this case, I actually sent

20   you the report by Dr. Schutte -- hopefully I didn't mispronounce

21   that -- Schutte.

22             UNIDENTIFIED SPEAKER:  Schutte.

23   BY MR. GREENBAUM:

24   Q    Schutte.  I stand corrected.  Dr. Schutte.

25        Were you able to review his report?

Browning - Direct                                    40

1    A    I was.

2    Q    And can you tell the Court a little bit of things that were

3    I guess out of the ordinary to you or a little bit different that

4    you saw in regards to his report that kind of stuck out to you?

5    A    I'd say in terms of things that stuck out, that was

6    primarily the difference of opinion previously noted in his

7    testimony.

8        A lot of that surrounded the opinion or the interpretation

9    of Mr. Perkins' report on his religious beliefs an angels and

10   things of that nature.

11   Q    Yes, sir.

12       And how did that stick out as different to you or what did

13   you think that may have been a little bit off or fallible?

14   A    I'm not -- I'm not sure if it was off or fallible.  I think

15   it's pretty easy to interpret what Mr. Perkins says or how he

16   describes those as delusions or -- and/or hallucinations.

17       And I think that that is because due to his autism spectrum

18   disorder, he speaks in a very rigid and very concrete manner.  So

19   things that we might describe more abstractly and more loosely,

20   he describes in a very more rigid and very discreet terms.

21       So I think that difference is notable.  I also think that,

22   you know, there was a difference in terms of, excuse me, the

23   degree to which Mr. Perkins emphasized his religious beliefs

24   during the evaluation with myself.

25   Q    Yes, sir.

1      And what else did -- if you saw anything else that was a

2  little bit different than what you evaluated Mr. Perkins as from

3  Dr. Schutte's report?

4  A      Aside from the -- the primary difference in terms of the

5  diagnosis and then the ultimate conclusion, so because of

6  reviewing his report of religious beliefs and experiences in the

7  light of both his autism spectrum disorder as well as his

8  upbringing in a Christian household and one that was described at

9  least per Dr. Bieber's report and per Mr. Perkins' and his

10  discussions as being quite religious in nature and focusing a lot

11  on prayer and religion and, you know, waving hands or laying

12  hands on individuals to assist with healing and that type of I

13  guess practice.

14      In that light, it was not -- it wasn't surprising to me that

15  he would describe religion both zealously and concretely.

16  Q      Yes, sir.

17          MR. GREENBAUM:  I pass the witness, Your Honor.  Thank

18  you.

19          THE COURT:  Thank you.

20          And Mr. Gorman, your witness?

21          MR. GORMAN:  Thank you, Your Honor.

22          THE COURT:  Yes, sir.

23                        CROSS-EXAMINATION

24  BY MR. GORMAN:

25  Q      And good afternoon, Dr. Browning.

Browning - Cross                                    42

1   A    Good afternoon.

2   Q    Now in the course of preparing your report in this case, Dr.

3   Browning, you reviewed the report of Dr. Bieber.  Correct?

4   A    Yes, sir.

5   Q    Did you happen to -- did you have occasion to speak with

6   her?

7   A    I did.

8   Q    So in her report, she had written that he started to develop

9   his own spiritual beliefs separate from his parents and branched

10  out to learn new division of Christianity.  He did not provide

11  details about a specific belief but said that the church he

12  attended taught him all the people possessed their own spiritual

13  gifts.

14       This sound more or less like the way she writes?

15  A    Yes.

16  Q    Now in conducting your evaluation, Dr. Schutte's reference

17  to schizoaffective or schizophrenia wasn't the first occasion you

18  heard that.  Is that correct?

19  A    That's correct.

20  Q    When other -- who other -- what other individuals have

21  mentioned that condition?

22  A    Dr. Bieber referenced an assessment by I believe it was Dr.

23  Pepermintwala when the Defendant was younger as well as his more

24  recent hospitalization through Oceans Behavioral Health, both of

25  which diagnosed him with a psychotic illness.  I believe both

1   diagnosed him with schizophrenia.

2   Q    And so it's your opinion that these prior evaluations were

3   incorrect?

4   A    Yes.

5   Q    And in terms of what Dr. Bieber wrote in her report, she had

6   indicated that he experienced voices that he described as

7   spiritual thoughts not psychiatric voices.  From your occasions

8   with him, was a consistent them with him?

