IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

PECOS DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION NO. |
| | * | PE:20-CR-388 |
| VS. | * | |
| | * | |
| THOMAS SCOTT PERKINS | * | October 24, 2022 |


BEFORE THE HONORABLE DAVID COUNTS
SENTENCING


APPEARANCES:

For the Government:   Scott Greenbaum, Kevin Cayton,
                     & Matthew Ellis, Esq.,
                     Assistant U.S. Attorneys
                     200 Highway 118
                     Alpine, Texas 79830


For the Defendant:   Michael F. Gorman, Esq.
                     700 E. San Antonio Ave., Suite D401
                     El Paso, Texas 79901

Court Reporter:      Tamara D. Ross
                     200 E Wall
                     Midland, Texas 79701

   Proceedings recorded by mechanical stenography,

transcript produced by computer-aided transcription.

2

1                         PROCEEDINGS

2                THE COURT:  Court calls U.S. V. Thomas

3    Scott Perkins, PE:20-CR-388 today for sentencing.

4                MR. GREENBAUM:  Good morning, Your Honor.

5    Scott Greenbaum on behalf of Government, also along

6    with Kevin Cayton for the Government as well.  Thank

7    you, Your Honor.

8                MR. GORMAN:  Good morning, Your Honor.

9    Michael Gorman on behalf of Mr. Perkins.  Ready to

10   proceed.

11               THE COURT:  Good to see you, as always.

12   Mr. Perkins, you're Thomas Scott Perkins.  Right?

13               THE DEFENDANT:  Yes.

14               THE COURT:  You're fine.  You can stay

15   seated.  We've got a lot of discussion to have.  I'll

16   have you stand up toward the end.  Mr. Gorman, you

17   continue to believe Mr. Perkins is competent?

18               MR. GORMAN:  I'm asserting to the

19   contrary, Your Honor.

20               THE COURT:  Oh, that's right.  You

21   asserted from the get-go that he was not competent.

22               MR. GORMAN:  That's correct, Your Honor.

23               THE COURT:  All right.  The Court

24   disagreed, respectfully.  Have you -- and I got a copy

25   of the advisory to the Court regarding a forfeiture.

1    I've got a copy, just for everybody's knowledge, of the

2    Defendant's sentencing memorandum and motion for

3    variance, as well as the presentence report and some

4    objections.  Mr. Gorman, have you reviewed with

5    Mr. Perkins the presentence investigation report?

6                    MR. GORMAN:  I did, Your Honor.

7                    THE COURT:  And Mr. Perkins, you've

8    reviewed this report.  Right?

9                    THE DEFENDANT:  Yes.

10                   THE COURT:  Okay.  There's some

11   hesitation.  Is there an issue?

12                   THE DEFENDANT:  I was going to review

13   over (sic) things later.  I reviewed over as much as

14   can be done.

15                   THE COURT:  Okay.  Are you satisfied with

16   your review thus far to get to this point, and you're

17   happy to review the rest of it later, I guess?

18                   THE DEFENDANT:  There's a few things I

19   didn't get to read, but I got the gist of it.

20                   THE COURT:  Okay.  Mr. Gorman or someone

21   talked you through that?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  Okay.  And you still want to

24   read through it in more detail later.  Right?

25                   THE DEFENDANT:  Yes.

1          THE COURT:  I see.  That's what you're
2   saying.
3          MR. GORMAN:  Can I clarify that, Your
4   Honor?
5          THE COURT:  Sure.
6          MR. GORMAN:  Your Honor, what we did --
7   he went through the initial presentence report cover to
8   cover.  What we didn't have the opportunity to do was
9   sit down and read through the entirety of the revision.
10  What I provided was the revisions themselves, Your
11  Honor, which are limited.
12         THE COURT:  Oh, okay.  Very good.
13         MR. GORMAN:  Thank you, Your Honor.
14         THE COURT:  I appreciate that
15  clarification.  With that then, Mr. Gorman, are there
16  objections or corrections -- let's take up corrections
17  first.  Are there any corrections to the report,
18  Mr. Gorman?
19         MR. GORMAN:  No further, Your Honor,
20  other than those previously mentioned in the
21  objections.  I believe we're fairly resolved on that.
22         THE COURT:  Very good.  Now, objections.
23  What do you have on those?  What's your first
24  objection, Mr. --
25         MR. GORMAN:  Your Honor, the first

5

1    objection was the Apprendi objection.  And that was

2    largely the --

3                    THE COURT:  Unless you need to, would you

4    mind using the podium?  Unless you need to use the --

5                    MR. GORMAN:  Oh, certainly, Your Honor.

6    Trying to get the posture down.

7                    THE COURT:  I understand.

8                    MR. GORMAN:  In terms of the Apprendi,

9    Your Honor, the possession offenses involved,

10   essentially a determination that there were

11   minors under the age of 12.  In that regard, Your

12   Honor, Apprendi requires that a matter that raises the

13   statutory maximum, in this case from 10 to 20 years, be

14   present in the indictment, be essentially forwarded to

15   the jury and essentially determined beyond a reasonable

16   doubt by the jury.  The request at the outset, Your

17   Honor, was to have that separately broken out in a

18   finding.  And that's usually with drug cases, Your

19   Honor, which simplifies that.  Typically, our drug

20   cases these days, if they're quantity-based, will have

21   some specific findings.  In this case, it does not.

22   The likelihood or the affect of that depends on largely

23   how sentencing goes, whether it's harmless or not.  But

24   with that, that would be the concern in this case, Your

25   Honor.  In this case, we didn't have those specific

1    findings that would raise it from 10 to 20.

2                    THE COURT:  And that deals specifically

3    with which count?

4                    MR. GORMAN:  I think all, except for the

5    first count, Your Honor, which is --

6                    THE COURT:  I through IX?  I see.

7    Mr. Greenbaum, your response?

8                    MR. GREENBAUM:  Yes, Your Honor.  The

9    Government would ask that the Court take -- draw its

10   attention to what's been filed, which is the indictment

11   in this case, Your Honor.  And in that indictment, it

12   specifically alleges that involved a prepubescent

13   minor under the age of 12 years of age.  So that's

14   alleged, and so that's given the Defendant notice.

15   It's the Government's position the Defendant has notice

16   that these depictions or the videos of child

17   pornography are under the age of 12 years of age, Your

18   Honor.  And that's for Counts II, III, IV, V, VI, VII,

19   VIII, and IX.  So all the counts they're objecting to,

20   Your Honor, the Government has given notice of that.

21   That was -- the same instruction as part of that

22   indictment was given back to the jury with the

23   instruction of or with the pleading that it was

24   children under the age of 12 years old.