9   A    Yes.

10       Again, he didn't emphasize his religious beliefs as much

11  during the evaluation that I conducted.  But when we did have

12  occasion to discuss that and review it, then, yes, it was

13  consistent with what he described as spiritual beliefs.  And I

14  believe he also stated to Dr. Bieber that they were non-

15  psychiatric or non-psychological in nature.

16  Q    In terms of your contact with Thomas Perkins, how did he

17  describe the distinctions between essentially what you would be

18  -- what you would characterize as a hallucination or delusion and

19  these spiritual voices?  How did you distinguish between the two?

20  A    So I distinguished between the two by reviewing the context

21  in which he was presenting this information.

22       So, for example, Mr. Perkins frequently spends a lot of time

23  online.  And we know that those with autism spectrum disorder as

24  one of the primary symptoms have restrictive repetitive

25  interests, and so one of those interests for Mr. Perkins is

Browning - Cross                                    44

1   computers.

2        Another one appears to be sort of a religious beliefs or

3   kind of Christian beliefs that may not conform to the general or

4   the broader Christian faith.

5        So in looking at that, I wanted to take into the context,

6   one, that he may have an excessive preoccupation in terms of his

7   interest in religion and also computers but also that in being on

8   his computer and being involved in online activity, he very well

9   might have engaged with others who have similar belief systems

10  within the online community.

11       Additionally, I made that determination by looking at the

12  manner in which he was describing the beliefs and what we kind of

13  tend to know about I guess different topics in which he was

14  discussing.

15       So, for example, he discussed the two angels which were

16  mentioned previously.  He discussed those in a manner that

17  represented comfort to him, that represented hope, that

18  represented these more abstract themes that he has a very

19  difficult time articulating.

20       So he was noted as having a very low ability for verbal

21  fluency and verbal understanding of information.  He gets

22  overwhelmed quite easily by verbal stimuli.  And with autism

23  spectrum disorder, his social engagement and his discussions with

24  others are somewhat hampered by that.  This is why we tend to see

25  those individuals speak in a more concrete and a more rigid kind

1    of way.

2        So taking those things into consideration, when he describes

3    having two angels and when he describes these types of

4    experiences, I look at that in the broader context of how he

5    would describe those types of things that might be commonplace.

6    How would somebody describe faith and their religion if they were

7    speaking in a very concrete manner because of autism spectrum

8    disorder?

9    Q    And in terms of I guess perceptions, when one looks at that

10   scenario, if there's actually a tangible manifestation of that

11   demon-angel in front of us, would you characterize that as a

12   hallucination or a delusion if there is a tangible object in the

13   room with you that isn't there?

14   A    That depends on the context.  Some individuals and some

15   religions, it's not uncommon to experience seeing quite literal

16   manifestations of their religion.  That wouldn't be outside of --

17   of the -- the norm for some of those religious groups.

18   Q    And did you discuss with anyone else his specific religious

19   beliefs?

20   A    No.

21   Q    No.  Did you contact the church?

22   A    No.

23   Q    So you're not certain of what the framework, his actual

24   religious beliefs are.  Correct?

25   A    Only from his discussion of them.

1   Q    If we look at -- if this object religious in nature is

2   directing us to do things not -- well, for example, in this case,

3   if the angel comes in and says the judge doesn't know what he's

4   talking about or he'll be told to carry out himself this way or

5   that the lawyer, it doesn't matter what the lawyer does, this is

6   the outcome, is that delusional?

7   A    It depends on the -- I mean so if we're talking about this

8   very specific case, it would be hard for me to say because Mr.

9   Perkins didn't make those statements to me.  If you're asking it

10  hypothetically if he made those statements to me, then that would

11  definitely be something that I would need to explore further with

12  him.

13  Q    And you did say you reviewed Dr. Schutte's report?

14  A    I have reviewed it since my evaluation, yes.

15  Q    That's right.  There's an excerpt, and I just want to read

16  it that's more in the background side that it's short, but it may

17  --

18  A    Sure.

19  Q    This is just one -- this is paragraph on Page 3.

20          "Defendant indicates that he hears voices but feels

21          that they are spiritual voices.  He indicated that he

22          always says he does not experience auditory or visual

23          hallucinations because he does not feel they are

24          psychological or psychiatric.