25                    Additionally, Your Honor, if you would

7

```
 1    also -- if I could ask the Court to draw its attention
 2    to the addendum, as you look through the addendum --
 3    and my recollection as well is the same as Probation's.
 4    We had multiple agents testify to the age of some of
 5    the children, some of the child pornography and images
 6    and videos that were inside the devices that the
 7    Defendant was convicted of.  We had first Agent David
 8    Firg, who testified --
 9                THE COURT:  Mr. Greenbaum, let me ask you
10    to come back up here.  You're looking down, and I
11    have -- I want to see your lips.
12                MR. GREENBAUM:  Yes, Your Honor.  I
13    apologize.
14                THE COURT:  That's okay.  Keep going.
15                MR. GREENBAUM:  Yes, Your Honor.  If we
16    look at the addendum, which the Government agrees with,
17    Your Honor -- so we have the testimony during the jury
18    trial of Agent David Firg, who testified that one of
19    the videos depicted a four-year-old prepubescent male
20    that was naked, Your Honor.  So that's for that one,
21    Your Honor.
22                In addition, Your Honor, we had
23    additional testimony from DPS Agent Michelle Wilson
24    that the Defendant admitted that his favorite child
25    groups were the ages of eight, nine, and 10-year-olds
```

1    involving child pornography, Your Honor.  So we have

2    that additional testimony.

3              Additionally, Your Honor, we had the

4    forensics expert, Special Agent Antonio Yanez with HSI

5    who said that his review -- that the videos and the

6    ages or the images ranged from the ages of three to 12,

7    Your Honor, again meeting that count.  And this was

8    concerning all those counts the Defense has objected

9    to, which is Count II through IV, Your Honor.  And some

10   of the search terms that the Defendant used, which is

11   reflected in paragraph 34, kiddy porn, naked preteen

12   girls, naked preteen boys, pics of naked preteens, sexy

13   nine-year-old girls, etcetera, Your Honor.

14             There was an additional agent, an FBI

15   agent, Shawn Mullins, that testified that he knew one

16   of the series that the Defendant had possessed, which

17   is a see baby series, and that had two prepubescent

18   females, Your Honor, that -- which would reflect in

19   Count IX, which is the ages of three to eight, Your

20   Honor.  So the Defendant had notice.  It's the

21   Government's position the Defendant did have notice of

22   this, Your Honor.  It was pled in the indictment.

23             The jury found him guilty of the same

24   action, Your Honor, of having the child pornography of

25   under 12 years old, Your Honor.  And plus, we have at

1    least four different agents, Your Honor, testifying to

2    the same thing, Your Honor.  Therefore, the Government

3    does believe the notice was proper and Apprendi was met

4    in this case, Your Honor.  Thank you.

5              THE COURT:  Mr. Gorman, was a bill of

6    particulars filed in the case by the Defense?

7              MR. GORMAN:  I'll get used to it, Your

8    Honor.

9              THE COURT:  Thank you.

10             MR. GORMAN:  Your Honor, it wasn't a bill

11   of particulars as the statutory -- as the indictment

12   itself is correct.  Obviously, Apprendi is a 6th

13   Amendment problem as to what specifically the jury

14   found, Your Honor.

15             THE COURT:  So no.

16             MR. GORMAN:  I'm sorry, Your Honor?

17             THE COURT:  The answer's no.

18             MR. GORMAN:  No bill of particulars.

19             THE COURT:  No bill of particulars.  And

20   so the Defense didn't think it necessary to clarify the

21   indictment so they could understand it.  Correct?

22             MR. GORMAN:  Correct, Your Honor.

23             THE COURT:  Okay.  And discovery was

24   complete.  Right?  You all had discovery.  The videos

25   that were spoken about were disclosed.  I don't know

1    how they were disclosed, but you were able to view

2    them.

3                    MR. GORMAN:  In terms of -- well, the

4    evidence at trial, Your Honor.  Yes.

5                    THE COURT:  Yes.  Well, you saw the

6    evidence at trial, but you saw that prior to trial.

7    Correct?  You knew what the evidence was going to be.

8    Right?

9                    MR. GORMAN:  In terms of videos, yes,

10   Your Honor.

11                   THE COURT:  Was there something you

12   didn't?

13                   MR. GORMAN:  Your Honor, if the Court

14   recalls, there was an ongoing issue regarding an expert

15   forensic report in this case, Your Honor, that was not

16   produced.  Ultimately, we relied on a summary ROI.

17                   THE COURT:  That's right.

18                   MR. GORMAN:  So that was a concern with

19   the PSR in terms of numbers, Your Honor, which, as a

20   matter of PSR calculations, is not an issue because we

21   believe we met the 600 image threshold.  But yes, that

22   was an ongoing issue.

23                   THE COURT:  I see what you're saying,

24   Mr. Gorman.  All right.  The Court will respectfully

25   overrule the objection, relying upon Mr. Greenbaum's

1   argument, as well as the U.S. probation officer's

2   response.  Your next objection?

3               MR. GORMAN:  Your Honor, we covered the

4   factual issues that were already presented and the

5   letter.  There's no need to rehash those.  The other

6   was the objection to the amount of restitution, Your

7   Honor.

8               THE COURT:  Okay.

9               MR. GORMAN:  And that was more

10  specifically restitution is not a simple case of if

11  there's an identified victim, we give whatever amount

12  is claimed.  In this case, there were conclusionary

13  claims that weren't documented or tied to the

14  trafficking.  Essentially, the elements of proof that

15  we just don't have before us that -- or to issue any

16  award on that, Your Honor, would be essentially based

17  on a lack of evidence, which obviously is not what

18  restitution requires.  They require a preponderance.

19  Thank you, Your Honor.

20              THE COURT:  Thank you.  Any other

21  objections?

22              MR. GORMAN:  That's it, Your Honor.  I

23  think you covered the objections.

24              THE COURT:  Very good.  So with the

25  exception of restitution, I just want to be -- for

1  clarification of the record, I overrule any

2  objection -- all the objections, relying upon U.S.

3  Probation -- U.S. Probation's response -- quite clear

4  response.  I'm withholding restitution for now, for the

5  time being.  We'll talk about that as we go this

6  morning.

7               Mr. Greenbaum, in addition to relying --

8  the Court relying upon the U.S. Probation officer's

9  response to the objections, is there anything the

10  Government wanted to add to those?  If there's

11  something that's missing in here that the Government

12  specifically wants the Court to consider, I'm happy to.

13               MR. GREENBAUM:  No, Your Honor.  The

14  Government would just reserve the right, obviously, to

15  make argument in regards to this case, but nothing

16  further.

17               THE COURT:  Oh, of course.  I'm just

18  talking about the objections.

19               MR. GREENBAUM:  Yes, sir.

20               THE COURT:  Any objections from the

21  Government or any corrections to the report?

22               MR. GREENBAUM:  No, Your Honor.  Thank

23  you.