25          "He indicated that he has two angels, as does everyone

1    else, and added that he hears these on a continuous

2    basis.  However, he indicated that he was grateful that

3    these angels were not talking while speaking with the

4    underside.  He indicated that these angels are going to

5    cause him to" -- I'm sorry -- "he indicated that these

6    angels are going to cause him to suddenly be released

7    by influencing the judge or prosecutor or by causing

8    evidence to suddenly disappear.

9    "He indicated that these angels try to convince him

10   that he is schizophrenic and also give him signs of

11   things.  He indicated that he has particular sensitive

12   to the numbers nine and five as these correspond with

13   dates of trials and hearings, the fact that his Social

14   Security disability benefits were cut off after nine

15   months of being incarcerated, and the fact that he was

16   once transferred from a room of five people.

17   "He indicated that if these angels provided him with

18   legal advice, he would rely on it more than the advice

19   of his attorneys.  He also commented that these angels

20   have provided him with other information and have

21   informed him that he can refuse the COVID-19 vaccine.

22   "He also reported that he occasionally feels the

23   presence of a sexual demon and that a female demon has

24   been harassing him for ten years and has sex with him

25   on a regular basis."

Browning - Cross                                    48

1    This paragraph here and these facts as described --

2    A    Uh-huh.

3    Q    -- does that suggest sort of inspiration or does that

4    suggest a more tangible object in the room that might be

5    qualified as a delusion?

6    A    With no further context, I would say that it sounds probably

7    like a delusion or a hallucination.

8    Q    And in regard to -- and stepping away from the evaluation,

9    Dr. Browning, your contact that you described with him, you said

10   three to four hours, was that total time?

11   A    Yes.  That was total time.

12   Q    And in terms of that, how long did it take you to conduct

13   the analysis, the diagnostic tools or did you not personally

14   perform those?

15   A    Psychological testing?

16   Q    Yes.

17   A    The MMPI-3 takes approximately 60 to 90 minutes.  And if I'm

18   remembering right, Mr. Perkins completed it in between 60 and 75

19   minutes.

20        So that was the only I think objective test other than the

21   ECST-R that I gave.  And the ECST-R is a semi-structured

22   interview.  It's a second-generation adjudicative competency

23   measure, and so that one we did sort of face-to-face in an

24   interview format.  So the rest of the time was spent

25   interviewing.

Browning - Cross                                    49

1   Q    And in your assessment of his autism spectrum disorder, you

2   said he lies on the lower level of that?

3   A    He appears to, again, in terms of a very extensive

4   neurodevelopmental assessment or inventory.  We -- I -- so I did

5   not conduct a lot of testing related to that.  He had been

6   diagnosed since childhood with autism spectrum disorder, and that

7   was pretty well covered in Dr. Bieber's report previously.

8        So in an effort not to re-test test measures or that were

9   assessing similar functions, I didn't engage in a whole lot of

10  additional testing.  So based on his records and based on his

11  behavior, his -- that we were able to observe, his level of

12  functioning as described by him as Dr. Bieber was able to glean

13  from his parents and as we saw in the jail unit, I would say

14  that, yes, it's likely a mild autism spectrum disorder.

15  Q    But you didn't run like a unique test like ADOS or one of

16  those series of tests that might be typical of an autism

17  assessment?

18  A    No, sir.

19  Q    And in terms of his stay with you, do you remember if you

20  recall how long Thomas Perkins was with you at Fort Worth?

21  A    He was with us from October 26th through December 10th.

22  Q    And that's Fort Worth, Texas.  Correct?

23  A    Yes, sir.

24  Q    And that's where you're located.  Correct?  That's where

25  you're officed?

Browning - Redirect                          50

1    A    Yes, sir.

2    Q    And in terms of -- last question.  In terms of his test-

3    taking, you indicated that he was not malingering, he didn't seem

4    to evade or misstate the truth?

5    A    No.  That was not -- I didn't notice any indication that he

6    was trying to malinger or fane.

7    Q    And that is typical of autism, correct?  A sense of I guess

8    a lack of deceit, essentially, in the ASD cases.  Correct?