24               THE COURT:  Very well.  So Mr. Perkins,

25  the Court has reviewed the presentence report, which is

1    prepared by U.S. Probation Officer Erica Carrillo.  I
2    find the report to be accurate.  I adopt it and the
3    application of the United States sentencing guidelines
4    contained in the report.  And still -- we still have a
5    lot of stuff to cover.  So don't -- this isn't the end
6    all, be all, but this is the guideline range that I see
7    at this point.  And again, there's a Defendant's
8    sentencing memorandum, motion for variance.  There's
9    going to be argument from both parties.  I just want
10   you to know the parameters of where we start.  Okay?
11          And so total base offense level 37,
12   criminal history category 1.  So that means the
13   guideline range in each count, each of those nine
14   counts, is 210 to 240 months.  Okay?  Those may run
15   concurrently or consecutively.  They may be ordered to
16   run that way.  Supervised release term -- I'm going to
17   talk more about supervised release in a little bit.  I
18   know you've been through that before, I'm sure, with
19   your attorney.  But in each count, I through IX, you
20   face five years minimum, up to life, of supervised
21   release.  And that's, of course, after your release
22   from a term of imprisonment.  All right?  So then
23   you're ineligible for probation.
24          As to the Counts I through IX, you face a
25   fine of $40,000 to $250,000.  And then we've got --

1    I'll come back to restitution in just a minute.  We've

2    got a special assessment of $100 per count.  That's

3    pursuant to the Victims of Crime Act, payable to the

4    Crime Victims Fund.  That totals $900.  Okay?  That's

5    for those -- but there's another special assessment for

6    each count, which is the Justice For Victims of

7    Trafficking Act assessment, I believe usually called a

8    JVTA assessment for short.  That's $5,000 per count.

9    That's nine times 5,000 is $45,000, I think.  Those are

10   required.  Each of those -- that $5,000 per count is

11   required.  The Court's required to impose it, should I

12   find that you're not indigent.  And of course, you know

13   what that means only if I find you nonindigent.  If I

14   find you indigent, then I don't assess that.

15            There's an AVAA, which I think -- Andy,

16   Vicki, Adam, Amy, or -- I have some of those names

17   wrong -- assessment, which I may have wrong, for Counts

18   II through IX, and those are the possession of child

19   pornography counts.  That totals $17,000.  And that's

20   available.  That's not necessarily assessed at this

21   point.  Okay?

22            Restitution -- let's go back and look at

23   restitution.  First of all, Mr. Greenbaum, any

24   objection or disagreement with what I've stated thus

25   far?

```
 1              MR. GREENBAUM:  No, Your Honor.  No
 2   disagreement.  Thank you.
 3              THE COURT:  And then Mr. Gorman, same
 4   question of you.  Any disagreement?  I know you
 5   disagree with the objection -- ruling on the
 6   objections, but any disagreement with what I've stated
 7   thus far?
 8              MR. GORMAN:  No, Your Honor.
 9              THE COURT:  I want to make sure we're all
10   starting on the same page.  Then restitution.  I'm
11   going to call them what they're called.  There's a
12   Tightsngold Series.  Seems strange to say this.  We
13   don't do them that often.  But that one, the
14   restitution there is stated right now at $545,500.
15   Lighthouse1 Series - Maureen is $10,000.  Sweet White
16   Sugar Series - Pia, $5,000.  There's a Tara Series,
17   which is one -- listed at $151,679.27, and Jenny Series
18   at $3,776,376.  I did not total all those up.  And I
19   will take that up in just a little bit, separately.
20              Mr. Gorman, what would you have the Court
21   consider?  Go ahead, if you would, and -- oh.  And
22   Mr. Perkins, let me remind you there's a -- I think
23   there's a forfeiture we still have to deal with.  Is
24   that correct?  Mr. Greenbaum, Mr. Gorman?  Are we done
25   with --
```

1          MR. GREENBAUM:  Judge, as far as the

2    forfeiture, I thought there was a bill of particulars

3    that was filed in this case by our asset forfeiture

4    department that was in agreement with (unintelligible)

5    that Mr. Gorman --

6          THE COURT:  There was a second bill of

7    particulars.

8          PROBATION OFFICER:  Yes, Your Honor.

9    That's correct.

10          MR. GORMAN:  They clarified that, Your

11   Honor.  Yes.  Obviously, the exhibits this Court saw at

12   trial would be subject to forfeiture.

13          THE COURT:  Okay.

14          MR. GORMAN:  There was no evidence tied

15   to the other objects, so I believe we clarified that.

16          THE COURT:  So is everything, I guess,

17   acceptable to the Defense?

18          MR. GORMAN:  It is, Your Honor.

19          THE COURT:  On the forfeiture?  All

20   right.  So the Court will grant any forfeiture that

21   needs to be granted if there is anything remaining

22   pending.  Mr. Gorman, as to the sentencing memorandum

23   and motion for variance, any allocution we have for

24   your client, go right ahead.

25          MR. GORMAN:  Thank you, Your Honor.

17

1          THE COURT:  Go ahead.

2          MR. GORMAN:  Your Honor, I've been -- as

3    the Court may have discerned from the trial and my

4    exchanges with some of the agents, I've been doing

5    these cases for a while.  My background -- I'm an

6    engineer, graduated in '91, saw sort of the birth of

7    the internet in the mid '80s and have kind of seen this

8    progress past that as I have picked up a few more

9    computer degrees along the way, which put me in line

10   with these cases.  That's why all those agents know who

11   I am.

12         THE COURT:  Yes, sir.

13         MR. GORMAN:  But with it, Your Honor,

14   looking at these cases, I view them through that lens.

15   And that's, I guess, the opening sort of volley in any

16   of these cases, whether it's Government or any defense,

17   has to be acknowledgment of the contents and images and

18   videos.  It feels like my eyes bleed every time I

19   review these, and I've reviewed these for my cases and

20   many others in the office, just given the insight.  But

21   nothing detracts from the horrible nature of the

22   content.  What I ask the Court to do from the Defense

23   perspective is to look beyond that.  It's very hard to

24   get a juror to do that, to try to bring in the data

25   around that.  It's not something I generally spend a

1    lot of time in front of juries, simply because the

2    affect of these images when they see them just burns

3    into their psyche.  And it's human.  And I've talked to

4    many people about this subject.  And ultimately, it's

5    not an easy one for anyone to come to terms with the

6    idea of sympathy.  But in certain cases, I do think it

7    merits bringing up.

8              In this case, Your Honor, we have an

9    individual who has, at a minimum, an undisputed

10   neurodivergent problem, in terms of autism.  That has

11   certain features, Your Honor.  And I know the Court

12   reviewed and received some specific documentation on

13   mental health.  I hope in the three weeks the Court

14   spent between the hearing and the decision on the

15   competency question, the Court was able to review that.

16   And I do like to think that time was because it was not

17   a layup case.  I don't think frivolously or sort of

18   even in gamesmanship file competency motions, only

19   because to me, the process doesn't serve the clients,

20   and I ultimately don't think it's a process that really

21   should be used in that manner.  But in terms of this

22   case, I think it legitimately applies.  Mr. Perkins

23   won't take the stand and explain himself largely

24   because I think there's a danger, as the Court knows

25   with trials, there will be an appeal.  He's somebody I

1    spent a good amount of time with.  And certainly on the

2    human side, certainly the military history I've had

3    with dealing with people and decades of that, as you

4    try to gauge people with how they are, some people are

5    evil.  Some people demonstrate evil characteristics.  I

6    honestly don't think he does, Your Honor.  And that's

7    something at the end of it and what the sentencing

8    memorandum asks you to consider is the idea of

9    oftentimes, people will engage in conduct that -- they

10   don't necessarily understand the wrongfulness of it.