9    A    Often, yeah.  I very often see that in the autism cases.

10   Q    And -- I'm sorry, one last question.  In terms of your

11   distinction between the hallucinations in the religious sense, in

12   many cases, the two reports, the report of Dr. Schutte and yours,

13   turn on essentially the impressions with regard to this religious

14   connection.  Would that be accurate to say?

15   A    I'm sorry.  I don't fully understand.

16   Q    Oh, in terms of the competing opinions in this case, it

17   seems that they turn on the distinctions between how one observes

18   these -- the involvement of religion in this case.  Is that

19   accurate?

20   A    Yes. That sounds about right, yeah.

21   Q    Thank you.

22        MR. GORMAN:  No further questions, Your Honor.

23        THE COURT:  Redirect?

24        MR. GREENBAUM:  Just a few follow-up questions, Your

25   Honor.

REDIRECT EXAMINATION

BY MR. GREENBAUM:

Q    Dr. Browning, in regards to defense counsel's question, I
think it was in regards to schizophrenia that the previous
diagnosis may be incorrect, what did you mean by that?  Can you
explain that?

A    Sure.

So as I mentioned previously in my testimony, it is not
uncommon to have somebody who describes something like religion
that's more abstract in a more concrete way.  It's not uncommon
for that to sound delusional.  And so it doesn't surprise me that
when he was younger that that came up as an issue and that was a
diagnosis.

I can speak more I guess clearly on the more recent
hospitalization because those were medical records that I had for
review.  While he came in with an admission diagnosis of
schizophrenia, I believe, the notes that characterized his time
in the MIL-U therapy while on the inpatient unit did not indicate
that he was presenting with psychotic symptoms.

They did not indicate he responded to internal stimuli, that
is hallucinations and things like that.  He did not appear to be
behaving or discussing or acting in any way as thought there was
any psychotic symptom influence on his behavior.  They did not
note any indication throughout the process.

That said, Mr. Perkins was, by the report anyway, fairly

Browning - Redirect                                    52

1  reluctant to participate with them, so he frequently denied that

2  those were occurring and they didn't appear to observe them

3  either.  That would be consistent -- well, at least the -- the

4  lack of those symptoms would be consistent with his presentation

5  while at Fort Worth.

6       There was no indication that he was ever experiencing any

7  internal stimuli, that he was hearing these angels, that he was

8  seeing things in the room with us, that he was I guess distracted

9  by the fact that he had these delusions and -- and in his

10 discussions of competency-related  matters, he was able to offer

11 not only his faith as a reason for making decisions but also some

12 rational explanations and understanding of the legal

13 consequences.

14      So based on all of that information collectively, it was --

15 it's my opinion that those diagnoses of schizophrenia were I

16 guess the best idea or the best diagnosis at the time.  But with

17 greater context in time and that kind of information, I feel that

18 we're able to kind of rule them out.

19 Q    Yes, sir.

20      And then I think defense counsel had said a statement or

21 asked you about in regards to sensitivity to certain numbers, I

22 think specifically nine and five.  Based on your training and

23 experience, sometimes do you see that in regards to people that

24 are say fanatical or strongly religious in certain ways where

25 maybe numbers mean something to them?

1    Can you speak a little bit about that?

2    A    I do.  I do see that with those who are more extreme in

3    their religious beliefs.

4    I also see it in individuals who have autism spectrum

5    disorder, a particular fixation on numbers that they appear to

6    have or that they perceive to have some type of significance or

7    some kind of particular meaning to them.  It's not uncommon in

8    the individuals I see with autism spectrum disorder.

9    Q    Yes, sir.

10   And then I believe defense counsel read you a long -- kind

11   of a long statement that was in one of the reports I think by Dr.

12   Schutte's report in regards to this -- and correct me if I'm

13   wrong, but I'm not trying to misspeak but like sort of sex demon

14   or something of that effect.

15   In regards to that, you didn't just take a snippet out of

16   one statement.  You looked at a lot of different things, right?

17   You looked at testing in regards to this Defendant?  Is that

18   right?

19   A    Sure.

20   Yes.  And I suppose in terms of testing, I guess the PAI

21   administered by Dr. Bieber, the MMPI-3 administered by myself,

22   the PAS administered by Dr. Schutte, none of those results had a

23   prominent finding or suggestion of psychotic illness, delusions,

24   or hallucinations.  So that was one thing that I did note, as

25   well.