11   Some people -- for example, to a 14-year-old, looking

12   at a 14-year-old is not wrong.  We look at an adult and

13   we say that's clearly wrong.  You should not be looking

14   at a child in that manner.  But what if that individual

15   perceived himself to be peers with that person?  I

16   think the Court has received information, and certainly

17   that may come up in the Government's response, that

18   suggested that he might be willing to do something to

19   it.  What I would point out in that, Your Honor, is one

20   of those statements was made in the context of a

21   polygraph, which is an unusual feature.  I've seen

22   probably 70 to 100 of these cases over the years.  I've

23   never seen an immediate polygraph examination.  But

24   with that, the question was a hypothetical.  It became

25   the subject of that bond issue in the very beginning of

1    this case, Your Honor, but it's not something somebody

2    that's homebound is ever going to see.  It's truly a

3    hypothetical question.  In terms of some of the other

4    negative aspects about what happened during entry, I

5    would ask the Court to consider what that --

6    essentially the exchange between Defense and prosecutor

7    when that was offered at trial.  The concern is we have

8    a 17-man entry team.  This person observed something

9    that in many cases I've seen repeated by multiple

10   agents.  That doesn't mean that he's lying.  It means

11   he could have been misinformed, misunderstood the

12   circumstances.  It's not corroborated by any other

13   source.

14              So in the end, what we have is this

15   information on a computer.  Information of a horrible

16   nature.  But the question is why is it there?  For

17   somebody like Thomas, Your Honor, this is a person

18   that, again -- I truly believe sees himself as peers

19   with those individuals.  He's homebound, he has

20   physical issues, he has psychological issues.  He's

21   somebody that sits there, and ultimately, the computer

22   is his life.  We characterized these devices as his

23   children.  He believes that they're the closest thing

24   he has to the outside world and understanding it.  His

25   comments on researching things -- it really is his

1    avenue to see the world as many of us do, but he just

2    has the limitations that it creates.

3              In terms of looking at his condition in

4    regards to others, I don't think he poses a threat,

5    Your Honor.  And that's not a sense of -- I offer this

6    baseless opinion from dealing with him, Your Honor.  I

7    don't see this person going out and becoming what the

8    Adam Walsh Act was designed to stop, which is the

9    aggressive sexually dangerous predator out there.  When

10   we look at that, I don't think it's in his nature.  I

11   don't think it's who he is.  I think in the end of

12   this, Your Honor, what we have is somebody that has

13   this condition.

14             The Court in trial had brought up a

15   question, or a statement, and it was not -- this is not

16   holding the Court to that position.  It was more the

17   musing of the idea of well, if it's something like a

18   bottle cap or a baseball card, I could see collecting

19   it.  He's an entirely different mindset.  It's the way

20   he sees the world, how he perceives it, and how he was

21   introduced to this.  I don't know how he first saw it.

22   It's not a conversation we've had, Your Honor.  But if

23   you live on a computer long enough and you're searching

24   somewhere you shouldn't, eventually you land on that.

25   A lot of this -- we didn't sort out duplicates or how

1    much of this is individual.  It doesn't really matter.

2    One of these is awful.  I'm not going to sit here and

3    say multiples or thousands or millions or billions of

4    these things changes that problem.  It's more a fact of

5    somebody that's prone to repetitive conduct or behavior

6    is going to accumulate these things.  And that's

7    something in the end that does not change the fact that

8    these are digital renderings of these victims that,

9    again, I feel has no business on the internet.  It's

10   something that if you study computers a bit, I would

11   like to see more of an aggressive posture in taking

12   this stuff down, which -- my thought would have been

13   putting a file out there essentially with a virus that

14   wouldn't spread and taking down computers to deter

15   searches of that nature.  That may work.  But this

16   stuff is out there.  I don't have to spend a lot of

17   time looking at it because after enough cases, I

18   recognize it.

19          But with a case like this, Your Honor,

20   the Court then has to consider well, I cannot overlook

21   the harm to these victims.  And we can read the

22   summaries and we can look at those, and there isn't

23   really a degree of bad to worse.  What I can tell you

24   is, Your Honor, whatever I looked at in July -- and as

25   I did tell the Court, Mr. Webber -- Andrew Webber.  I

1    did have the opportunity to sit down with what HSI had

2    stored in a file somewhere.  But with Mr. Webber, we

3    sat there and we looked at the predominant collection,

4    which was more or less a series of images, 90 percent

5    of which would not be child pornography.  So we've

6    sifted through this, but that's what these series do.

7    They build toward essentially the nudity component.

8    That was essentially why there was an ongoing concern

9    with that.

10                 Again, we're well in excess of the

11   numbers, even taking off 85 percent.  That wasn't the

12   point of it, Your Honor.  It was more when we look at

13   what we're looking -- when you try to examine what

14   somebody's looking at or focussing on, what the Court

15   is seeing is a person that's not looking at the conduct

16   or behavior.  These videos, which are the small

17   fraction relative to the images represent that, and

18   that was what came up at trial.  But they're looking at

19   these images, which are -- again, if you view yourself

20   as a peer, they're looking at these image series that

21   depict that.  Not acceptable in terms of a defense,

22   Your Honor, but certainly something that says the

23   physical abuse, the contact of adults and that was not

24   the focus of much of this material.

25                 Leaving that aside, Your Honor, we turn

1     to the assessment in terms of punishments, putting the

2     image base calculations against that.  I don't attempt

3     to profess this is a copyright infringement case that

4     -- everybody understands listening to music.  Nobody's

5     really going to understand this aspect.

6               But what I would ask the Court to

7     consider -- and over the years, I've run into these

8     cases, is that the divergence and the claim that was

9     brought up in the case Doherty in the 2nd Circuit and

10    reviewed by the 5th Circuit in Miller was it doesn't

11    make sense.  We put a contact offender, somebody that

12    has a hand on these individuals and do this, you know,

13    essentially engages in this horrible conduct.  Well,

14    what's the sexual abuse of a minor without

15    enhancements?  It's -- if you have no criminal conduct,

16    it's 18 to 24 months under the guidelines.

17              I had a client in Oklahoma.  Stabbed his

18    stepfather five times, Your Honor.  Sixty-three to 78,

19    voluntary manslaughter.  I had a client that shot

20    somebody four times out the window.  That client was

21    looking at 13 years.  And when the Court looks at this,

22    and essentially a comparison one to the other, to hold

23    somebody more accountable than the person that

24    initially did this is an audit.  Doesn't mean it's

25    something that doesn't merit some degree of punishment.

```
 1   It's only that it essentially conflicts with other
 2   guidelines in the way we look at it.  That was why the
 3   2nd Circuit in Doherty found the guideline itself to be
 4   substantively unreasonable.  It doesn't reflect a
 5   logical rendering.  And ultimately, every adjustment
 6   applies to every person that gets the charge in 90
 7   something percent.  That's why about 70 percent of the
 8   Judges issued -- imposed downward variances in these
 9   cases.  Logically, it doesn't stick.
10              In a case like his, Your Honor -- and the
11   focus of our sentencing memo was the mental health
12   component.  If we set aside everything else that goes
13   with essentially schizophrenia or something of that,
14   Your Honor, what you have is a gentleman that's
15   autistic.  Unquestionably autistic.  The Court's
16   looking at me.  I'm 6' 3", Your Honor.  If you put me
17   side by side with him, he's about a foot -- a head
18   shorter than I am.  He's going to be in an environment
19   right now in prison, Your Honor, where he can't really
20   tell the -- he can't tell a lie.  He doesn't understand
21   social cues.  He's a vulnerable person sitting in that
22   environment.  If he walks up -- you know, walks up to
23   me, or I walk up to him and I challenge him, and I ask
24   him a question like do you think I'm stupid, he's going
25   to honestly assess that.  In prison, that can be
```

1   exceedingly dangerous.  It's the type of thing that can

2   cost you your life.  It's not a normal situation where

3   somebody that thought through all this, the

4   consequences, really researched how this could all play

5   out is going to face that prison environment.  Even in

6   FMC, it's going to be exceedingly dangerous for him.

7   I'd ask the Court to factor that into the

8   determination.