Browning - Redirect                                        54

1        In addition to that, yes, I did look at -- I tried to look

2   at the larger context, the lens through which Mr. Perkins was

3   evaluating his religious beliefs.  Yeah.

4   Q    Yes, sir.

5        And in regards to I think defense counsel asked you about

6   outcome, did you actually speak to the Defendant about outcome

7   and evidence on this case and can you tell the Court what his

8   response was in regards to outcome and evidence of this case?

9   A    Yes.

10       So Mr. Perkins was asked as part of the externus part of the

11  process about potential outcomes in this case, and he was able to

12  indicate that, you know, he -- he has faith and he has hope that

13  the case will be dismissed or that things will happen that will

14  fall in his favor.  He also recognized that, and I believe as he

15  put it logically speaking, there's a pretty good chance that he

16  will be found guilty or that he could be found guilty and that

17  that would carry a sentence of incarceration.

18       His reluctance to accept a plea agreement as he discussed it

19  with me was a reluctance to -- to settle on being guilty and

20  rather he would have somebody else make him I guess assume that

21  role of being guilty rather than admit it on his own.

22  Q    Yes, sir.

23            MR. GREENBAUM:  I pass the witness, Your Honor.

24            THE COURT:  Mr. Gorman, anything further?

25            MR. GORMAN:  Nothing further, Your Honor.

1          THE COURT:  Thank you.

2          You may step down.  Thank you very much, sir.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  I appreciate it, Dr. Browning.

5     (Witness excused)

6          THE COURT:  Mr. Greenbaum, did you have other

7     witnesses?

8          MR. GREENBAUM:  No other witnesses, Your Honor.

9          THE COURT:  Mr. Gorman?

10          MR. GORMAN:  No, Your Honor.  But I just I didn't move

11     to for that Dr. Schutte be characterized as an expert, Your

12     Honor.

13          THE COURT:  Oh.

14          MR. GORMAN:  And I'd ask the Court to do that.

15          THE COURT:  Any objection, Mr. Greenbaum?

16          MR. GREENBAUM:  No objection.

17          THE COURT:  The Court so finds that Dr. Schutte is also

18     an expert, again, forensic clinical -- I wrote it down to make

19     sure I said it right -- psychology, correct?  Would that be

20     correct?

21          MR. GORMAN:  That's correct, Your Honor.

22          THE COURT:  All right.  Very good.  Absolutely.

23          Any -- do you have any other -- do you want to recall

24     Dr. Schutte for any reason, Mr. Gorman?

25          MR. GORMAN:  I don't believe so, Your Honor.

56

1          THE COURT:  Very well.  Thank you very much.

2          May Dr. Schutte be excused or do we want to leave him

3  on?

4          MR. GORMAN:  Oh, he may be excused, Your Honor.

5          THE COURT:  All right.

6          Mr. Greenbaum, any objection?

7          MR. GREENBAUM:  No, Your Honor.  No objection at all.

8          THE COURT:  Dr. Schutte, we thank you very much.  I

9  appreciate it very much.  We're going to cut you off and let you

10  go, all right?

11          MR. SCHUTTE:  Thank you, Judge.

12          THE COURT:  Thank you very much, sir.  I appreciate

13  your time.

14          MR. SCHUTTE:  Bye now.

15          THE COURT:  Bye.

16      (Witness excused)

17          THE COURT:  And Dr. Browning I assume is excused, as

18  well, if that --

19          MR. GREENBAUM:  Yes, Your Honor.

20          THE COURT:  He's going to make a beeline for the door

21  and catch --

22      (Laughter)

23          MR. GORMAN:  No objection, Your Honor.

24          THE COURT:  He's got to catch a train to Fort Worth.

25          All right.  Mr. Gorman, would you like to lead us off

1       or do you want Mr. Greenbaum to?  It doesn't matter to me.

2                MR. GORMAN:  I can do that, Your Honor.

3                THE COURT:  Very well.

4                MR. GORMAN:  Your Honor, in the case --

5                THE COURT:  Would you come over to the podium?

6                MR. GORMAN:  Oh, sorry, Your Honor.

7                THE COURT:  That's okay.  Different judges like it

8       different ways.  I just -- I prefer the podium.