9           When the Court looks at this in terms of

10  deterring future misconduct, this problem for somebody

11  that's homebound is very simple to solve, Your Honor.

12  Unplug the internet.  Put monitors on the internet.  He

13  showed even in the short period on supervision that he

14  was not a problem in listening to what he was told to

15  do.  The Court can easily impose something like that

16  that's resolvable at the lowest end, keeps him safe,

17  out of harm's way, in terms of a prison environment,

18  but at the same time, if we're concerned about him

19  getting on the internet and spreading this stuff or

20  using it or looking for it, we routinely impose

21  restrictive conditions, certainly in the El Paso

22  division, that says you're to look at nothing.  No

23  smart phones.  You have the lowest order of technology

24  on your cell phone.  It's a fixable problem, but it's

25  one I ask the Court consider.  Doesn't necessitate even

1    a guideline sentence here because somebody like this --

2    who are we advertising -- who are we broadcasting the

3    sentence to?  Somebody that has some limitations in

4    life, that essentially faced the harshest of

5    punishments?  Or are we trying to deter people that are

6    far more involved, far more, I guess, enlightened about

7    how to avoid and stay out of these situations.  And

8    that's something in court -- that the Court essentially

9    heard at trial to some degree with the experts.

10             The smartest people, Your Honor, when we

11   look at this -- you know, we had a client that briefly

12   -- he wasn't ours.  He was actually a New Orleans

13   sentence from that state, from Louisiana.  He was given

14   a life sentence in child pornography.  He ran what was

15   called the dream board.  The dream board was this

16   horrible concept where, knowing that the statutes

17   restrict agents from turning over child pornography, it

18   did what you heard in drug cases:  Give me some, and

19   I'll let you in.  That got you lowest level, and it

20   went up and up and up.  This character supervised or

21   had a hand in essentially running this operation with

22   the highest security.  They could not break this.

23   Everything was encrypted.  And outside of essentially

24   an informant turning him in, this guy would have gone

25   on forever.  But the smartest are not going to fear

—28

1   this type of response.  The people that know how to

2   avoid it know how to stop this.  And whether it's

3   military, it's not a shot at HSI or FBI.  The

4   technology and computers is essentially known well in

5   the corporate sector.  But in many ways, they're

6   smarter than the military and any agent investigating

7   them.  So those people, the deviant souls that are

8   truly enjoying and profiting off this and allowing this

9   to propagate, are the hardest ones to get to.  And the

10  low-hanging fruit where people honestly used

11  peer-to-peer, and there was suggestion of VPN use --

12  The expert stated he found there was evidence of that

13  in the investigation.  But with that, Your Honor, he's

14  using these commercially available search things that

15  show up.  And the statement was he really didn't know

16  he was sharing.  He didn't want to put this out there.

17  If anything, he was the end user of this due to his

18  condition.  And ultimately, Your Honor, he's an

19  individual that -- he's not going to repeat.  He can

20  follow rules.  His condition allows him to do that.

21  When the Court tells him not to do something, Your

22  Honor, he'll be able to follow that.

23           But in the end of that, Your Honor, I

24  would ask the Court to consider leniency, not

25  essentially escalation, in imposing a sentence in this

1    case.  He's somebody that can benefit from treatment.

2    He also, due to his autism, can profit from essentially

3    the structured environment of supervised release.

4    Allow him to get out there, Your Honor.  Obviously he's

5    somebody that's not going to be mobile, not going to be

6    a threat, as the Adam Walsh Act essentially warns, to

7    other people.  He knows what he has to do and will do

8    that, Your Honor.  Thank you.

9                THE COURT:  Do you have any comments on

10   the restitution?  And realizing that that's largely an

11   academic discussion.  I mean, I don't think anybody is

12   of the -- I would hope nobody is of the opinion that

13   that gets paid.  Do you have thoughts?  I know we've

14   talked about what -- about restitution, and we talked

15   about look up -- you look up the Supreme Court case,

16   Paroline -- is that how you say it?

17               MR. GORMAN:  Paroline.

18               THE COURT:  Paroline V. U.S.  And they do

19   say that victims should receive that restitution.  We

20   all know in this business, that that's rare.  But you

21   feel like -- evidently the Defense feels like what's

22   been submitted thus far to the Court -- and I'll tell

23   you I have victim impact statements that -- this is, I

24   think, was just part of it.  I have a lot here.  You

25   think that it's not -- it doesn't give a line item

1    specific enough to go with those specific damages that

2    they're able to recover for?

3                    MR. GORMAN:  I think I can probably

4    answer that one quickly, Your Honor.

5                    THE COURT:  Okay.

6                    MR. GORMAN:  We didn't see the victim

7    impact statements.  What we saw is conclusionary

8    figures.  So with Paroline, Your Honor, and especially

9    with the six-digit claims, they're unusual.  Usually in

10   these cases, we can resolve when it's possible to

11   resolve -- I don't know if we could do it here.  We can

12   resolve these with stipulations.  Frequently with the

13   lack of means, they become the minimum, in terms of

14   stipulations, but with numbers as high as that when

15   when you consider in re: Umu (phonetic) was 7.8

16   million, there's a reason why the Supreme Court kind of

17   reigned that in and said you had to tie, essentially,

18   the harm to that.  I'll be the first to say, Your

19   Honor, if somebody has been harmed from this, I'm not

20   sitting here objecting to any number.

21                    THE COURT:  I know you're not.

22                    MR. GORMAN:  With a half million dollars

23   claimed, I would have to see how that was tied to

24   Mr. Perkins and not a bunch of other cases.

25                    THE COURT:  As opposed to just a

1      conclusion.

2                      MR. GORMAN:  That's correct, Your Honor.

3                      THE COURT:  All right.  Thank you.

4      Mr. Gorman, is Mr. Perkins going to make any statement

5      at all?  He obviously has the opportunity if he'd like

6      to speak to me prior to sentencing.

7                      MR. GORMAN:  We've discussed that, Your

8      Honor.  I think given the posture, he will not, Your

9      Honor.

10                     THE COURT:  Mr. Perkins, you're good with

11     that?