9                MR. GORMAN:  Your Honor, Mr. Perkins' case I would ask

10      the Court to consider a standard that we frequently read during

11      our plea colloquies.  The test must be whether he has sufficient

12      present ability to consult with his lawyer with a reasonable

13      degree of rational understanding and whether he has a rational as

14      well as factual understanding of the proceedings against him.

15               That turns back to the 241 standard about assisting

16      properly in his defense.  Your Honor, in the end of this, we have

17      two experts that are currently at odds in regards to what --

18      essentially what religion means in the life of Mr. Perkins.  I

19      would ask the Court to consider in this case this is more than

20      your frequent inspirational or signs or something that's out

21      there.

22               This is something plus something in addition to that

23      that actually creates a very tangible manifestation.  And in

24      terms of supernatural beings in terms of beings sent by God or a

25      higher power, frequently those are going to be the louder voices

58

1    in the room, whether it's a judge, a lawyer, or a prosecutor.

2         I have no doubt that Mr. Perkins understands and can

3    repeat back what a lawyer does, a defense lawyer or a prosecutor,

4    the role of the judge, and the role of the jury.  We've certainly

5    talked about the evidence in this case.  Ultimately, my concern

6    -- and this comes down to what Dr. Schutte pointed out in those

7    summary statements -- the reason for the presence of Elyse

8    Bataller, Your Honor, in that session with Dr. Schutte was not to

9    oversee that but rather to give an illustration for the

10   evaluating expert of a dialogue between counsel and client.

11        In his case, Your Honor, he is driven by this idea and

12   unfaltering idea that ultimately all of this will go away.  It's

13   not a discussion of the evidence, nor is it sentencing or plea

14   agreements or any of that.  It's ultimately -- it ultimately

15   comes down to a belief that goes beyond mere religion that he

16   will not essentially be held to account for this.  And that's a

17   problem, Your Honor, in terms of looking at this.

18        As Dr. Browning pointed out, the difference between

19   hallucination, the difference between what we read in the Bible -

20   - and I do have faith, I am Christian.  I understand the

21   difference.  This isn't a denigration of religion, but rather a

22   sense of when entities such as God, Jesus, or anything appear in

23   the room with us, that could certainly happen within our faith.

24   But the whole idea of faith is we move on with the lack of

25   evidence but rather the belief that something will happen.

1          If we were given that tangible evidence, then that

2     becomes something more.  And it's strange that we often look at

3     the shadows in the corner and the demons and, you know, these

4     voices that are speaking evil into our minds and we quickly will

5     account for that.  Ultimately here, we seem to be dismissing that

6     because it seems to be on the right side of this in terms of we

7     don't want to overpathologize religion which is what Dr. Bieber's

8     statement more or less.

9          This isn't about pathologizing.  It's a question of are

10    we creating -- is there something in the room other than the

11    people standing here that we can detect that's ultimately driving

12    the train here.  I would ask the Court to consider when it looks

13    at the question of competency can Mr. Perkins essentially listen

14    to any voice other than the voices he's hearing.

15         I think we've seen this, Your Honor.  This isn't a case

16    where this was a novel diagnosis launched by Dr. Schutte for the

17    first time.  This appears in his historical records.  He himself

18    has mentioned being treated in those records.

19         Schizophrenia, the object that we're essentially

20    confusing in this case with autism spectrum disorder, Your Honor

21    -- which is about repetition, which is about sometimes social

22    awkwardness or the way we conduct ourselves and sometimes it's an

23    IQ problem -- doesn't lend itself well to competency but items

24    such as schizophrenia, they certainly raise that question.  It

25    doesn't necessarily mean he's not competent.

1           But I would ask the Court to consider with the

2    diagnosis in this case from Dr. Schutte, it does suggest he's not

3    competent because ultimately his decisions will be made on

4    something that aren't really the core legal discussions that

5    aren't about evidence, elements, or burdens of proof.  These

6    ultimately come down to, Your Honor, what do these voices say.

7    And if it's a voice other than any of the identified members of

8    the Court talking about it, that presents a large problem in

9    terms of presenting a defense in this case.