12                     THE DEFENDANT:  I think it's best not.

13                     THE COURT:  I'm sorry?

14                     MR. GORMAN:  He said it's best not, Your

15     Honor.

16                     THE COURT:  Very good.  Thank you.

17     Mr. Greenbaum?

18                     MR. GREENBAUM:  Thank you, Your Honor.

19                     THE COURT:  The floor is yours.

20                     MR. GREENBAUM:  Thank you, Judge.  As the

21     Defense counsel and the Court probably agree to it with

22     me, this case is largely about, obviously, images of

23     videos.  One of the images that I can't get out of my

24     head doesn't have to actually deal with the child

25     pornography itself, Your Honor, but I would draw the

1    Court back to -- its attention to when we had the

2    trial.  We had a table set up with all the devices.

3    All eight of the devices the Defendant had filled with

4    child pornography, Your Honor.  So much so, Judge, that

5    when we -- again, I would go back to trial and proffer

6    that the first download was approximately 10 years ago,

7    Your Honor.  Continuing on, Your Honor, so much so that

8    each of these devices -- it's not that he got a new

9    device.  The reason why -- the Government would proffer

10   why he got a new device and why it filled up an entire

11   table is because he filled up that device and he went

12   on to another device, filling up that device, for a

13   total of eight devices that we knew of, Your Honor.  In

14   regards to that, we're not talking about one oopsie of

15   images.  We're talking about approximately 95,316

16   images, Your Honor.  And additionally, we're talking

17   about 1,230 -- approximately 1,237 videos of child

18   pornography, Your Honor.

19                And when we look at -- you know, going

20   back in history or looking at the past 10 years, I

21   would like to draw the Court's attention to the

22   presentence investigation.  If you look at paragraph

23   number 17, Your Honor, agents spoke -- before they

24   spoke to the Defendant, I believe, spoke to the

25   Defendant's father, which is Mr. John Perkins.  And he

1    had said while the Defendant was still in high school,

2    Mr. Perkins, that being the father, had noticed that

3    the Defendant had viewed child pornography.  And he

4    advised his son, Thomas, to stop viewing these

5    materials.  And Mr. Perkins, that being the father,

6    said that the Defendant was not very cooperative, Your

7    Honor.

8              Additionally, now, if we move -- again,

9    this goes to history and what an appropriate punishment

10   would be under -- considering the 3553 factors, Your

11   Honor.  We look at -- agents spoke to the Defendant's

12   mother, Ms. Elizabeth Perkins.  And looking at

13   paragraph number 19, Your Honor, when she spoke to him

14   about not looking or downloading this child

15   pornography, Your Honor, the Government would

16   proffer -- and this is just, quote -- you need to get

17   off of there, and wouldn't.  Presumably, the Defendant

18   wouldn't stop downloading child pornography.  And how

19   do we know that, Your Honor?  Well, we have eight

20   devices full of child pornography, both images and

21   videos, to tell us he would not stop downloading child

22   pornography, Your Honor.

23             And when the Defendant -- or Defense

24   argued the Defendant's mind state or in the sense of

25   autism -- but I would draw the Court's attention that

1    -- I think it's referenced in paragraphs 24 and 25.

2    The Defendant, to get away from law enforcement or

3    avoid detection, Your Honor, used multiple VPNs.  A way

4    that he could skirt his availability to law enforcement

5    or so they could not find him, Your Honor, the

6    Government would argue, Your Honor.  Additionally, he

7    used programs, BitTorrent programs or software, Your

8    Honor, like Scotty.  What the Government would say is

9    somewhat sophisticated, or at least advanced programs

10   to download.  The Defendant used and admitted that he

11   was actually pretty tech-savvy, according to paragraph

12   23 of the PSR, Your Honor.  So those are all concerning

13   to the Government.

14            Additionally, when you go back and you

15   look -- and I think it's in paragraph maybe 19, but it

16   is in the PSR.  He had downloaded some of this

17   pornography into folders with his parents' name on it.

18   And again, the Government would argue that would be an

19   attempt to avoid detection to this Defendant.  To skirt

20   possible blame from this Defendant, I guess, to

21   potentially get his parents.  But at any rate, to

22   definitely avoid potential detection, Your Honor.

23            Moving on, Your Honor, in talking about

24   what we have here is a Defendant that is category

25   criminal number one.  But what's concerning to the

1    Government and I think should be considered, as far as

2    in the factors, is that if we look at page 30 -- and

3    this is in regards to those factors.  Promoting respect

4    for the law and deterrence, but also protecting the

5    community, Your Honor.  The Defendant admitted that

6    he'd be willing to have sexual intercourse with a child

7    as young as the age of 12 or 13.  Again, that's in

8    paragraph number 30.  The Defendant, when asked further

9    about it, he could not act on it because he advised he

10   did not have access to a secure environment to

11   basically commit the crime, Your Honor.  So that's very

12   concerning to the Government, Your Honor.

13              Further, again -- and this is in

14   paragraph 31, Your Honor.  You see the Special Agent

15   Michelle Wilson from DPS -- when asked if he were to

16   initiate any type of sexual contact with a child, he

17   said he would be willing to act on it, Your Honor.

18   Now, again, this was during a polygraph investigation

19   or examination.

20              THE COURT:  Right.

21              MR. GREENBAUM:  But that's still very

22   concerning, in regards to promoting safety and

23   protecting the public, Your Honor.  But -- so we have

24   these thoughts, Your Honor.  But let's look a little

25   further on 31, Your Honor.  In paragraph 31, when he

1    spoke to DPS agents, he, the Defendant, had said he

2    touched a female child's chest while attending a church

3    event approximately four years before this interview,

4    Your Honor.

5                    THE COURT:  That's in paragraph 32.

6    Right?

7                    MR. GREENBAUM:  That is in 32.  You're

8    correct, Your Honor.  In paragraph 32.  So he actually

9    did act upon this, Your Honor, would be the Government

10   contention, touching this child's chest at a place that

11   should be a safe place.  A church event, Your Honor.

12   And the Defendant believed that the female child viewed

13   the contact as inappropriate due to the child's

14   reaction after the Defendant touched her chest, Your

15   Honor.  So he has acted upon it, Your Honor, and at

16   least in this one circumstance that the Defendant

17   admits to, Your Honor.  Now, he characterizes it as

18   roughhousing, Your Honor, but that's not how the child

19   viewed it, Your Honor, in his own words, Your Honor.

20   So these things are very concerning to the Government,

21   Your Honor.

22                    It's very concerning when you turn to

23   paragraph 34 and you look at the intent of search terms

24   that were found in the Defendant's computers.  Pics of

25   10-year-old girls getting F'd.  I'll make it short.

1    (Unintelligible).  Let me move on to another one.

2    Preteen girls having sex.  And I'm not even

3    characterizing all the search terms.  Sexy

4    nine-year-old girls.  Naked preteen girls.  So there, I

5    think, it's not just that he's doing some sort of

6    experiment or trading baseball cards or baseballs or

7    whatever.  Some sort of hobby.  This is a Defendant

8    that was searching out these things that -- specific

9    searches, and the engine to populate -- to get these

10   images, Your Honor.  Over a hundred thousand --

11   approximately 100,000 images, Your Honor.  A lot of

12   child pornography images and videos here.  I think over

13   a thousand videos, Your Honor.  So these things are all

14   very concerning to the Government, Your Honor.