10          And with that, Your Honor, I would ask the Court to

11   consider Mr. Perkins not to be competent in this case.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.  And, Mr. Gorman, there's

14   absolutely no -- I know they examined -- both seems to examine

15   him possibly Dr. Bieber, as well -- him for sanity.  There's no

16   question about sanity.  We're just talking competence, right?

17          MR. GORMAN:  This hearing was set up for competency,

18   Your Honor.  That's what I prepared for.  I think Dr. Schutte was

19   taken a little aback which is why he kept hedging back away from

20   that.

21          THE COURT:  Yes, sir.

22          MR. GORMAN:  We were expecting a discussion on

23   competency, so I would have to have that conversation with him,

24   Your Honor, in terms of his ultimate read on that.

25          THE COURT:  Thank you.

1          MR. GORMAN:  Thank you, Your Honor.

2          THE COURT:  Mr. Greenbaum?

3          MR. GREENBAUM:  Yes, Your Honor.  Thank you.

4          May it please the Court, my colleagues, opposing

5   counsel.

6          Judge, I think a problem here, Your Honor, is that Dr.

7   Schutte did one evaluation of the Defendant back about eight

8   months ago on September the 4th, 2021, Your Honor.  He makes

9   these evaluations with testing, makes these evaluations in two

10  and a half hours, Your Honor.

11         That is problematic, but it's more problematic because

12  of this limited time, I think from the Government's perspective,

13  it's -- he's relying on the Defendant's words.  So it's self-

14  reporting from the Defendant which from the Government's

15  perspective and that we would proffer or argue is highly

16  unreliable, Your Honor.

17         So we don't know what's self-serving, what's not self-

18  serving.  He doesn't independently evaluate things such as

19  offense reports.  He doesn't independently evaluate other people

20  in the church to see if maybe these are just the religious

21  beliefs of this Defendant and the other parishioners.  So that is

22  problematic, Your Honor, that he never goes through the case

23  files or anything of that nature, Judge.

24         Ultimately, when we're talking about this Defendant,

25  we're talking about when we're looking at the different experts,

1   we're talking about Dr. Browning that saw this Defendant on three

2   different occasions.  Dr. Bieber also works at the same place as

3   Dr. Browning there at the Federal Bureau of Prisons or the

4   Medical Center there, as well, saw him at least on two occasions,

5   Your Honor.

6           So when we look at that and we look at what's more

7   complete or what just from a time standpoint, Judge, it's highly

8   problematic that Dr. Schutte would just evaluate him in such

9   small amount of time, rely solely -- specifically I think if I

10  understood Dr. Schutte on the Defendant's own testimony or his

11  self-reporting and that of Dr. Bieber, the Government's or one of

12  the other experts in this case, Your Honor.  So that's troubling,

13  Your Honor.

14          In regards to the Defendant himself, he clearly had

15  spoke to Dr. Browning, understood what the role of the judge was,

16  understood what the role of the prosecutor, Your Honor, and

17  understood the role of the defense attorney in regards to his

18  case.  So he did have from the Government's perspective a

19  rational understanding of he even understood the difference

20  between the judge and the jury as far as possible -- if I

21  remember correctly, as far as possible punishment and who would

22  do the punishment in regards to the case.  And so he knew the

23  different types of roles about that, Judge.

24          And then in regards to evaluating the evidence, Your

25  Honor, and you'll see it in Government's Exhibit Number 1, I

1  believe, from the report from Dr. Browning, and I'll just -- he

2  said logically -- and this was being the Defendant -- that based

3  on the evidence, he would be found guilty.  So there is some

4  discussion that he understands and he imputes and he understands

5  that looking at this evidence, Your Honor, that he himself --

6  that being the Defendant -- would be found guilty, Your Honor.

7  　　　　The Government does believe it's met its burden in

8  regards to competency, Your Honor.  I think the report by Dr.

9  Browning speaks for itself, Your Honor.  And the Government would

10 ask that you find this Defendant competent to stand trial.

11 　　　　Thank you, Your Honor.

12 　　　　THE COURT:  And, Mr. Greenbaum, so you've admitted

13 Government's Exhibit 1 which is exactly what?

14 　　　　MR. GREENBAUM:  Yes, sir.  Government's Exhibit Number

15 1 is going to be the actual report from Dr. Browning.  It's going

16 to be the psychological evaluation from Dr. Browning, Your Honor.