15            Ultimately, the Government would be

16   asking for the Court to fashion an appropriate sentence

17   on this case, Your Honor.  And in considering that, in

18   looking at the 3553 factors, we would ask that the

19   Court look at a sentence that promotes respect for the

20   law, deterrence, and also protection of the community,

21   Your Honor.  And in that, Your Honor, the Government

22   would ask that a high-end guideline range sentence be

23   definitely considered in this case and potentially,

24   Your Honor, that the Government does believe there is

25   reason here to have an upward departure, upward

1      variance in regards to running the sentences

2      consecutively, Your Honor, due to the vast nature of

3      the amount of child pornography.  Again, that image

4      where there was so much child pornography that there's

5      devices that are literally almost falling off that

6      table that are stacked because of that child

7      pornography and those videos, Your Honor.

8                  In addition, that we hear from the

9      Defendant's own words, Your Honor, that he has touched

10     a child in the past, Your Honor.  That he would have

11     sex with a 12 or 13-year-old girl if he had a secure

12     place.  So all those reasons, Your Honor, to promote

13     respect for the law, to promote public safety, Your

14     Honor, the Government does believe that running

15     consecutive sentences would be in order in this case.

16     And we would turn to the Court to consider what would

17     be an appropriate sentence in that regard, Your Honor.

18     Thank you very much.

19                  THE COURT:  Mr. Greenbaum, have you got

20     any thoughts about the mental health component?

21                  MR. GREENBAUM:  Yes, Your Honor.  Here's

22     the issue with that, Your Honor:  While a lot of people

23     do have mental health conditions, Your Honor, and

24     obviously the Government is sympathetic, Your Honor --

25     but people with mental health issues don't act upon it.

1   They don't go to church events looking for their next

2   victim, Your Honor.  They don't go out saying that,

3   hey, and having the knowledge of oh, I would -- I

4   definitely want to have sex with a 12 or 13-year-old,

5   but I need to find a place that's secure.

6             And if the Court remembers the mental

7   aspect of it, if you remember the testimony of Agent

8   Michelle Wilson, she said during trial -- and if I

9   remember correctly, Your Honor, in our proffer -- that

10  he said I knew something like this was going to happen.

11  So he knew that there was nature and consequences of

12  his actions, Your Honor, but he continued to do them.

13  And he continued to do them for 10 years, Your Honor.

14  And we know that from the date stamp from those first

15  downloads, just from those devices all the way through,

16  Your Honor.  And we're not talking about, again, that

17  this is a mistake, that maybe it's 100 images or 10

18  images.  We're talking about 95,000 plus images, Your

19  Honor.  So in that sense, yes, the Government is

20  sympathetic to mental health.  But in this case, Your

21  Honor, I don't think the sense of appropriateness

22  because of the Defendant's actions, Your Honor, and the

23  Defendant's actions to try to cover up his actions by

24  putting it in -- some of the child porn in his parents'

25  names files, by using multiple VPNs to try to cover his

1    tracks, Your Honor -- all those things are very

2    concerning to the Government.

3              And with that being said, Your Honor, the

4    Government would still ask for a high end guideline

5    range sentence in this case and possibly -- the

6    Government does believe that a consecutive sentence

7    would be or consecutive sentences would be appropriate

8    in this case.

9              THE COURT:  Mr. Greenbaum, your motion

10   for variance is not to vary outside -- and I could be

11   wrong.  I may have misunderstood.  I just want to make

12   sure.  Not to vary outside the guidelines, but to give

13   the high end and run them all consecutive.

14             MR. GREENBAUM:  Correct, Your Honor.

15   That's correct.

16             THE COURT:  So is that really a variance?

17             MR. GREENBAUM:  I guess the Court -- I

18   think they would have a point that the Court is well

19   within, I believe, its power to run it consecutively,

20   Your Honor.  But out of abundance of caution, I will

21   ask for a variance.  But I do see what the Court's

22   point or purpose is, Your Honor.

23             THE COURT:  I'm not trying to say I know.

24   Mr. Gorman will have a thought on this, I think.

25             MR. GORMAN:  I can answer that one, Your

1    Honor.

2                    THE COURT:  Go ahead.

3                    MR. GORMAN:  Under chapter 5, Your Honor,

4    when the Court computes this, it's directed to use the

5    highest statutory maximum, borrow from the others, and

6    run it concurrent.  So if this Court were to impose

7    anything greater than the recommended guideline range,

8    then it would be an upward variance, Your Honor.

9                    MR. GREENBAUM:  Judge, I did want to add

10   one thing, and I want to thank my colleague for

11   bringing this point up.  They did have a mental health

12   expert that came and testify if the Court recalls, Your

13   Honor.  So wholly, I think, from the verdict, Your

14   Honor, the jury rejected that expert's viewpoint, Your

15   Honor.  So I think those things did get in front of a

16   jury for them to decide.  Ultimately, they decided that

17   this Defendant was guilty of all counts, Your Honor.

18   And therefore, the Government does believe this

19   Defendant should be punished appropriately, Your Honor.

20   Thank you.

21                    THE COURT:  And I just don't want to

22   leave anything untouched.  Was there anybody,

23   Mr. Greenbaum, that you had that wanted to speak?

24                    MR. GREENBAUM:  No, Your Honor.

25                    THE COURT:  Mr. Gorman, anybody else?

1          MR. GORMAN:  Your Honor, Thomas' parents

2    are here, Your Honor.  They had submitted a letter.  So

3    they're just present, Your Honor.

4          THE COURT:  Very good.  And I have

5    reviewed what has been submitted to me.  Did you have

6    anything you want to respond to?  You're welcome to if

7    you'd like.

8          MR. GORMAN:  Thank you, Your Honor.  Your

9    Honor, in regard to some of the facts pointed out, the

10   Government's own expert at trial stated there was no

11   evidence of a VPN, virtual private network.  So any

12   statements Thomas made in that regard, Your Honor, are

13   in conflict with what their own expert has to say.

14   Whatever planning or ploy that went into that, Your

15   Honor, is not in the evidence on the record.

16          In terms of the two incidents, Your

17   Honor, I did touch on those.  The first one with regard

18   to the church issue was roughhousing, Your Honor.

19   Ultimately -- I've been in martial arts class.  I've

20   hit somebody where I didn't want to.  To sit there and

21   try and make that more than that is a little bit

22   dubious.

23          In terms of the other statement, Your

24   Honor, when posed a direct question, I still ask the

25   Court to consider that the nature of autism has a

1   very -- essentially the idea of counterfeit deviance.

2   If you believe you're a 14-year-old, the notion of

3   doing something with a 14-year-old isn't quite as

4   insane as the proposition when you know you're an

5   adult.  That's something different.  His condition

6   lends into that.  He was posed a direct question at a

7   time of essentially stress, and essentially answered

8   that question in a way that follows him since, Your

9   Honor.  But with it, the ultimate point with that is

10  he's homebound.  He doesn't interact with children like

11  that, Your Honor.  The notion of isolating and luring a

12  child anywhere is fairly ridiculous when you

13  understand, Your Honor, his home life, his physical

14  limitations, and his mental health limitations, Your

15  Honor.  So with that, Your Honor, I would ask the Court

16  consider leniency in imposing a sentence.  Thank you,

17  Your Honor.

18                 THE PROBATION OFFICER:  Your Honor?

19                 THE COURT:  Yes, ma'am.

20                 THE PROBATION OFFICER:  Late last week, I

21  got another victim's restitution request that's not

22  included in the presentence report.