17 I believe it's approximately a 12-page document, and then the

18 first page is just the cover sheet to Judge Fannin.

19 　　　　THE COURT:  And then Government's Exhibit 2 is what?

20 　　　　MR. GREENBAUM:  Government's Exhibit Number 2 is going

21 to be the curriculum vitae of --

22 　　　　THE COURT:  Oh, Dr. Browning.

23 　　　　MR. GREENBAUM:  -- Dr. Browning.  Yes, sir.

24 　　　　THE COURT:  Okay.  Thank you.

25 　　　　MR. GREENBAUM:  Thank you, Your Honor.

64

1      THE COURT:  And I've got -- have we got Dr. Schutte's

2  -- I know I've got a copy of it here.  Is it in evidence?  Do you

3  want to place it in evidence?

4      MR. GORMAN:  I would, Your Honor.  I would offer that

5  in evidence.

6      THE COURT:  Defense Exhibit 1?

7      MR. GORMAN:  Defense Exhibit A or --

8      THE COURT:  1?  Any objection?

9      MR. GREENBAUM:  No objection, Your Honor.

10     THE COURT:  Defense Exhibit 1 is admitted without

11 objection.  I want to make sure we get all that in there.

12     (Defense Exhibit 1 marked for identification and admitted

13 into evidence)

14     THE COURT:  And that -- what I'm looking at is the

15 report which is -- and Mr. Greenbaum I think referred to it.  The

16 report is dated September 16th, 2021.  It references the exam on

17 I think September 4th.  I've lost it now all of a sudden.

18     MR. GORMAN:  That sounds right, Your Honor.

19     THE COURT:  Okay.

20     MR. GREENBAUM:  That does sound --

21     THE COURT:  Yeah, September 4th.  Here it is.

22     And that's the report.  It's like -- it looks like it's

23 six pages.  And then his CV is attached, and it's another nine or

24 ten pages.  So that's what the Court has.

25     MR. GREENBAUM:  Yes, Your Honor.

1          MR. GORMAN:  That's correct, Your Honor.

2          THE COURT:  I just want to make sure.  Very well.

3          All right.  So, Mr. -- to the attorneys, to Mr.

4    Perkins, I'm going to take this under advisement.  I've got

5    everything I need.  I've heard the testimony of the two

6    witnesses, Dr. Schutte, Dr. Browning.  I want to review -- I have

7    not -- I've reviewed Dr. Schutte's CV and report.  I have not

8    reviewed Government's Exhibits 1 and 2.  I'd like some time to do

9    that, and then I'll take it under advisement.  I'll make a

10   ruling.  I'll issue the ruling.  Okay?

11         MR. GREENBAUM:  Yes, Your Honor.

12         MR. GORMAN:  Your Honor, would the Court appreciate a

13   post-hearing briefing on that just for trying to simplify?

14         THE COURT:  I don't think I need it.  If you want to,

15   give me one this week, and there's no requirement.  If you feel

16   better doing it, I have no problem with that.  Give it to me

17   before the end of the week, and if you do.

18         And don't feel like -- you know, if you're the opposing

19   counsel and you don't do one and someone does one, don't feel

20   like you have to respond to it.  I think I've got a good handle

21   on it, but I'll not typically reject additional briefs.  All

22   right?

23         MR. GREENBAUM:  Yes, Your Honor.

24         MR. GORMAN:  Thank you, Your Honor.

25         THE COURT:  Thank, y'all.

66

1          So, Mr. Perkins, I'm going to remand you to the custody

2     of the United States Marshals pending the outcome of the hearing.

3     Thank you.

4          MR. GREENBAUM: Thank you, Judge.

5       (Proceedings adjourned at 4:04 p.m.)

6                         ---oOo---

7

8

9

10

11

12

13                  **C E R T I F I C A T E**

14     I, DIPTI PATEL, court-approved transcriber, certify that the

15     foregoing is a correct transcript from the official electronic

16     sound recording of the proceedings in the above-entitled matter.

17

18

19     *Dipti Patel*

20     _____

21     DIPTI PATEL, CET-997

22     LIBERTY TRANSCRIPTS                    Date: July 17, 2022

23

24

25