23                 THE COURT:  Okay.

24                 THE PROBATION OFFICER:  I didn't know if

25  you needed that.

—44—

```
 1            THE COURT:  So there's more than I had.
 2            THE PROBATION OFFICER:  Yes.  One more
 3  victim for the Vicki series.
 4            THE COURT:  What is that total?
 5            THE PROBATION OFFICER:  She's asking for
 6  $10,000.
 7            THE COURT:  Okay.  Thank you.
 8  Ms. Carrillo, come up.
 9            (Discussion held off the record and
10        out of the hearing of the court reporter.)
11            THE COURT:  The Court -- Mr. Perkins, if
12  you would stand for this part, along with Mr. Gorman.
13  Thank you, Mr. Gorman.  The Court does not depart from
14  the recommended sentence.  Pursuant to the Sentencing
15  Reform Act of 1984, which I have considered in an
16  advisory capacity, and the sentencing factors set forth
17  in 18 USC section 3553(a), which I have considered in
18  arriving at a reasonable sentence, I find the guideline
19  range in this case to be fair and reasonable.  The
20  Defense motion for variance is respectfully denied.
21  The Defendant is placed in the custody of the United
22  States Bureau of Prisons to serve a term of
23  imprisonment of 210 months as to each count, I through
24  IX, those to run consecutively, one with the other.
25                 Upon release from the United States
```

1    Bureau of Prisons, Mr. Perkins, you're placed on

2    supervised release to serve a term of life.  Standard

3    and mandatory conditions of supervision are imposed.

4              Additionally, the Court will impose the

5    special conditions of supervision that are listed

6    beginning on page 36, paragraphs 96 through 106.

7    Basically, just to go through them very quickly, the

8    Defendant shall participate in the mental health

9    treatment program, follow the rules and regulations of

10   the program, shall not have direct contact with any

11   child the Defendant knows or reasonably should know to

12   be under the age of 18, with some limits there.  Some

13   different parameters.  The Defendant shall not go to or

14   remain at any place where the Defendant knows

15   children under the age of 18 are likely to be,

16   including parks, schools, playgrounds, and childcare

17   facilities.  The Defendant shall not go to or remain at

18   a place for the primary purpose of observing or

19   contacting children under the age of 18.  The Defendant

20   shall not view or possess any visual depiction as that

21   is described in the -- defined in -- by statute and all

22   the things that it includes.  The Defendant shall

23   participate in sex offense-specific treatment program,

24   submit to periodic polygraph testing, all the rules and

25   regulations that go with that.  The Defendant shall

1   participate in sex offense-specific assessment.  Pay

2   the cost if financially able.  Submit to periodic

3   polygraph tests at the instruction of probation

4   officer.  Shall not possess or use computers as those

5   are defined or other electronic communications or

6   storage devices or media.  Shall not access the

7   internet, except for reasons approved in advance by the

8   probation officer.  Shall submit his or her person to

9   the search condition of supervision within the Western

10   District of Texas.

11                There's no fine imposed.  The Court finds

12   the Defendant has an inability to pay a fine.  There's

13   a $100 mandatory special assessment you're required to

14   pay on each count.  That's a total of $900.  The Court

15   finds the Defendant to be indigent.  There's no Justice

16   For Victims of Trafficking Act assessment, and there's

17   no AVAA as well.

18                So that leaves us with restitution, which

19   -- I'm going to set us for a hearing on December 14th

20   in Pecos for a restitution hearing.  We'll go through a

21   full-blown hearing.  I recommend the parties

22   collaborate between now and then and see.  Mr. Gorman,

23   I think, needs to see more detail so that he can make

24   an intelligent -- at least some decision as to whether

25   or not there's some agreement that can be reached or

1    not.  If there can't be, then the Court will ferret

2    that out at that hearing.  But obviously, you ought to

3    have some serious discussion about that.  I would

4    request the parties do that.  And we'll take it up,

5    like I say, that day and we'll go through it.  And if

6    it requires a trial, we'll have that hearing, and we'll

7    take as many days as we need to do that.  If it takes

8    days.  I mean, it's up to the parties.

9                    There's no fine.  There's no --

10   Mr. Greenbaum, Mr. Gorman, with the low end of the

11   guidelines having been imposed, is it necessary for the

12   Court to upwardly vary for that?

13                   MR. GREENBAUM:  Not from the Government.

14   Thank you, Judge.

15                   THE COURT:  Mr. Gorman?

16                   MR. GORMAN:  That is an upward variance,

17   Your Honor.  Again, under chapter 5, consecutive

18   sentences.

19                   THE COURT:  So the Court does vary upward

20   for that purpose from the low end of the guidelines and

21   run consecutively Counts I through IX, each and every

22   count running consecutively.  The presentence report

23   will be sealed.

24                   You have the right to appeal, of course,

25   your conviction and sentence.  You've got to file

1    notice of appeal in writing within 14 days of entry of

2    the judgment.  If you're unable to afford the appellate

3    costs, those services will be provided at no expense to

4    you, Mr. Perkins.  Mr. Gorman, anything further today?

5              MR. GORMAN:  No, Your Honor.  In terms of

6    a recommendation, could the Court recommend FMC?

7              THE COURT:  Yes, sir.  I think that's a

8    good suggestion, Mr. Gorman.  Thank you.

9    Mr. Greenbaum?

10             MR. GREENBAUM:  Nothing further.  Thank

11   you, Your Honor.

12             THE COURT:  Mr. Perkins, I remand you to

13   the custody of the United States Marshals.  I'll see

14   you on the 14th of December.

15             MR. GORMAN:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17     (Whereupon unrelated cases were dealt with at this

18                        time.)

19             MR. ELLIS:  Your Honor, before we move

20   from the sentencing to the hearing, my colleague Scott

21   Greenbaum asked me to verify if -- on the case

22   PE:20-CR-388, if the underlying indictment was

23   dismissed.  If not, we would move to dismiss it.

24             THE COURT:  Okay.

25             DEPUTY CLERK:  Yes.  He needed to do

1    that.  I told him earlier.

2                   THE COURT:  That's granted.  Thank you.

3                   MR. ELLIS:  Thank you, Your Honor.

4                        (Hearing concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS     )

3

4       I, Tamara D. Ross, Official Court Reporter for the

5    United States District Court, Western District of

6    Texas, do certify that the foregoing is a correct

7    transcript from the record of proceedings in the

8    above-entitled matter.

9       I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial

11   Conference of the United States.

12      Certified to by me this 21st day of December, 2022.

13
                            /s/ Tamara D. Ross
14                          TAMARA D. ROSS
                            Official Court Reporter
15                          200 E. Wall
                            Midland, Texas 76703
16                          (432) 685-0346
                            Tamara_Ross@txwd.uscourts.gov
17

18

19

20

21

22

23

24

25