```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
                       PECOS DIVISION

UNITED STATES OF AMERICA,      )    Case No. 4:20-CR-000388-DC
                               )
          Plaintiff,           )    Appeal No. 22-50987
                               )
     vs.                       )
                               )
THOMAS SCOTT PERKINS,          )
                               )
          Defendant.           )    Monday, July 18, 2022
_____)    9:50 A.M.


              TRANSCRIPT OF JURY TRIAL, DAY 1
          BEFORE THE HONORABLE DAVID C. COUNTS
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:        United States Attorney's Office
                          BY:  SCOTT GREENBAUM, ESQUIRE
                               KEVIN CAYTON, ESQUIRE
                          2500 North Highway 118, Suite 200
                          Alpine, Texas 79830


For the Defendant:        Office of the Federal Public Defender
                          BY:  ELYSE BATALLER-SCHNEIDER,ESQUIRE
                               MICHAEL F. GORMAN, ESQUIRE
                          700 East San Antonio, Suite D401
                          El Paso, Texas 79901



Deputy Clerk:             Cristina Lerma
                          United States District Court
                          410 South Cedar Street
                          Pecos, Texas 79772


Transcription Service By: Dipti Patel, CET-997
                          Liberty Transcripts
                          7306 Danwood Drive
                          Austin, Texas 78759
                          (847) 848-4907
                          www.libertytranscripts.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

2

INDEX

PAGE
Case called                                          4
Preliminary Jury Instructions                        5
Opening Statements
By:  Mr. Cayton                                      16
By:  Mr. Greenbaum                                  18
End of Proceedings                                 228
Certificate of Transcriber                         228



WITNESSES

FOR THE GOVERNMENT:

Andrew Bonneau
     Direct Examination by Mr. Cayton                22
     Cross-Examination by Mr. Gorman                 29
     Redirect Examination by Mr. Cayton              37
     Recross-Examination by Mr. Gorman               41

David Ferg
     Direct Examination by Mr. Cayton                62
     Cross-Examination by Ms. Bataller-Schneider    118
     Redirect Examination by Mr. Cayton             125

David Barkley
     Direct Examination by Mr. Greenbaum            128

Michelle Wilson
     Direct Examination by Mr. Greenbaum            154
     Cross-Examination by Ms. Bataller-Schneider    166
     Redirect Examination by Mr. Greenbaum          172
     Recross-Examination by Ms. Bataller-Schneider  174

Antonio Yanez
     Direct Examination by Mr. Cayton               182

FOR THE DEFENDANT:

None

3

INDEX

EXHIBITS:                                              ID        EVD

FOR THE GOVERNMENT:

1 - IP subscriber information                  69         69
2 - Surveillance photos                        70         71
3 - Photos of home at time of seizure         132        134
5 - Signed Miranda card                        74         75
6 - CD of interview with defendant            114        116
9 - Hard drive                                139        146
12 - Hard drive                               141        146
15 - Hard drive                               142        146
18 - Hard drive                               143        146
21 - Hard drive                               143        146
24 - Hard drive                               144        146
27 - Hard drive                               144        146
30 - Hard drive                               144        146
38 - Video explanation of BitTorrent           23         23
39 - Signed Miranda warning                   156        157
41 - CD of files from defendant's devices     207        208


FOR THE DEFENDANT:

None

4

1  **Pecos, Texas - Monday, July 18, 2022**          **(9:50 a.m.)**

2                    **P R O C E E D I N G S**

3                         ---O0O---

4       (Outside the presence of the jury; defendant present)

5            THE COURT:  Be seated, please.

6            THE COURT:  Mr. Cayton, Mr. Gorman, were you all able

7  to view and agree on anything?

8            MR. GORMAN:  We did.  I reviewed the content on that,

9  Your Honor.  The excerpts they want to play, I don't have any

10 objection to it, Your Honor.

11           THE COURT:  Okay.

12           MR. GORMAN:  I would stipulate that is fact --

13           THE COURT:  Okay.

14           MR. GORMAN:  -- the material it's purported to be.

15           THE COURT:  Very good.  All right.  So we're ready to

16 bring in the jury, correct?

17           MR. CAYTON:  Yes, Your Honor.

18           THE COURT:  All right.  Very well.

19           Ms. Lerma, you got your indictment ready?

20           THE CLERK:  Yes, sir.

21           THE COURT:  All right.  Let's rise for the jury,

22 please.

23        (Jury in at 9:51 a.m.)

24           THE COURT:  All right.  We are all going to be seated.

25 You all stay standing, please, and raise your right hand.

5

1           Let's all everybody else be seated.

2       (Jury sworn)

3           THE COURT:  Thank you.  You may be seated.

4           You'll find in your chairs some -- a pad.  We'll talk

5       about that in a minute.  And then your juror button, or juror

6       badges.  If you'd go ahead and put those on.  You'll want to wear

7       those while you're here.  If you go out to lunch or go home,

8       don't -- just leave it in here.  I don't want anybody in town or

9       on the economy recognizing you, profiling you as a juror.  But we

10      want to know here if you're a juror, of course.

11          Members of the jury, you've now been sworn as the jury

12      to try this case.  You and you alone are the judges of the facts.

13      By your verdict you'll decide the disputed issues of fact.  I'll

14      decide all questions of law that arise during the trial.  Before

15      you retire to deliberate at the close of the case, I'll instruct

16      you on the rules of law that you must follow and apply in

17      deciding upon your verdict.

18          Nothing I may say or do during the trial is intended to

19      indicate, nor should be taken by you as indicating what your

20      verdict should be.  Your verdict should be based upon your

21      independent assessments of the facts in this case as applied to

22      the law on which the Court instructs you at the conclusion of the

23      case.

24          The evidence from which you will find the facts will

25      consist of the testimony of witnesses, documents, and other

6

1    things received into the record as exhibits, and any facts the

2    lawyers agree or stipulate to, or that the Court may instruct you

3    to find.

4         Certain things are not evidence and must not be

5    considered by you.  Statements, arguments, and questions by

6    lawyers are not evidence.  Objections to questions by lawyers are

7    not evidence.  Lawyers have an obligation to their clients to

8    make an objection when they believe the evidence being offered is

9    improper under the rules of evidence.

10        You should not be influenced by the objection or by the

11   Court's ruling on it.  If I sustain an objection, ignore the

12   question.  If I overrule an objection, treat the answer like you

13   would any other.  If you are instructed that some item of

14   evidence is received for a limited purpose only, you must follow

15   that instruction.

16        Testimony the Court has excluded or told you to

17   disregard is not evidence and must not be considered by you.

18   Anything you may have seen or heard outside the courtroom is not

19   evidence and must be disregarded.  You'll decide the case solely

20   on the evidence presented here in the courtroom.

21        There are two kinds of evidence, direct and

22   circumstantial.  Direct evidence is direct proof of a fact such

23   as testimony of an eyewitness.  Circumstantial evidence is proof

24   of facts from which you may infer or conclude that other facts

25   exist.  I'll give you further instructions on these as well as

1   other matters at the end of the case.  But have in mind that you

2   may consider both kinds of evidence, direct and circumstantial.

3          It will be up to you to decide which witnesses to

4   believe, which witnesses not to believe, and how much of any

5   witness' testimony to accept or reject.  I'll give you some

6   guidelines for determining the credibility of witnesses at the

7   end of this case.

8          You should give careful attention to the testimony and

9   evidence presented for your consideration during the trial, but

10  you should not form or express any opinion about the case one way

11  or the other until you have heard all of the evidence, the

12  closing arguments of the lawyers, and my instructions on the

13  applicable law.

14         Although exhibits which I admit into evidence during

15  the course of the trial will be available to you for your

16  inspection and review during your deliberation on a verdict,

17  under normal circumstances, no written transcript of the

18  testimony of witnesses can be made available to you for your

19  review during your deliberations.  Nor under normal circumstances

20  can all or any significant portion of a witness' testimony be

21  read to you once you commence your deliberations.

22         It's therefore very important that you pay strict

23  attention to the testimony given by each witness during the trial

24  of the case.  If you'd like to take notes during the trial, you

25  may do so.  On the other hand, you're not required to take notes.

8

1    Each of you should make your own decision about this.

2            We've provided a notebook, a little steno pad and a

3    pencil for you.  You're welcome to use that.  You're welcome to

4    set it down on the floor and not use it.  Either way.  If you

5    decide to take notes, be careful not to get so involved in your

6    note taking that you become distracted from the ongoing

7    proceedings.

8            Your notes should be used only as memory aids.  You

9    should not give your notes precedence over your independent

10   recollection of the evidence.  If you do not take notes, you

11   should rely upon your independent recollection of the

12   proceedings, and you should not be unduly influenced by the notes

13   of other jurors.

14           Notes are not entitled to any greater weight than the

15   memory or impression of each juror as to what the testimony may

16   have been.  Whether you take notes or not, each of you must form

17   and express your own opinion as to the facts of the case.

18           During the trial, you must not discuss the case in any

19   manner among yourselves or with anyone else.  And you must not

20   permit anyone to attempt to discuss it with you or even in your

21   presence.  And insofar as the lawyers are concerned, as well as

22   others who you may come to recognize as having some connection

23   with the case, you're instructed that in order to avoid even the

24   appearance of impropriety, you should have no conversation

25   whatsoever with those persons while you're serving on the jury.

1    You'll notice our court security officers in the

2  courtroom.  A couple just left.  We've got one over here, those

3  officers in the blue blazers with that distinctive tie.  If you

4  have a question that you feel you need to ask me or something to

5  bring to my attention, tell one of them and they'll let me know.

6    You may not attempt to conduct any independent

7  investigation concerning this case.  You must avoid reading any

8  articles that might be published about the case now that the

9  trial's in progress.  You must also avoid listening to or

10  observing any broadcast news program, whether that be television,

11  radio, or internet, because there is a possibility of mention be

12  made of the case during such a broadcast.

13    Do not research the case on the internet or post about

14  the case on social media.  The reason for these cautions, of

15  course, lies on the fact that it will be your duty to decide this

16  case solely on the basis of the testimony and evidence presented

17  during the trial without consideration of any other matters

18  whatsoever.

19    At times during the trial I may be called upon to make

20  rulings of law on motions or objections made by the lawyers.  You

21  should not infer or conclude from any ruling that I may make that

22  I have any opinions about the merits of the case concerning one

23  side, or favoring one side of the case or the other.  I don't.

24  If I sustain an objection to a question that goes unanswered by

25  the witness, you should not speculate on what answer might have

1    been given, nor should you draw any inferences or conclusions

2    from the question itself.

3            During the trial, it may be necessary for me to confer

4    with the lawyers at times out of your hearing for certain

5    questions of law or procedure that require consideration by the

6    Court alone.  Feel free to stand and stretch quietly during any

7    such sidebar conference.

8            On occasion, should I think the private conference may

9    take longer, I may excuse you from the courtroom as a convenience

10   to you while I discuss matters with the lawyers.  We'll try to

11   keep -- limit those interruptions as much as possible.  But you

12   should remember at all times the importance of the matter you're

13   here to determine, and should be patient even if the case seems

14   to go slowly at times.  I promise to try to keep that to a

15   minimum.

16           We'll take regular comfort breaks.  There are snacks

17   and beverages in the jury room along with restrooms.  At any

18   time, however, if you feel you need to take an unscheduled break,

19   simply raise your hand so that I see it.  I'll take a break at

20   the soonest point possible thereafter.

21           Ms. Lerma, my courtroom deputy, is real good at

22   spotting too.  If I don't see it, if you just hold your hand up

23   and leave it up, we'll get you out of here.  And if it's real

24   urgent, let us make sure we know.  I'll get you out of here as

25   soon as possible, I promise.

1          As the trial begins, the lawyers for each side are

2     going to be given an opportunity to make opening statements in

3     which they may explain the issues in the case and summarize the

4     facts they expect the evidence will show.  First, the prosecution

5     may make an opening statement, which again is simply an outline

6     to help you understand the evidence the prosecution expects to

7     introduce.

8          Next, the defendant's attorney may elect to make an

9     opening statement or may defer the opening statement until after

10    the prosecution rests its case in chief, should the defense wish

11    to make an opening statement.  No opening statement is required

12    by either party.  If they choose to give you an opening

13    statement, they have the same amount of time.  Neither side has

14    more than the other.

15         The Government will then present witnesses and counsel

16    for the defense will -- for the defendant will -- may cross-

17    examine those witnesses.  Following the Government's case, the

18    Defense may, should the Defense elect, present witnesses.  And

19    the Prosecution would have the opportunity to cross-examine.

20    Subsequently, the Government may decide to present rebuttal

21    witnesses.

22         After all the testimony and evidence has been

23    presented, the lawyers will then be given another opportunity to

24    address you and make their summations or final arguments in the

25    case.  The statements the lawyers make now, or are about to make

1   now as well as the arguments they present at the end of the trial

2   are not to be considered by you either as evidence in the case

3   which comes only from the witnesses and exhibits, or as your

4   instruction on the law which will come only from me.

5          Nevertheless, these statements now and the arguments

6   later are intended to help you understand the issues and the

7   evidence as it comes in, as well as the positions taken by both

8   sides.

9          Ms. Lerma?

10         THE CLERK:  In Cause Number P:20-CR-388, the United

11  States of America versus Thomas Scott Perkins, the grand jury

12  charges, Count 1, from September 27th, 2019 to October 1st, 2019,

13  within the Western District of Texas and elsewhere, the defendant

14  Thomas Scott Perkins did knowingly distribute child pornography

15  as defined in Title 18 United States Code Section 2256(8)(A),

16  that had been shipped or transported in or affecting interstate

17  or foreign commerce by any means including by computer all in

18  violation of Title 18 United States Code Section 2252A(a)(2).

19         Count 2, on or about January 9th, 2020, in the Western

20  District of Texas, the defendant Thomas Scott Perkins did

21  knowingly possess materials, specifically a Western Digital hard

22  drive Model Number WD800, Serial Number WD-WCAJ92661471, that

23  contained images of child pornography as defined in Title 18

24  United States Code Section 2256(8)(A) that involved a pre-

25  pubescent minor under the age of 12 years that had been mailed,

1   shipped, and transported in interstate and foreign commerce, was

2   produced using material which had been shipped and transported in

3   interstate and foreign commerce by any means including by

4   computer, all in violation of Title 18 United States Code Section

5   2252A(a)(5)(B).

6          Count 3, on or about January 9th, 2020, in the Western

7   District of Texas, the defendant Thomas Scott Perkins did

8   knowingly possess material, specifically a Maxtor hard drive

9   device model Diamondmax Plus 9, Serial Number Y45BC9X3 that

10  contained images of child pornography as defined in Title 18

11  United States Code Section 2256(8)(A) that involved a

12  prepubescent minor under the age of 12 years that had been

13  mailed, shipped, and transported in interstate and foreign

14  commerce, was produced using material which had been shipped and

15  transported in interstate and foreign commerce by any means

16  including by computer, all in violation of Title 18 United States

17  Code Section 2252A(a)(5)(B).

18         Count 4, on or about January 9th, 2020, in the Western

19  District of Texas, the defendant Thomas Scott Perkins did

20  knowingly possess material, specifically a Seagate hard drive

21  device model ST1000LM049, Serial Number WGS5QBVC that contained

22  images of child pornography as defined in Title 19 United States

23  Code Section 2256(8)(A) that involved pre-pubescent under the age

24  of 12 years that had been mailed, shipped, and transported in

25  interstate and foreign commerce, was produced using material

14

1  which had been shipped and transported in interstate and foreign

2  commerce by any means including by computer, all in violation of

3  Title 18 United States Code Section 5252A(a)(5)(B).

4         Count 5, on or about January 9th, 2020, in the Western

5  District of Texas, the defendant Thomas Scott Perkins did

6  knowingly possess material, specifically a Seagate hard drive

7  device model SRDONF2, Serial Number NA8EYNL7 that contained

8  images of child pornography as defined in Title 18 United States

9  Code Section 2256(8)(A) that involved a prepubescent minor under

10 the age of 12 years that had been mailed, shipped, and

11 transported in interstate and foreign commerce, was produced

12 using material which had been shipped and transported in

13 interstate and foreign commerce by any means including by

14 computer, all in violation of Title 18 United States Code Section

15 2252A(a)(5)(B).

16        Count 6, on or about January 9th, 2020, in the Western

17 District of Texas, the defendant Thomas Scott Perkins did

18 knowingly possess materials, specifically a Seagate hard drive

19 device model SRDOPV1, serial number NA9QO2S9 that contained

20 images of child pornography as defined in Title 18 United States

21 Code Section 2256(8)(A) that involved a pre-pubescent minor under

22 the age of 12 years that had been mailed, shipped, and

23 transported in interstate and foreign commerce, was produced

24 using material which had been shipped and transported in

25 interstate and foreign commerce by any means including by

1  computer, all in violation of Title 18 United States Code Section

2  2252A(a)(5)(B).

3          Count 7, on or about January 9th, 2020, in the Western

4  District of Texas, the defendant Thomas Scott Perkins, did

5  knowingly possess material, specifically a Western Digital hard

6  drive, device model WDEYFT0040BVK-0-OA, Serial Number

7  WX51D961NE27 that contained images of child pornography as

8  defined in Title 18 United States Code Section 2256(8)(A) that

9  involved a prepubescent minor under the age of 12 years that had

10 been mailed, shipped, and transported in interstate and foreign

11 commerce and was produced using material which had been shipped

12 and transported in interstate and foreign commerce by any means

13 including by computer, all in violation of Title 18 United States

14 Code Section 2252A(a)(5)(B).

15         Count 8, on or about January 9th, 2020, in the Western

16 District of Texas, the defendant Thomas Scott Perkins did

17 knowingly possess material, a Samsung hard drive, Serial Number

18 S267J1LZ503188, that contained images of child pornography as

19 defined in Title 18 United States Code Section 2256(8)(A) that

20 involved a pre-pubescent minor under the age of 12 years that had

21 been mailed, shipped, and transported in interstate and foreign

22 commerce, was produced using materials which had been shipped and

23 transported in interstate and foreign commerce by any means,

24 including by computer, all in violation of Title 18 United States

25 Code Section 2252A(a)(5)(B).

1          Count 9, on or about January 9th, 2020, in the Western

2    District of Texas, the defendant Thomas Scott Perkins did

3    knowingly possess material, specifically a SimpleTech hard drive

4    device model 96300-41001-68, Serial Number 09335092000206005 that

5    contained images of child pornography as defined in Title 18

6    United States Code Section 2256(8)(A) that involved a pre-

7    pubescent minor under the age of 12 years that had been mailed,

8    shipped, and transported in interstate and foreign commerce, was

9    produced using material which had been shipped and transported in

10   interstate and foreign commerce by any means including a

11   computer, all in violation of Title 18 United States Code Section

12   2252A(a)(5)(B).  A true bill signed by the foreperson of the

13   grand jury.

14          THE COURT:  Thank you.  Counsel, how does the defendant

15   plead to Counts 1 through 9 of the indictment, guilty or not

16   guilty?

17          MS. BATALLER-SCHNEIDER:  Not guilty.

18          THE COURT:  Thank you very much.  The Court will

19   recognize Mr. Cayton to begin our opening statements.  You may

20   proceed, sir.

21          MR. CAYTON:  Thank you, Your Honor.

22          THE COURT:  Yes, sir.

23              OPENING STATEMENT BY THE GOVERNMENT

24          MR. CAYTON:  Good morning, ladies and gentlemen.

25          You're going to hear that in September of 2019, a

1   special agent with the Department of Homeland Security or HSI

2   investigations from the Southern District of Texas was doing a

3   BitTorrent search, and you're going to hear a little bit more

4   about that, but searching for people who were sharing or

5   distributing child pornography.  And he was able to locate and

6   download child pornography from an IP address that was located in

7   Fort Stockton, Texas.

8          And Fort Stockton was not his area.  He was contacted

9   later by an HSI agent from the Alpine office about these

10  downloads that he had received.  And through secure means, those

11  downloads were sent to computer forensics analysts in El Paso,

12  Texas through HSI, and then were given to special agent from the

13  Alpine division of Homeland Security who reviewed those

14  downloads.

15         And Agent Ferg is going to talk to you about some of

16  those videos that he viewed that were downloaded from this IP

17  address in Fort Stockton.  After reviewing those videos, Special

18  Agent Ferg opened an investigation.  He used public source

19  information to find out where this IP address was located, this

20  internet address, whose address it was.  He obtained a search

21  warrant for the address.  And on January 9th, 2020, a search

22  warrant was preformed, or a search was performed on the

23  defendant's address.

24         Multiple pieces of electronic evidence were seized.

25  And you're also going to hear that Special Agent Ferg had a

1   chance to talk to the defendant about this.  And the defendant

2   made admissions to not only possessing child pornography, but

3   also to sharing or distributing child pornography.

4           You're going to hear next that all of these electronic

5   devices that were seized were sent to a computer forensics

6   analyst who reviewed the data on several of those devices.  What

7   they do is they go through those devices, they use special

8   software, and they look at the data.  Once they've got data they

9   believe is potentially criminal, then they send that off to the

10  HSI special agent who's in charge of the case and have him review

11  that data.  And you're going to have an opportunity to see some

12  of the data that was recovered from the defendant's devices.

13          You just heard about one count of distribution and

14  eight counts of possession of child pornography images or videos.

15  And you're going to hear that each of those possession counts, or

16  you've already heard, are on separate devices.  And you're going

17  to have a chance to hear that all those devices were in the

18  possession of the defendant.  Like I said, he made admissions.

19          And at the end of this trial, after you've heard all

20  the evidence, we will stand before you again and ask that you

21  find the only logical conclusion based upon the evidence, and

22  that's that the defendant is guilty of all charges.  Thank you.

23          THE COURT:  Thank you, Mr. Cayton.

24          Ms. Bataller?

25              OPENING STATEMENT BY THE DEFENDANT

1          MS. BATALLER-SCHNEIDER:   Perception is everything.

2     Each of our own personal realities is created through the lenses

3     of our own personal perspective.   Thomas Perkins' perception is

4     very different from yours or mine.   And as a result, so is his

5     reality.

6          You will hear that from a young age, Thomas was

7     diagnosed with Asperger's also known as Autism Spectrum Disorder

8     or ASD, and schizoaffective disorder as well as schizophrenia.

9     Unlike what you may have seen in the movies, this doesn't make

10    Thomas rock back and forth uncontrollably, make repetitive and

11    exaggerated hand movements, or visibly respond to voices in his

12    head.   But it does have a profound effect on his ability to

13    understand reality as we do.

14         Let's talk about Asperger's first.   People with

15    Asperger's have severe impairments in social skills, ability to

16    understand others' feelings and facial expressions.   Though

17    people with Asperger's try to be rule-followers, they often can't

18    tell the difference between right and wrong when it comes to

19    social situations.

20         Because people with Asperger's have a difficult time

21    interacting with others or understanding the world the way that

22    others do, they tend to be loners, unable to develop the

23    relationships that they and all humans crave.   They often don't

24    experiment sexually like other young people, and have few if any

25    friends.

1    They often become obsessed with collecting things, not

2  because of an interest in the actual thing that they're

3  collecting, but rather an interest in the act of collecting

4  itself.  You will hear evidence of why Thomas has been diagnosed

5  with Asperger's.  You will hear that he struggles to understand

6  social cues in a world where that's expected of us.

7    As a result, he has very few friends or other people

8  that he interacts with regularly.  You will hear that he's never

9  had a sexual relationship and doesn't understand sexuality the

10  way you or I might.  You will hear that like many people with an

11  Autism Spectrum Disorder, Thomas has an obsession with computers

12  and collecting things.

13    Schizoaffective Disorder, on the other hand, is a

14  mental health disorder that is marked by a combination of

15  schizophrenia symptoms such as hallucinations or delusions and

16  mood disorder symptoms such as depression or mania.  You will

17  hear evidence that Thomas regularly hears voices.  He has two

18  beings which he calls angels that tell him what to do and explain

19  what will happen to him.

20    He also has what he calls a sex demon who regularly

21  visits him and has sex with him against his will.  You will hear

22  that these delusions are so real to Thomas that he can hear the

23  voices of these angels and feel the touch of this demon.

24    All that said, like I told you on Friday, we understand

25  that this is not an easy case.  You will have to see some awful

1  things.  The Government will show you images you will not want to

2  see.  We are genuinely sorry that you have to see these things.

3  But this case is not about how terrible these images are.  This

4  case is about perception.

5  The Government will use these images to paint a picture

6  for you of what happened in this case.  But this painting is only

7  a small part of what the actual reality is.  Your job will be to

8  decide whether knowing about the disorders that Thomas has that

9  directly impact his reality, Thomas could have understood that he

10  was knowingly possessing these images, or knowingly distributing

11  them to others, especially when the evidence will show that he

12  didn't actively send out any images or videos to anyone else.

13  He simply failed to turn off the sharing capabilities

14  that come as a default of the programs he was using.  And in

15  fact, he had told agents he did not intentionally share these

16  things.

17  When you look at the whole picture of this case, and

18  when you understand the limited lense through which Thomas sees

19  the world, we believe you will come to the only just decision in

20  this case and find Thomas not guilty on all counts.  Thank you.

21  THE COURT:  Thank you, ma'am.

22  Mr. Cayton, Mr. Greenbaum, your first witness?

23  MR. CAYTON:  Your Honor, the Government calls Agent

24  Bonneau.

25  THE COURT:  Can you have that agent come on in?

 1      (Pause)

 2              THE COURT:  Sir, if you'd come on up.  Stop right

 3      there.  We'll have you raise your right hand, please.

 4              ANDREW BONNEAU, GOVERNMENT'S WITNESS, SWORN

 5              THE COURT:  You may have a seat.  Adjust yourself to

 6      the microphone, pull it down if you need to.  I'll tell you as we

 7      go if you need to be closer or farther from it.  You may proceed,

 8      Mr. Cayton.

 9              MR. CAYTON:  Thank you, Your Honor.

10                          DIRECT EXAMINATION

11      BY MR. CAYTON:

12      Q    Good morning.  Can you please spell -- state your name and

13      spell it for the record?

14      A    My name is Andrew Bonneau spelled B-O-N-N-E-A-U.

15      Q    Where are you currently employed?

16      A    I'm a special agent with Homeland Security Investigations in

17      Fort Wayne, Indiana.

18      Q    And how long have you --

19              THE COURT:  Back up.

20              MR. CAYTON:  I apologize, Your Honor.

21              THE COURT:  It's all right.

22      MR. CAYTON:

23      Q    How long have you been a special agent with Homeland

24      Security Investigations?

25      A    I've been employed as a special agent with Homeland Security

Bonneau - Direct/Cayton                        23

1    Investigations since 2016.

2    Q    Now was Fort Wayne, Indiana, your first assignment?

3    A    It was not.

4    Q    Where were you previously assigned?

5    A    Brownsville, Texas.

6    Q    And while in Brownsville, were you part of any particular

7    investigations regarding children or child electronic material?

8    A    Yes.  I was assigned to the Rio Grande Valley Child

9    Exploitation Investigation Task Force down in Brownsville, Texas,

10   focusing primarily on child exploitation-type investigations.

11   Q    And through that duty, did you participate in searches for

12   BitTorrent files?

13   A    I ran law enforcement BitTorrent software that would

14   identify IP addresses that were known to possess torrent files

15   that contained files of child pornography.

16            MR. CAYTON:  And at this time, Your Honor, I'd like to

17   show a brief video that explains BitTorrent.  I believe it's

18   Government Exhibit 38.

19            MR. GORMAN:  No objection, Your Honor.

20            THE COURT:  Government's Exhibit 38 is admitted without

21   objection.

22        (Government's Exhibit 38 admitted into evidence)

23            THE COURT:  You may publish.

24   BY MR. CAYTON:

25   Q    And, Special Agent Bonneau, have you previously watched this

1   video?

2   A    Yes, sir, I have.

3   Q    Does it explain how the BitTorrent program works?

4   A    Yes, it does.

5   Q    Will it assist you in your testimony?

6   A    Yes, it will.

7        (Pause)

8        MR. CAYTON:  I apologize, Your Honor.  Just brief

9   technical difficulties.

10        THE COURT:  Yes, sir.

11       (Video begins at 10:24 a.m./ends at 10:28 a.m.)

12  BY MR. CAYTON:

13  Q    So, Agent Bonneau, when you're doing searches, or when

14  you're doing investigations regarding BitTorrent, is this

15  essentially the type of software you're using?

16  A    Yes.  That's essentially the type of software.  We use a law

17  enforcement version of that software.

18  Q    What is unique about the law enforcement version?

19  A    So on the law enforcement side, one of the functions is it

20  does not share with other people.  So there's no distribution in

21  regards to the files.  And when it connects to a certain IP, it

22  makes sure -- it makes sure that IP is the single source for all

23  downloads.  So we're not getting it from multiple users.

24       As the video explained there, it's pulling pieces.  And if

25  it pulled pieces from multiple different IP addresses, we

1    wouldn't know for sure which one actually gave us the piece that

2    contains the child pornography.  So it pulls from a single source

3    or a single IP, and we get all the pieces which proves that that

4    image or the child pornography is from that particular IP

5    address.

6    Q    Can you describe briefly what an IP address is?

7    A    Basically an IP address is just like an internet-type

8    address, like your home address.  It just allows you to connect

9    to the -- to the internet.  Everyone who connects to the internet

10   has an IP.  If you have internet service at home, you're assigned

11   an IP so when you connect out to the web it just knows where to

12   send the information to.

13   Q    And so you said when you're doing a search through your law

14   enforcement software, you're looking at the IP address that

15   you're receiving information from?

16   A    So to be clear, I'm not doing any sort of active searches on

17   my own.  The software just runs, and it runs based off what are

18   known torrent files out there that contain child pornography.

19   And it looks for any IP addresses sharing those torrents with

20   other users.  And when it identifies an IP, it directly connects

21   to the IP to see if there's any files there that it's willing to

22   share with our investigative software.

23   Q    Are you able to limit the region where you're trying to find

24   these torrents from?

25   A    It usually is assigned by what state you're working in.  So

1    when I was assigned to Brownsville, Texas, my software worked for

2    the entire State of Texas.

3    Q    So it wouldn't be uncommon for you to get a link or a file

4    from an IP address that was outside of your generalized area with

5    HSI?

6    A    That's correct.

7    Q    Were you ever contacted from a special agent from the Alpine

8    division regarding potential downloads that you had received?

9    A    I was.

10   Q    And who was that agent?

11   A    Special Agent David Ferg.

12   Q    And after he contacted you, did you do a search of the files

13   that you had downloaded to see if you had received any from the

14   Alpine region?

15   A    Yes.  He provided the IP address.  I looked for the IP

16   address in the files that were downloaded by the investigative

17   software.  I identified that IP address and make sure there was

18   actually files in there worthwhile to even forward off to him.

19   Usually I do that because I usually get, like, two or three

20   requests a month from the investigators all around the State of

21   Texas when I was here in Texas requesting if I had files.

22        So I worked through them just to make sure at least one file

23   in there contained child pornography.  And if it does, I let them

24   know and then we work on getting those files to that

25   investigator.

1  Q    Do you remember about how many downloads or how many files

2  you got from the IP address that was requested by Special Agent

3  Ferg?

4  A    I don't specifically.

5  Q    What did you do based upon his request with the files that

6  you had downloaded from that IP address?

7  A    From that IP address, once it confirmed there was actually

8  at least one file of child pornography, I -- basically the way we

9  work it, we have our own law enforcement-owned cloud-type system.

10  I downloaded those files, that whole file packet, upload it to

11  own cloud to CFAs in El Paso, Texas.  And I believe from there

12  Mr. Ferg was able to obtain those files.

13  Q    And so you sent it to the agent who may have responsibility

14  for that area to follow up on an investigation?

15  A    Correct.

16  Q    Because that's not your area to investigate?

17  A    Correct.

18              MR. CAYTON:  May I have just a moment, Your Honor?

19              THE COURT:  Yes, sir, you may.

20  BY MR. CAYTON:

21  Q    I want to talk to you a little bit more about BitTorrent.

22  Before you started doing these types of investigations, had you

23  ever been familiar with BitTorrent software?

24  A    Before I started these, I never even heard of it before.

25  Q    And did -- was it a learning curve to learn how to use, or

1    was it pretty easy to just start clicking a button?

2    A    No, I had -- to even use the software, I had to go through a

3    40-hour training to be able to be certified in actually using the

4    law enforcement BitTorrent software.

5    Q    So you talked about these single source downloads.  The

6    videos that you sent to Special Agent Ferg, did all of them come

7    from the IP address that was requested?

8    A    They did.

9    Q    And was that IP address out of Fort Stockton, Texas?

10   A    I didn't know.  It usually gives us a region, but I can't

11   remember exactly what region.  But based on the reports that I

12   read written by Mr. Ferg, it was out of Fort Stockton.

13   Q    Now you said you don't look through all the files.

14   A    For cases that are not mine, I do not look through all the

15   files.

16   Q    Why not?

17   A    I just don't want to see all that stuff all the time.  I

18   mean, that's --

19   Q    And it's not an investigation that you would complete?

20   A    Correct.

21   Q    Is that fair to say?

22            MR. CAYTON:  Pass the witness, Your Honor.

23            THE COURT:  Thank you.

24            Mr. Gorman, your witness.

25                            CROSS-EXAMINATION

1  BY MR. GORMAN:

2  Q    Agent Bonneau, you indicated you had worked at Brownsville,

3  correct, not currently?

4  A    Yes, sir.  Correct.

5  Q    And you work covers the entire State of Texas?

6  A    So the investigative software that we use, how it's

7  defaulted, it, you know, the administrators of the software

8  assign you to a state.  And it just grabs -- it's monitoring all

9  the state.  So I look for, specifically for my investigations, I

10  look for IPs that are sharing these files in my area.

11       However, I get contacted by investigators all around the

12  state who are looking for files.  And they ask me if I have them.

13  They do -- I mean, I've asked other investigators for files too

14  if I didn't get any in my area and I notice that they have them.

15  So I think that answered your question.

16  Q    And during your time at Brownsville, you worked primarily on

17  a computer?

18  A    Define that for me.

19  Q    So much of the investigation you did while you were working

20  in Brownsville specifically during the time of this case, did you

21  go to the office, sit down, log into this computer, and that was

22  your primary role?

23  A    I mean, cyber-type investigations were my primary role.  The

24  computer would just run on its own.  The software would run on

25  its own.  So I wouldn't check it every day.  We're also getting

1   numerous other types of leads from hands-on offenses, child porn,

2   child production -- child pornography production.  And we'd get

3   leads from NCMEC as well.  So I had all kinds of influxes of

4   information while working down there.

5        So I would every once in a while check the computer to see

6   if there was any new IPs in my area, and also would purge out my

7   system because as it downloaded, it would take up all the storage

8   space.  So I would have to purge all those downloads out.  We

9   usually did that once a month or so.

10  Q    And more or less with this investigative system, when you

11  did sit down at your computer, you would sign into it and it

12  would give you a bunch of alerts more or less?

13  A    So it was more just a program running, almost how BitTorrent

14  runs itself, and it would just have what Ips we were able to

15  connect to and obtain files from that were making available for

16  sharing.  So the program would just be running.  It wouldn't

17  really sign into it.

18       You know, I look at it and see -- mainly I focus on my area,

19  if there was new IPs in my area that had -- that were making

20  available for sharing child pornography files.  So I'd have to

21  have a photo to really describe it to you.

22  Q    But you had indicated that this is entirely generated by

23  more or less an autonomous system that runs itself?

24  A    Yes, it would.

25  Q    And with regard to the system, and I guess the best analogy

1   is when you look at a car you usually have drivers, people that

2   operate them, mechanics, people who work on them, and engineers,

3   the people who envision and create them.  In terms of this

4   system, are you more of a driver?

5   A    I'm more -- I'd be -- I would say I would be best more of a

6   passenger.  It's almost a self-driving car.  Then I'm just

7   sitting in it and watching things work, if that makes sense.

8   Q    So you can't strip down the guts of this program, take it

9   apart, and tell you what everything's doing in terms of the

10  programming or how this program's built?

11  A    No, I cannot.

12  Q    So when you describe single-source download, you're more or

13  less assuming something that came out of your training?

14  A    No.

15      Based on the data file information we get, when it connects

16  to a device, it actually prints us, not prints but it develops a

17  data file that shows our direct handshake or connection to a

18  particular IP and exactly what (indiscernible) it was looking for

19  and what files it was able to download from that device or that

20  IP that was making available for sharing.

21  Q    And that's the autonomously generated information by this --

22  I guess this computer system?

23  A    The software, yes.

24  Q    And in terms of that information, where is it stored?

25  A    What do you mean by that?

1  Q    So you just described the handshake connection, all this

2  sort of data.  Is it stored by this system?

3  A    It's -- so it's actually when we initiate our software or

4  law enforcement for the first time, we have to designate where

5  the files are to be saved to.  So it could either be on our work

6  computer desktop in a certain file, or onto an external hard

7  drive depending on how we set it up.  So it just depends on where

8  we -- where we point where the download should go.

9  Q    Okay.  And do you recall where that was in this case?

10 A    I believe this case I had it -- I had it pulling it towards

11 either it's called a TD receptor file, or TD down pulled file.

12 And I believe those are an external that I had assigned to me at

13 the time.

14 Q    And referring to these movies or images or whatever it may

15 be that the system picks up, how were those -- you said they were

16 processed by more or less an automatic download system?

17 A    Not necessarily.  So it doesn't just download files

18 randomly.  The program's designed to look for torrents that

19 contain child pornography.  That's how it's designed.  So known

20 torrents are brought into a central database.  It's usually

21 through the National Center for Missing and Exploited Children.

22     Those torrents are brought into the software.  And it just

23 basically sits there and looks for any IPs that are sharing these

24 torrent files that contain child pornography.  I like to

25 reference it to, like, it's like a traffic cop sitting on the

1   side of the road using radar and watching cars go by speeding.

2   It's essentially what it is doing.

3   Q    But did you testify previously that it can have false hits,

4   or is it -- do you have to do any sort of processing on this

5   information in terms of the various information the system may

6   download?

7   A    What are you exactly asking?

8   Q    So do you have to sort through these videos and images once

9   the system brings them in, in terms of a download and decide this

10   is something that's against the law.  This is, you know, this is

11   within the law, any type of decision like that on your part?

12   A    Within context, yes, because as we are not sharing our files

13   out, we are very low on the priority as far as receiving files

14   from other BitTorrent users.  So there might be times where we do

15   a connection with a certain IP and we get a piece of a file just

16   like how you saw on the video.  And that piece, although it's a

17   known series of child pornography, may not contain child

18   pornography itself.

19        So we might only get that.  So therefore technically at that

20   point we do not have a crime in what we define as a crime even

21   though we know it's child pornography.  But we don't have the

22   piece that actually shows the child pornography, the sexual act

23   or the nudity or whatever the case may be.

24        So when I work an investigation regarding BitTorrent, I have

25   to review the files to make sure, like, yeah, we actually

1   captured or we got the piece that they were making available for

2   sharing that is in fact child pornography.  And then from there

3   we send our subpoenas off for the IP addresses and continue the

4   investigation from there.

5   Q    And, Agent Bonneau, you indicated that in this case, Agent

6   Ferg contacted you.  How exactly did that happen?  Why did he

7   contact you?

8   A    He would probably have to testify as to why he reached out

9   to me.  He just, he called me direct and asked if I had any

10  downloads for this particular IP.  And I looked at the software

11  and I noticed that I did.  I verified that at least one of the

12  files was child pornography, and from there provided to Agent

13  Ferg.

14  Q    So the system is then generating alerts and sending it to

15  other people as well, or is this -- sorry.  Stated otherwise, was

16  this contact potentially triggered by that automatic system you

17  use, triggering something to Agent Ferg or some other reason?

18  A    So the system itself does not send alerts to anybody.  There

19  is a law enforcement database system that basically looks for

20  kind of the same things.  However, it does not download child

21  pornography files.  It looks for IPs that are sharing torrents

22  that are -- that contain child pornography.  And I believe that's

23  what Mr. Ferg did, as I've done before on some of my

24  investigations.

25  Q    All right.  Agent Bonneau, in terms of this system, this

1    system is essentially searching everywhere, correct?  This -- in

2    terms of the BitTorrent system.

3    A    Define everywhere.

4    Q    It's running searches on the internet in terms of -- in the

5    BitTorrent network.  It --

6    A    I would say so it's not really searching for anything.  It's

7    actually just more sitting there, waiting for certain IP

8    addresses to distribute known torrent files that contain child

9    pornography.  And when it sees it, it's like hey, I want some of

10   that file just like how BitTorrent works.  And when it latches on

11   to that IP it says hey, thank you for sharing with me because

12   you're making available to share to me.

13        So it's almost acting like anybody who downloads BitTorrent

14   can use -- can get files from other people.  So if we're all on

15   the same network, we're all sharing with each other.  We're

16   downloading from each other and sharing with each other.  The law

17   enforcement system works almost exactly like that, however it's

18   just to one IP and does not share out.

19   Q    And I guess in part to clarify, the BitTorrent in question,

20   or the BitTorrent issue, BitTorrent more or less is advertising

21   software that's available on single computers.  It doesn't

22   actively project to a site like this, correct?

23   A    So you're talking about BitTorrent itself?  It's not

24   necessarily advertising.  It's people are searching for torrents.

25   And once it -- once the user of that device downloads that

1    torrent, that torrent then works to go retrieve the files from

2    that torrent.  And that could be the file of the sasquatch or

3    files of child pornography.

4         The law enforcement system is just acting as one of those

5    systems that wants you to share a file with them.  And as long as

6    the user of BitTorrent has not moved those files out of their

7    share folder, it automatically makes it available for sharing.

8    Q    And that's a product of essentially the BitTorrent software

9    on systems that are -- that have something displayed, correct?

10   Something is on their system that's essentially being shared on

11   the BitTorrent system by virtue of some program sharing it,

12   correct?

13   A    I mean, that's exactly how BitTorrent works.  In order for

14   BitTorrent to work, as it explains, you have to be willing to

15   share.  So people who know what BitTorrent is know for a fact

16   that they will also be sharing unless they manually go and change

17   those defaults.  Otherwise, the system doesn't work.

18        So if you're not sharing, your chances of getting downloads

19   are very minimal, which is why our system, the law enforcement

20   system is very low priority.  We -- it's hard for us to even

21   connect to an IP that receive downloads because we are in fact

22   not sharing on that same network.

23   Q    And in regard to that last statement, you had indicated that

24   they know it.  Ultimately, they're bound by whatever their

25   software does, correct?

1      You don't know what that software program is telling anyone

2  else to do meaning you don't know what a user has done with its

3  program other than the fact what you see is some program just

4  reaching out saying the program itself has offered to share

5  something, whatever the user's interaction with it, you wouldn't

6  be able to know that, correct?

7  A    Well, I would say if you're looking to download BitTorrent,

8  you're going to have an understanding of what BitTorrent is.

9      And it's a decentralized file sharing network.  The reason

10 you download BitTorrent is so you can download files, whatever

11 they may be, at a quicker pace than trying to download directly

12 from a centralized server.  So, and you understand that when you

13 are downloading using BitTorrent, you're also sharing.  That's

14 how I would define that.

15 Q    But you indicated again that you had no acquaintance with

16 BitTorrent before you took on this job, correct?

17 A    That is correct.

18              MR. GORMAN:  All right.  Thank you, Your Honor.

19              THE COURT:  Thank you.  Any redirect?

20              MR. CAYTON:  Yes, Your Honor.

21                       REDIRECT EXAMINATION

22 BY MR. CAYTON:

23 Q    I'd like to pick up where what you were just talking to

24 Defense about sharing and downloading and BitTorrent software.

25 You said it's pretty much a default of the system?

1  A    Yes, pretty much.

2  Q    Can you turn off sharing?

3  A    You can.

4  Q    Can you remove all the files from the shared folder so

5  you're not sharing something?

6  A    Yes, you can.

7  Q    And you talked about someone -- I think you talked about it

8  a little bit on direct but also on cross that this is complex

9  software that people who are involved in torrents typically know

10 how these things work?

11 A    Yeah.  If you're looking for BitTorrent, you have an

12 understanding of how that system works.

13 Q    It's not something that you can just -- it's not Microsoft

14 Word, you just download the program and you can open up a window

15 and start typing something on there.  You have to know how this

16 system works to get what you want?

17 A    Yeah.  Essentially you're going to have to --

18          MR. GORMAN:  Objection, calls for speculation.

19          THE COURT:  I'll sustain the objection.  You can

20 rephrase your question.  If he has training and experience and

21 knows that, I'll allow the answer, but if he does not -- rephrase

22 your question.

23 BY MR. CAYTON:

24 Q    You've used BitTorrent software?

25 A    The law enforcement investigative software, yes.

Bonneau - Redirect/Cayton                                    39

1    Q    For your law enforcement software, do you just turn it on

2    and it starts downloading?

3    A    I mean, there's --

4    Q    Or it starts working?

5    A    So the answer to the question have I download -- have I

6    downloaded BitTorrent for investigative purposes like the client

7    software, the normal public access software, I have.  And that

8    was to see what defaults were and everything else.  As far as the

9    law enforcement investigative software, we have to -- we download

10   it, but we download it from the specific law enforcement site.

11   And there's certain things we have to put in there to make sure

12   that it actually operates correctly.

13   Q    When you download the client software, do you just download

14   it and it starts running?

15   A    There are some prompts that you have to agree to.  You know,

16   it will give you default folders where your files that you

17   download will go into.  You have the option to change that or to

18   make it not able to share from when you initially download the

19   program.

20        If you agree to everything or the defaults, it essentially

21   starts -- it doesn't just start downloading.  You actually have

22   to search for torrents.  But it will default to where your files

23   go into a download folder, and a shareable folder which sometimes

24   are the same thing.  So as long as you're downloading files,

25   you're also sharing.

Bonneau - Redirect/Cayton                    40

1    Q    Now a little bit earlier when the Defense attorney was

2    talking to you, he was talking about an analogy of driving a car,

3    and you have a driver, a mechanic, a passenger.  And you said for

4    your law enforcement software you're kind of a passenger in a

5    self-driving car.

6    A    Correct.

7    Q    But you said the law enforcement software is already

8    searching for specific torrents that are known child pornography.

9    A    That's correct.

10   Q    If you are a standard client-user of BitTorrent, can you

11   just sit back and let the program run, and it automatically will

12   bring you what you want without you typing something in?

13   A    No.  You -- you have to actively search for torrents.  And

14   usually you have to go to some sort of file index and look for

15   that specific torrent file.  And once you download that torrent

16   file, that's when BitTorrent will start working to retrieve the

17   pieces of that torrent file.

18   Q    So if the law enforcement officer using the law enforcement

19   software is a passenger, how would that analogy work for the

20   person, the standard BitTorrent user who's trying to find files

21   using BitTorrent?

22   A    I would say a driver.

23           MR. CAYTON:  May I have just a moment, Your Honor?

24           THE COURT:  Yes, sir.

25           MR. CAYTON:  Pass the witness, Your Honor.

1          THE COURT:  Mr. Gorman?

2                    RECROSS-EXAMINATION

3     BY MR. GORMAN:

4     Q    Agent Bonneau, in terms of I guess as a general matter, this

5     is not a direct client reaches out to you saying I want to send

6     an email to you.  This is not that type of software, correct?

7     A    That is correct.

8     Q    All right.  And in terms of general software out there,

9     you're sort of saying understanding of what people do or don't

10    do, in terms of that, you said that you're not essentially a

11    power user of BitTorrent.  You don't dig into the sort of

12    personal use, the type of public use software, correct?

13    A    Are you asking me if I personally --

14    Q    Personally.

15    A    -- go into the public use of BitTorrent software?

16    Q    Stated otherwise, you haven't downloaded all these various

17    sites of BitTorrent and become familiar with the various settings

18    and configurations or otherwise, correct?

19    A    I would say not like -- I mean, there's so many versions out

20    there.  I've downloaded a few.  I've downloaded other peer-to-

21    peer clients as well just to have an understanding of what it is

22    on the public market.  As far as, like, deep dive using them

23    every day, I don't do that.

24         But I mean, I -- like, version, you know, there's version

25    2.73 and there's version 2.74.  I haven't downloaded every single

1    version of BitTorrent.  It's almost impossible unless I have all

2    kinds of time on my hand.  But I have a basic understanding of

3    what BitTorrent is and how it operates.

4    Q    But for example, uTorrent, BitTorrent, there's a ton of

5    different BitTorrent software programs out there, correct?

6    A    I mean, there's different versions, different -- you know,

7    you have uTorrent clients, you have BitTorrent clients, you have

8    -- I mean, even other peer-to-peer clients that all kind of do

9    the same thing.  I mean, they're all decentralized file sharing

10   networks that, you know, you have to download a torrent in order

11   to start downloading the files that you're looking for.  And when

12   you're downloading, you're also sharing direct.

13   Q    But you would not be able to say with any certainty what

14   every individual user's understanding is of the software, its

15   settings, or otherwise, correct?  It doesn't give you a vision

16   into the world and once somebody sat at the computer and the

17   computer to do that day, correct?

18   A    So based on my experience, any person I have encountered or

19   interviewed regarding these BitTorrent-type investigations, all

20   of them have had an understanding of what BitTorrent or peer-to-

21   peer clients are and what they do.  And part of those

22   investigations, especially if we enter a house with a lot of

23   occupants, we tend to ask everyone what's your understanding of

24   peer-to-peer clients.

25          And a majority of people would say I have no understanding

1    of peer-to-peer clients.  But usually the person we're looking

2    for or the suspect would have some sort of understanding of what

3    BitTorrent is or what peer-to-peer clients are and what they do.

4    Q    But you're testifying through general experience, not some

5    crystal ball to look into the brains of everyone and their

6    computers, correct?

7    A    I mean, that would be impossible for me to --

8              MR. GORMAN:  Correct.  Thank you.  No further

9    questions, Your Honor.

10             THE COURT:  Thank you.  Mr. Cayton?

11             MR. CAYTON:  No further questions, Your Honor.

12             THE COURT:  You may step down. Thank you.

13             THE WITNESS:  Thank you, sir.

14        (Witness excused)

15             THE COURT:  Your next witness is?

16             MR. CAYTON:  Special Agent David Ferg, Your Honor.

17             THE COURT:  David Ferg?  How long will he take?  About,

18   just about.  We won't hold you to it.

19             MR. CAYTON:  Probably about an hour and a half, Your

20   Honor.

21             THE COURT:  Okay.  So let's take a short break then now

22   so that we don't have to break up that testimony of that witness

23   if that's going to be that long of a direct.  And I'll try to

24   send you to lunch around 12:30 or so.  So get a snack if you need

25   one in there.

1          When you come back out, you'll leave and come back,

2     line up, and come back the same way you did.  We'll all stay

3     standing until we -- we all of us will sit down together.  That

4     way we honor everyone that comes in last, or later.  And we'll do

5     that.

6          But I'll try to stagger lunch so that we're not hitting

7     the restaurant at the same time everybody else is.  That usually

8     works out pretty well.  So I want to make sure y'all know the

9     plan so that you can kind of plan accordingly.

10         You'll leave your notebooks here in the courtroom.

11    Whether you're using it or not, leave your notebooks here.  You

12    won't take your notebooks back if you ever want to 'til you go

13    retire to deliberate.  So I'm going to keep telling you that.

14         Remember until the trial's over, you're not to discuss

15    the case with anyone including your fellow jurors.  If anyone

16    approaches you or tries to talk to you about the case, advise me

17    about it immediately.  Just tell the court security officer.

18         Do not read or listen to any news reports of the trial

19    or use any technology tools to do independent research.  Do not

20    post about this, please, on social media.  There's no reason to

21    do that.  When the case is over, the trial's over, you're welcome

22    to talk to anybody you want and do whatever you like.

23         Remember to keep an open mind until all the evidence

24    has been received.  Finally, do not speak with anyone in or

25    around the courthouse other than your fellow jurors and court

1     personnel.  Any questions?

2          Let's go, let's take a ten-minute break.  Tell you

3     what, let's go 'til ten after eleven going by that clock.  That

4     means you'll have 12 minutes.  We'll stay here and do some work,

5     and then we'll take a short comfort break as well.  We'll come

6     back kind of for a bit of a long haul.  Around 12:30 I'm probably

7     going to let you go to lunch even if we break up this next

8     witness' testimony.

9          Any questions?  All right.  With that, let's rise for

10    the jury, please.  Thank you.  You all just go ahead and go.

11         (Jury out at 10:58 a.m.)

12         THE COURT:  All right.  Please be seated.  Outside the

13    presence of the jury.  Mr. Cayton, Mr. Greenbaum, anything you

14    want to take up before we break also?

15         MR. CAYTON:  Yes, Your Honor.  Now might be an

16    appropriate time to talk about the 404 --

17         THE COURT:  Sure.

18         MR. CAYTON:  -- notice because I -- I mean, I believe

19    most everything but the first, the very first bullet on the 404

20    would come out during Special Agent Ferg's testimony or the

21    playing of the hearing.

22         THE COURT:  Let me find that document.

23         MR. CAYTON:  I figure it's easier now, and that way we

24    can also make sure that --

25         THE COURT:  No, that's why I asked.  I wanted to talk

1    about it now.  All right.  So tell me what, to the extent that

2    you can, tell me what statements --

3            MR. CAYTON:  So item number one would be if the parents

4    testify.  And that's --

5            THE COURT:  You're going to have to speak up for me.

6    I'm sorry.

7            MR. CAYTON:  I apologize, Your Honor.

8            THE COURT:  No, no.  I've got a fan back here that's

9    keeping some computer parts I think for the whole thing, the

10   whole system cool.  And so I have a hard time.  I'm not just

11   getting old.  I'm not just years and years in the military.  But

12   I'll have to ask sometimes to speak up.  When everybody else is

13   here, they're saying why is he asking that because it's perfectly

14   clear.  That's why I do that.  So --

15           MR. CAYTON:  My wife says she can't hear me either,

16   Your Honor.

17           THE COURT:  Yeah, well I'm with your wife.  You're a

18   little soft spoken.  So it's all right.  Go ahead.

19           MR. CAYTON:  Item number two on the 404 notice,

20   specifically that he had masturbated to looking at nudist,

21   underage nudist images and images that he knew to be child

22   pornography.  I believe specifically he says in the interview

23   that he hadn't masturbated to it in over a year.

24           THE COURT:  Right.

25           MR. CAYTON:  But it's still the fact that he was

sexually aroused by the material I think goes to his motive and

intent and otherwise desire to download and possess this

material.

THE COURT:  Ms. Bataller?

MS. SCHNEIDER-BATALLER:  Yes, Your Honor.

Whether or not he masturbated to this has nothing to do

with whether or not he possessed these things.  Beyond that, Your

Honor, it is so highly prejudicial and is so low on the probative

scale that I believe that the -- even if Your Honor were to find

that there was some valid reason for it, it's just way to

prejudicial to introduce to the jury.

MR. CAYTON:  Well, Your Honor, in response, I mean, one

of the elements is knowledge.  He had to knowingly possess and

knowingly distribute.  And the fact that he is acknowledging that

he sexually gratified himself to this shows that he knew he

possessed it.

I think that the Court could easily see an argument

from the Defense that he downloaded it, and he actually says this

in some of his interview as well, that he just downloaded a ton

of files and he would weed through it later.  Well, arguably if

he didn't know he downloaded child pornography, that wouldn't be

knowledge.

But if he was using the child pornography for a

specific purpose, then that is knowledge that he possessed the

material and that is relevant and I don't think it's unduly

1   prejudicial, especially when we have the type of material we're

2   talking about here.

3         THE COURT:  Ms. Bataller, not that what you state in

4   opening statement is evidence.  But it does dictate sort of a

5   roadmap to the jury of what the Defense sees.

6         You did speak about collecting because of Mr. Perkins

7   mental illness or whatever it may be, collecting things and sort

8   of left the 9impression, I thought, collecting things for whether

9   there was a good reason to or not.

10        MS. SCHNEIDER-BATALLER:  Right, Your Honor.  And I

11   understand that.

12        I would just point to I don't see how -- I mean, under

13   the statute, there's nothing in the statute that says you have to

14   be turned on by these things, that you have to be -- it has to be

15   something that you are interested in.  It's just whether or not

16   you knew that you possessed it.

17        THE COURT:  Right.

18        MS. SCHNEIDER-BATALLER:  Your Honor, and I understand

19   your point --

20        THE COURT:  But that's the thing, the --

21        MS. SCHNEIDER-BATALLER:  -- about --

22        THE COURT:  -- knowledge.  And that's what I -- when I

23   listened to your opening statement, I wrote down the word

24   knowledge because to me that sounds like --

25        MS. SCHNEIDER-BATALLER:  That's one of the elements,

1    right.

2            THE COURT:  -- that's the -- I get that that's one way

3    to get that in.  But that to me sounds like the Defense seems to

4    be knowledge, you know, he didn't know what he was doing.  If he

5    did, he didn't understand that, whatever it may be.  But I

6    suspect that the fact that he's viewing these things for a

7    specific reason would be quite probative in determining the

8    intent, the motive, the knowledge for this possession.

9            MS. SCHNEIDER-BATALLER:  I understand your point, Your

10   Honor.  I guess my point more was not so much that he -- just I

11   guess the first part of that was perspective, that he has a

12   completely different perspective.  And I specifically talked

13   about distribution --

14           THE COURT:  Right.

15           MS. SCHNEIDER-BATALLER:  -- that whether he could

16   understand that portion, Your Honor.  So I would just --

17           THE COURT:  Okay.

18           MS. SCHNEIDER-BATALLER:  -- state that for the record.

19           THE COURT:  Okay.  So I'll -- the court determines that

20   as to that statement about that he masturbated to certain images

21   of child pornography, of what the Government's going to propose

22   is child pornography, the probative value is not outweighed by

23   the prejudicial effect, and that it would go to show defendant's

24   motive, intent, and knowledge to commit these offenses.

25           MS. SCHNEIDER-BATALLER:  Your Honor, if I could just

50

1  clarify really quickly with the Government.  My understanding is

2  that that information was said to Agent Wilson.  Is that correct?

3  Not Agent Ferg.  I don't have in my notes that he --

4          THE COURT:  That's a good point.

5          MR. CAYTON:  I believe he said it in both.  I mean, in

6  the --

7          THE COURT:  That they're both there?

8          MR. CAYTON:  For Agent Ferg he said that he masturbated

9  to, and I can find the --

10         THE COURT:  That will be apparent for whoever's

11 testifying, right?  I mean, they're --

12         MS. SCHNEIDER-BATALLER:  Thank you.

13    (Pause)

14         MS. SCHNEIDER-BATALLER:  Just to clarify, I believe

15 that the only time that is mentioned with Agent Ferg is when he

16 says that he did do that to content he understood was legal under

17 the Supreme Court, under Supreme Court ruling.  So nudist

18 content, not any sort of child pornography content.

19         THE COURT:  Mr. Cayton?

20         MR. CAYTON:  Your Honor, he does go in through the

21 interview, and these was things that I was going to get into in

22 the interview with Agent Ferg too.  He does talk about doing a

23 lot of research on child pornography and grey areas and --

24         THE COURT:  He being the defendant?

25         MR. CAYTON:  Yes, Your Honor.

51

1        THE COURT:  Okay.

2        MR. CAYTON:  and doing research on child pornography

3  and his understanding of the nudist images were legal under

4  Supreme Court ruling, and he was trying to stay within that grey

5  area.  He talks about -- Agent Ferg asked him at the end of the

6  interview why would you get in the grey area, and he said I like

7  being in the grey area.

8        So the defendant stated, and I quote, it was probably

9  over a year ago, and that it had been to nudist content that was

10  in the defendant's opinion legal under the Supreme Court.

11  There's other parts of the interview where he describes his

12  interpretation of what he was looking for was he was -- he

13  believed that he was able to get certain nudist content under the

14  Supreme Court.

15        THE COURT:  Is he talking about children?

16        MR. CAYTON:  He talks about nudist content involving

17  children, yes.

18        THE COURT:  My ruling would be the same then, that

19  under 403, the prejudicial effect does not significantly outweigh

20  the probative value that it would provide.  Of course I'll give

21  an instruction.  What was the second statement?  There's like

22  five statements.

23        MR. CAYTON:  I believe --

24        THE COURT:  You guys are losing your comfort break, by

25  the way.  But go ahead.

1          MR. CAYTON:  Sorry, Your Honor.  I believe --

2          THE COURT:  It's all right.

3          MR. CAYTON:  I believe bullet number three is only to

4    Agent Wilson.

5          THE COURT:  Hang on.  Let's go ahead and talk about all

6    of them.  What's two?

7          MR. CAYTON:  Yes, Your Honor.

8          THE COURT:  What's the second?  The first one was the

9    masturbation.

10         MR. CAYTON:  No, two is what we -- the masturbation.

11   The first one was involving his parents stated that they had

12   found him downloading child pornography approximately ten years

13   ago, and they told him to stop because he would get in trouble.

14   And he refused.

15         THE COURT:  He stated that?  He's the one that said

16   that?  The defendant --

17         MR. CAYTON:  No.  So the parents, so both of the

18   parents, when they were interviewed, they said that they had

19   caught him either downloading it or an image that he had printed

20   out of child pornography and that they had told him to knock it

21   off, and he did not.

22         THE COURT:  Okay.  Let's pass -- let's move past that

23   one because that's not going to come up yet, right?

24         MR. CAYTON:  Right.  That's why I skipped it earlier.

25         THE COURT:  Oh, sorry.  Sorry.  My apologies.

1    MR. CAYTON:  Okay.  So two is the masturbation we just

2    talked about.

3    THE COURT:  You know your case better than I do.  I

4    guess I should let you try it.

5    MR. CAYTON:  I appreciate your confidence, Your Honor.

6    Number three is that the defendant preferred to look at images or

7    videos of children between the ages of eight and ten years old,

8    and if given the opportunity he would be willing to have sexual

9    intercourse with a child as young as 12 or 13 years old.  Those

10   statements were made to Agent Wilson.

11   THE COURT:  Ms. Bataller?

12   MS. BATALLER-SCHNEIDER:  Again, Your Honor, I think

13   this goes even further.  This is even more irrelevant to the

14   actual charge of whether or not he knowingly possessed or

15   distributed these things.  What he would do hypothetically with a

16   child has nothing to do with the elements of what they have to

17   prove for this offense, Your Honor.  And it's just incredibly

18   prejudicial in this case.

19   THE COURT:  I agree it's prejudicial.  This would come

20   in for Ferg or Wilson?

21   MR. CAYTON:  This would come in through Wilson, Your

22   Honor.  And I think that there are two parts to that.  I

23   understand the Defense's position on his willingness or desire to

24   have sexual intercourse with a young child.  I think that that is

25   a different analysis than he prefers to look at images or videos

54

1    of children between the ages of eight and ten years old.

2           THE COURT:  I agree.  The court will allow -- did you

3    have something else you wanted to say?

4           MS. BATALLER-SCHNEIDER:  Just to add on to that, if

5    that's okay.  Your Honor, I'm not sure what the relevance of the

6    actual age ranges is.  There's no argument for us that these are

7    not -- that there's not a specific age range or that there's a

8    specific age range that he's interested in.  We're not going to

9    go there, Your Honor.  So I don't know how that's relevant.  This

10   --

11          THE COURT:  Well then -- well, I think it's very

12   relevant in that the age of 12 years is stated repeatedly in the

13   indictment.  I think the -- just because the defense doesn't have

14   an argument about it doesn't mean the Government doesn't have the

15   right to try their case as well as the Defense.

16          And so here is what my thought is.  I'll allow under

17   403 balancing that he preferred to look at girls, little girls or

18   little kids?  I don't remember.

19          MR. CAYTON:  Children between the ages of eight and ten

20   years old was his --

21          THE COURT:  Yeah, children between the ages of eight --

22          MR. CAYTON:  -- preference.

23          THE COURT:  -- and 12.  I'll allow that under Rule 403.

24   But I will not allow, at least unless the door is opened, that

25   about having -- choosing to have sex with -- intercourse, excuse

1  me, with a child that age if allowed.  That may come up later.  I

2  can see how it might not.  Hopefully it won't.  And I think there

3  are ways not to have it come up and that door not to be opened.

4          And so, Mr. Cayton, does the Government have any

5  question about what I'm not allowing?

6          MR. CAYTON:  No, Your Honor.  The Court is specifically

7  not allowing any statements by the defendant regarding his desire

8  to have sexual intercourse with a child.

9          THE COURT:  And the first part of that that I am

10  allowing, and the Court finds that under Rule 403 balancing that

11  prejudicial effect does not substantially outweigh the probative

12  value in showing motive, intent, and knowledge that I will not

13  only of course give written instruction at the end of the case,

14  but I'll give an oral instruction, as well.

15          What's your next statement?  There's, like, five.

16          MR. CAYTON:  Number four would only come in under Agent

17  Wilson.  And based upon the Court's previous ruling on number

18  three, my assumption would be that that would not come in unless

19  the door was open.

20          That is regarding him having contact with an

21  approximately 12-year-old child while roughhousing at a church

22  function.  He didn't believe it to be sexual, but the child, he

23  believed, did take it that way.  My assumption is that would not

24  come in without the door being opened.

25          THE COURT:  Your assumption's correct.  And so if you

1   all think any of that comes in under the last bifurcated ruling

2   or this one, approach.  Don't go there.

3          MR. CAYTON:  Absolutely, Your Honor.  And then number

4   five is the defendant stated that he searched for nudist content

5   specifically searching for children between the ages of eight and

6   ten years of age.  He also stated he had search terms such as

7   PTHC which he knew was associated with child pornography.

8          THE COURT:  I was going to ask.  I saw your motion.

9   What is PTHC?

10          MR. CAYTON:  Preteen hardcore, Your Honor.

11          THE COURT:  Preteen hard -- okay.  I tried to come up

12   with that in my mind what it might be.  I could never --

13          MR. CAYTON:  I'm glad you were not able to.  Definitely

14   don't Google it.

15          THE COURT:  I didn't think about that.

16          Ms. Bataller?

17          MS. SCHNEIDER-BATALLER:  I completely lost my train of

18   thought.  Pretty funny, I'll give it to him.  Your Honor, I would

19   just, to put it in context, what happened was -- and I mean, I

20   can get this out through cross but it might be confusing to the

21   jury.  But Mr. -- Thomas never brought up PTHC.  That was asked

22   of him.  He never said what it meant or anything like that.  So I

23   think that could be a bit confusing for the jury.

24          THE COURT:  Okay.  Okay.  Well, are you bringing up

25   something like PT -- it's something that was not ever said.

1          MR. CAYTON:  Judge, so he was asked about it in the

2     interviews if he had used common search terms such as things like

3     PTHC, and he acknowledged that he had.

4          THE COURT:  So he actually says that in the interview?

5     He says PTHC, and he says I've used common terms like that?

6          MR. CAYTON:  I've searched for almost everything I

7     possibly could.  And then he agreed, he nodded his head when he

8     was asked about PTHC, Lolita, preteen hardcore, preteen softcore.

9     He gave a non-verbal response to Agent Wilson.

10          MS. SCHNEIDER-BATALLER:  That was Agent Wilson after he

11     had already met with Agent Ferg.  And Agent Ferg asked him have

12     you heard of PTHC, and he just simply said yes.

13          MR. CAYTON:  He acknowledged that he heard the term.

14          THE COURT:  Okay.  So I will allow that statement, as

15     well.  Having done a Rule 403 balancing, I do believe that the

16     prejudicial effect, make not mistake, there is a prejudicial

17     effect to all of this, does not substantially outweigh the

18     probative value as it goes to motive, intent, knowledge, possibly

19     lack of mistake or accident.  I guess it would go to all those,

20     all of these would.  And I'll give an oral instruction, of

21     course.

22          Now I propose -- Ms. Bataller, I'd like your input on

23     this.  I propose that once the witness is through testifying,

24     that I give the instruction.  However, I can do it -- there's a

25     chance that he may be -- we may break for lunch and he may still

58

1    be on direct.  I think I should likely give it then as well.

2              Are you -- do you want me to wait?  You all think about

3    that.  I mean, you've got time to tell me.

4              MS. SCHNEIDER-BATALLER:  Okay.

5              THE COURT:  I'll have it ready by then even though he's

6    not done.  Just so I don't want them going to lunch thinking

7    about it.

8              MS. SCHNEIDER-BATALLER:  Right.

9              THE COURT:  But then you all may be saying well, you're

10   raising the red flag where we don't want it.  I'll --

11             MS. SCHNEIDER-BATALLER:  Right.

12             THE COURT:  -- do whatever you'd like.

13             MS. SCHNEIDER-BATALLER:  Okay.

14             THE COURT:  Okay?  You tell me.

15             MS. SCHNEIDER-BATALLER:  We'll let you know, Your

16   Honor.

17             THE COURT:  Okay.

18             MS. SCHNEIDER-BATALLER:  Thank you very much.

19             THE COURT:  Thank you.

20             MS. SCHNEIDER-BATALLER:  Do I have a brief moment to

21   run to the --

22             THE COURT:  Yeah, let's run.  I need to, too.

23             MS. SCHNEIDER-BATALLER:  Thank you.

24             THE COURT:  So let's take five.  I want Mr. Perkins to

25   make sure he gets a break if he can.

1          MS. SCHNEIDER-BATALLER:  Thank you.

2          THE COURT:  Five minutes, and we'll be back in here.

3  We won't keep this jury waiting any longer.  Thank you all.

4      (Recess at 11:15 a.m./Reconvened at 11:22 a.m.)

5      (Outside the presence of the jury; defendant present)

6          THE CLERK:  All rise.

7          THE COURT:  All right.  Everybody's back in, including

8  Mr. Perkins.  Mr. Cayton, Mr. Greenbaum, anything?

9          MR. CAYTON:  Yes, Your Honor.

10          One brief issue that Agent Ferg brought to my

11  attention.  There is a small portion of the audio where he -- the

12  defendant does -- they ask the defendant whether or not he has

13  ever thought about touching a child.  And he kind of mumbles on

14  about it.  He doesn't make any admissions.

15          And I'll just read from the agent's notes if that's

16  okay.  Any contact between him and any kids they asked him, and

17  then a long pause.  I don't do that with kids.  In the past, done

18  debates over different things.

19          Well, I do want to do this or not, if this is a --

20  well, I do -- well do I want to do this or not.  Is this of

21  interest or not.  Usually no.  I've never done anything, it

22  doesn't appeal to me.

23          We're trying to find that part of the audio to cut it

24  out based upon the Court's prior ruling.

25          THE COURT:  So don't just try.  Find it and cut it out.

1          MR. CAYTON:  That's the --

2          THE COURT:  Okay.

3          MR. CAYTON:  -- goal.

4          THE COURT:  Now listen, I'm okay -- I'm assuming this

5     video which is pretty long, I guess --

6          MR. CAYTON:  This is audio only.

7          THE COURT:  It's --

8          MR. CAYTON:  Yeah.

9          THE COURT:  Oh, it's audio only?

10         MR. CAYTON:  Yes.

11         THE COURT:  How long is that one?

12         MR. GREENBAUM:  It's one hour, sir.

13         THE COURT:  It's an hour long?

14         MR. CAYTON:  Yes.  So maybe if the Court's okay, we

15    could go through direct and then when we get time for the audio

16    we can take our break for lunch?  Or I don't know --

17         THE COURT:  That's fine.

18         MR. CAYTON:  -- what the Court's preference is.

19         THE COURT:  That's fine.  As long as it's not, you

20    know, 15 minutes from now.  I mean, let's --

21         MR. CAYTON:  My goal is to make it longer than that,

22    Your Honor.

23         THE COURT:  Okay.

24         MR. CAYTON:  But I never make a guarantee.

25         THE COURT:  And I'm okay -- I want to tell all the

1   attorneys, it's okay that if you all decide to explain why there

2   are lapses in the audio or something like that, or video where

3   there's no sound or something like that.  Just a simple question

4   of the witness basically, was this taken out by agreement of the

5   parties or something like that.  It makes it kind of non-

6   nefarious all of a sudden.  You know, but that's up to y'all how

7   you try your case, both of you.

8           Anything else?

9           MR. CAYTON:  No, Your Honor.

10          THE COURT:  I'm glad you caught that.  Thank you, Agent

11  Ferg.

12          And, Ms. Bataller, Mr. Gorman, anything?

13          MS. BATALLER-SCHNEIDER:  Nothing from us.

14          MR. GORMAN:  No, Your Honor.  Thank you.

15          THE COURT:  Let's bring the jury in.  Thanks.  Agent

16  Ferg, why don't you go ahead and come on up.  And you just stand

17  with the rest of us.  And when we sit down, you stay standing.

18  Okay?

19       (Jury in at 11:24 a.m.)

20          THE COURT:  All right, thank you.  Let's be seated.

21  Mr. Cayton, your next witness is?

22          MR. CAYTON:  Special Agent David Ferg, Your Honor.

23          THE COURT:  Sir, could you raise your right hand,

24  please?

25              DAVID FERG, GOVERNMENT'S WITNESS, SWORN

1          THE COURT:  You may have a seat and adjust yourself.

2    And Mr. Cayton, you may proceed whenever you're ready.

3          MR. CAYTON:  Thank you, Your Honor.

4                      DIRECT EXAMINATION

5    BY MR. CAYTON:

6    Q    Can you please state your name and spell your last?

7    A    My name is David Ferg.  My last name is F-E-R-G.

8    Q    And where are you employed?

9    A    I'm currently assigned as a supervisor and special agent

10   with Homeland Security Investigations in Alpine, Texas.

11   Q    And how long have you been a special agent with Homeland

12   Security Investigations?

13   A    It's 11 years this month.

14   Q    Congratulations on your anniversary.

15   A    Thank you.

16   Q    I want to direct your attention back to the fall of 2019.

17   Where were you assigned at that point?

18   A    I was assigned as a special agent to the office in Alpine,

19   Texas.

20   Q    So you were not a supervisor at that point?

21   A    That's correct.

22   Q    At any point between now and, or between September 2019 and

23   now did you leave the Alpine office?

24   A    Yes.  I had a temporary assignment for 18 months to ICE HSI

25   headquarters in Washington, D.C.

Ferg - Direct/Cayton                63

1   Q    And when approximately did you leave for that?

2   A    That was approximately October of 2020.

3   Q    And around the fall of 2019, did you start an investigation

4   into child pornography?

5   A    Yes, I did.

6   Q    Were you able to complete that investigation based upon the

7   special detail you went on?

8   A    I completed the investigative process.  But the4re were

9   still elements of the case that was ongoing.

10  Q    So you weren't the case agent through the entirety of the

11  case?

12  A    That's correct.

13  Q    And then directing your attention to the investigation you

14  started in the fall of 2019, how did you begin your

15  investigation?

16  A    I located information on law enforcement database that

17  indicated that an IP address located in Fort Stockton, Texas, had

18  possibly made some downloads available to Agent Bonneau in the

19  Rio Grande Valley area.  And so I contacted Agent Bonneau to

20  confirm that information to see if he actually had successfully

21  made downloads from that IP address.

22  Q    And after contacting Agent Bonneau, were you able to confirm

23  whether or not there were downloads that were made?

24  A    Yes.  He made the downloads available to our computer

25  forensics agents in El Paso who provided me with a copy so that I

1    could review them.

2    Q    Now why didn't he send them directly to you?

3    A    Well, because the content involved in that is contraband.

4    And it's not something that we can just, you know, send across

5    our work computers and we have to handle it carefully.

6    Q    Now they -- the information or the data that you received

7    from Agent Bonneau, did you review the content?

8    A    Yes, sir, I did.

9    Q    And what approximately was contained in what you received

10   from Agent Bonneau?

11   A    From what I found that had been provided to me, there were

12   approximately 17 files that were functioning files of varying

13   lengths that would open on a standard computer using your normal

14   video software, video viewing software.  And based on my training

15   and experience, they appeared to be child pornographic materials.

16   Q    And you said that there were 17 functioning files.

17   A    Yes, sir.

18         MR. CAYTON:  Your Honor, at this time I would request

19   permission to play one small clip of one of the files.

20         THE COURT:  Has that been introduced into evidence yet?

21         (No audible response)

22         THE COURT:  So request is denied unless and until

23   that's introduced.

24         MR. CAYTON:  Your Honor, then I would offer into

25   evidence a disc and mark it as Government Exhibit 33.  Actually I

Ferg - Direct/Cayton                                    65

1    think I'm up to 40.  So it would be 41.  And it is a disc

2    containing approximately ten videos and one picture file.

3               MS. BATALLER-SCHNEIDER:  Your Honor, I'm just going to

4    object as to foundation.

5               THE COURT:  As to?

6               MS. BATALLER-SCHNEIDER:  Foundation.

7               THE COURT:  Agreed.  Sustained.  The objection is

8    granted, sustained.  Go right ahead, Mr. Cayton.

9    BY MR. CAYTON:

10   Q    You say you reviewed these 17 files?

11   A    Yes, sir.

12   Q    Were there any filers that you believed to be child

13   pornography?

14   A    Yes, sir.

15               MS. BATALLER-SCHNEIDER:  Your Honor, I'm going to

16   object as that's a legal conclusion.

17               THE COURT:  Sustained.

18   BY MR. CAYTON:

19   Q    Were there any files that appeared to be child sexual abuse

20   material to you?

21   A    Based on my training and experience --

22               MS. BATALLER-SCHNEIDER:  Your Honor, another objection.

23   It's the same thing.

24               MR. CAYTON:  The legal definition of child pornography,

25   Your Honor.

1          THE COURT:  I'll sustain the objection.  Rephrase your

2   question.

3   BY MR. CAYTON:

4   Q     Were there any videos that were concerning to you in your

5   investigation?

6   A     Yes, sir, there were.

7   Q     Why?

8   A     In viewing the videos, they appeared to be involving

9   underage individuals engaged in sexual activity.

10  Q     Were there only underage individuals in these videos?

11  A     No, sir.  Some of the videos also included adults

12  interacting with underage individuals.

13  Q     Now you were present during jury selection on Friday,

14  correct?

15  A     Yes, sir, I was.

16  Q     And you heard a description of a particular video by Defense

17  Counsel?

18  A     Yes, I did.

19  Q     Do you remember what the basic description of that video

20  was?

21  A     I do remember the basic description.  Yes.

22  Q     Can you describe that for the jury today?

23  A     Essentially it's a short, color video showing what appears

24  to be a pre-pubescent naked male with an erect penis straddling a

25  naked adult male with an erect penis.  And the adult male is

Ferg - Direct/Cayton                                    67

1    masturbating himself against the pre-pubescent boy's penis.

2    Q    And does the adult male ejaculate on the child?

3    A    In the video, yes, he does.

4    Q    Is this one of the videos that you received from Agent

5    Bonneau?

6    A    Yes, it was.

7    Q    So this was one of the videos that was downloaded from the

8    IP address you were investigating?

9    A    Yes, sir.

10   Q    Do you know what that IP address is?

11   A    I do not know it off the top of my head, sir.

12   Q    Would reviewing your notes or your records refresh your

13   recollection?

14   A    Yes, it would.

15        MR. CAYTON:  With the Court's permission, can the

16   witness refresh his recollection?

17        THE COURT:  Yes, sir.  Of course.  You may approach.

18   BY MR. CAYTON:

19   Q    Do you have a copy with you?

20   A    I don't.  If there are any ROIs in here, it would have it.

21   Q    Let me take a step back.  Did you do any subpoenas based

22   upon the IP address?

23   A    Yes, sir, I did.

24   Q    And what was the purpose of those subpoenas?

25   A    The purpose of the subpoena was to obtain what's called the

1  subscriber information.  Basically the account holder, user of

2  that specific IP address.

3  Q    And did you say you had a copy of your ROI?

4  A    Not with me, sir.  No.

5  Q    And the IP address that you were looking for, was it the IP

6  address that was able to receive the downloads?

7  A    Yes, sir.

8  Q    pk and would reviewing your -- a copy of your report of

9  investigation help you refresh your recollection?

10  A    Yes, sir, it would.

11         MR. CAYTON:  May I approach, Your Honor?

12         THE COURT:  Yes, sir, you may.

13  BY MR. CAYTON:

14  Q    Please don't testify off the document, just review it and

15  look up when you're ready.

16  A    Yes, sir.

17  Q    Do you remember the IP address that you were investigating?

18  A    Sir, 69.128.225.159.

19  Q    And that's a standard IP address?  It's that grouping of

20  numbers like that

21  A    Yes, sir.

22  Q    So you said you did a subpoena to try to find subscriber

23  information.  Is that correct?

24  A    Yes, sir.  That's correct.

25         MR. CAYTON:  Your Honor, I have what's been marked as

1  Government Exhibit 1 for identification.  I'd like to show it to

2  the witness.

3            THE COURT:  Yes, sir.

4            MR. CAYTON:  May I approach?

5            THE COURT:  Yes, sir, you may.

6  BY MR. CAYTON:

7  Q    Agent Ferg, I've just handed you what's been marked as

8  Government Exhibit 1 for identification.  Do you recognize that

9  document?

10 A    Yes, I do.

11 Q    What is that document?

12 A    This was the response that we received from the internet

13 provider which was TDS Telecom in request to our -- to our

14 request for subscriber information.

15 Q    Did they also include a business record affidavit?

16 A    Yes, sir, they did.

17 Q    And how do you know that's what that document is?

18 A    Because I received this myself.  And I recognize it.

19 Q    And is that the same IP address that you were investigating?

20 A    Yes, sir.

21           MR. CAYTON:  Your Honor, I'd offer into evidence

22 Government Exhibit 1 for identification as Government Exhibit 1.

23           THE COURT:  Ms. Bataller?

24           MS. BATALLER-SCHNEIDER:  No objection.

25           THE COURT:  Government's Exhibit 1 is admitted without

1    objection.

2         (Government's Exhibit 1 admitted into evidence)

3    BY MR. CAYTON:

4    Q    Special Agent Ferg, based upon the subpoena you got, were

5    you able to develop a target for your investigation based upon

6    that IP address?

7    A    Based in the information we received, we were able to

8    identify a target location and attempt to identify anyone living

9    at that location.

10   Q    And where was the target location?

11   A    The target location was a residential address.  It was 404

12   South Seals Street in Fort Stockton, Texas.

13   Q    And after you received that address, what was the next step

14   in your investigation?

15   A    From there we started doing kind of our basic investigative

16   checks.  Based on the subscriber information, it had included the

17   name John Perkins as the subscriber.  So we did basic background

18   on what we could find on Mr. Perkins and anyone else that we

19   could discover living at that address.

20   Q    As part of this investigation, did you do any surveillance

21   at the address?

22   A    Yes, sir.  On multiple occasions I drove by that particular

23   residence and either would stop for a brief -- brief times or

24   just drive by.

25              MR. CAYTON:  Your Honor, I have what's been marked as

Ferg - Direct/Cayton                                    71

1    Government Exhibit 2 for identification.  May I approach the

2    witness?

3              THE COURT:  You may approach.

4              THE WITNESS:  Which number?

5              MR. CAYTON:  Number 2.

6              THE WITNESS:  Yes.

7    BY MR. CAYTON:

8    Q    So reviewing Government Exhibit 2 for identification, do you

9    recognize this picture?

10   A    Yes, I do.

11   Q    And how do you recognize that picture?

12   A    This looks like one of the photos that I would have taken

13   during surveillance of the target location.

14   Q    Why do you take photos of the target location?

15   A    So I don't have to rely on my memory and we have documented

16   what the house looked like and who may have been there at the

17   time.

18   Q    And this is a fair and accurate reflection of how the house

19   looked when you were doing your surveillance?

20   A    Yes, sir.

21             MR. CAYTON:  Your Honor, I'd offer into evidence

22   Government Exhibit 2 for identification as Government Exhibit 2.

23             MS. BATALLER-SCHNEIDER:  No objection.

24             THE COURT:  Government's Exhibit 2 is admitted without

25   objection.

1         (Government Exhibit 2 admitted into evidence)

2    BY MR. CAYTON:

3    Q    How many times did you go to that location and do

4    surveillance?

5    A    It was spread across a couple of months.  I would say

6    somewhere between six to ten times.

7    Q    And what is the point behind doing surveillance when you

8    have a target location?

9    A    To identify who's living there, see if we can discern any

10   sort of patterns of life, identify vehicles that might be there.

11   We also start to consider things if we're going to be moving

12   towards a search warrant as far as officer safety such as do we

13   see dogs in the yard or other things like that.

14   Q    And after -- what other investigative steps are you taking

15   at this time?

16   A    Based on the information that we had located, we also found

17   that Mr. Perkins was a federal employee with the Department of

18   Agriculture.  And so part of that, knowing that each federal

19   agency has their own it's called the Office of Inspector General

20   or OIG, that has investigators tasked with investigating fraud,

21   waste, and abuse related to the employees or programs of that

22   specific agency.

23        We contacted the OIG office for Department of Agriculture

24   just to basically give them notice about our investigation, and

25   also to see if they wanted to participate.

1   Q    Now when you're talking about Mr. Perkins, are you talking

2   about the defendant or someone else?

3   A    As far as the Department of Agriculture employee, that would

4   be Mr. John Perkins, not the defendant.

5   Q    Is that the defendant's father?

6   A    Yes.

7   Q    So after reaching out to OIG, what was the next

8   investigative step you took?

9   A    At that point, we continued to gather information, conduct

10  surveillance until we felt that we had sufficient probable cause

11  to seek a federal search warrant for the location.

12  Q    And was a search warrant obtained?

13  A    Yes, it was.

14  Q    And was that search warrant executed?

15  A    Yes, it was.

16  Q    On what day was the defendant's house searched?

17  A    That was on January 9th, 2020.

18  Q    Prior to searching the house, did you try doing -- or prior

19  to the house being searched, did you try to take any steps to

20  ensure there would be minimal damage or minimal issues during the

21  search?

22  A    Yes, sir.  Myself and the special agent with Department of

23  Agriculture OIG interviewed both Mr. John Perkins and

24  subsequently his wife, Elizabeth Perkins outside of their house

25  to try to gather more information about what the situation was

1    inside the house before sending any agents in.

2    Q    And while you had Mr. and Mrs. Perkins, was the search

3    warrant executed?

4    A    Yes, it was.

5    Q    And were you present during the search warrant being

6    executed?

7    A    No, I was not.

8    Q    At any point were you able to meet a Thomas Perkins?

9    A    Yes, I was.

10   Q    And how did you come to meet Thomas Perkins?

11   A    After the initial clearance of the search warrant, he was

12   brought over to the Texas DPS office where we were located, and

13   we conducted an interview with him there.

14   Q    And is Mr. Thomas Perkins in court today?

15   A    Yes, he is.

16   Q    Can you please identify him for the record?

17   A    He's sitting at the defense table in a dark jacket with

18   glasses and facial hair.

19           MR. CAYTON:  Your Honor, I would ask the record reflect

20   the identification of the defendant.

21           THE COURT:  The record shall so reflect.

22   BY MR. CAYTON:

23   Q    Now you said you came to interview the defendant,

24   Mr. Perkins --

25   A    Yes, sir.

Ferg - Direct/Cayton                    75

1    Q    -- Mr. Thomas Perkins?  And prior to interviewing him, did

2    you read him his Miranda rights?

3    A    Yes, we did.

4    Q    I'd ask you to flip to Government Exhibit 5 for

5    identification.

6    A    Yes, sir.

7             MR. CAYTON:  May I have just a moment, Your Honor?

8             THE COURT:  Yes, sir.

9         (Pause)

10   BY MR. CAYTON:

11   Q    And what is Government Exhibit 5 for identification?

12   A    This would be the standard form in English that our agency

13   uses to advise individuals of their rights.

14   Q    And are there any signatures on this form?

15   A    Yes, there are.

16   Q    Whose signatures are on this form?

17   A    They're the signatures of Thomas Perkins, myself, and USDA

18   OIG Agent Craig Butler.

19   Q    And were you there when these signatures were made?

20   A    Yes, I was.

21            MR. CAYTON:  Your Honor, at this time I'd offer into

22   evidence Government Exhibit 5 for identification as Government

23   Exhibit 5.

24            MS. BATALLER-SCHNEIDER:  No objection.

25            THE COURT:  Government's Exhibit 5 is admitted without

1    objection.

2        (Government's Exhibit 5 admitted into evidence)

3    BY MR. CAYTON:

4    Q    And after informing the defendant of his rights, did he

5    agree to speak with you?

6    A    Yes, he did.

7    Q    I want to talk a little bit about your interview with the

8    defendant.  How did the interview begin?

9    A    The interview began with us introducing ourselves, showing

10   him our identification to assure him who we were.  And then

11   generally, we -- we move on to a little bit of kind of

12   biographical information just to get to know the person and a

13   little bit about their background.

14   Q    Is this also called rapport building?

15   A    Yes, sir.

16   Q    What's the general purpose around it?

17   A    The general purpose is to try to just build a little bit of

18   trust and relationship with that person, a little bit of common

19   ground, and also just to get to know a little bit more about them

20   to -- to see where they're coming from.

21   Q    At any point do you inform the defendant, or did you inform

22   the defendant what he was being investigated for?

23   A    Yes, we did.

24   Q    And what did you inform him you were investigating him for?

25   A    Actually at the very beginning of our interview when we

1    first sat down, we indicated just that we were there based on

2    some computer activity that we had become aware of.

3    Q    And when you told the defendant you were there about

4    computer activity, did he have any response?

5    A    He did.  He immediately said there's a lot of stuff I've

6    been meaning to get rid of.

7    Q    Did that -- I'll move on.  Did you attempt during your

8    interview to ascertain the defendant's computer skills?

9    A    Yes, we did.

10   Q    Why?

11   A    The potential violations or technology use in this case

12   based on my training and experience require at least a little bit

13   more than your basic user.  I know before I began any of these

14   investigations, I wasn't familiar with peer-to-peer, BitTorrent,

15   anything like that.  And so it's helpful to know what level a

16   person may be at when we're talking to them.

17   Q    When you asked about his technical skills, what if anything

18   did the defendant say?

19   A    He confirmed that he thought himself quite tech savvy.  He

20   confirmed that he graduated high school and had taken some

21   college classes.

22   Q    Did he -- did you ever ask him about his ability with

23   computer hardware, different types of computers?

24   A    I believe we did ask him generally what sort of devices he

25   used, if he liked video games, things like -- of that nature.

1   Q    And what if anything was his response?

2   A    Yes.  That he had multiple computers, laptops.  He confirmed

3   that he did play video games.

4   Q    Did you ever attempt to ascertain his knowledge of peer-to-

5   peer programs or BitTorrent, anything like that?

6   A    Yes.  We did ask him specifically if he was familiar with

7   peer-to-peer and BitTorrent.

8   Q    And what if anything was his response?

9   A    He confirmed that he was.  He gave a basic explanation of

10  the way the system worked and confirmed that he had used that

11  software in the past.

12  Q    Did he talk about any particular peer-to-peer softwares that

13  he used?

14  A    He did specifically mention one called Tixati that he had

15  used.

16  Q    Now once you had ascertained that he understood about peer-

17  to-peer or BitTorrent-type softwares, did you ask him about any

18  searches he had done?

19  A    We did ask him what sort of searches he would use for --

20  while using the software, yes.

21  Q    And what if anything was his response?

22  A    In general, his responses were that he made very, very broad

23  searches, sometimes as broad as just jpeg which is like a picture

24  file, computer, things of that nature.

25  Q    Did he say why he was searching for these broad searches?

Ferg - Direct/Cayton                                                    79

1   A    Basically said that he enjoyed searching, he enjoyed the

2   downloading and uploading.

3   Q    Did he talk about what he did with the material that he

4   downloaded?

5   A    He stated that he would -- that by basically the searches,

6   he was collecting very large amounts of information, and that he

7   would sort of weed through and determine what he wanted to keep

8   and what he would want to get rid of.

9   Q    Did he have a specific term he used for things he would want

10  to get rid of?

11  A    Undesirable content I believe was -- were some of his words.

12  Q    Did he say how he got rid of undesirable content?

13  A    Well, he stated that he had been intending to what's called

14  secure delete things, but that he had not gotten around to it

15  yet.

16  Q    Did he say how long or how long he'd been intending to

17  securely delete things?

18  A    He told us he had approximately ten years worth of data that

19  he had been intending to go through.

20  Q    Did he tell you when he was planning on securely deleting

21  this information?

22  A    He did tell us that he had planned to get the software that

23  very same day.

24  Q    Now as you continued to interview him, did you tell him a

25  little bit more of why you were there and what you were able to

Ferg - Direct/Cayton                                    80

1    find?

2    A    Yes, we did.

3    Q    And what did you tell him as far as why you were there and

4    what you were able to find?

5              MS. BATALLER-SCHNEIDER:  Objection, hearsay.

6              THE COURT:  Can you repeat the question, please?

7              MR. CAYTON:  What did you tell him on why you were

8    there and what you were able to find?

9              THE COURT:  Overruled.

10             THE WITNESS:  We told him that we were there based on

11   law enforcement having successfully downloaded images or videos

12   from his IP address that contained child exploitation materials.

13   BY MR. CAYTON:

14   Q    What if anything was his response?

15   A    In general with his responses he frequently just said that

16   it was a lot I had meant to get rid of.

17   Q    Did he say about any techniques he used to prevent someone

18   from finding out?

19   A    He --

20   Q    Or --

21   A    He mentioned -- he reacted very surprised that anyone had

22   been able to get any downloads from him.  He stated that he had

23   been using two or more VPNs for virtual private networks.

24   Q    And did he say anything specifically regarding the idea that

25   you were able to get a download from him/

Ferg - Direct/Cayton                                81

1    A    Again, he was quite surprised by that, and indicated that it

2    must have been done in some sort of illegal fashion.

3    Q    Do you know what a VPN is?

4    A    I have a rudimentary understanding of VPN, yes.

5    Q    But he said that he was using two different VPNs?

6             MS. BATALLER-SCHNEIDER:  Your Honor, I'm going to

7    object.  That was not in evidence.

8             THE COURT:  I'm sorry, the objection is?

9             MS. BATALLER-SCHNEIDER:  That was not in evidence.

10            THE COURT:  Sustained.

11   BY MR. CAYTON:

12   Q    What did he say specifically regarding VPNs?

13   A    Just that he was surprised that we had been able to get

14   anything from him because he had been using two VPNs.  We asked

15   him why he would be using VPNs, and he said for security

16   purposes.

17   Q    So he seemed surprised over the idea that you would be able

18   to get something because of these VPNs he was using?

19   A    Yes.

20   Q    Did you ever ask him to talk to you about how BitTorrent

21   worked?

22   A    Yes, we did.

23   Q    And what if anything was his response?

24   A    Basically -- he gave us a basic understanding, explanation

25   that it was peer-to-peer software with multiple files being

Ferg - Direct/Cayton                    82

1    shared and downloaded from other users.

2    Q    Did he tell you whether or not he had any knowledge of

3    sharing on BitTorrent software?

4    A    I know that we told him specifically that we had been able

5    to, and that is software had made these things available to

6    download.  And he stated that he should have disabled that

7    feature.

8    Q    Did he talk about what if any content he was sharing?

9    A    As far as content that was being shared, he stated that it

10   was none of his own content, but indicated that things that he

11   had downloaded may have been available for sharing.

12   Q    Now through this interview that you're having with him, is

13   it a linear interview?  Are you guys kind of bouncing back and

14   forth?  How were you going through the interview?

15   A    There was definitely some kind of bouncing back and forth as

16   topics came up and as we were able to stay on focus.

17   Q    Did you continue to talk to him about the facts that agents

18   had been able to download material from him?

19   A    We did mention that on several occasions, yes.

20   Q    And what was his response each time?

21   A    Just continuing to be kind of incredulous that that had

22   happened.

23   Q    Now going -- stepping away from downloading, at any point

24   did you talk to him about if he was ever searching for specific

25   material?

Ferg - Direct/Cayton                                        83

1    A    Yes, we did ask him multiple times to try to clarify exactly

2    which sort of search terms or what sort of content he was looking

3    for.

4    Q    Did he talk to you about any search terms he used?

5    A    He was quite evasive about any sort of terms.  He

6    specifically said I'm only going to speak in general terms and

7    not -- not give you any specifics.

8    Q    Did he ever talk about researching what he could and could

9    not download?

10   A    Yes, he did.

11   Q    And how did this topic come up?

12   A    So this was kind of in relation to when we had mentioned --

13   actually, we were discussing child pornography.  And I asked him

14   what does child pornography mean to him, what is his

15   understanding of it.  And he indicated that he had been doing his

16   own research.  And based on his understanding that there had been

17   a Supreme Court ruling that if there was only nudity involved but

18   nothing else that that was legal to view and possess.

19   Q    So as you continued to talk to him about what he's searching

20   for, does he ever talk about this nudity again?

21   A    Yes.  He did bring it up fairly often that what he called

22   nudist content was what he preferred.

23   Q    Did he ever talk about a particular age range or type of

24   nudity content that he liked?

25   A    Not that I recall in our interview.

Ferg - Direct/Cayton                                    84

1   Q    Did you ever talk to him about what you might find if you

2   searched his devices?

3   A    Yes, we did.

4   Q    And what if anything was his response to those questions?

5   A    Again, it was generally repeating that there were lots of

6   things that he intended to get rid of.

7   Q    Did you ever ask him what he did with the content outside of

8   it being on the computer?

9   A    I don't recall at this time.

10  Q    Did you ever ask him if he was aroused by the content?

11  A    Yes, we did.

12  Q    And what if anything was his response?

13  A    He indicated that he would be aroused by the nudist content

14  that he had.

15  Q    Did he ever tell you if he would do anything based upon

16  being aroused by the content?

17  A    We did ask him specifically if he masturbated while watching

18  the content.  And he confirmed that he had in the past.

19  Q    Did he say what type of content specifically he masturbated

20  to?

21  A    Just nudist content were the terms that he would use.

22  Q    Did you ask him about any known child pornography search

23  terms?

24  A    Yes, we did.

25  Q    And what specifically did you ask him in regard to known

1  child pornography search terms?

2  A    I specifically asked him about PTHC which I know stands for

3  preteen hardcore and is a common term that is used to locate

4  child exploitation materials.

5  Q    Did he tell you whether or not he was familiar with that

6  term?

7  A    He told me that he did know what that stood for.

8  Q    Did he tell you if he had ever used that search term?

9  A    He would not confirm that.

10  Q    Did you ever talk to him about the concept of possession and

11  distribution?

12  A    Yes, we did.

13  Q    In regards to possession, what if anything was his response

14  when you were speaking to him about possessing material?

15  A    He grew quite frustrated with us that we kind of continued

16  to talk to him about -- he just continued to say that there was

17  stuff he wanted to get rid of, that he needed more time to get

18  rid of it.  And we explained to him that even if he was intending

19  to get rid of it, he was still possessing the material at that

20  time.

21  Q    Did he have any response after you explained that to him?

22  A    I believe he did say that again that was more that he should

23  have gotten rid of, and that -- that's all I recall for the

24  moment.

25  Q    In regards to distribution, did he tell you whether or not

1    he knew that he was sharing material?

2    A    After we made that known to him that law enforcement had

3    been able to, he did state that he should not have had that

4    option selected.

5    Q    The option to share?

6    A    Yes.

7    Q    So he acknowledged to you that he was sharing?

8    A    Yes.

9         MS. BATALLER-SCHNEIDER:  Objection to that, Your Honor.

10   I'd move to strike.  That was a leading question.

11        THE COURT:  Sustained to the leading question.  I'll

12   strike the question and the answer, and the jury will disregard.

13   Go ahead, Mr. Cayton.

14   BY MR. CAYTON:

15   Q    Did you ever ask him whether or not he knew he was sharing?

16   A    Yes.  I believe we did.

17   Q    And what if anything was his response?

18   A    I believe that he acknowledged that he recognized that his

19   software was sharing.

20   Q    Did you ask him when the last time he downloaded material

21   was?

22   A    Yes, I believe we did.

23   Q    And what if anything was his response?

24   A    I believe he had stated that it was a few months prior.  And

25   this again was in January of 2020.

1    Q    Did he say why?

2    A    Can you clarify the question?

3    Q    Did he say why the last time he downloaded was a few months

4    prior?

5    A    I believe he indicated that all of his devices and hard

6    drives were basically full, and so that he had sort of stopped

7    since then.

8    Q    Now did you ever ask him whether or not anyone on the

9    household was involved in downloading this type of material?

10   A    He specifically mentioned to us that his parents were not

11   involved in anything else, in anything related to this.

12   Q    Now after you interviewed him, you stated that at some point

13   you went on a temporary duty?

14   A    Yes, sir, that's correct.

15   Q    Were there any other investigative steps that you took

16   before you went on that temporary duty?

17   A    At that point investigative stage was essentially completed.

18   I do remember one specific request that I made to our computer

19   forensics agent in El Paso, Tony Yanez.

20   Q    And what was that request?

21   A    That request was I provided him with the information, the

22   file names and descriptions that I had received from Agent

23   Bonneau and asked Agent Yanez to search the devices that had been

24   seized from the search warrant to see if he could find any of

25   those same files.

Ferg - Direct/Cayton                                    88

1    Q    And did Agent Yanez ever get you a response?

2    A    Yes, he did.  He confirmed that of the 17 files that I had

3    received, he found approximately 15 of them on the devices seized

4    from the Perkins' residence.

5    Q    And did you ever get a chance to review the evidence from

6    the devices that were seized from the Perkins' residence to

7    confirm that?

8    A    Yes, sir.  I have reviewed some of the videos.

9    Q    Now that video we spoke about a little bit earlier about an

10   adult male with a male child on his lap while the adult male is

11   masturbating, were you able to locate that on one of the hard

12   drives --

13   A    Yes, sir.  CFA --

14   Q    -- seized from the residence?

15   A    CFA Yanez was able to locate that on I believe two different

16   devices.

17   Q    And did you review that video based upon the computer

18   forensics analysis that was conducted?

19   A    Yes, I have reviewed it since then.

20   Q    So just to be clear, you reviewed it when you got the

21   original evidence from Agent Bonneau, and then you reviewed it

22   again based upon the evidence you received from the drives?

23   A    Yes, sir.  That's correct.

24   Q    Was the video the same video that you had seen months

25   earlier in your investigation?

1  A    Yeah.  And as far as I could tell, yes, it was the same.

2          MR. CAYTON:  May I have a moment, Your Honor?

3      (Pause)

4          MR. CAYTON:  Your Honor, at this point I would request

5  permission to publish Government Exhibit 1, 2, and 5 to the jury.

6          THE COURT:  You may.  Why don't you pull this flat

7  screen, can we pull it back around where they can see it?  Thank

8  you.  Thank you.  So you ought to have two screens to look at.

9  You can go to your right, or you could look straight ahead.

10  BY MR. CAYTON:

11  Q    Now, Agent Ferg --

12          THE COURT:  I'm going to have to get you on the

13  microphone.  You're going to have to get closer than that.  You

14  talk softer than my wife.

15          MR. CAYTON:  My wife says the same thing, Your Honor.

16          THE COURT:  You need to speak up.

17  BY MR. CAYTON:

18  Q    Agent Ferg, can you see this document?

19  A    Yes, I can.

20  Q    Is this Government Exhibit 1, the certification of business

21  records?

22  A    Yes, it is.

23  Q    This is why they don't let lawyers touch things.  Can you

24  move to the second page?  And do you recognize this document?

25  A    Yes, I do.

Ferg - Direct/Cayton                                    90

1   Q    And is that the subpoena return that you received from TDS?

2   A    Yes, it is.

3   Q    And that confirms the subscriber information?

4   A    Yes.

5            THE COURT:  Now is this one going to pop up too,

6   Mr. Cayton?  Is it just trying?  There we go.  Thank you.

7            MR. CAYTON:  Now, Your Honor, I'd like to publish

8   Government Exhibit 2.

9   BY MR. CAYTON:

10  Q    And, Special Agent Ferg, is this the house you were doing

11  surveillance on?

12  A    Yes, it is.

13  Q    And is this the Perkins residence?

14  A    Yes.

15  Q    And is this the only picture you took?

16  A    No.  I took multiple pictures.

17  Q    But for reference, this is the house that you ended up doing

18  a search warrant on?

19  A    Yes, sir.

20  Q    Now Government Exhibit 5.  And, Special Agent Ferg, can you

21  see this document?

22  A    Yes, I can.

23  Q    Is this the rights advisement that you gave the defendant?

24  A    Yes, it is.

25            MR. CAYTON:  And, Your Honor, at this point we may be

Ferg - Direct/Cayton                    91

1    at a good stopping point.

2            THE COURT:  I'll have the attorneys approach.  Y'all

3    feel free to stand if you'd like for a moment.  This won't take

4    long.

5        (Bench conference at 12:06 p.m.)

6            THE COURT:  Outside the presence of the jury.  All

7    right.  So how much more do you have on him?  Are you going to

8    play --

9            MR. CAYTON:  This is where I'd like to play the audio.

10   And that would pretty much be the end of him.

11           THE COURT:  How long is that going to take?

12           MR. CAYTON:  (Indiscernible) snip that part out or to

13   --

14           THE COURT:  Is it not ready to go yet?

15           MR. CAYTON:  No.

16           THE COURT:  How long is it going to take to play it

17   once you play it?  And if you had it ready right now, how long

18   would it take?

19           MR. CAYTON:  Approximately 45 to 50 minutes.

20           THE COURT:  Okay.

21           MR. CAYTON:  We were going to snip out the last ten

22   minutes and then just --

23           THE COURT:  Okay.

24           MR. CAYTON:  -- this little portion.

25           THE COURT:  All right.  Well, it sounds like this is

Ferg - Direct/Cayton                        92

1    the best place for a break.  When that comes back, that brings me

2    back to my question of you.  It seemed to me like you really

3    haven't gotten anything yet done.  You're good?

4            MS. BATALLER-SCHNEIDER:  No, we can wait.

5            THE COURT:  Okay.  I'll wait till --

6            MS. BATALLER-SCHNEIDER:  Yeah, that's fair.  Thank you,

7    Your Honor.

8            THE COURT:  I'll wait till after he's completely

9    finished and about to get off the stand unless you want it after

10   his direct, and you can tell me that later.

11           MS. BATALLER-SCHNEIDER:  I'll let you know, Your Honor.

12           THE COURT:  Just trying to think which would be best.

13   Y'all can decide.

14           MS. BATALLER-SCHNEIDER:  Yeah.  We'll discuss that.

15           THE COURT:  Okay.  Thank y'all.

16           MS. BATALLER-SCHNEIDER:  Thank you.

17       (Bench conference ends at 12:07 p.m.)

18           THE COURT:  So, ladies and gentlemen of the jury,

19   there's some things I've ordered the attorneys to do for -- in

20   preparation of the next step in the case with this witness.  And

21   I've got to give them time to do that.  You'll understand later.

22   So I'm going to have you go to lunch.

23           This is earlier than I meant to, but only because it's

24   the best time to do it.  We'll just waste your time for the next

25   20 minutes if I was trying to get to 12:30.  So tomorrow I'll try

1    to make the 12:30.  You know, that's my plan.  I don't want you
2    to have a lot of trouble.

3            You're going to leave your juror badges here in the
4    chair, or in the jury room.  Just don't take them to your vehicle
5    and then remember because then you'll forget when you come back.
6    When you come back from lunch, we've got to have all of you.

7            So don't think oh, I know -- they can get started
8    without me.  I know I'm late but they can get started without me.
9    We can't.  We've got to have all of you, and they've got to have
10   me.  So the 15 of us, you know, are important regardless of what
11   my wife says.  I am important for that one moment.

12           So you can go to lunch.  You can go to lunch together
13   if you want.  You don't have to, but you're welcome to.  Just
14   don't talk about anything about the case.  I always joke that
15   don't even talk about how good looking the judge is.  And that's
16   a -- I know that's a joke.  I know, the men are all shaking their
17   heads.

18           But the reason I say it is if you don't say anything,
19   and the anything no matter how silly it might be about the trial,
20   you don't get started talking about the trial either if you're
21   with each other or somebody else because if you're like me, I can
22   just say oh yeah, well that one lawyer's really smart or
23   whatever.  And the next thing I know, I'm talking about the case.
24   And so I don't want you going there.  I'm just trying to help
25   prevent that from happening.

1    You'll leave your notebooks in here.  You'll get sick

2    of me saying that.  I'm going to give you about an hour and a

3    half.  So you'll be back -- if you'll be back about 1:35 or 1:40,

4    we will start no later than 1:40.  Cristina, is that right?

5         THE CLERK:  Yes, sir.

6         THE COURT:  It's an hour and a half.  Okay.  I misread

7    the clock one time a few years back, and we gave everybody, like,

8    two and a half hours for lunch.  And later I was asking

9    Ms. Lerma, I was like where is everybody.  And she said you gave

10   them all -- you told them -- I misread the clock.  That's what I

11   -- yeah.  I learned how to tell time when I was a little boy, and

12   I misread the clock.  So I always ask her now.

13        Until the trial's over, you're not to discuss the case

14   with anyone including your fellow jurors.  If anyone approaches

15   you and tries to talk to you about the case, advise me about it

16   immediately.  Do not read or listen to any news reports of the

17   trial or use any technology tools to do independent research.

18        Don't post on social media, please.  We've not ever had

19   any problems with that here.  There have been problems elsewhere

20   in the nation.  And there's no reason for that. The people who

21   know -- you have the -- I don't know if it's the luxury, the

22   benefit of having the weekend to tell people, your loved ones,

23   your employers, people like that that you had jury duty.

24        So if you have to tell anybody during lunch, just tell

25   them that.  If anybody asks you -- we all know in this day and

Ferg - Direct/Cayton                     95

1   age that you can't talk about it.  Everybody knows that.  You can

2   tell them after the trial's over, the Judge tells me that I can

3   give you a full download.  You know, that usually puts -- you

4   know, okay, okay, I'll talk to you about it later.  And you'll be

5   free to do that once you're released from your oath.

6           Finally, don't speak with anyone in or around the

7   courthouse or your fellow jurors -- other than your fellow jurors

8   and the court personnel.  So I if see you, I'm going to say

9   hello.  I'd like you to say hello.

10          If an attorney sees you, you're passing in the hallway,

11  you're passing on the sidewalk, typically the lawyer is going to

12  look the other way.  They're not trying to be rude.  They're

13  trying to make sure because you may just be saying hello, good

14  afternoon, I hope you had a good lunch, whatever.  And it's

15  really, there's nothing harmful about that.

16          But somebody who can't hear you but can see you talking

17  won't know what you said.  And so they'll sometimes think oh,

18  that doesn't look good.  And so just to keep the appearance of

19  impropriety at bay, we don't do that.  And so the lawyers aren't

20  trying to be rude.  They're trying to follow my ruling, my orders

21  that they not look at you and not talk to you.

22          I'll be offended if you don't say hi to me.  So, but

23  for them, let's keep it that way, or anybody else that you know,

24  you've come to realize has a part in the trial.

25          Remember most importantly to keep an open mind until

Ferg - Direct/Cayton                                    96

1    all the evidence has been received.  When it's been received and

2    you're about to go deliberate, I'll tell you.  Now you've got the

3    case, it's yours.  I'll make sure you know that.  You've not

4    received it yet.  We're going to have a number of stops and

5    starts and breaks, and I want to make sure you know that.

6         So talk about the Cowboys, how good they're going to be

7    next year.  It's always next year, right, or whatever.  That's

8    what I always think.  But don't talk about this, okay?

9         With that, any questions?  You all good?  All right.

10   And we're going to stay and work because you'll find that most of

11   the time when y'all, especially when you leave the building,

12   we'll stay and work a little bit.  And I'll bring them back early

13   so that we're not in your way in the hallway.  You know, there's

14   a reason for all that.  But we also have other work we can do and

15   keep you all from having to wait on us.

16        So I'll see you back here at 1:40.  We're going to

17   start right then.  Let's rise for this jury.  Have a good lunch,

18   y'all.  And don't forget to come back.

19        (Jury out at 12:13 p.m.)

20        THE COURT:  Let's have a seat, please.  Outside the

21   presence of the jury.  All right.  So, Mr. Cayton, as to your

22   request the first time, when you went to retrieve the document,

23   you didn't ask.  Please ask permission to approach.  I think that

24   was just an oversight.  I didn't want you thinking once I get

25   permission, I can go.

1          On publishing, if you'll ask my permission the first

2    time, then for the rest of the trial whoever wants to play it can

3    play it.  But just let me know.

4          I had one time a -- I thought we had it clear, and I

5    think it was a pro se civil case, a pro se defendant.  I thought

6    we had it clear, and he -- and I was working and wasn't looking

7    up.  And he already -- he put something up that was not supposed

8    to be up.  And I just -- that's why I do that.  I'm very

9    regimented about that.  I want to make sure that nobody is

10   unfairly prejudiced by anybody else.

11         Mr. Cayton and Mr. Greenbaum, anything you want to take

12   up or we need to take up outside the presence, or anything we

13   need to come back early for?

14         MR. GREENBAUM:  Judge, I just wanted to bring one

15   simple housekeeping thing up.  I believe that one of our next

16   witnesses, or soon to be called witnesses is going to be evidence

17   custodian.

18         THE COURT:  Okay.

19         MR. GREENBAUM:  The reason why I bring that up is

20   there's actual physical evidence here like laptops, computer like

21   the desktops in addition to devices.  Would it be okay with the

22   Court's permission if I go ahead, I set up a table here, if I go

23   ahead and put them over there now, or should I just have them try

24   to lug them in when he comes and testifies.

25         It's just normally if it's just a few things, I just

1   have them lug it in.  But if the Court's preference is just to

2   have them bring it in groups or whatever, I could do that, Judge.

3            THE COURT:  Is there a table up here?

4            MR. GREENBAUM:  I did.  I set up a little one --

5            THE COURT:  Oh, you did?

6            MR. GREENBAUM:  -- with Ms. Lerma's permission, Your

7   Honor.

8            THE COURT:  Ms. Bataller, do you or Mr. Gorman have --

9   I mean, they're going to be -- if they're hard drives, they're

10  not going to be really identifiable.  I mean, it's not going to

11  be prejudicial just in and of itself by viewing it.  Anything

12  that would be, Mr. Greenbaum?

13           MR. GREENBAUM:  No, Judge.  The --

14           THE COURT:  A big Uzi or anything like that?

15           MR. GREENBAUM:  I'll look at it briefly, but it's just,

16  it's basically, it's just your CP units, Your Honor.  So there's

17  nothing like -- there's nothing --

18           UNIDENTIFIED SPEAKER:  CBUs.

19       (Multiple parties speaking)

20           MR. GREENBAUM:  Yes.  Thank you for that, yes.  Just

21  your standard computers, Judge.  So there's nothing, there's

22  statements or anything like that, or stickers or anything like

23  that --

24           THE COURT:  Any objection?

25           MR. GREENBAUM:  -- that I'm aware of.

1            MS. BATALLER-SCHNEIDER:  No objection.  I guess the

2     only thing I would ask is the relevance of having the actual

3     physical devices.

4            MR. GREENBAUM:  Sure, Judge.  It's part of our

5     elements, part of the elements that's alleged is specifically to

6     the actual physical evidence.

7            THE COURT:  There's no objection.  You can put them --

8     I tend to agree with her, but you know, I'm not going to try your

9     case for you.

10           MR. GREENBAUM:  Yes, Your Honor.

11           THE COURT:  You both get to try your case.  So if you

12    want to show that stuff and make it -- that's fine.  Anything

13    else?

14           MR. GREENBAUM:  No, Your Honor.  That was it.

15           THE COURT:  Ms. Bataller?

16           MS. BATALLER-SCHNEIDER:  No, Your Honor.  Thank you.

17           THE COURT:  Thank you all very much.  All right.  So

18    let's get back here at 1:30 in case something comes up.  And if

19    it does, Ms. Salas will be here.  You let her know that we need

20    to talk about something before the jury gets in here.  That way

21    we're not waiting 'til I get here at 1:40 and then you go now we

22    need to talk about something.  Okay?  Let's do that.

23           You have a good lunch though.  Okay, Mr. Perkins?

24    We're going to get you fed.  Thank you all.

25           (Recess at 12:16 p.m./Reconvened at 1:29 p.m.)

1       (Outside the presence of the jury; defendant present)

2           THE COURT:  All right.  So we're outside the presence

3   of the jury.  All the parties are here including the defendant.

4   Go ahead and have a seat.  We'll bring in a -- jurors.  I've been

5   told by Ms. Baisa (phonetic) that during the lunch break, outside

6   the presence of any other jurors -- and, Ms. Baisa, this was

7   outside -- none of the other jurors heard this, right?  Okay.

8   Good.  That was my impression.

9           Juror number 12 is a Jessica Garcia (phonetic).  And

10  she was somewhat upset during lunch, the lunch break, and told

11  Ms. Baisa that she didn't feel like she could continue on with

12  this subject matter in the trial.

13          What I propose to do, I've had her, Ms. Baisa sat her

14  across in the jury assembly room.  So she's been sequestered from

15  the rest of the jurors.  And I'll bring her in and have her speak

16  to me from the podium.  And then I'm not going to ask the

17  attorneys if they have questions.  I'm going to talk to her.  And

18  then I'll excuse her.

19          And then if y'all have specific questions you just

20  can't live without, you may ask them and we can talk about it.

21  Let's talk about it once we get the lay of the land kind of with

22  her.  I don't want her to be upset, but I want her to -- we need

23  to confront this now because this is only going to get more

24  intense I think as we go.

25          Let's bring her in.  And, ma'am, if you'll escort her

1    on up here to the podium.  There's tissues up there.

2              UNIDENTIFIED SPEAKER:  I don't know if there's any up

3    there.

4              UNIDENTIFIED SPEAKER:  Oh, we have some.  We have some.

5              THE COURT:  Yeah, that would be great.  Thank you

6    anyway.

7              Yes, hi.  Come on up.  You come on up to this podium

8    right here.  Hi.  And the attorneys can go ahead and have a seat,

9    please, if you would.

10             JUROR NO. 12:  Yes, sir.  I --

11             THE COURT:  Hi.

12             JUROR NO. 12:  Hi, Your Honor.

13             THE COURT:  Just for the record, we're outside the

14   presence of the jury.  We have Juror number 12 here with us.

15   And, ma'am, I was told by Ms. Baisa a few minutes ago --

16             JUROR NO. 12:  Yes, sir.

17             THE COURT:  -- that you're struggling during lunch,

18   during the lunch break.

19             JUROR NO. 12:  Yes, I am.

20             THE COURT:  And I've spoken with her about concerns

21   about going forward.  Is that right?

22             JUROR NO. 12:  Yes, that's correct.

23             THE COURT:  Okay.  And is that based on what you've

24   heard thus far this morning?

25             JUROR NO. 12:  Yes.  Just the whole -- the whole thing

Ferg - Direct/Cayton                           102

1    in general --

2              THE COURT:  Okay.

3              JUROR NO. 12:  -- is just awful.  And I tried my best.

4    That's why I was here today.  I tried my best.  But I, honestly,

5    I can't.  It's too much.

6              THE COURT:  Okay.  What does that mean exactly, too

7    much?

8              JUROR NO. 12:  Like, I get really bad anxiety.

9              THE COURT:  Okay.

10             JUROR NO. 12:  So I just, it's just awful for me to

11   hear.

12             THE COURT:  Okay.

13             JUROR NO. 12:  And it makes me sick.

14             THE COURT:  Sure.  Well, keeping in mind that under

15   your juror's oath which I know you've been sworn a couple of

16   times now --

17             JUROR NO. 12:  Yes, sir.

18             THE COURT:  -- right?  The Friday and today.  You're to

19   keep an open mind.  You're to -- the juror's oath is real simple.

20   I know it's --

21             JUROR NO. 12:  Yes.

22             THE COURT:  -- longer than this, but all it is is that

23   you swear to keep an open mind, that you swear to listen to the

24   facts and the evidence and apply the law.  That's really all

25   anybody can do.

1    Let me tell you a couple of things.  I always look at a

2   case like this, this is a tough subject matter for anybody.  If

3   you think this is easy for anyone, including the lawyers here,

4   Mr. Perkins of course, and anybody, staff, if you think it's easy

5   for anyone because of the subject matter, you're just incorrect.

6    If you think that any of us have any special fortitude

7   that we've been granted by God to get through this, you're wrong.

8   You're incorrect.  I would suggest that you're just not correct.

9   So that tells me we're all in the same level, plateau, playing

10  field here.

11    I always think of it as my mom, if my mom were here as

12  a juror, how difficult this would be for her.  Here's the thing.

13  That doesn't make it -- though it's difficult for everyone, the

14  fact that it's difficult for you doesn't make it easier for

15  someone else.

16    JUROR NO. 12:  Yes.

17    THE COURT:  It's not like, you know, I'm a big, tough

18  guy and I just, I can handle it better than you can.  I can't.

19  I'm not a big, tough guy and I can't handle it any better than

20  you can.  We have to sometimes catalogue these things.

21    And I will tell you that I suspect, and in listening to

22  the evidence, that it's going to get more intense, I would say.

23  I won't say worse or better or anything like that because I can't

24  judge that, not knowing what the evidence is.  I haven't seen it

25  either.  You and I are in the same position.

1    I don't know what the evidence is.  The parties know

2    the evidence, the parties are prepared.  I come in and preside

3    over the trial.  I don't prepare or anything like that.  And I

4    don't have a side.

5        There have been cases in the past very similar to this

6    where when there are things, and there are going to be some

7    things shown, there are going to be some things in audio

8    recordings, I think, that you're going to need to look at and

9    decide as a juror.  You're the fact finder, the judge of the

10   facts.  You've got to look at it, listen to it, put it all

11   together to see if, you know, you think -- how you want to vote,

12   how do you want to decide.

13       That's up to you completely.  I just will tell you

14   this.  We have two alternates.  And if you step out and I go

15   okay, well this upsets you and so I can't allow you to -- I don't

16   want you to stay, I'll have you leave, what do I do when the next

17   person says the same thing.

18           JUROR NO. 12:  Yes, I understand.

19           THE COURT:  You understand?  Does that make sense?

20           JUROR NO. 12:  Yes.  Yes.

21           THE COURT:  It's very difficult.  And we only have two

22   alternates.  So if we lose one now, we've only got one more.

23   What if somebody gets sick, you know, this COVID stuff, with --

24   it's not the common flu season, but somebody might have a heat

25   stroke because it's hot as the dickens out side.

1          But, or I've had instances where someone's spouse had

2    to have emergency surgery, or anybody on the jury, somebody's

3    family member, they had to be gone and we lost them.  So it's

4    critically important to us because one other thing I'm going to

5    tell you.  If I were -- well, I am a citizen so this matters to

6    me.  But even if I were the accused, it would matter to me as

7    well.

8          We want -- we don't want the Government, you don't want

9    me, judges, making these decisions for us.  You know, this is one

10   of the very few places on Earth where you'll have citizens

11   actually making decisions of this import, of this nature.  And

12   that's what the whole system's built on, which is just an

13   amazing, you know, experiment to begin with.

14         But that doesn't mean they're all pleasant, doesn't

15   mean they're all easy.  I will say you went through -- I'll say

16   this.  I believe, and I wasn't here Friday.  I was elsewhere at a

17   meeting, and so Judge Fannin presided over the jury selection.  I

18   believe that the 14 people, the 12 plus the two alternates, have

19   the confidence of these attorneys.

20         These are very seasoned and good attorneys.  I don't

21   know if he explained to you, we don't select our juries.  We

22   don't get to say yeah, I want him and I want her and I want --

23   like kickball, playing kickball on the playground when I was a

24   kid.  We would select up, somebody would get to be captain, two

25   captains would get to pick their teams.

1    We don't get to do that.  What we do is we have

2  strikes.  And the lawyers strike those who they think, you know,

3  there's usually nothing wrong with those folks, but they might be

4  better off serving on other juries, different -- so I can tell

5  you this right here, these lawyers, I believe, since you're here

6  and you haven't been challenged or you haven't been stricken,

7  they have full faith and confidence that you're going to sit and

8  make a good decision.

9    Are there times when in different cases, these and

10  other types of homicides, things like that where you're having to

11  look at video, audio, listen to audio, look at pictures, hear

12  descriptions of things where you're kind of sitting there, you

13  know, hearing what you got to hear, absolutely.  Everybody is the

14  same way.

15    I don't want you to feel like you're any different than

16  anyone else.  You're not.  Everybody's the same when it comes to

17  anything along those lines.  Rarely -- I did a naturalization

18  ceremony over in at Fort Davis about a week and a half, coming up

19  on two weeks ago now.  And I've done a bunch of those.  I love --

20  because everybody's smiling.

21    Rarely in a criminal case, and especially not in a

22  civil case, trials, do you have anybody that's happy.  And this

23  is not fun.  This is not what we consider fun.  And so, you know,

24  but it's important.  Why is it important.  Well, if you were

25  accused, you'd want people that sit in judgment of you and make

Ferg - Direct/Cayton                    107

1   those decisions that they should make, you know, with the facts,

2   taking the facts and the evidence, keeping an open mind until you

3   have all the evidence, and applying the law that I give you.

4   You're not expected under the law, nobody is.

5           Even if you do, you can even disagree with it.  It

6   doesn't matter.  As long as you will swear, and you did, to take

7   whatever I give you as the law and use it.  If I give you the

8   wrong law, then the lawyers will have my paper graded by the

9   circuit court and they'll tell me I was wrong.  Does that make

10  sense?

11          JUROR NO. 12:  Yes.

12          THE COURT:  So you know, obviously it would be my

13  preference and my desire that you continue to serve.  I cannot

14  promise you you'll be comfortable.

15          JUROR NO. 12:  No.

16          THE COURT:  For any of us.  Okay?  I wish I could.

17  It's just not going to be easy.  And I know don't think also that

18  you're the only one that has anxiety.  That doesn't make it any

19  easier for you.

20          JUROR NO. 12:  I know.

21          THE COURT:  But many of us do.  And we always have to

22  deal with that the best we can.  Okay?

23          JUROR NO. 12:  Yes.

24          THE COURT:  Do you have any comments after I've --

25          JUROR NO. 12:  No.  Thank you.

1              THE COURT:  I'm not trying to give you -- and I promise

2    you, I'm not trying to give you a rah-rah speech.  I'm not trying

3    to hold you in here.

4              JUROR NO. 12:  No.

5              THE COURT:  I just want you to know that's sort of my

6    thinking.  That's how I think through this.  And again, we got

7    really good lawyers in this case.  I have full faith and

8    confidence in them.  That tells me they have full faith and

9    confidence in you as well.

10             And none of them would have you here if -- none of them

11   would be here if we didn't have to.  Does that make sense?

12             JUROR NO. 12:  Yes, sir.  Yes.

13             THE COURT:  And so they're not putting you through the

14   torture of doing this in your mind for, you know, nefarious

15   reasons.  Does that make sense?

16             JUROR NO. 12:  Yes.  I understand.

17             THE COURT:  Do you have any questions?

18             JUROR NO. 12:  No, thank you.

19             THE COURT:  Do you feel better?

20             JUROR NO. 12:  Yes, I do.

21             THE COURT:  Okay.  Good.  I appreciate that.  I'm glad

22   you do, I hope you do.  I want you to feel good about it, and I

23   want you to serve, obviously.  But I worry, you know, if you look

24   at the bigger picture, there are different parts of a trial, and

25   I think you're going to see some different things as you go

Ferg - Direct/Cayton                        109

1   through the trial, and maybe some things you don't even know or

2   anticipate.

3          Now I'm not saying it's all going to be, you know,

4   great.  Some of it may be difficult.  It's going to be difficult

5   for everyone, okay?

6          JUROR NO. 12:  Okay.

7          THE COURT:  Thank you very much.

8          JUROR NO. 12:  Yes, sir.  Thank you.

9          THE COURT:  Keep going, Ms. Baisa.  Ms. Baisa, would

10  you have her just over in the room across the hall for a few more

11  minutes?  And can you come back in?

12         All right.  Outside the presence of the jury and

13  outside this present juror, number 12.  Mr. Cayton,

14  Mr. Greenbaum, any objection to having her just stay on?  I don't

15  see any reason to take her off.

16         MR. CAYTON:  No objection, Your Honor.

17         THE COURT:  Ms. Bataller or Mr. Gorman?

18         MS. BATALLER-SCHNEIDER:  Your Honor, our only concern

19  is that as Your Honor said, it's just going to get worse.  I

20  don't know if this is going to be a continuing issue.

21         THE COURT:  I try to say intense instead of worse.

22         MS. BATALLER-SCHNEIDER:  Right.

23         THE COURT:  But it is going to get worse, yeah.

24         MS. BATALLER-SCHNEIDER:  Yeah.

25         THE COURT:  Okay.  So -- but I'm not hearing any reason

Ferg - Direct/Cayton                          110

1   to take her off.  The concern I have is every one of those people

2   are probably feeling the same way.  And I do worry.  I want to

3   make sure that we, you know, I think without more, I'm not -- I

4   don't feel comfortable releasing her, whether being with

5   objection or without.  I just, I don't think that that's going to

6   be an issue.

7          If she brings it up again, Ms. Baisa will do the same,

8   her or any other juror, and will let me know.  She wanted -- she

9   told Ms. Baisa she wanted to speak with me privately.  And I of

10  course -- and Ms. Baisa said I don't think you can do that.  So,

11  and I of course said no, that we'd talk all together.

12         And so I think, you know, my only fear was I didn't

13  want to embarrass her or anything like that.  And I don't think

14  she was.  Obviously seems like she's better now.  That doesn't

15  mean she won't -- we won't have a regression at some point

16  either.

17         MS. BATALLER-SCHNEIDER:  Your Honor, the one thing

18  that, if I could just mention one thing.  I guess there was no

19  real question of whether or not she could continue to be fair.  I

20  don't know if she made any statements like that.

21         THE COURT:  I didn't -- Ms. Baisa --

22         MS. BATALLER-SCHNEIDER:  That would be my only concern.

23         THE COURT:  -- did she say anything to you about

24  fairness or whether she could be fair or not?  No?  The answer is

25  no.  So she never said anything like that to us.  She just said

Ferg - Direct/Cayton                                    111

1    my anxiety is causing this to be a problem.  It may end up being

2    a problem.  I can't guarantee y'all that.  But I'd like to hold

3    her in there if we can.

4            All right.  Mr. Greenbaum, Mr. Cayton, anything you

5    want to say?  Oh, somebody's phone needs to be turned off.

6            MR. CAYTON:  No, Your Honor.  Not from the Government,

7    Your Honor.

8            THE COURT:  Ms. Bataller?

9            MS. BATALLER-SCHNEIDER:  No, Your Honor.  Thank you.

10           THE COURT:  All right.  Let's rise for this jury then.

11   And we do have a jury, right?  Oh, hang on.

12           UNIDENTIFIED SPEAKER:  Yeah.  We need to get her back

13   over there?

14           THE COURT:  Yeah, get her back in there before --

15           UNIDENTIFIED SPEAKER:  And then we'll bring her.

16           THE COURT:  -- we bring her in.

17           MR. GREENBAUM:  Your Honor, do you want Special Agent

18   Ferg to retake the stand?

19           THE COURT:  Oh, yeah.  Come back up, sir.  My bad.  And

20   you're still going on direct, right?

21           MR. CAYTON:  Yes, Your Honor.

22       (Jury in at 1:44 p.m.)

23           THE COURT:  All right.  Let's be seated, please.  Thank

24   you.  Mr. Cayton, you may proceed with your direct examination of

25   Mr. Ferg.

1              MR. CAYTON:  Thank you, Your Honor.

2    BY MR. CAYTON:

3    Q    Special Agent Ferg, I'm going to take you back a little bit

4    to the video you described that you had reviewed from the

5    downloads.

6    A    Yes, sir.

7    Q    Do you remember that video?

8    A    Yes, I do.

9    Q    Did it appear that the young child on the video was under or

10   over the age of 12?

11   A    Based on my training and experience, I would say under the

12   age of 12.

13   Q    And what do you base that on?

14   A    General body development, lack of pubic hair.

15             MR. CAYTON:  And, Your Honor, I'd like to republish

16   Exhibit 5 which is the Miranda waiver.

17             THE COURT:  Yes, sir.

18             THE CLERK:  Mr. Cayton, can you pick up that

19   microphone?

20             MR. CAYTON:  I'll try to be louder, too.

21   BY MR. CAYTON?

22   Q    And you said this was the -- this was the Miranda warnings

23   that you gave to the defendant, correct?

24   A    Yes, sir.  That's correct.

25   Q    I'd like to just go through that a little bit more.  Is this

1    a pre-printed form or is this something that you guys type up

2    when you're interviewing someone?

3    A    This is a pre-printed, agency issued form.

4    Q    Now do you just hand this to someone when you're reading

5    them their rights, or do you read it to them?

6    A    Typically, sir, we will give them a copy.  We'll confirm

7    which language they're most comfortable in.  And then depending

8    on if the person would like to read it to themselves or we'll

9    read it out loud to them.

10   Q    And in this case, did you read it out loud?

11   A    Yes, sir.  We gave a copy to Mr. Perkins and then also read

12   it out loud.

13   Q    And are these the standard Miranda warnings that say we've

14   seen on TV?

15   A    Pretty close, sir.

16   Q    And so he's told that he has a right to remain silent?

17   A    Yes, sir.

18   Q    Anything he says can be used against him?

19   A    Correct.

20   Q    He had the right to consult an attorney at any time?

21   A    Yes, sir.

22   Q    He has a right to have an attorney present during

23   questioning?

24   A    Yes, sir.

25   Q    And that an attorney can be appointed for him?

Ferg - Direct/Cayton                                    114

1    A    That's correct.

2    Q    And you informed him of all these rights orally and with the

3    paper?

4    A    Yes, we did.

5    Q    And below that did he sign anything?

6    A    Yes, he did.

7    Q    And you said he agreed to speak with you.  Is that also part

8    of this?

9    A    Yes, that's correct.

10   Q    and it says at this time, I'm willing to answer questions

11   without a lawyer present?

12   A    That is what's on the form.  Yes, sir.

13   Q    Is that his signature that he's hand-signed that, or did you

14   sign that for him?

15   A    He -- that's his signature, sir.

16   Q    Did he have any questions for you during the Miranda

17   warnings?

18   A    Not that I recall.

19   Q    And the signature right below Mr. Perkins, who's signature

20   is that?

21   A    That would be my signature.

22   Q    And then the signature below that, who is that?

23   A    That is special Agent Butler with the USDA OIG.

24   Q    Now during this interview, is it just you present, or is

25   Agent Butler present, as well?

Ferg - Direct/Cayton                     115

1   A    Agent Butler was also present.

2   Q    Was there anyone else present in the room?

3   A    Just Mr. Perkins.

4        MR. CAYTON:  Your Honor, may I approach the witness?

5        THE COURT:  Yes, sir, you may.

6   BY MR. CAYTON:

7   Q    I have what's been marked as Prosecution Exhibit 6 for

8   identification.  Do you recognize that?

9   A    Yes, I do.

10  Q    What did I just hand you?

11  A    That is a CD with an audio recording from our interview with

12  Mr. Perkins.

13  Q    How do you know that's what it is?

14  A    It's the one that I reviewed earlier and I put my initials

15  on.

16  Q    And you said it's the audio interview from Mr. Perkins when

17  you interviewed him?

18  A    That's correct.

19  Q    And you said you had a chance to review it?

20  A    Yes, I did.

21  Q    Is it an accurate reflection of the interview you had with

22  Mr. Perkins?

23  A    Yes.

24       MR. CAYTON:  Your Honor, at this time, the Government

25  would offer Prosecution Exhibit 6 for identification as

1    Prosecution Exhibit 6.

2            THE COURT:  Government's Exhibit 6.  Ms. Bataller?

3            MS. BATALLER-SCHNEIDER:  No objection, Your Honor.

4            THE COURT:  Government's Exhibit 6 is admitted without

5    objection.

6        (Government's Exhibit 6 admitted into evidence)

7            MR. CAYTON:  May I approach the witness, Your Honor?

8            THE COURT:  Yes, you may approach.

9            MR. CAYTON:  And, Your Honor, at this time I would ask

10   to publish Prosecution Exhibit 6 to the jury by playing the

11   audio.

12           THE COURT:  That's the audio.  Is it all audio, or do

13   we have any transcript?

14           MR. CAYTON:  It's only audio, Your Honor.

15           THE COURT:  Only audio.

16           MR. CAYTON:  Yeah.

17           THE COURT:  How long about, just a ballpark.

18           MR. CAYTON:  Approximately 50 minutes, Your Honor.

19           THE COURT:  Fifty?

20           MR. CAYTON:  Yes, Your Honor, 5--.

21           THE COURT:  Okay.  Okay.  I may stop you at some point

22   to let everybody take a break.  That's a long time.

23           MR. CAYTON:  That's fine, Your Honor.

24           THE COURT:  To listen.  Okay.  All right.  Go right

25   ahead.

1           MR. CAYTON:  I trust Ms. Rosemary to be able to pause

2    and replay.

3           THE COURT:  I trust her too.  I don't trust you though.

4    So --

5           MR. CAYTON:  I wouldn't either, Your Honor.

6           THE COURT:  Ms. Martinez, if it doesn't start loud

7    enough, you can always back it up and restart it, whatever you'd

8    like.

9           MS. MARTINEZ:  Thank you, Your Honor.

10         (Audio plays from 1:51 p.m. to 2:48 p.m.)

11          MR. CAYTON:  Am I okay to keep going, Your Honor?

12          THE COURT:  Sure.

13   BY MR. CAYTON:

14   Q    Special Agent Ferg, during the audio, we heard multiple

15   times being referenced that he was not under arrest.  The

16   defendant was not under arrest.  Why would you -- why did you

17   tell that to the defendant?

18   A    I told him that because specifically for that reason, that

19   he was not under arrest.  There was no decision made about

20   whether he was going to be charged or not at that time.

21   Q    And at one point during the interview you asked him about

22   the term PTHC.

23   A    Yes, sir, that's correct.

24   Q    And you asked him if he knew what it stood for.

25   A    That's correct, yes.

Ferg - Cross/Bataller-Schneider                    118

1   Q    And he told you that he did?

2   A    He did say that he knew what it meant.

3   Q    What does PTHC stand for?

4   A    Based on my training and experience, it will stand for

5   preteen hardcore.

6   Q    And is this a common search term for child pornography?

7   A    Yes, it is.

8              MR. CAYTON:  May I have just a moment, Your Honor?

9              THE COURT:  Yes, sir, you may.

10       (Pause)

11             MR. CAYTON:  Pass the witness, Your Honor.

12             THE COURT:  Thank you.  Ms. Bataller, your witness.

13             MS. BATALLER-SCHNEIDER:  Thank you.

14                        CROSS-EXAMINATION

15   BY MS. BATALLER-SCHNEIDER:

16   Q    Good afternoon.

17   A    Good afternoon.

18   Q    Do you have any personal experience with Asperger's or

19   schizoaffective disorder?

20   A    No, ma'am, I don't.

21   Q    Have you been trained on interviewing people with Asperger's

22   or schizoaffective disorder?

23   A    No, I have not.

24   Q    And before you met with Thomas, you were aware that he was

25   diagnosed with schizophrenia, correct?

1   A     Yes, ma'am.  His parents had mentioned that.

2   Q     And you were aware that he had Asperger's as well, correct?

3   A     Yes.  I believe that that had come up, as well.

4   Q     And you were aware that he was considered disabled.  Is that

5   right?

6   A     Yes, ma'am.

7   Q     And that as an adult man who was still living with his

8   parents?

9   A     Yes, ma'am.

10  Q     You're also aware that -- you were also aware he doesn't

11  drive and doesn't have a license?

12  A     Yes, ma'am.  That's correct.

13  Q     Because of his disability?

14  A     His father had said that he was kind of a dangerous driver.

15  Q     And that was in the conversation about his disability,

16  correct?

17  A     Yes, ma'am.

18  Q     And you're aware that he stays home most of the time as

19  well?

20  A     Yes, ma'am.

21  Q     When you first confronted Thomas about what you'd found on

22  the computers, he admitted he was the person doing the

23  downloading, correct?

24  A     Yes, ma'am.  I believe he did.

25  Q     He never tries to blame anyone else?

Ferg - Cross/Bataller-Schneider                120

1    A    No, he did not.

2    Q    I think you testified in direct about him saying he was tech

3    savvy.  You just listened to that disc, correct, with everyone

4    else here?

5    A    Yes, ma'am.

6    Q    And in fact, Thomas never personally says I'm a tech savvy

7    person.  He doesn't use that language, correct?

8    A    In reviewing, yeah, I believe it was his parents that had

9    called him tech savvy.

10   Q    But he doesn't say that, correct?

11   A    Yes, ma'am.  I believe that's correct.

12   Q    and you're the one who uses the term tech savvy about five

13   times throughout that interview?

14   A    I didn't keep count.

15   Q    Does five times sound about right?

16   A    I could review my notes.  That might be right.

17   Q    He -- at one point Thomas talks about a program called, you

18   pronounced it Tixati.  Is that right?

19   A    Yes, ma'am.

20   Q    I'm not very tech savvy.  So bear with me.  But Thomas was

21   calling it tiaxi (phonetic).  Is that right?

22   A    He -- I believe he said that he didn't know how it was

23   pronounced.  But that is how he pronounced it, yes.

24   Q    Now Thomas described some of his use of computers as sort of

25   like an addiction.  Is that right?

1    A    Yes.  He did use that term.

2    Q    That he was addicted to the actual act of downloading.

3    A    Yes, ma'am.  He did say that.

4    Q    And that he liked downloading stuff and watching it upload

5    and download for the sake of watching it.

6    A    He did say that.

7    Q    And speaking of this sort of obsessive behavior, he also

8    told you that he had 12 YouTube accounts?

9    A    Yes, ma'am.  He did --

10   Q    And that they were all categorized?

11   A    I don't recall him specifically saying they were

12   categorized.

13   Q    And you also recovered over 60 devices from that home.  Is

14   that right?

15   A    Personally, I did not.  But my agents that were doing the

16   search warrant, yes.  Approximately 60 devices.

17   Q    That's not the typical amount of devices to get from one

18   individual, correct, when you're doing these search warrant

19   executions?

20   A    You know, ma'am, in my experience, it varies widely.  We've

21   had people with a few devices to a very large number.

22   Q    Would you say 60 devices is a large number?

23   A    I would say 60 devices is probably a large number for one of

24   these cases.

25   Q    Now I want to talk about how this case originated.  You said

1   that you received this information or these files from Agent

2   Bonneau.  Is that right?

3   A    Yes, ma'am.

4   Q    And how would you receive these?

5   A    I receive them from a -- from our computer -- sorry,

6   computer forensics agents or CFAs in El Paso who would actually,

7   they were the ones who received them from Agent Bonneau.

8   Q    And do you know how Agent Bonneau sent those over to El

9   Paso?

10  A    I'm not too familiar with the technology.  There's a way

11  that it can be safely and securely shared between the agents.

12  Q    But you can't testify as to exactly how that's done,

13  correct?

14  A    I know it's called the ohm cloud.  Beyond that, I haven't

15  used it much personally.

16  Q    Now how did the CFAs in El Paso get it over to you?

17  A    They just burned a disc of it.  And then I don't remember

18  now if it was hand delivered or FedExed.

19  Q    So it may have been sent in the mail, but you don't know.

20  A    I don't know.

21  Q    And were you there when they burned those discs?

22  A    No, I was not.

23  Q    Now you're the one who first mentioned PTHC in the

24  interview, correct?

25  A    Yes, ma'am, that's correct.

1    Q    Thomas did not bring that up.

2    A    that's correct.

3    Q    And he just said yes when you asked him if he knows what it

4    stands for, correct?  He didn't specifically say what it stands

5    for?

6    A    That's correct.

7    Q    I want to talk a little bit about VPNs.  You use a VPN while

8    working for the federal government, correct?

9    A    Yes, ma'am.

10   Q    In fact, a lot of agencies and businesses use VPNs, correct?

11   A    I believe so, yes.

12   Q    And private home networks also use VPNs, correct?

13   A    I know that it's an option that can be used.

14   Q    And as far as you understand in your investigation, the

15   allegation of distribution was based on an agent being able to

16   get a video or image from Thomas' account, correct?

17   A    From the IP address that he was using, yes.

18   Q    I apologize.  That's a better explanation than what I gave.

19   And but that IP address didn't specifically send that over to the

20   Government, correct?

21   A    It had made the content available by using the software.

22   Q    Available for the Government to get, correct?

23   A    Available for any of the BitTorrent users to correct.

24   Q    Right.  But they would have to collect it, correct?

25   A    I'm not sure.  I'm not familiar with that enough to know if

1    that was somebody would have to specifically choose to download,

2    or how it would -- how they would get it.

3    Q    As far as you understand from BitTorrent, that's -- there's

4    simply a sharing feature that comes as a default with the

5    program.  Is that right?

6    A    That is my understanding, yes.

7    Q    So when you get this program, the default is going to be for

8    it to share?

9    A    I've never used the software myself.  But that is my

10   understanding.

11   Q    And your understanding is that you actually -- you actively

12   have to do something to turn off that feature of sharing,

13   correct?

14   A    That is what I've been told.  Yes, ma'am.

15   Q    You were the one who brought up the sharing feature of

16   BitTorrent first, correct?

17   A    Yes, ma'am.  I believe so.

18   Q    And you explained it a little bit to Thomas.  Is that right?

19   A    I know we discussed it.

20   Q    And when you were discussing it, he said I personally did

21   not share anything.

22   A    He says he did not share his own content.

23   Q    But that's the statement that he -- he made the statement

24   not talking about his own content when he said he does not share

25   anything.  In the first -- let me just go back.  I'm sorry.  Let

Ferg - Redirect/Cayton                    125

1   me ask this in a better way.  When you first talked about

2   sharing, he said that he does not share, correct?

3   A    Yes, ma'am.  That's the first statement he made.

4   Q    And he doesn't ever mention that he should have disabled

5   that feature until much further along in the conversation,

6   correct?

7   A    I do know that he mentions that.  I don't remember exactly

8   at what point in the conversation it was.

9            MS. BATALLER-SCHNEIDER:  Could I have just one moment,

10  Your Honor?

11           THE COURT:  Yes, ma'am.  Of course.

12           MS. BATALLER-SCHNEIDER:  Nothing further.  Thank you.

13           THE COURT:  Anything on redirect?  On those points?

14           MR. CAYTON:  May I have just a moment, Your Honor?

15           THE COURT:  Yes, sir.

16                        REDIRECT EXAMINATION

17  BY MR. CAYTON:

18  Q    Agent Ferg, when you were talking to the defendant, did he

19  mention that Tixati or however the word was pronounced, was that

20  the first time he used a BitTorrent software?

21  A    No, sir.

22  Q    How long did he say he'd been using peer-to-peer software?

23  A    He said that he had first begun using peer-to-peer software

24  in 2008 and 2009.

25  Q    Did he mention other devices that had peer-to-peer software

1    on it?

2    A    He did mention that there was an older computer desktop that

3    he had originally used for BitTorrent and peer-to-peer activity.

4    Q    He mentioned a program called BitTorrenting?

5    A    I'm not sure if that was just part of the interview that was

6    hard to understand.  I believe that he had called it actually --

7    that he thought it was called BitTorrent like the original

8    version.

9            MR. CAYTON:  May I have just a moment, Your Honor?

10           THE COURT:  Sure.

11           MR. CAYTON:  Pass the witness, Your Honor.

12           THE COURT:  Anything further?

13           MS. BATALLER-SCHNEIDER:  No, Your Honor.

14           THE COURT:  You may step down.

15       (Witness excused)

16           THE COURT:  Ladies and gentlemen of the jury, you just

17   heard testimony regarding other acts of the defendant.  This

18   evidence is admitted for limited purposes.  Though other acts may

19   be similar to those charged in the indictment, they were

20   committed on another occasion.  You must not consider defendant's

21   other acts in deciding if the defendant committed the acts

22   charged in this indictment.

23           You may, however, consider this evidence for other

24   limited purposes.  If you find beyond a reasonable doubt from

25   other evidence in the case that the defendant did commit the acts

127

1    charged in the indictment, then you may consider this evidence of

2    similar acts committed on another occasion to determine whether

3    the defendant had the state of mind, intent, or knowledge

4    necessary to commit the crime charged in the indictment, or

5    whether the defendant committed the acts for which he is on trial

6    by accident or mistake.  These are the limited purposes for which

7    these similar acts may be considered.

8            Government's next witness?

9            MR. CAYTON:  The Government wishes to call David

10   Barkley to the stand, Your Honor.

11           THE COURT:  David Barkley.  Is everybody okay?  Anybody

12   need a break?  We'll get one about 3:30 or so, how about that?

13   That okay?  You ask me, I say I need a break.  But I'm asking

14   y'all.

15      (Pause)

16           THE COURT:  Sir, if you'd come on up to the stand.

17           THE CLERK:  Sir, could you stop right there?  Could you

18   raise your right hand?

19            DAVID BARKLEY, GOVERNMENT'S WITNESS, SWORN

20           THE CLERK:  You can have a seat.

21           THE COURT:  You may have a seat, sir.  Just adjust

22   yourself to the microphone.

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Mr. Greenbaum, you may proceed whenever

25   you're ready.

1          MR. GREENBAUM:  Thank you, Your Honor.

2                      DIRECT EXAMINATION

3    BY MR. GREENBAUM:

4    Q    Sir, can you introduce yourself to the jury?

5    A    David Barkley.

6    Q    Yes, sir.  And can you spell your last name please, sir, for

7    the record?

8    A    B-A-R-K-L-E-Y.

9    Q    Yes, sir.  And, sir, how are you employed?

10   A    Currently employed as a seized property specialist for

11   Homeland Security Investigations.

12   Q    Okay.  So what we would call as maybe the evidence

13   custodian.  Is that correct?

14   A    Yes, sir.

15   Q    Sir.  And can you tell us your law enforcement -- or how

16   long have you been with Homeland Security?

17   A    Thirteen years.

18   Q    Sir.  And prior to being with Homeland Security, can you

19   tell us some of the duties you've had working with Homeland

20   Security?

21   A    Working with Homeland Security, we established an evidence

22   collection program in which we are actually involved in the

23   actual search itself to maintain a complete chain of custody for

24   all evidence that are seized or taken as evidence.

25   Q    Yes, sir.  And that's your current assignment.  Is that

1   correct?

2   A    Yes, sir.

3   Q    And are you out -- where are you out of?  Where --

4   A    El Paso, Texas.

5   Q    El Paso, Texas.  Correct.  Okay.  Prior to working with

6   Homeland Security, can you tell the jury a little bit about any

7   other law enforcement experience that you may have?

8   A    Sir, I have 20 years as a state -- officer for the State of

9   Texas working at the city department level as a peace officer,

10  and then subsequent detective, retired.  Prior to that, at the

11  age of 17 I was enlisted in the United States Army as a military

12  police officer.

13  Q    Sir.  Thank you for your service.  Let me draw your

14  attention back to January the 9th of 2020.  Did you become

15  involved in a search warrant in a home located in Fort Stockton,

16  Texas?

17  A    Yes, I did.

18  Q    And is Fort Stockton, Texas located in the Western District

19  of Texas?

20  A    Yes, it is.

21  Q    Okay.  Can you tell the jury what was your role back on

22  January the 9th of 2020 in regards to the search of a residence

23  in Fort Stockton, Texas?

24  A    We normally receive an operational plan prior to the

25  operation action taking place, at which team -- at which time

Barkley - Direct/Greenbaum                    130

1    myself and my team, we organize who is going to attend and to

2    what extent.  With this particular search warrant, we created the

3    seizure number which is unique to this location, and all

4    documentation to be used at that -- at that location.

5    Q    Okay.  And in regards to anticipation, you're basically the

6    evidence custodian, the person that's going to be picking up any

7    possible evidence in this case, correct?

8    A    Correct.

9    Q    And I'm looking at it looks like a custody receipt form.

10   How do we know specifically -- let me start off with this.  And

11   this form that I'm looking at, it's called an FPF number.  What

12   is that to your agency?

13   A    That is the Fines, Penalties and Forfeiture number.  It's

14   unique to this specific seizure event, and the items that are

15   seized thereupon.  They are stored under that specific number.

16   And that number can never be repeated because of the breakdown of

17   the number.  It always begins with the fiscal year which would be

18   2020.

19        And then it begins -- then the next sequence of numbers are

20   going to be that specific port area.  This case, it would be

21   2424.  And the last portion of the numbers will indicate the

22   numerical sequence of the seizure event.  This would be number 28

23   out of 30, or 40, or 50.  And the last two numbers indicate how

24   many violators we have.

25   Q    So much like a fingerprint, this number would only

1   correspond to one single case, correct?

2   A    Correct.

3   Q    And in regards to this number, does this correspond to the

4   residence, the search based on I believe it's South Seals Street

5   in Fort Stockton, Texas?

6   A    Yes, sir, it does.

7   Q    Okay.  In addition to that, as part of your housekeeping, is

8   there something called an instant number?

9   A    Yes, sir.  The instant number contained upon that form is

10  also a unique number in that it begins again with the fiscal

11  year.  It also indicates by alpha sequence what type of event it

12  was, whether it would be SZ would be for a seizure only, and SA

13  would be a seizure arrest event.  And then the next sequence of

14  numbers will be the numerical sequence in which this event

15  occurred.  If it was arrest number 200, that sequence would be

16  200.  If it was 205, it would be 205.

17  Q    Sir.  And furthermore, is there another number also to -- so

18  you know in regards to at the top of it's usually in the right-

19  hand corner of the evidence receipt, of the custody of the

20  evidence receipt that also specializes to know where this

21  evidence came from?

22  A    Yes, sir.  That's each one of our chain of custody documents

23  are serialized.  That's a unique number for that specific form.

24  And it will never be used in the same format again for any other

25  document seizure, or past.

Barkley - Direct/Greenbaum                    132

1    Q    Yes, sir.  And do you have the actual, that actual number

2    for this seizure that occurred back on January the 9th of 2020 on

3    South Seals Street in Fort Stockton, Texas?

4    A    If I could take a look at the chain of custody document?

5    Q    Yes, sir.  You may, sir.

6    A    All right.

7              MR. GREENBAUM:  May I approach, Your Honor?

8              THE COURT:  Yes, sir, you may.

9    BY MR. GREENBAUM:

10   Q    Whenever you're ready, go ahead and tell us that number.

11   A    Yes, sir.  This actual Fines, Penalties, and Forfeiture

12   number, it is 2020-2424-00002803.

13   Q    And this corresponds to the Perkins' residence on South

14   Seals Street and Fort Stockton, Texas?

15   A    Yes, sir, it does.

16   Q    And in regards to that, since I have you here, do you also

17   have some items that were seized, in other words are there line

18   items for each item that was seized in this case?

19   A    Yes, sir.  Each -- each line item is listed on the chain of

20   custody document at the residence at the time of seizure.

21   Q    Okay.  And in reference to this case, do you know

22   approximately how many items were seized, if you know?

23   A    Sixty-one.

24   Q    Sixty-one.  Yes, sir.  Now, sir, before we talk about

25   seizure of the items, did you actually document the inside of the

Barkley - Direct/Greenbaum                        133

1  interior of the home?

2  A    Yes, sir.  Our normal procedure, once we had the location,

3  in this case a residence, secured, I will go in and I will

4  photograph the residence as we enter it, as we found the

5  residence, the shape, condition, and what is in plain -- plain

6  view.  And we will do what's called in photographs that indicate

7  how it was initially when we walked in the door.

8  Q    Yes, sir.  If I could have you turn to the Government

9  exhibit book and take a look at Government's Exhibit Number 3.

10  It's going to be tabbed number 3.  And once you're done looking

11  at that, let me know and then I have some questions for you.  I

12  think there's going to be a couple pages in regards to

13  Government's Exhibit Number 3.  If you have to pull it out,

14  that's okay.

15  A    Yes, sir.

16  Q    Okay.  Are you familiar with what's contained in

17  Government's Exhibit Number 3?

18  A    Yes, sir.  What is contained in this photograph is the

19  taking of photographs going in the residence.  And this is how we

20  located these items and how they were placed when we first

21  entered the residence.

22  Q    Okay.  And were these photographs actually -- are they a

23  fair and -- let me ask it this way.  Are they a fair and accurate

24  depiction of what they show in the photographs?

25  A    Yes, sir, they are.

Barkley - Direct/Greenbaum                    134

1    Q    And to the best of your knowledge, has any of these

2    photographs in Government's Exhibit Number 3 been altered or

3    tampered with in any way?

4    A    No, sir, they can not.

5    Q    And are you the actual person that took these photographs?

6    A    Yes, sir, I am.

7    Q    and did you take these photographs on or about January the

8    9th of 2020?

9    A    Yes, sir, I did.

10          MR. GREENBAUM:  At this time, Your Honor, Government

11   moves to admit Government's Exhibit Number 3 which is a series of

12   photographs.

13          THE COURT:  Ms. -- or I'm sorry, Mr. Gorman?

14          MR. GORMAN:  No objection, Your Honor.

15          THE COURT:  Government's Exhibit 3 is admitted without

16   objection.

17      (Government's Exhibit 3 admitted into evidence)

18          MR. GREENBAUM:  May I publish to the jury, Your Honor?

19          THE COURT:  Yes, sir, you may.

20          MR. GREENBAUM:  Thank you, Your Honor.

21   BY MR. GREENBAUM:

22   Q    All right.  Let's start with this first photograph.  What is

23   this -- Agent, can you tell us what this first photograph is, or

24   what the significance of this photograph is?

25   A    This photograph indicates the location of a television set

Barkley - Direct/Greenbaum                    135

1   and numerous computer systems that were attached thereto and were

2   being utilized.

3   Q    Okay.  And specifically when we're looking at this, I see

4   some -- in addition -- below, what is that that we're seeing?

5   There's two items there at the bottom of the photograph.

6   A    What you see there are two laptops.  They were operational

7   and they were placed on top of the boxes in which they came in, I

8   assume.

9   Q    Okay.  And then next to these laptops, I see some other

10  electronic devices.  Based on your training and experience, or if

11  you know, what are these electronic devices that are around the

12  laptops?

13  A    Those are the hard drives.  External hard drives.

14  Q    External hard drives.  Okay.  And it looks like, if I'm

15  looking at it right, it's approximately four, is that right, I

16  see in the picture?

17  A    Yes, sir.

18  Q    And then up here, I can't tell so I'll ask you.  Is this

19  another hard drive, or is that maybe a phone?

20  A    That's another external hard drive.

21  Q    So there's a hard drive that's connected here, and the up --

22  I guess the lower right-hand corner, and is that another hard

23  drive there connected to the upper left-hand corner.  Is that

24  correct?

25  A    Correct.

1      MR. GREENBAUM:  Okay.  If you could go ahead and move

2  on to the next one, Ms. Rosemary.  Thank you.

3  BY MR. GREENBAUM:

4  Q    Can you tell us what the significance of the next one on

5  Government's Exhibit Number 3 is, what this photo means.

6  A    And if you have to look up, it's also published on the

7  screen as well, sir.

8  Q    This photograph again, and as I'm photographing in, I'm

9  panoramic photographing the room so that you can piece together

10  the entire residence as it was when we entered.  And this would

11  be a location that was obviously being utilized.  But it's one of

12  the panoramic photographs of the area.

13  Q    Yes, sir.  And do you know whose room or residence this was

14  in this photograph?

15  A    This was the one of the violator's individual's faces.

16  Q    Yes, sir.  And when you say violators, are you talking about

17  Mr. Thomas Scott Perkins?

18  A    Yes, sir.  He was the individual of the search.

19  Q    Okay.  And so this is basically where he was living or his

20  residence.

21      MR. GORMAN:  Objection.  Move to strike the term

22  violator.

23      THE COURT:  Sustained.  That word is stricken.  The

24  jury will disregard.

25  BY MR. GREENBAUM:

1  Q    And so was -- sir, was this Mr. Perkins' residence here that

2  we're seeing?

3  A    Yes, sir.

4  Q    Okay.  So this is basically -- do you know, and if you know,

5  is this the area that he was apprehended at or the police

6  encountered him at, law enforcement?

7  A    Yes, sir.  And along with our other duties, we are perimeter

8  security.  At that specific time I was at the front of the

9  residence.  When they entered, that's where they first

10 encountered an individual.

11 Q    Yes, sir.  So he was basically in this area.  Is that

12 correct?

13 A    Yes, sir.

14 Q    Okay.  If we could go ahead and move on to the next.  What

15 is, again, Government's Exhibit Number 3, this image?

16 A    This is another photograph of the laptops encountered in the

17 first room.

18 Q    Okay.  And if we could move on to the next exhibit.  What is

19 the significance of this Government's Exhibit Number 3?

20 A    This was another photograph of one of the laptops

21 encountered in the first room.  As we take our photographs, we

22 photograph the evidence in place that's in plain view.

23 Q    So this is how it would have been as it was set up by the

24 person that was living there.  Is that correct?

25 A    Yes, sir, it is.

Barkley - Direct/Greenbaum                           138

1   Q    Okay.  So this hadn't been moved or anything at the time

2   that this picture was taken?

3   A    No, sir.  No search begins until after all the intake

4   photographs are done.

5   Q    Yes, sir.  And what type of laptop, just so we can have a

6   clean record, does this deal with?

7   A    This is a Dell laptop.

8   Q    Yes, sir.  Okay.  And we can move on to I believe the final

9   picture of the series.  Can you tell us what this picture

10  depicts?

11  A    This picture depicts another area of the residence as you're

12  coming into the residence.  And it photographs all the documents,

13  mail, et cetera in the photograph, or the panoramic view of that

14  room.

15  Q    Yes, sir.  So this is just maybe, like, a little bit

16  different angle from the other photograph that we saw earlier in

17  this series.  Is that correct?

18  A    Yes, sir, it is.

19  Q    Okay.  All right.  Thank you for that, sir.  Now as part of

20  your duties there, did you actually seize some items that we

21  talked about?

22  A    Yes, sir.  Our standard operating procedure, when an agent

23  is conducting a search of an assigned area, if items of

24  evidentiary value based on the search warrant are located, they

25  will call out and I will go photograph that item in its location

Barkley - Direct/Greenbaum                    139

1  originally where it was and how it was, at which time we will go

2  ahead and we will bag it.  I will take custody of it and place it

3  on a chain of custody at the residence.

4  Q    Okay.  And so just so we're clear for the record, in this

5  case you seized approximately 61 electronics or some sort of

6  device.  Is that right?

7  A    Yes, sir, we did.

8            MR. GREENBAUM:  Okay.  Your Honor, if I may ask this

9  witness to step down, and we have some physical evidence in a

10  box.

11           THE COURT:  Certainly.  Make sur we're staying near a

12  microphone though.

13           MR. GREENBAUM:  Yes, Your Honor.  I will --

14           THE COURT:  Is there one up here, Cristina --

15           MR. GREENBAUM:  -- figure that out.

16           THE COURT:  -- that he can use?  You may step down.

17           THE WITNESS:  Yes, sir.

18  BY MR. GREENBAUM:

19  Q    Sir, if I could ask you to step down.  Thank you.  I do not

20  want to break anything.  All right.  I think we're good.  All

21  right.  Sir, let's go ahead and I want to go kind of line by

22  line.  First I want to go, there's different counts in what we

23  call a superceding indictment.

24       I want to go by the first digital -- the first hard drive or

25  the first computerized thing that's listed in the indictment

1   which is Count 2.  Specifically I want to see if there is a

2   Western Digital hard drive model WD800, with a Serial Number WD-

3   WCAJ92661471.  I believe if you can refer to it, see if you can

4   find it on here.  It looks like to me it is line item 16.  See if

5   that is correct to you.

6   A    Yes, sir.  That will be the hard drive from within

7   (indiscernible).

8   Q    Okay.  And --

9          THE COURT:  Mr. Yanez, sir, you know you're speaking to

10  them.  Be sure you're speaking up toward this microphone right

11  here.

12         THE WITNESS:  Oh, I'm sorry, sir.

13         THE COURT:  I mean, I think you ought to be looking at

14  them, but you ought to be talking on this mic.

15         THE WITNESS:  Yes, sir.

16         MR. GREENBAUM:  Sorry, sir.  I know it's a little bit

17  awkward.

18  BY MR. GREENBAUM:

19  Q    In regards to Count number 2, this item, can you find this

20  item inside this box and see if we have it on line item number

21  16?

22  A    Okay.  Line item 16 was one of the desktop tower computers.

23  The item listed is the hard drive.  The computer forensic

24  analyst, they remove the hard drive to analyze it.  And it is

25  then subsequently placed back into the desktop computer to keep

1   the line of evidence in its entirety.  It is not a separate item

2   by itself.  It stays with the line that it came from.

3   Q    Yes, sir.  And for record purposes, I'm going to go ahead

4   and mark this as Government's Exhibit Number 9.  And I'll ask you

5   the same questions on all of these.  But to the best of your

6   knowledge, has this computer, other than forensic analysis that

7   may have been done on it, been altered or tampered with in any

8   way?

9   A    No, sir, it has not.

10       The chain of custody and the evidence is always joint

11  verified wherever it goes to be stored.  In this case it's

12  (indiscernible) so it would be stored in our (indiscernible)

13  vault where it is joint verified by personnel who put it on the

14  shelf and myself.

15  Q    Yes, sir.

16       And the next one that I'm going to ask you is going to be in

17  regards to Count 3.  There is a device named Maxtor hard drive

18  device model Diamondmax Plus 9, Serial Number Y45BC9XE.  And I

19  have in my notes that that corresponds with line item number 18.

20  Can you confirm in effect that is line number 18?

21  A    Yes, sir, it is.

22  Q    Yes, sir.  And if you could, could you tell us which one is

23  line number 18?

24  A    This here would be line number 18.

25  Q    Yes, sir.  For the record, I'm going to go ahead and put

Barkley - Direct/Greenbaum                    142

1  Government's Exhibit Number 12 on line item 18.

2  A    Line number 18 is marked and corresponds with the chain of

3  custody as a line number.

4       Those numbers are generated by our system.  The hard drive

5  from that line would be removed for forensic analysis, and then

6  it would be placed back with the original equipment and receive

7  that.

8  Q    Yes, sir.  And I neglected to ask you these questions.  But

9  in regards to -- let's go back to line item number 9.  Is there a

10 way that you can make a determination where this item was

11 manufactured at?  Is that something you could make that

12 determination on?

13 A    No, sir.

14 Q    That's okay.  That's okay because of the way it's covered.

15 Okay.  That's fine.  Let's go ahead and move on to what is going

16 to be Count 4.  And there's a device named Seagate hard drive

17 model number ST1000LM049, with a Serial Number WGS5QBVZ.  And in

18 regards to that, can you see if you can locate that line item?  I

19 have it as line item number 11, but can you confirm in fact if

20 that is line item number 11?

21 A    Yes, sir, it is.  It is line number 11.

22 Q    Okay.  And if you could go ahead and pull that out of the

23 box if you locate that device.  I'll go ahead and mark this for

24 the record as Government's Exhibit Number 15.  And what is this

25 Government's exhibit that I've marked as Government's Exhibit

1  Number 15?  What does that appear to be?

2  A    This would be the HP Windows laptop and the hard drive

3  that's within it.

4  Q    Yes, sir.  And was that one of the photos that we saw that

5  you testified to in Government's Exhibit Number 3?

6  A    Yes, sir, it is.

7  Q    Okay.  Now let's go ahead and move on to Government's

8  Exhibit Number 5.  And again, similar questions.  The Seagate

9  hard drive model device number SRDONF2, serial number NA8EYNL.

10 And I have that as corresponding to line item number 27.  Can you

11 confirm if that is in fact line item number 27 and then see if we

12 have that in evidence.

13         THE COURT:  Mr. Greenbaum, you stated Government's

14 Exhibit 5.  You mean Count 5 of the indictment?

15         MR. GREENBAUM:  Yes, Count 5.  I apologize, Your Honor.

16 Thank you for that clarification.  Count 5.

17         THE WITNESS:  What was your --

18 BY MR. GREENBAUM:

19 Q    Yes, sir.  Line item number 27, does that match up to the

20 Seagate hard drive model number SRDONF2?

21 A    Yes, sir, it does.

22 Q    Okay.  If we can go ahead and find that exhibit, or that

23 evidence.  Okay.  If I could have you just lay it on top there.

24 And for the record, I'm going to mark this as Government's

25 Exhibit Number 18.  Okay.  Now moving to Count 6, there's a

Barkley - Direct/Greenbaum                    144

1    device named Seagate hard drive device model SRDOPV1, serial

2    number NA9Q02S9.  In regards to I have it as line number 28.  Can

3    you confirm that in fact that is line number 28?

4    A    Yes, sir, it is.

5    Q    Okay.  And if you could, go ahead and see if we have that

6    item of evidence available today as well.  I'm going to go ahead

7    and mark Government's Exhibit Number 21 on that.

8         Moving on to Count 7, can you see if you have a Western

9    Digital hard drive device model WDBYFT0040BBK0A with a serial

10   number of WX51D961NE27?  And that, I have it corresponding to a

11   line number 39.  Can you see and confirm in fact that matches

12   with line number 39?

13   A    Yes, sir, it does.

14   Q    Okay.  And if I could just have you retrieve that item from

15   out of the evidence box.  For the record, I'm going to go ahead

16   and mark this Government's Exhibit Number 24.  Moving on to Count

17   number 8, can you verify if we have a Samsung hard drive serial

18   number S267J1LZ503188 contained, I believe it's number line item

19   34.  Can you see if we have that piece of evidence, as well?

20   A    Yes, sir, we do.

21   Q    Okay.  If you could go ahead and bring that piece of

22   evidence out as well.

23        For the record, I'm going to go ahead and mark this as

24   Government's Exhibit Number 27.  And finally, as for Count number

25   9, do we have, it references a SimpleTech hard drive model number

Barkley - Direct/Greenbaum                    145

1   96300-41001-68, Serial Number 093350920000206005.  It corresponds

2   from my records to line number 32.

3         Do you see that there, and can you confirm if that is in

4   fact line number 32?

5   A    Yes, sir, it is.

6   Q    Okay.  And if you could go ahead and get that out of the

7   evidence box, as well.

8         And for the record, I'm going to go ahead and mark that as

9   Government's Exhibit Number 30.  You can go ahead and have a

10  seat, sir.  Thank you.

11  A    Yes, sir.

12  Q    So much.  And in regards to all these exhibits that we just

13  talked about, and for the record it's going to be number 9,

14  number 12, number 15, number 18, number 21, number 24, number 27,

15  and number 30, these were all items that were seized from the

16  Perkins' residence back on January the 9th, 2020?

17  A    Yes, sir, they were.

18  Q    And to the best of your knowledge, other than the

19  Government's exhibit sticker that was just placed on it, none of

20  them have been altered or tampered with in any way?

21  A    Correct.  They are as bagged.

22        MR. GREENBAUM:  Okay.  At this time, Your Honor,

23  Government would move to admit Government's Exhibit Number 9,

24  Number 12, Number 15, Number 18, Number 21, Number 24, Number 27,

25  and Number 30.

1            THE COURT:  Mr. Greenbaum, Government's Exhibit 9

2    corresponds to -- which one corresponds to different counts?

3            MR. GREENBAUM:  Yes, Your Honor.  I apologize.  Number

4    9 would --

5            THE COURT:  No reason to apologize.  Just I just lost

6    track.  24 is Count 7.  27 is Count 8.

7            MR. GREENBAUM:  Yes, sir.

8            THE COURT:  What's 9?

9            MR. GREENBAUM:  Number 9 is going to correspond to

10   Count 2, Your Honor.  Number 12 would --

11           THE COURT:  12 is what?

12           MR. GREENBAUM:  12 would be Count 3, Your Honor.

13           THE COURT:  15?

14           MR. GREENBAUM:  15 would be Count 4, Your Honor.  18 is

15   going to be Count 5.  Count 6 is going to be 21.  Count 7 is

16   going to be 24.  And Count 8 is going to be Government's Exhibit

17   Number 29.  And then --

18           THE COURT:  Wait, wait, wait.

19           MR. GREENBAUM:  I'm sorry.  I'm sorry, Judge.  I

20   apologize.  Count 8 is going to be number 27.  And Count 9 is

21   going to be Government's Exhibit Number 30, Your Honor.

22           THE COURT:  Defense?  Objections?

23           MR. GORMAN:  No objections, Your Honor.

24           THE COURT:  Government's Exhibits 9, 12, 15, 18, 21,

25   24, 27, 30 are admitted without objection.

1          (Government's Exhibits 9, 12, 15, 18, 21, 24, 27, and 30

2    admitted into evidence)

3               MR. GREENBAUM:  Thank you, Your Honor.

4               THE COURT:  Yes, sir.

5               MR. GREENBAUM:  The Government passes the witness, Your

6    Honor.

7               THE COURT:  Cross?

8               MR. GORMAN:  It's been a while since I talked to Agent

9    Barkley, Your Honor.  But no questions.

10              THE COURT:  Okay.  You may step down.  Thank you, sir.

11              THE WITNESS:  Thank you, sir.

12         (Witness excused)

13              THE COURT:  All right.  This is a good time for us to

14   take an afternoon break.  You know, if I needed to take one 30

15   minutes ago, you know I need to take one now.  So I need one too.

16   Some of you look like you're filling up, you're ready to go.

17              So we're going to take a short break.  You're going to

18   leave your notebooks here.  You're going to remember your

19   instructions.  We're not talking about the case.  Let's make it a

20   15-minute one.  That's a good break.  But you need time to go to

21   the restroom and whatnot.  You got way more men than women, so

22   y'all can switch it up.  You don't have to just go men's,

23   women's.  Y'all can decide how to do that.

24              Let's see.  Are we okay working 'til 5:30 today, or is

25   that too late?  If that's too late for any one of you, I'll stop

148

1  at five.  5:30's okay?  All right.  Good.  Can I hear six?  Can I

2  hear, do I hear six?  I'll get you 'til, like, 8:30 or 9:00 if

3  you want to, but that's up to you.

4          If y'all want something later than 5:30, tell

5  Mr. Whitehead and we'll figure that out.  We'll do whatever y'all

6  want to do.  All right?  With that, we'll see you back here in 15

7  minutes.  Have a nice break.  Let's rise for the jury, please.

8      (Jury out at 3:31 p.m.)

9          THE COURT:  That was cumbersome.  All right.  Let's --

10  outside the presence of the jury.  Please have a seat.  I mean,

11  that was cumbersome, y'all.  There probably was a better way to

12  do that, I don't know.  But I'll leave it for y'all to try your

13  cases, obviously.  That was rough.

14          All right.  So next witness is going to be the --

15          MR. GREENBAUM:  It's going to be Coleman Boring, Your

16  Honor.

17          THE COURT:  Coleman Boring?

18          MR. GREENBAUM:  Coleman Boring, yes, sir.

19          THE COURT:  Boring?

20          MR. GREENBAUM:  Yes, sir.

21          THE COURT:  All right.  Hope he's not boring.

22          MR. GREENBAUM:  He's going to be exciting, Judge.

23          THE COURT:  Coleman Exciting.  He can be up here, have

24  him up here when we start back at a quarter 'til.

25          MR. GREENBAUM:  Yes, sir.

1          THE COURT:  Or thereabouts.  Mr. O'Neal, you're going

2     to have to wait on us.  Your client's here.

3          MR. O'NEAL:  Yes, sir.

4          THE COURT:  Your client is here.  But you're going to

5     have to wait on us 'til we're done, okay?

6          MR. O'NEAL:  Oh, I thought you were going to do it

7     during this break.

8          THE COURT:  No.  I don't think we can do it, not with

9     you talking.

10         All right.  So have him up here.  Mr. Greenbaum,

11    Mr. Cayton, anything you need to take up outside the presence?

12         MR. GREENBAUM:  No, Your Honor.

13         THE COURT:  Ms. Bataller -- I mean, I called you

14    Balatar a moment ago.  I'm sorry.  It was --

15         MS. BATALLER-SCHNEIDER:  You know, I answer to that

16    too, Your Honor.  It's fine.

17         THE COURT:  As soon as I said it I was like --

18         MS. BATALLER-SCHNEIDER:  Whatever you want.

19         THE COURT:  -- that's not her name.  I thought I'd make

20    a bigger deal out of it if I could apologize though.  So,

21    Mr. Gorman, Ms. Bataller --

22         MS. BATALLER-SCHNEIDER:  That's pretty good.  That's

23    pretty good.

24         THE COURT:  Anything y'all want to take up before we

25    take a break?

1          MS. BATALLER-SCHNEIDER:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  Mr. Perkins, we'll get you a

3    break and we'll take one, too.  See y'all back here at quarter

4    'til.  Thank you all.

5          (Recess at 3:34 p.m./Reconvene at 3:47 p.m.)

6          (Outside the presence of the jury; defendant present)

7          THE CLERK:  All rise.

8          THE COURT:  All right.  Very well.  We're ready?

9    Government need anything outside the presence?

10          MR. GREENBAUM:  I don't know if Defense wanted to raise

11    a possible objection.  I told them about a statement that's

12    alleged that was made by their defendant.

13          THE COURT:  Okay.

14          MR. GREENBAUM:  And so I don't know if they had an

15    objection to that.  And so if they did --

16          THE COURT:  On their client?

17          MR. GREENBAUM:  Of Mr. Perkins, yes, sir.

18          MS. BATALLER-SCHNEIDER:  Yes, Your Honor.

19          And I apologize.  I just, when they told me that this

20    agent was going to be testifying, it reminded me that after the

21    deadline to give us discovery, the Government sent us an email

22    that Agent Boring would be testifying to something that was not

23    in discovery, something about when he had Mr. Perkins outside of

24    the home that he -- and the Government can maybe get the correct

25    wording, but that he said that I don't know how you got past my

151

1    VPNs.  That would be cumulative evidence.

2              THE COURT:  Oh, I see.  Mr. --

3              MS. BATALLER-SCHNEIDER:  And also, we did not receive

4    notice on time.

5              THE COURT:  Mr. Greenbaum, why was this late?

6              MR. GREENBAUM:  Judge, in quick response, Your Honor,

7    this was tendered over, so the record's clear, on Friday, Your

8    Honor, the 15th.  As trial prep --

9              THE COURT:  Which is after the deadline, though.

10             MR. GREENBAUM:  It was after the deadline.  Yes, Your

11   Honor.  So I want to make that clear.  As we trial prepped and we

12   talked to Mr. Boring, we found this out.  So this wasn't

13   something that was in our ROI or anything.  This was just in our

14   trial discussion.

15             So when we found this out, obviously we disclosed this

16   to Defense.  The Government does wish to get into it.  I

17   understand the Defense's objection to cumulative.  However, Your

18   Honor, I think they have -- I think it goes to state of mind,

19   Your Honor.  And the statement would be something to the effect

20   what -- and I just proffer this, what's going on, you guys got

21   this information illegally.  There's no way you got passed my

22   VPN.

23             And so since they're saying that basically by raising

24   certain sanity in this case, Your Honor, I think this does go to

25   the state of mind.  He knows that illegal actions, he knows that

152

1   something about computers is going wrong with his house.  Before

2   anything else, what this statement I would proffer was just given

3   by the defendant spontaneously against his interest without

4   questioning by Mr. Boring.  So the Government does wish to get

5   into that, Your Honor.

6          THE COURT:  All right.  I'll disallow it for now.  If I

7   feel like the door's been opened, or you all do, you can

8   approach.

9          MR. GREENBAUM:  Okay.

10          THE COURT:  Depending on where the Defense goes with

11   this witness or other witnesses.  I think it's very likely it may

12   come in later.  But I'm not going to prejudge that.  I'll

13   disallow it now.  Unless -- obviously everybody knows about it

14   now.

15          MR. GREENBAUM:  Yes, Your Honor.

16          THE COURT:  And so if somebody opens that door, we'll

17   -- I'll consider it at the time.  And then I realize it's not in

18   response to -- allegedly it's not in response to a question.  But

19   this is something that the Defense I think has a right to know at

20   an early stage where they could move to suppress it or whatever

21   there may be.  I mean, so that's just I just don't think that's

22   fair.

23          Now that they know about it, and they knew about it

24   since Friday, I get that.  I'm glad y'all thought of it before

25   this agent testified, Defense.  But so with that, we're not going

153

1    to get into that right now.

2              MR. GREENBAUM:  Yes, Your Honor.

3              THE COURT:  Because I don't think that's fair play.

4    But it could become -- it's certainly relevant.  It could become

5    admissible I think, at least in my mind, depending upon the

6    Defense --

7              MR. GREENBAUM:  Yes, Your Honor.

8              THE COURT:  Okay.

9              MR. GREENBAUM:  With that being said then, the

10   Government would like to call a different witness, Your Honor.

11             THE COURT:  Okay.

12             MR. GREENBAUM:  And that's going to be --

13             THE COURT:  They really don't like you.

14             MR. GREENBAUM:  And it's going to be Ms. Michelle

15   Wilson, Your Honor.

16             THE COURT:  Okay.  Have Ms. Wilson come on in before we

17   bring the jury in.  That way they don't have to wait on her.

18             MR. GREENBAUM:  Yes, Your Honor.

19             THE COURT:  Did they say they wanted to stay later than

20   5:30?  Okay.  Mr. O'Neal wanted to stay late.

21             UNIDENTIFIED SPEAKER:  Yeah, Mr. O'Neal until, like,

22   seven.

23             THE COURT:  You're keeping Mr. O'Neal 'til seven.

24   He'll keep me 'til seven or later, probably.

25             UNIDENTIFIED SPEAKER:  That he will.

Wilson - Direct/Greenbaum                     154

1           MR. O'NEAL:  I would have been done by now.

2           UNIDENTIFIED SPEAKER:  No, he's just saying that.

3           THE COURT:  Yeah, exactly.  I know how he is.

4           UNIDENTIFIED SPEAKER:  Once up there, it's a whole

5      other story.

6        (Pause)

7           THE COURT:  Let's bring the jury in.

8           Tell you what.  If you want, go ahead and come on up

9      here.  You're going to stand up here.  And we'll all sit down

10     except you stay standing.  I'll ask who's the next witness, and

11     he'll call your name.

12       (Jury in at 3:52 p.m.)

13          THE COURT:  Let's be seated, please.  Thank you.

14          Mr. Greenbaum, your next witness is?

15          MR. GREENBAUM:  Yes, Your Honor.  Michelle Wilson, Your

16     Honor, with DPS.

17          THE COURT:  If you can raise your right hand, please,

18     and be sworn.

19          MICHELLE WILSON, GOVERNMENT'S WITNESS, SWORN

20          THE COURT:  You may have a seat and adjust that

21     microphone.  And, Mr. Greenbaum, you may proceed whenever you're

22     ready.

23          MR. GREENBAUM:  Thank you, Your Honor.

24                        DIRECT EXAMINATION

25     BY MR. GREENBAUM:

1  Q    Ma'am, can you introduce yourself to the jury, please?

2  A    My name is Michelle Wilson.

3  Q    And can you spell out your last name for the record, ma'am?

4  A    W-I-L-S-O-N.

5  Q    And, Ms. Wilson, how are you employed?

6  A    I am currently a special agent with the Texas Department of

7  Public Safety Criminal Investigations Division, Investigative

8  Support section.

9  Q    Yes, ma'am.  And I think you might have answered, but what

10  are some of your current duties there?  Do you -- can you tell

11  the jury a little bit about that?

12  A    Yes.  I work with the Investigative Support Section, and I

13  assist with interviews.

14  Q    So part of the things that you do for DPS as an investigator

15  is conduct interviews.  Is that correct?

16  A    Yes.  That's correct.

17  Q    Okay.  And prior to this, how long have you been working or

18  employed with DPS?

19  A    I have been employed with DPS for the past 11 years.  I came

20  in 2010.

21  Q    Yes, ma'am.  And prior to that, do you have any other type

22  of law enforcement experience or military experience you could

23  briefly tell us about?

24  A    Yes.  I joined the military in 2001 right before September

25  11th.  And then I served five years as a military police officer.

1    Q    Okay.  Now going back to this case, were you asked to do an

2    interview with an individual by the name of Thomas -- I'm sorry,

3    Thomas Scott Perkins.

4    A    Yes.

5    Q    And if -- and did you actually do an interview with

6    Mr. Thomas Scott Perkins?

7    A    I did.

8    Q    Okay.  And do you remember when you actually did that

9    interview with Mr. Thomas Scott Perkins?

10   A    Do you mind if I look at the exact date?

11   Q    Yes, if you need to refer back to your notes or --

12   A    Okay.  It would have been on the 9th of January, 2020.

13   Q    Okay.

14   A    2020.

15   Q    And if you see Mr. Thomas Scott Perkins in the courtroom

16   today, can you point him out and identify an article of clothing

17   that he's wearing?

18   A    Gentleman to my left wearing a blue colored shirt, black

19   jacket, glasses.

20         MR. GREENBAUM:  May the record reflect the witness has

21   identified the defendant in this case, Mr. Thomas Scott Perkins.

22         THE COURT:  It shall so reflect.

23   BY MR. GREENBAUM:

24   Q    Prior to speaking to Mr. Perkins, did you do something

25   called Miranda warnings?

Wilson - Direct/Greenbaum                157

1   A    I did.

2   Q    Okay.  In this case, did you actually execute Miranda

3   warnings?

4   A    I read it aloud to him, and he signed the document.  Yes,

5   sir.

6   Q    Okay.  Let me have you turn, it's going to be in that white

7   binder there, to Government's Exhibit Number 39.  And when you're

8   done, let me know and I'll have a couple questions for you.

9   A    Yes.

10  Q    Are you familiar with that document, whatever Government's

11  number 39 is?

12  A    Yes.  It's the waiver of rights form we use.

13  Q    Okay.  And is that a fair and accurate copy of the actual

14  original?

15  A    It is.

16  Q    Okay.  And who does this waiver of rights form pertain to?

17  A    Mr. Perkins.

18  Q    Okay.  And to the best of your knowledge, has it been

19  altered or tampered with in any way?

20  A    No, sir.

21          MR. GREENBAUM:  Okay.  At this time, Your Honor,

22  Government would move to admit Government's Exhibit Number 39

23  into the record.

24          THE COURT:  Any objections?

25          MS. BATALLER-SCHNEIDER:  No objection.

1          THE COURT:  Government's Exhibit 39 is admitted without

2   objection.

3      (Government's Exhibit 39 admitted into evidence)

4          MR. GREENBAUM:  Permission to publish, Your Honor.

5          THE COURT:  Yes, sir, you may.

6          MR. GREENBAUM:  Thank you, Your Honor.

7   BY MR. GREENBAUM:

8   Q    Okay.  Let's first start -- let's just start at the

9   beginning part.  It says State of Texas --

10         THE COURT:  Be sure you speak up, Mr. Greenbaum.

11         MR. GREENBAUM:  Yes, Your Honor.  I apologize.

12  BY MR. GREENBAUM:

13  Q    It first starts State of Texas, County of Pecos, Fort

14  Stockton, correct?

15  A    That's correct.

16  Q    And is that in the Western District of Texas?

17  A    That's correct.

18  Q    Okay.  And then we have the -- what's the date on this

19  document?

20  A    Thursday, January 9th, 2020.

21  Q    Okay.  And Special Agent, who is that person?

22  A    Myself.

23  Q    Okay.  And who is this person here that's being advised?

24  A    Thomas Perkins.

25  Q    Okay.  And would you have had read him these Miranda

1  warnings?

2  A    Yes, sir.

3  Q    Okay.  Would he have had the chance to review them, read

4  them if he wanted to?

5  A    Yes, sir.

6  Q    Okay.  And furthermore, after he was read these Miranda

7  warnings, what happened next?

8  A    After I advised him, he signed a writ acknowledgment that I

9  read them and that he understood the rights as he was read.

10  Q    Okay.  And so it says I knowingly, intelligently, and

11  voluntarily waive these rights set forth in this document.  Is

12  that right?

13  A    Yes, sir.

14  Q    Okay.  And whose signature is that?  Is that your signature

15  or somebody else's signature?

16  A    Thomas Perkins.

17  Q    Okay.  So that would be the defendant's signature in this

18  case?

19  A    Yes, sir.

20  Q    Okay.  And then further down, the examiner, it has a

21  signature there.  Whose signature is that, obviously?

22  A    That's mine.

23  Q    So you read him these warnings, correct?

24  A    Yes, sir.

25  Q    And then after you did these warnings, then you proceeded to

1   ask him a few questions.  Is that right?

2   A    That's correct.

3   Q    Okay.  I specifically want to ask you a couple questions.

4   Did you ask him anything in regards to during your interview

5   about the use of VPNs?

6   A    It did come up.  Yes, sir.

7   Q    Okay.  And I don't know if you have your notes, but I'm

8   specifically looking at 30.16 from the interview.  Did he say why

9   he used VPNs?

10  A    He advised that he used them for risky downloads.

11  Q    Okay.  And what is a VPN, if you know?

12  A    It's a virtual private network.

13  Q    Okay.  And looking down again at the notes, and I don't know

14  if yours are the same as mine, but I have it 33.17.  Did you ask

15  if he had ever searched for a term called PTHC?

16  A    Yes, sir.  That is correct.

17  Q    And what was his response when you asked him if he had ever

18  searched for PTHC?

19  A    He had said that he had searched for basically everything

20  that he possibly could.  And then I clarified with him, like,

21  preteen hardcore, and he acknowledged with a head nod.

22  Q    Okay.  So when you clarified what PTHC meant as far as him

23  searching, he acknowledged by nodding his head that he had

24  searched that, those terms?

25  A    That's correct.

1   Q    Okay.  Is that synonymous, PTHC, for somebody, based on your

2   training and experience, that's looking for child pornography?

3   A    That is correct.

4   Q    And going a little further down, and I have it at 43.12, did

5   he say what his favorite age groups that he would look for and

6   search for

7   A    He did.  When I asked if there was any specific age range

8   that he looked for, he said that his favorite to look for was

9   eight, nine, or ten.

10  Q    And was this in the context of child pornography?

11  A    That's correct.

12  Q    And in regards to I have it at 51.09, did he talk about

13  basically sharing or the share feature on his computer that would

14  have distributed child pornography?

15  A    That's correct.  He was talking about the browser that he

16  was using having the share function, that he stated that he

17  should have disabled the share function knowing that he should

18  have disabled that feature in order not to share with others.

19  Q    And did he say if he was worried about that feature

20  basically sending out child pornography?

21  A    He told me at the time that he wasn't worried about it

22  because he used what he called a double VPN or a secondary layer

23  of the VPN meaning he had two VPN services.  So he advised that

24  it was leakproof to me.

25  Q    So on his own words he had said that he had used multiple

1   VPNs so there wouldn't be any leaks, so it couldn't be found, Is

2   that correct, or caught?

3   A    That is correct.

4   Q    Okay.  And then in regards to did he say, and I move along

5   at 54.35, did he say was he afraid of any sort of consequences or

6   did he make any statements in regards to that?

7   A    He advised that he had been using the browser for a period

8   of time, and that he was afraid that if he continued to use it,

9   that he was going to be found out, that he might be raided.  And

10  then he kind of made the statement well, that just happened.

11  Q    So that's what exactly happened to him?

12  A    Right.

13  Q    Okay.  And then in regards to, and again I go to 100.27 in

14  my notes, what did he say about this whole ordeal?

15  A    In reference to the child pornography and things of his

16  likes, he said that he wasn't ashamed of it.

17  Q    Okay.

18       (Pause)

19       MR. GREENBAUM:  Judge, may I approach on something,

20  Your Honor?

21       THE COURT:  You may.

22       (Bench conference at 4:03 p.m.)

23       MR. GREENBAUM:  Judge, I just did not want to violate

24  any --

25       THE COURT:  Outside the presence of the jury.  Yes,

Wilson - Direct/Greenbaum                    163

1    sir.

2            MR. GREENBAUM:  Yes, Your Honor.  I wanted to -- so one

3    of the things she asked, did certain things get -- Lolita,

4    preteen hardcore, and preteen softcore.  So I was going to ask

5    her those questions.  But I just wanted to make sure to do it

6    outside the presence of the jury before I got into that.

7            THE COURT:  Okay.  Anything?

8            MS. BATALLER-SCHNEIDER:  I mean --

9            THE COURT:  You've already gone into PTHC.

10           MR. GREENBAUM:  Yes, sir.

11           MS. BATALLER-SCHNEIDER:  Right.

12           THE COURT:  Is the other one --

13           MR. GREENBAUM:  Lolita.

14           THE COURT:  -- PTSC?

15           MR. GREENBAUM:  Preteen hardcore and preteen softcore

16   are the other things he said he had searched, or agreed that he

17   had searched.

18           MS. BATALLER-SCHNEIDER:  Just cumulative and

19   prejudicial, Your Honor.

20           THE COURT:  I'll overrule the objection.  But you'll

21   have to objection if you want to.  It's up to you.  You've

22   preserved it.  I'll overrule it.

23           MS. BATALLER-SCHNEIDER:  Okay.

24           THE COURT:  But I'm not going to let him continue to

25   say it.  I mean, it's what he said.

1          MR. GREENBAUM:  Yes.  What happened was, Judge, he was

2     asked and he agreed that's what he looked up, Your Honor.

3          MS. BATALLER-SCHNEIDER:  That was the question.

4          MR. GREENBAUM:  That was the question.

5          MS. BATALLER-SCHNEIDER:  He didn't bring it up.

6          THE COURT:  He didn't -- right.

7          MR. GREENBAUM:  And he agreed to it basically.

8          THE COURT:  Okay.  Thank you.

9     (Bench conference ends at 4:04 p.m.)

10    BY MR. GREENBAUM:

11    Q    Ma'am, going back to 33.17, did you ask him if he had

12    searched a search term named Lolita?

13    A    I did.

14    Q    And what was his response to Lolita?

15    A    The same as the PTHC.  He nodded in agreement.

16         MS. BATALLER-SCHNEIDER:  Your Honor, can we approach

17    again?

18         THE COURT:  Oh, of course.

19    (Bench conference at 4:05 p.m.)

20         MS. BATALLER-SCHNEIDER:  I'm sorry.

21         THE COURT:  Outside the presence of the jury.  Yes,

22    ma'am.

23         MS. BATALLER-SCHNEIDER:  Yes.  I apologize.  I know you

24    don't like to do this.  But the question was asked all at once.

25    So asking it over and over and over is even more prejudicial, and

1   that's not the way the question was --

2            MR. GREENBAUM:  I can do all three at the same time.

3            THE COURT:  Do it and get it over with.

4            MR. GREENBAUM:  Yes.

5            MS. BATALLER-SCHNEIDER:  Yeah.

6            MR. GREENBAUM:  Yes.  I'll do it all three.

7            THE COURT:  That's what I want, too.

8            MR. GREENBAUM:  Okay.

9            MS. BATALLER-SCHNEIDER:  Okay, thank you.

10           MR. GREENBAUM:  I can do that.  Yes, Your Honor.

11      (Bench conference ends at 4:05 p.m.)

12   BY MR. GREENBAUM:

13   Q    All right.  Ma'am, going back to 33.17, was he asked if he

14   had looked up terms such as Lolita, preteen hardcore, and preteen

15   softcore?

16   A    Yes, sir.  That is correct.

17   Q    And what was his response when he was asked if he looked

18   those terms up?

19   A    He nodded his head in agreement.

20   Q    Okay.  And what is the term Lolita and for child porn, as

21   relevant based on your training and experience to child porn,

22   child pornography?

23   A    Typically like a nude modeling series that displays children

24   sexually.

25   Q    And the term preteen hardcore, based on your training and

Wilson - Cross/Bataller-Schneider                    166

1   experience, what is that search for?

2   A    Young children engaged in what would be considered hardcore

3   sex acts.

4   Q    And then in regards to the term preteen softcore, what would

5   that be in correspondence to child pornography?

6   A    Young children displayed in a sexual manner, not necessarily

7   in a hardcore sex act.

8         MR. GREENBAUM:  I pass the witness, Your Honor.  Thank

9   you.

10        THE COURT:  Thank you.

11                       CROSS-EXAMINATION

12  BY MS. BATALLER-SCHNEIDER:

13  Q    Good afternoon, Agent Wilson.

14  A    Hello.

15  Q    Before you met Thomas, were you told that he was diagnosed

16  with autism and schizophrenia?

17  A    No, ma'am.

18  Q    Do you have any training in interviewing people with autism

19  or schizophrenia?

20  A    Not specifically, no.

21  Q    He did tell you, however, that he had a psych evaluation and

22  as a result got on disability.  Is that right?

23  A    He told me that he had an evaluation for disability for

24  schoolwork.  Yes, ma'am.

25  Q    And he confirmed to you that he doesn't take medication

1    though, or he wasn't taking medication at that time.  Is that

2    right?

3    A    That's correct.

4    Q    And he told you he rarely leaves his home?

5    A    I'm sorry?

6    Q    He told you that he rarely leaves his home?

7    A    I believe he said he was unemployed.

8    Q    At one point in his conversation with you, Thomas told you

9    about a succubus.

10   A    Yes, ma'am.

11   Q    And that's something that he described as a sex demon.

12   A    That's correct.

13   Q    And as far as you understand, that's not an actual, real

14   living thing, correct?

15   A    Yes, ma'am.

16   Q    Okay.  Just checking.  But he did tell you this is something

17   he can actually feel.  Is that right?

18   A    That is correct.

19   Q    And described this sex demon as tormenting him for nine or

20   ten years?

21   A    Yes.  And he described that he also has learned to enjoy

22   what has happened as well.

23   Q    Yeah.  At this point he said that.  But before, his comments

24   would suggest to you that it was against his will.  Is that

25   right?

1    A    It could.  Yes, ma'am.

2    Q    He did make clear to you, however, that he's never had sex

3    with an actual human being.  Is that right?

4    A    He did say that.  Yes, ma'am.

5    Q    And at one point when you were explaining to him why you

6    were there, and one of the things that you said was to determine

7    whether he was distributing child porn intentionally, he

8    responded to you I wasn't distributing it intentionally.  That's

9    about minute 32, if that helps, 32.02.

10   A    He -- he had told me that he knew that he had possessed it.

11   That's correct.

12   Q    And then afterwards he said I wasn't distributing it

13   intentionally.

14   A    That's possible.  Yes, ma'am.

15            THE COURT:  I'm sorry?

16            THE WITNESS:  I don't recall him saying I wasn't

17   distributing it intentionally.  He -- I had asked him did you

18   intentionally distribute this, and he said that he knew that

19   there was stuff that he had been aware of in the past that he

20   had.  Yes, ma'am.

21   BY MS. BATALLER-SCHNEIDER:

22   Q    Okay.  Is that what you're talking about with --

23   A    The possession. Yes, ma'am.

24   Q    And then you had mentioned -- well let me -- would it

25   refresh your recollection to hear a clip of that portion?

1   A     Yes, ma'am.

2              MS. BATALLER-SCHNEIDER:  Your Honor, we need to do that

3   outside the presence of the jury.  It's just a clip of --

4              THE COURT:  It's a clip that's not of an audio

5   recording?  It's not a --

6              MS. BATALLER-SCHNEIDER:  It's a video.

7              THE COURT:  It's not been introduced?

8              MS. BATALLER-SCHNEIDER:  It's not been introduced.

9              THE COURT:  Okay.  Yeah.  Let's take a very short

10  break.  Remember your instructions.  You'll leave your notebooks

11  here.  And if you wouldn't go too far from the door, we'll get

12  you right back in here.  Thanks.  Let's rise for the jury,

13  please.

14         (Jury out at 4:10 p.m.)

15              THE COURT:  All right.  Let's be seated, please.

16  Outside the presence of the jury.  Can you play that real quick?

17              MS. BATALLER-SCHNEIDER:  Yes, Your Honor.  It should be

18  very, very grief.  It's going to be TP26 on the thumb drive.  And

19  then you have to play TP27 afterwards.  So TP26 is going to be

20  the question.  And then TP27 is going to be his answer.

21              We're going to try to do it without speakers and see if

22  she can hear it.  And then if we need speakers, we'll use that.

23  But it should be very brief.

24              THE COURT:  If she needs to step down and listen to it,

25  that's fine.

1        MS. BATALLER-SCHNEIDER:  Would that be easier?

2     (Audio plays at 4:12 p.m.)

3        THE COURT:  We good?

4        MS. BATALLER-SCHNEIDER:  We're good, Your Honor.

5        THE COURT:  All right.  Let's bring the jury back in,

6     please.  All rise for the jury.

7     (Jury in at 4:13 p.m.)

8        THE COURT:  Let's be seated, please.  Thank you.  I

9     believe you were going to re-ask the question.

10       MS. BATALLER-SCHNEIDER:  Yes.

11    BY MS. BATALLER-SCHNEIDER:

12    Q    Did that refresh your recollection?

13    A    Yes, ma'am.

14    Q    So I'll re-ask you the question.  After you told him you

15    were there to determine whether he was distributing child

16    pornography intentionally, he said to you that he said I wasn't

17    distributing it intentionally.

18    A    That is correct.

19    Q    And the statement that he made that he should have disabled

20    it, that was well after that in the interview, correct?

21    A    That was later on.  Yes, ma'am.

22    Q    Thomas told you multiple times that he would not want to

23    have sex with children, correct?

24    A    That's correct.

25    Q    And he told you as well that he does not want to harm

Wilson - Cross/Bataller-Schneider                171

1    children.

2    A    That's correct.

3          MS. BATALLER-SCHNEIDER:  One moment, please.  Nothing

4    further.

5          THE COURT:  All right.  Redirect?

6          MR. GREENBAUM:  Judge, may we approach, Your Honor?

7          THE COURT:  Yes, sir.  You may.

8          MR. GREENBAUM:  Thank you.

9          THE COURT:  Forgive us for a few more minutes.  Feel

10   free to stand if you want.

11       (Bench conference at 4:15 p.m.)

12         MR. GREENBAUM:  Judge, I first --

13         THE COURT:  Hand on a second.

14         MR. GREENBAUM:  Yes, Your Honor.

15         THE COURT:  I get to run --

16         MR. GREENBAUM:  Sorry.

17         THE COURT:  Outside the presence of the jury, because

18   that's kind of important to know, right, later on appeal.

19   Mr. Greenbaum, what did you need.

20         MR. GREENBAUM:  I apologize, Judge.

21         THE COURT:  Stop apologizing.

22         MR. GREENBAUM:  Yes, Your Honor.  So I think the door

23   has now been open and --

24         THE COURT:  I agree.

25         MR. GREENBAUM:  So with the statements that the

Wilson - Redirect/Greenbaum                    172

1  defendant allegedly made was it would have been very -- in

2  regards to having sex with a 12 -- in a very secure environment,

3  I really wouldn't want to get caught.  So I think I should be

4  allowed to get into that.

5          One, it would go to state of mind.  Two, in regards to

6  saying that he doesn't want to have sex with children, that's the

7  same, correct, because there's a statement contrary to that that

8  he himself made.

9          THE COURT:  Ms. Bataller?

10          MS. BATALLER-SCHNEIDER:  I understand his point, Your

11  Honor.

12          THE COURT:  I think that's right.  And I think we all

13  agree.  I believe the prejudicial effect of it, certainly

14  prejudicial.

15          MS. BATALLER-SCHNEIDER:  It's very prejudicial, yes.

16          THE COURT:  Does not outweigh the probative value.  Now

17  that that door's been opened, you may ask about that.

18          MR. GREENBAUM:  Yes, Your Honor.

19          THE COURT:  For those reasons, and then move on.

20          MR. GREENBAUM:  Yes, sir.

21          THE COURT:  Okay.

22          MS. BATALLER-SCHNEIDER:  Okay.

23          MR. GREENBAUM:  Thank you, Judge.

24      (Bench conference ends at 4:16 p.m.)

25              REDIRECT EXAMINATION

1   BY MR. GREENBAUM:

2   Q    Ma'am, I want to go back to your interview in regards to I

3   believe I have it noted as one hour, 16 and 20, in regards to

4   this defendant, did he say anything in regards to him having some

5   sort of relationship in regards to having sex with a 12-year-old,

6   or some sort of thought process to that?

7   A    Yes.

8        So we questioned him then would he have sex with a child.

9   And he made the statements that he wouldn't harm a child.  And I

10  agreed that he did not want to harm a child.  However, I asked

11  given the opportunity if he would have sex with a child.  And he

12  said that if a 12 to 13-year-old child initiated the sex, that he

13  would be willing to do that.

14  Q    Okay.  And did he say anything about the type of environment

15  that it would have to be?

16  A    He eluded to the fact and stated that it would have to be a

17  secure environment where he could lock the door or be in a place

18  not like his apartment or something where somebody could come in.

19  Q    And why did he say he wanted to do it that way, in his

20  words?

21  A    So he really didn't want to get caught.

22           MR. GREENBAUM:  I pass the witness, Your Honor.

23           THE COURT:  Ma'am?

24           MS. BATALLER-SCHNEIDER:  If I could, Your Honor, just

25  briefly?

1          THE COURT:  Of course.

2                    RECROSS-EXAMINATION

3    BY MS. BATALLER-SCHNEIDER:

4    Q    Those answers about 12- to 13-year-olds came as a result of

5    you asking Thomas on multiple occasions what is the youngest age

6    of someone that he would consider having sex with.  Is that

7    right?

8    A    That's correct.

9    Q    And he made it very clear that he didn't believe he would

10   ever be in that situation, correct?

11   A    That's correct.

12   Q    And that it would be -- it would not be a situation where he

13   would take on that role.  It would have to be them wanting to

14   take on that role?

15   A    Correct.  He said the child would have to initiate.

16          MS. BATALLER-SCHNEIDER:  Nothing further.

17          THE COURT:  Thank you.  Anything further?

18          MR. GREENBAUM:  Nothing further, Your Honor.

19          THE COURT:  You may step down.  Thank you so much.

20       (Witness excused)

21          THE COURT:  Your next witness, Mr. Greenbaum?

22          MR. CAYTON:  Your Honor, the Government would call

23   Special Agent Tony Yanez.

24          THE COURT:  Tony?

25          MR. CAYTON:  Yanez.

175

1          THE COURT:  Okay.  Thank you.

2          MR. CAYTON:  Your Honor, may we approach briefly

3    while --

4          THE COURT:  Sure.

5          MR. CAYTON:  -- he's coming in.

6          THE COURT:  While he's coming.

7     (Bench conference began at 4:18 p.m.)

8          MR. CAYTON:  Your Honor, I know that the --

9          THE COURT:  Hang on a second.  I get to start.

10         MR. CAYTON:  I'm sorry.

11         THE COURT:  Outside the presence of the jury because

12   that's kind of important --

13         MR. CAYTON:  It is.

14         THE COURT:  -- on appeal to know.  Right?

15         MR. CAYTON:  Yes, sir.

16         THE COURT:  That conversation, at this point you guys

17   don't need to come up here and start just talking.

18         MR. CAYTON:  Yes, sir.

19         THE COURT:  Outside the presence of the jury.  Yes,

20   sir.

21         MR. CAYTON:  I just wanted to let the Court know this

22   witness may be a little long.

23         THE COURT:  sure.

24         MR. CAYTON:  So if the court ever finds a natural

25   stopping point or anything like that.

1          THE COURT:  We're going to go 'til 5:30 anyway.

2          MR. CAYTON:  Yeah.

3          THE COURT:  We don't need another break.

4          MR. CAYTON:  Probably -- I could probably get done with

5     direct on him.  I'm sure Defense will probably have a lengthy

6     cross.

7          THE COURT:  Okay.

8          MR. GORMAN:  Your Honor, a request on this.  And again,

9     what we talked with this morning with the report, there's a

10    possibility of this, and I don't know if they're going to go down

11    that road.  But talking about volumes of images, obviously 1006,

12    if he's doing that with no listing of files, no evidence, no

13    physical of any of this stuff, that's very -- obviously that's

14    pretty prejudicial.

15         THE COURT:  Are you going to ask about -- what are you

16    asking about?

17         MR. CAYTON:  I'm having him go through his analysis.

18    We did discover when we got it, I believe it was on Saturday,

19    some metadata for some of the -- for the videos that I had parsed

20    out for each drive.  So, like, five for some, three for another.

21    I mean, I think earlier we talked about getting into, like, the

22    total number of images that he said he found.

23         MR. GORMAN:  Yeah, that's --

24         MR. CAYTON:  And that's listed in the report.  But I

25    don't have --

177

1          THE COURT:  He's going to tell you that he found X

2     number of images or videos?

3          MR. CAYTON:  Yeah.

4          THE COURT:  What else?

5          MR. CAYTON:  I mean, then I'm going to have him go

6     through the forensic analysis in each drive that he found content

7     on and what he did with it.  He sent it over --

8          THE COURT:  I don't think that's a problem.

9     Mr. Gorman, make sure I'm not misstating --

10         MR. GORMAN:  Yeah.  My concern on this, Your Honor, is

11    he's -- ultimately there is no way this is not a case of, like, a

12    summary where we're saying you've received all these, you've been

13    able to review these images and ultimately we know that there are

14    73,000 of these images.

15         That's kind of the volume he's talking about.  And

16    obviously we have never seen this stuff identified.  And a lot of

17    this stuff even when we saw a viewing was probably 85 percent

18    inaccurate.

19         MR. CAYTON:  And I can just ask him (indiscernible).  I

20    can go talk to him right now and say make sure you say suspected

21    child pornography if --

22         THE COURT:  Make sure you say --

23         MR. CAYTON:  Suspected.  Suspected child pornography or

24    something like that.  I know it's an issue --

25         MR. GORMAN:  It softens the blow there.

1          MR. CAYTON:  I know there's also an issue with the

2    legal definition.

3          THE COURT:  Would you prefer them to bring in the

4    images?  You're going to say they're cumulative.

5          MR. GORMAN:  Not in terms of that, Your Honor.

6          He's making a summary of a report we never received

7    meaning if we had sat down there and said okay, meaning when we

8    get these reports, and you've likely seen them before Your Honor,

9    they identify child erotica, suspected child pornography.  We see

10   the images and there's no doubt as to what it is.

11         This one here is really coming out of left field

12   because it was never a report that wrote --

13         MR. CAYTON:  But those are done in a secured

14   environment because there is contraband on it.  We don't just

15   hand those over to the Defense.  That's part of the -- I mean,

16   the Defense could have had an expert come over to --

17         MR. GORMAN:  We did --

18         MR. CAYTON:  -- El Paso and --

19         MR. GORMAN:  There was somebody that looked at the

20   stuff.  But again there were no listings of this stuff.  It took

21   them essentially ten months to process this.

22         THE COURT:  Were these images available for view?

23         MR. CAYTON:  Yes.  And my understanding is Defense

24   actually -- I mean, I wasn't the attorney on the case at the

25   time.  The Defense actually went over to HIS Alpine and viewed --

1          THE COURT:  (Indiscernible) come up here and --

2          MR. GORMAN:  It was Andrew Weber then, Your Honor.

3    So yeah.

4          MR. CAYTON:  I mean he was the AUSA.  I mean, there

5    were -- there was the ability to go view it.  Defense did come

6    over and view it.

7          MR. GORMAN:  That was me, Your Honor.

8          MR. CAYTON:  It sounds like a CFA or another expert

9    went over to El Paso to the CFA's office and had a chance to view

10   it.  And as far as a report being generated, the software, I

11   mean, Agent Yanez has told me the software was made available to

12   the other expert.  And he -- I mean, he told me yesterday he

13   actually --

14         THE COURT:  Who told you that, Yanez?

15         MR. CAYTON:  Agent Yanez.  And he told me that he

16   actually believed that the expert made some of his own reports.

17         MR. GORMAN:  He collected data, Your Honor.

18         THE COURT:  Who was your expert?

19         MR. GORMAN:  The expert was essentially a group we used

20   out of -- I'm trying to remember.  It's an east Texas group.  But

21   they didn't have a report to work out of.  So largely what they

22   did was it was just a collection of --

23         THE COURT:  (Indiscernible) review without the report,

24   right?

25         MR. CAYTON:  I mean, the report's (indiscernible) and

1    generating a PDF document.  I mean, but they can go through all

2    that data that he wants in a report was available to their expert

3    to review.

4          MR. GORMAN:  We can make this simple.  Your Honor,

5    since we've never broken this out, again, part of this in terms

6    of having never seen which is which in terms of --

7          THE COURT:  I'm trying to understand.  If the images

8    were available for your expert's review --

9          MR. GORMAN:  Two days, Your Honor, when what, they had

10   ten months.

11         THE COURT:  It was they were available.  And now you're

12   saying there's no report so you really shouldn't be able to get

13   into that.  That's a suspected child porn images, right?

14         MR. GORMAN:  In terms of the -- again, Your Honor, in

15   order to simplify this process, in terms of, like, what these

16   experts do, for meaningful access, and I'm not going to be less

17   than candid on this, Your Honor, we arranged two days in November

18   without the benefit of a report where they could do data

19   collection essentially to try and get through this.

20         It was two days, that was all they were able to do,

21   $14,000 to the Government.  And ultimately, the report was

22   meaningless because they didn't have that guiding hand of what

23   essentially the suspected stuff was.  It was 20 terabytes.

24         THE COURT:  It was made available to them, correct?

25         MR. CAYTON:  Yes, Your Honor.

1          THE COURT:  Could they have used -- whose decision was

2    it to only let them look for two days, or was it their own time

3    limits?

4          MR. GORMAN:  In terms of that was the request.  Yes,

5    Your Honor.

6          THE COURT:  All right.  Well I'm going to allow him to

7    make the testimony -- to testify.  You can cross-examine him,

8    obviously.  Obviously you will.  I know that.  And you're talking

9    about you wouldn't be less than candid.  I know you are.  I mean,

10   I believe what you all are saying.  I understand.

11         This is voluminous, obviously.  The Government made

12   those images, possibly videos, whatever there were, the metadata

13   available.  I'm convinced of that.  That's what you're telling

14   me.

15         MR. CAYTON:  Yes, sir.  And I mean, if the experts were

16   going through it, then yes.

17         THE COURT:  The experts were going through it back in

18   November.

19         MR. GORMAN:  It was November.

20         THE COURT:  You're saying there wasn't a report.  So it

21   was rudderless.  There was no way to really find --

22         MR. GORMAN:  With 20 trillion bytes of data to use two

23   days.

24         THE COURT:  Right.

25         MR. GORMAN:  Again --

Yanez - Direct/Cayton                    182

1          THE COURT:  But again, it was their decision for the

2     two days, right?  I mean, it was available since November,

3     correct?

4          MR. GORMAN:  Right, Your Honor.

5          THE COURT:  I mean, this is July.  And I'm not saying

6     it wouldn't have been expensive.  I am saying though that it was

7     available.  So I'm going to allow that.  And I'll overrule your

8     objection, okay?

9          MR. GORMAN:  All right, Your Honor.

10         MR. CAYTON:  Thank you.

11     (Bench conference ends at 4:25 p.m.)

12         THE COURT:  Sir, if you'd raise your right hand,

13     please.

14          ANTONIO YANEZ, GOVERNMENT'S WITNESS, SWORN

15         THE COURT:  You can have a seat and adjust yourself to

16     that microphone.  Mr. Cayton, you may proceed whenever you're

17     ready.

18         MR. CAYTON:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20     BY MR. CAYTON:

21     Q    Can you please state your name for the Court?

22     A    Antonio Yanez.

23     Q    Can you please spell your last name?

24     A    Y-A-N-E-Z.

25     Q    And where are you currently employed?

Yanez - Direct/Cayton                                183

1    A    Homeland Security Investigations.

2    Q    What is your current duty title?

3    A    Special Agent Computer Forensics Agent.

4    Q    And how long have you been a computer forensics agent?

5    A    Since 2013.

6    Q    And how long have you been a special agent for?

7    A    Since 2008.

8    Q    Is it common for special agents to become computer forensics

9    agents?

10   A    Yes.

11   Q    And do we hire, or does Homeland Security hire anyone else

12   besides special agents to become computer forensics agents?

13   A    The Homeland Security also hires other individuals who could

14   do the computer forensics, as well.

15   Q    What kind of training did you go through to become a

16   computer forensics agent?

17   A    The agency provided basic and advanced evidence recovery

18   training.

19   Q    And is that it?

20   A    No.  I've also been involved in mobile forensics training,

21   vehicle forensics training, network forensics training.  Also,

22   Windows and Macintosh forensics training.

23   Q    Now do you use different -- or what tools do you use to do

24   computer forensics?

25   A    To do computer forensics, we use laptops and write blockers,

1    hardware write blockers to make copies of evidence.  And we also

2    use other forensic software to parse out the, or to -- to pull

3    evidence from those images or copies, and to identify different

4    types of files in those evidence types.

5    Q    Start from the beginning.  You said you use a write blocker.

6    What's a write blocker?

7    A    A write blocker's a hardware device that allows myself to

8    gain access to the hard drives without making any changes to the

9    hard drives by preventing changes to the hard drive.

10   Q    And when you're talking about a hard drive, describe for the

11   jury, are you talking about, like, the internal hard drive maybe

12   on a desktop, or are you talking about that little internal hard

13   drive on a laptop?  Or are we talking about a portable hard

14   drive?  Or are we talking about all of them?

15   A    It could be all of them.  It could be a laptop hard drive

16   that's in -- a hard drive that's in the laptop or is in a desktop

17   computer.  It could be anything from a USB stick, it could be an

18   external hard drive that has a hard drive, either a smaller hard

19   drive or a larger hard drive in size.

20   Q    What about a little, like, SD flash card or something you'd

21   put in a camera?

22   A    SD cards, as well.  Yes, SD cards and micro SD cards which

23   are usually found in mobile phones or mobile devices.

24   Q    You also talked about training doing say, like, auto

25   forensics.

Yanez - Direct/Cayton                185

1   A    Yes.

2   Q    That uses different types of tools, I'm assuming?

3   A    Yes.

4   Q    Okay.  So for a type of computer storage, we have a write

5   blocker.  That's what we start off with.  What do we do next?  Or

6   what other tool do we use after the write blocker?

7   A    With the write blocker, we use the laptop, and we use under

8   the piece of software that allows us to -- we connect the write

9   blocker to the laptop and let the other software, in this case I

10  used FTK Imager, connects the computer to the external device or

11  the hard drive and allows me to preview the device and make an

12  image or copy of it to another location for storage and use.

13  Q    And when we're talking about an image of a hard drive, are

14  you talking about, like, taking a photo of the hard drive or

15  something different?

16  A    No.

17       An image is like a bit-for-bit copy.  It's an actual copy of

18  the content of the hard drive that are stored as a file or as a

19  collection of files that I can later use in forensic software to

20  analyze it.

21  Q    So if I have a hard drive and I've only used up say ten

22  percent of that drive, and I do an image of it, am I only carving

23  out that ten percent I've used up?

24  A    It depends on what type of image you create.  If you're

25  going to only make a copy of the ten percent that you used,

Yanez - Direct/Cayton                    186

1    that's what we would call a logical image.

2         A logical image is only of the content on the hard drive.

3    The physical image would be the entire content of the hard drive

4    which is the unallocated space or anything that's not being used.

5    Q    Now when you do a forensic analysis, are you using a logical

6    or a physical image?

7    A    We usually use the physical image.

8    Q    Why?

9    A    Because it would contain anything on the hard drive that has

10   possibly been deleted but not been overwritten.

11   Q    Okay.  That's a really big statement you just made.  So if

12   you delete something on a hard drive, it's still there?

13   A    Possibly yes, if it hasn't been overwritten by other data.

14   Q    And how would it become overwritten by other data?

15   A    If -- for instance, if something's deleted, it remains on

16   the hard drive.  It doesn't show up on the file system per se

17   because that locator or that pointer to that file in the file

18   system has been erased.  But the content is on the hard drive

19   until it is overwritten with new content.

20   Q    Okay.  So you make a -- you use a write blocker and then you

21   make a physical image.  And then how else do you do your

22   analysis?

23   A    Well, that physical image would go and add that physical

24   image or the copy file into the forensic software.  And the

25   forensic software would go in and identify types of files, and in

1   this case would be image, pictures, or it would be videos per se,

2   or any other types of files that are commonly found in operating

3   systems.

4   Q   Now you just described deleted files might still be there.

5   When you do a forensic analysis, can you find only the files that

6   were not deleted, or can you also find files that were deleted?

7   A   You can also find files that have been deleted.

8   Q   So anything that's still on that drive, whether it was

9   deleted or not, as long as it hasn't been overwritten, you can

10  look at it in that forensic software?

11  A   Correct.

12  Q   Now you talked about copying a drive, making an image for

13  the purpose of doing your investigation.  Why do you want to use

14  an image versus the actual drive itself?

15  A   It's a best practice to make an image and work with the

16  image rather than the original evidence because we don't want to

17  change any of the original evidence.

18  Q   So you want to look for what you're looking for, but not

19  affect the original?

20  A   Correct.

21  Q   Now when you're doing -- take a step back.  What types of

22  cases do you do computer forensics for?

23  A   What types of cases I've worked computer forensics?

24  Q   Yes.

25  A   I've worked in child sexual exploitation cases.  I've worked

1   in narcotics cases.  I've worked fraud cases.  I've worked with

2   state and local authorities on homicides, murders, also drug

3   cases.

4   Q    So any type of case where potentially electronic information

5   may be stored?

6   A    Correct.

7   Q    Is that fair to say?

8   A    Yes.

9   Q    And you talked about copying a little bit.  So you make this

10  image.  Can you describe for the jury a little bit about how a

11  file -- how copying a file from say one drive to another works?

12  A    Well, when you copy a file from one drive to another, some

13  attributes remain with the file and some will change.  I believe

14  with file copies, and depending on the operating system, the only

15  thing that would change on the file copy would be the

16  modification that I believe the access date and I believe the

17  created date will remain the same.

18      Or the created date -- I'm sorry.  The created date and the

19  access date change.  And I think the modification stays the same.

20  Q    So you're talking about attributes that go along with each

21  individual file.  You can see that data, and  when they copy it

22  you can see some changes there?

23  A    Correct.

24      As far as the dates and times because when something is

25  created in a file system, and in this case if I copy a file from

Yanez - Direct/Cayton                    189

1  a computer to an external drive or a USB drive, the created date

2  changed because it's being crated on that USB drive from the

3  computer or the hard drive.

4  Q    Now when you make an image, you use the write blocker and

5  then you make your forensic image, would all those dates change?

6  A    Forensic image of the files, the -- excuse me, the

7  attributes stay the same because it's an image and you're not

8  making any changes to the files in the original evidence.

9  Q    Even though you're making a copy?

10  A    Yes because we have it connected to the write blocker.  So

11  it prevents us writing any information to the original evidence.

12  Q    So if I have a laptop and I plug in a USB drive and I copy a

13  file over, we're going to see some changes to that file.  But if

14  you plug in your special hardware and software and we copy the

15  entire drive over, none of those files will change?

16  A    If we create a forensic image of it, yes, correct.

17  Q    So I want to direct your attention to the present case.

18  Were you asked to do a forensic analysis on several devices that

19  were seized in Fort Stockton, Texas on January 9th, 2020?

20  A    Yes.

21  Q    And were you informed what you were looking for when you

22  were doing a forensic analysis?

23  A    Yes.

24  Q    Now how many devices were brought to you to do an analysis

25  on?

1    A    At the location or back at the office?

2    Q    Oh, I'm sorry.  Let me take a step back.  Were you actually

3    present at the location when the search warrant was being done?

4    A    Yes.

5    Q    And for what purpose?

6    A    To preview evidence items for -- for CSAM, or child sexual

7    abuse material.

8    Q    And why do you want to preview files at the date of a search

9    warrant?

10   A    To identify those files and to proceed with the

11   investigation, to relay information to the case agent.

12   Q    Is that where you would stop on a case?  I did a preview and

13   I'm done?

14   A    No.  We do the actual analysis back at the office.

15   Q    Okay.  So previously you talked about what you do on an

16   actual analysis of electronic devices.  What's different about a

17   preview?

18   A    A preview is just going through the file system and trying

19   to identify those files, either pictures or videos and identify

20   any of those types of files that were of suspect.

21   Q    Do you still use the write blocker and the forensic image

22   and all those things?

23   A    Yes.

24        We connect the hard drive, the device to a computer write

25   blocker.  We connect it to the laptop which in turn we use the

Yanez - Direct/Cayton                    191

1  forensic software to do a preview of that evidence.

2  Q    Now, I mean, we have several pieces of evidence that are --

3  several pieces of electronics that were introduced into evidence

4  here.  And one of them is a laptop.  Do you hook that laptop up

5  to your other laptop, or do you take the hard drive out of that

6  laptop?

7  A    We end up taking the laptop -- the hard drive out of the

8  laptop.  And then we connect the hard drive to the evidence write

9  blocker.

10  Q    And so are some drives easier to remove from their computers

11  than others?

12  A    Yes.

13  Q    So for the particular laptop in this case --

14         MR. CAYTON:  May I approach the evidence, Your Honor?

15         THE COURT:  Sure.  Yes, sir.

16         MR. CAYTON:  May I approach the witness, Your Honor?

17         THE COURT:  Sure.

18  BY MR. CAYTON:

19  Q    I'm showing you what's been marked as Government Exhibit 15.

20  Do you recognize this device?

21  A    Yes.

22  Q    And is this one of the laptops that you forensically

23  previewed?

24  A    Forensically previewed?  No.  I believe it was an L1H1 was

25  the one I previewed.

Yanez - Direct/Cayton                    192

1    Q    A different laptop?

2    A    A different laptop, yes.

3    Q    Now talking about the laptop you previewed, was it a similar

4    type of laptop?

5    A    I believe so.

6    Q    And so how do you remove a hard drive from a laptop?

7    A    It depends on the laptop itself.  Some laptops there might

8    be a few screws that you pull out.  And the hard drive is there.

9    And all I would need to do is just unscrew some screws from the

10   hard drive enclosure that's holding the hard drive to the laptop.

11        Others I would have to take the whole back panel off and

12   then get access to the hard drive.  And there's some that I would

13   need to get access through the keyboard.  I would have to lift up

14   the keyboard and then remove some screws.  It would be a little

15   more detailed as far as removing the hard drive from those.

16   Q    And do you have special tools to do that with when you go on

17   a preview?

18   A    Yes.

19        We have just a variety of small size screwdriver bits,

20   different types of screwdriver bits, phillips heads and multiple

21   different bits for the -- Macintosh computers have different

22   sizes or styles of bits.  And then we also have tools that are we

23   call spudgers.  They're plastic and they allow us to pry open the

24   device or the laptop or computer without making large -- or a lot

25   of damage to the device.

Yanez - Direct/Cayton                    193

1          THE COURT:  Did you say Spudger?

2          THE WITNESS:  Spudgers.  I think that's what they call

3    them.

4          MR. CAYTON:  I learned something new today.

5          THE COURT:  So did I.

6    BY MR. CAYTON:

7    Q    Now why not just open up the laptop itself and look at it?

8    A    Because if we turn on the laptop or make attempts to, if

9    it's off and turn it on, we'd be turning on and be making changes

10   to the original evidence.

11   Q    And you want to make sure that before you give a full

12   analysis, that you're still not modifying --

13   A    Making any changes to time -- the timestamps.

14   Q    Now you said you did a forensic preview in this case.  How

15   many devices did you preview?

16   A    I believe it was just that laptop, L1H1 I believe is that

17   one.

18   Q    And did you find anything pertinent to the investigation

19   during your preview?

20   A    Yes.  We found, or I found multiple, multiple files that are

21   suspected of containing that CSAM material.

22   Q    Did you open and view these files?

23   A    I viewed a few.

24   Q    And can you describe if you remember what you saw in those

25   files?

1  A    I do not remember the specifics of the files.

2  Q    But you were convinced that there needed to be a further

3  analysis --

4  A    Yes.

5  Q    -- of these devices.  So you're present at the search

6  warrant and the preview.  When do you next become involved in a

7  case?

8  A    When we receive the evidence from our seized property

9  specialist back at the office.

10  Q    and was that Mr. Barkley in this case?

11  A    Yes.

12  Q    And approximately how many devices did Mr. Barkley bring you

13  to do a forensic analysis on?

14  A    I think there was about 50 or 60 line items.  But I'd say

15  over 30, 30 devices.

16  Q    And did you do an analysis on all of the items?

17  A    I attempted to do an analysis on most of the items.  Some of

18  the devices were -- I wasn't able to connect to the write

19  blockers to be able to create an image of them.  And so of all,

20  there were gaming stations or gaming consoles that have previewed

21  or didn't preview.

22  Q    Now can that type of material be stored on a gaming device?

23  A    If it has a hard drive and there's storage, it can possibly.

24  I haven't seen anything yet to this date as far as my

25  investigations.

Yanez - Direct/Cayton                    195

1    Q    So you didn't bother analyzing those because in your

2    experience, there's not going to be anything on those?

3    A    Correct.

4    Q    Now of the computer devices that you analyzed, you talked

5    about the write blocker and the software, and the forensic image.

6    What happens when you start doing the analysis of that forensic

7    image?

8    A    I'm sorry.  Can you repeat the question?

9    Q    What do you do with the software once you make that forensic

10   copy of that physical image?  What does your software do?

11   A    Okay.  So the physical image, I add the physical image to

12   the software.

13        And then the software starts processing the image and

14   looking for different types of files.  It does this by I believe

15   by looking through the files and finding specific headers of the

16   files and identifies them as either pictures, videos, text files,

17   documents, internet evidence of that nature.  So it has certain

18   things it looks for in the image itself of the raw data, and then

19   it'll identify and categorize those different types of files.

20   Q    Can you do more specific requests when you're doing this

21   categorization, or is that pretty much just what the computer

22   does?

23   A    Well, you can -- you can select different types of files

24   that you're looking for just if you want to focus on ceratin

25   things.  Or you can have the software focus on everything that

1   it's capable of finding.

2   Q    So when you're involved in a case like this where it's

3   suspected child pornography, are you worried necessarily about

4   text files?

5   A    Well, I pretty much try to get as much as information as I

6   can off of the device and then look through some of the text

7   files and see if there's anything, for instance like passwords or

8   login credentials or specific websites or URLs or -- URLs meaning

9   web addresses for certain things that might be related to that

10  type of material.

11  Q    Of the amount of devices that you analyzed, can you tell the

12  court approximately the amount of data or the size of data that

13  you were going through?

14  A    Of the devices?  Total?  I think it was over 30 terabytes of

15  data.

16  Q    Now can you describe a little bit for the jury and for the

17  Court what a terabyte is?

18  A    A terabyte is -- let's say for instance we have a thumb

19  drive that's 32 gigabytes.  Then from gigabytes you would go up

20  to 1,000 gigabytes is going to be a terabyte.  And then from

21  there, you start going further and further up.

22        But let's say one -- one terabyte is found on most computers

23  now.  And like a phone, it's maybe about 256 gigabytes.  So

24  that's -- it holds a lot of data.

25        As far as number of files, it just depends because videos

1   are larger than -- than pictures.  So you can hold more pictures

2   on a terabyte than you could videos.

3   Q    And you were not -- when we're talking about 30 terabytes,

4   it sounds like a lot of data.  That's about -- one terabyte is

5   about the size on a laptop.  You didn't analyze 30 different

6   laptops.

7   A    No.

8   Q    So some of these were desktop computers, some of them were

9   laptops, some of them were external drives?

10  A    Yes, external drives.  Some of the external drives were up

11  to eight terabytes of storage.

12  Q    So that one little drive can actually hold a lot of the

13  storage that you were --

14  A    Yes.

15  Q    -- you were analyzing?

16  A    Yes.

17  Q    Now when you were doing your forensic analysis, did you

18  locate any files that you believed were suspect based upon the

19  case that you were investigating?

20  A    I'm not too sure what you're trying to --

21  Q    Any suspect files?  Any possible child exploitative material

22  in --

23  A    Yes.

24  Q    -- those files?  And what types of files were these

25  primarily?

Yanez - Direct/Cayton                              198

1   A    For the most part, a majority of them are pictures, picture

2   files.  And a large number were video files.

3   Q    Approximately how many files in your analysis did you have

4   that you suspected might be illegal material?

5   A    I bookmarked over 100,000 files.

6   Q    Now did you look through all 100,000 of those files?

7   A    No.

8   Q    Okay.  Do you believe -- you didn't have anyone make a

9   determination on all 100,000 files.

10  A    No.

11  Q    You select a small portion?

12  A    Well all the files themselves, I looked -- there's

13  thumbnails.  So I would skim through the thumbnails.  A majority

14  of the videos I would check, make sure they played and just to

15  see if the material, like, the thumbnail matched the material on

16  the video.  But no, I did not go through each and every one of

17  them.

18  Q    Now what do you do once you have carved out and discovered

19  these files through your forensic software?

20  A    So what we do, what I do is I collect the files, and then

21  collect them and notify the case agent that we have so many

22  files.

23       And then the case agent prepares paperwork to submit to the

24  files to NCMEC, the National Center for Missing and Exploited

25  Children.  And NCMEC goes and reviews those files and matches

Yanez - Direct/Cayton                              199

1    them up to known victims or known images that they've -- that law

2    enforcement has seen in previous investigations.

3    Q    So you say that's what NCMEC does.  Can you tell the Court a

4    little bit what NCMEC stands for?

5    A    Oh, the National Center for Missing and Exploited Children.

6    Q    And so why would you send these files to the National Center

7    for Missing and Exploited Children?

8    A    They built, like, a database of these types of files.  And

9    they try to identify individuals in those videos, and victims

10   that have been identified in those videos and try to get some

11   restitution I believe through the courts.

12   Q    Now besides files being submitted in NCMEC, what else

13   happens to the files that you find?

14   A    So as the files that I find, I create a report and just

15   notify the case agent of the files that we find.

16   Q    And a case agent -- who's responsible for looking at the

17   files and determining whether or not they think they have a child

18   pornography case on their hands?

19   A    Well I look through them.  And if the case agent assists

20   with the viewing of the files, then the case agent will look

21   through them as well.

22   Q    Now in the present case, did you provide any files to

23   Special Agent Ferg that you believed would be relevant to his

24   investigation?

25   A    Yes.

1    There's a listing of files that he provided of downloaded

2    files that were found by I believe a task force officer.  And a

3    lead was provided to him to investigate some sort of his area of

4    responsibility.  So that list, I ran a search of those file names

5    and file folder which was one of the file folders that was in the

6    file (indiscernible).  I ran that name or that folder through the

7    forensic software.

8    Q    So let me take a step back.

9         So Special Agent Ferg has a list of files that were

10   downloaded.  And he provides that to you to search and see if

11   they can find any of those downloaded files on the devices that

12   you had?

13   A    Correct.

14   Q    Is that fair?  And did you search for those specific files

15   when you were doing your search?

16   A    Yes.

17   Q    Did you find any of those files?

18   A    I did.

19   Q    How many of the files did you find?

20   A    I believe over 15, 15 files, 17 files I believe were found.

21   Q    So there were 17 files that were downloaded from an agent in

22   Brownsville, Texas, and you found 15 of them on the devices that

23   you analyzed?

24   A    The list, yes, that was provided to me.

25        MR. CAYTON:  May I have just a moment, Your Honor?

1          THE COURT:  Yes, sir.

2    BY MR. CAYTON:

3    Q    Now I want to take you back to the seized property

4    specialist brings you the physical evidence, correct?

5    A    Correct.

6    Q    And are they in bags kind of like what's in front of the

7    jury here?

8    A    Yes.

9    Q    Like an evidence bag?

10   A    Yes.

11   Q    So what do you do once you get this item in this evidence

12   bag?

13   A    I identify the item, verify the bag number or the line item

14   itself with the custody receipt, make sure we're looking at the

15   same evidence item.  And then once I verify the evidence items

16   with the custody receipt, I take custody of the items.  And then

17   I'll go in and create an inventory of the devices.

18   Q    And do you assign certain numbers or letters to these

19   devices for your purposes?

20   A    Yes.  Identifiers, yes.

21   Q    And how do you go about assigning identifiers?

22   A    Well, like a laptop I would name them L1.  And then hard

23   drive 1, H1.  If it's a desktop, I would say C1H1.  If it has

24   more than one hard drive, I would C1H1 or C1H2.  Of course with

25   the corresponding hard drives.

1          MR. CAYTON:  Your Honor, I want to -- I know this is

2     kind of tedious.  But I want to go through each of the counts we

3     have.

4     BY MR. CAYTON:

5     Q    Count 2 is listing material stored on a Western Digital hard

6     drive, model number WD800, serial number WDWCAJ92661471.  Do you

7     recognize that hard drive model?

8     A    Off of the top of my head, I don't.

9     Q    Is that something that you would have in your notes?

10    A    Yes.

11    Q    Do you have your notes with you?

12    A    Yes.

13    Q    Can you please review your notes and look up when you're

14    done reviewing them?  And if you'd like me to repeat the number,

15    I'm happy to do so.

16    A    Excuse me?

17    Q    I'm happy to repeat the number if you'd like me to.

18    A    Could you repeat it?

19    A    It's serial number ending in 661471, Western Digital hard

20    drive.

21    A    Okay.  Yes.

22    Q    Does that hard drive ring a bell?

23    A    Yes.

24    Q    Is that a hard drive that you analyzed?

25    A    Yes.

1    Q    And what was your label for that hard drive?

2    A    661471?  I labeled it a USB8.

3    Q    Western Digital 661471?

4    A    Oh, I'm sorry.  I have these notes -- it's C1H1.

5    Q    C1H1.  Now what would a C1H1 be?

6    A    It's a desktop computer, and it is a Western -- I'm sorry.

7    It is a -- I have other notes.  Let me refer to the other notes.

8    Okay.  So C1H1 is a Dell desktop computer.  It is a Dimension

9    4600.  And the serial number is DYHN351.

10             MR. CAYTON:  Your Honor, may I approach the witness?

11             THE COURT:  Sure.

12   BY MR. CAYTON:

13   Q    Agent Yanez, I'm showing you what's been previously marked

14   as Government Exhibit 9.  Do you recognize this?

15   A    Yes.

16   Q    Is this the device that C1H1, or that Western Digital hard

17   drive would have been removed from?

18   A    Yes.

19   Q    Where is the hard drive now?

20   A    It is inside the device or the computer.

21   Q    You put it back in after you're done with the analysis?

22   A    Yes.

23   Q    Can you tell us where this hard drive was manufactured?

24   A    Yes.  The hard drive, C1H1, was manufactured in Thailand.

25   Q    In the country of Thailand?

1    A    Correct.

2    Q    And was that one of the devices that was seized from the

3    defendant's house?

4    A    Yes.

5    Q    I'm going to go to Count 3 which is a Maxtor hard drive,

6    Diamondmax Plus 9, serial number Yankee 45 Bravo Charlie 9 X-ray

7    Echo.  Can you tell us what your identifier was for that device?

8    A    That was C2H1.

9    Q    And was that also a Dell desktop computer?

10   A    Correct.

11   Q    And where is that hard drive right now?

12   A    It's in the computer.

13   Q    It's back in the computer?

14   A    Correct.

15   Q    And if I proffer to you that was probably Government Exhibit

16   12 sitting in front of you, would that make sense?

17   A    Yes.

18   Q    On the model?  Now can you tell me where this hard drive was

19   manufactured?

20   A    that hard drive, C2H1, was manufactured in the country of

21   Singapore.

22   Q    Singapore?  And was this also a device that was found at the

23   defendant's residence?

24   A    Yes.

25   Q    And did you do a forensic analysis on both of these devices?

Yanez - Direct/Cayton                                    205

1    A    I did.

2    Q    I'm going to go to Count 4, that's a Seagate hard drive

3    device model ST1000LM0049, Serial number WGS5QBVZ.  Can you tell

4    us what your identifier was for that device?

5    A    That is L2H1.

6    Q    Would that be a laptop computer then?

7    A    Correct.

8         MR. CAYTON:  May I approach, Your Honor?

9         THE COURT:  Yes, sir.

10   BY MR. CAYTON:

11   Q    I'm showing you what's been marked as Government Exhibit 15.

12   Would this be the laptop computer?

13   A    Yes.

14   Q    And has the hard drive been placed back in this laptop

15   computer?

16   A    It appears so.  Yes.

17   Q    And for all these devices, you analyze all of them?

18   A    Yes.

19   Q    Okay.  And can you tell me with the hard drive that's in

20   that laptop, where that was manufactured?

21   A    That laptop hard drive was manufactured in the country of

22   China.

23   Q    China.  Count 5 is a Seagate hard drive device model

24   SRDONF2, serial number NA8EYNL7.  Is that a drive that you

25   analyzed?

Yanez - Direct/Cayton                                    206

1    A    Excuse me?

2    Q    Is that one of the drives that you analyzed?

3    A    Yes.

4    Q    Can you tell me what your identifier was for that one?

5    A    The identifier was USB3.

6    Q    And was this a computer, or was this an external hard drive?

7    A    It was an external hard drive.

8    Q    And can you tell me where this hard drive was made?

9    A    That hard drive was manufactured in the country of Thailand.

10   Q    Thailand.  Count 6 is a Seagate hard drive model SRDOPV1,

11   serial number NA9QO2S9.  Can you tell me what your identifier was

12   for that drive?

13   A    USB4.

14   Q    And can you tell me where that drive was manufactured?

15   A    The country of China.

16   Q    And is that also an external hard drive?

17   A    Yes.

18   Q    Count 7 is a Western digital WDBYFT0040BBK-OA, serial number

19   WX51D961NE27.  Can you tell me what your identifier was for that

20   device?

21   A    That was USB5.

22   Q    Can you tell me where that device was manufactured?

23   A    That was manufactured in the country of Malaysia.

24   Q    Malaysia?

25   A    Malaysia.

Yanez - Direct/Cayton                    207

1    Q    Is it fair to say that most hard drives are manufactured --

2    A    Outside of the U.S.

3    Q    -- in Asia?  Yeah.  Count 8 is a Samsung hard drive serial

4    number S267J1LZ503188.  Can you tell me what your identifier was

5    for that drive?

6    A    USB8.

7    Q    And can you tell me where that device was manufactured?

8    A    The country of Korea.

9    Q    And finally Count 9 is a SimpleTech hard drive device model

10   963004100168, serial number 09335092000206005.  Is that a device

11   that you analyzed?

12   A    Yes.

13   Q    Can you tell me what your identifier was for that device?

14   A    USB12.

15   Q    Can you tell me where that device was manufactured?

16   A    The country of China.

17   Q    And that was also an external drive.

18   A    Correct.

19   Q    So the first three were computers, and all the others were

20   external drives?

21   A    Yes.

22   Q    Is there anything different you do in an analysis of an

23   external drive versus a working computer?

24   A    No.  We would still hook it up to an external -- I mean to

25   the write blocker and get an image of that device.

1    Q     Knowing that all these drives were made in Asia, did these

2    devices that were being used necessarily have to be involved in

3    interstate commerce?

4    A     Excuse me, can you repeat the question?

5    Q     Did these devices have to enter interstate commerce in order

6    to be sold in the United States?

7    A     Yes.

8               MR. CAYTON:  Your Honor, may I approach the witness?

9               THE COURT:  Yes, sir.

10   BY MR. CAYTON:

11   Q     Agent Yanez, I'm showing you what's been marked as

12   Government's 41 for identification.  Do you recognize that?

13   A     I do.

14   Q     And what is that?

15   A     This is a disc, a CD disc that contains files, videos of

16   suspected CSAM material.

17   Q     And how do you know that's what that is?

18   A     Because I reviewed it.

19   Q     And did you provide those videos to --

20   A     Yes, I did provide those videos to yourself and to Special

21   Agent Ferg.

22   Q     And did you make any markings on that disc to confirm that

23   that was the disc you reviewed?

24   A     Yes.  I provided my initials.

25   Q     Now the file that are on this disc, where did they come

Yanez - Direct/Cayton                    209

1    from?

2    A    They came from the devices that we just talked about.

3    Q    How many videos, or how many files are on the discs?

4    A    Files that are on the disc?  About seven or eight files.

5    Q    Is there a video for each device that you -- or a video or

6    image for each device that you analyzed and that's present here

7    today?

8    A    Yes.

9         MR. CAYTON:  Your Honor, at this time, the Government

10   would offer Government Exhibit 41 into evidence.

11        THE COURT:  Mr. Gorman?

12        MR. GORMAN:  Your Honor, subject to the previous

13   objections on the topic, no additional objections, Your Honor.

14        THE COURT:  Government's Exhibit 41 is admitted over

15   objection as previously stated.

16     (Government's Exhibit 41 admitted into evidence)

17        MR. CAYTON:  Your Honor, at this point I would like to

18   publish the exhibit to the jury.

19        THE COURT:  Go right ahead.

20        MR. CAYTON:  And, Your Honor, for the record, the

21   Government intends on showing only a four-second clip of any of

22   the videos.

23        THE COURT:  Okay.  Very good.  So be watching a four-

24   second clip of each, or any of them?

25        MR. CAYTON:  Yes.  Any of them in their --

1           THE COURT:  So playing a series of four-second or

2     fewer, or less clips?

3           MR. CAYTON:  Yes, Your Honor.

4           THE COURT:  Okay.

5     BY MR. CAYTON:

6     Q    Agent Yanez, I want to start off with a file named boy 05.

7     Does that file ring a bell for you?

8     A    Yes.

9     Q    Do you know what device that file was found on?

10    A    May I refer to my notes?

11          MR. CAYTON:  With the Court's permission to refresh

12    your recollection.

13          THE COURT:  Sir.

14        (Pause)

15    BY MR. CAYTON:

16    Q    Did reviewing your notes -- excuse me, reviewing your notes

17    refresh your recollection?

18    A    Yes.

19    Q    What device was boy 05 found on?

20    A    Laptop 2, hard drive 1.

21    Q    And is this also one of the images or videos that was

22    downloaded originally from the defendant's computer by the

23    Brownsville agent?

24    A    Yes.

25          MR. CAYTON:  And, Your Honor, I apologize.  Just a few

1    technical difficulties to make sure we're queuing up for only

2    four seconds.

3         (Pause)

4              MR. CAYTON:  You can stop it there.

5    BY MR. CAYTON:

6    Q    Is that the video boy 05?

7    A    Yes.

8    Q    And that was found on L2 --

9    A    H1.

10   Q    -- H1, the laptop?

11   A    Yes.

12   Q    There's a video titled 4YOPTHCR@Ygoldreel with three

13   exclamation points.  Do you recognize that video title?

14   A    Yes.

15   Q    And what drive was that video found on?

16   A    On C1H1.

17        (Pause)

18   BY MR. CAYTON:

19   Q    While that's queuing up, you said you recoginzed this file

20   from C1H1, the desktop hard drive?

21   A    Yes.

22   Q    And when you're doing your analysis, are you just looking

23   for videos, or are you looking for the data that goes along with

24   those videos or images, as well?

25   A    As far as can you explain --

1   Q    Like a created date, where the file location is, modified,

2   things like that.

3   A    For the most part, we look for the location.

4   Q    And --

5   A    Or I look for the location.

6   Q    And can you tell me where in C1H1 that the file name 4YOPTHC

7   ray gold reel (phonetic) was located?

8   A    I do not have that -- the notes.  I can't tell you off the

9   top of my head.

10  Q    Would reviewing the notes that you've provided refresh your

11  recollection?

12  A    Yes.

13            MR. CAYTON:  May I approach the witness, Your Honor?

14            THE COURT:  Yes, sir.

15            THE WITNESS:  So for C1H1, 4YOPTHC ray gold reel, that

16  one was located in file path of C1H1 under the documents and

17  settings folder, under the owner by DYHN351 folder which is also

18  underneath that is the my documents folder.  And under that

19  folder is my videos folder.  And within that folder is child porn

20  folder.  And then within that folder is videos folder.

21  BY MR. CAYTON:

22  Q    Now in your experience as a computer forensics analyst or

23  agent, are you experienced with standard file folders that are

24  created through windows or other operating systems?

25  A    Yes.

1    Q    In a standard my documents and my videos folder on a Windows

2    desktop, is there a child porn folder that is a default folder

3    that's made?

4    A    No.

5    Q    How would a folder titled child porn be created on an

6    operating system?

7    A    The user of the device creates that folder at that location.

8    Q    And we're now going to play a short, four-second clip from

9    that video.  And I ask you to watch it, and I'll ask you some

10   more questions afterwards.  Or maybe not.

11         THE COURT:  And when this finally plays, it's going to

12   play on both screens, right?

13         MR. CAYTON:  It should, Your Honor.  Yes.

14         THE COURT:  It will be either one.  Okay.

15    (Video plays at 5:12 p.m.)

16         MR. CAYTON:  And we can move on to the next one.

17   That's fine.

18   BY MR. CAYTON:

19   Q    For Count 3, or there's a file listed on the disc that's

20   titled king pass new, exclamation point, 022 Asian, dash PTHC,

21   parentheses tied eight-year-old Cambodian boom-boom, end

22   parentheses, girl fucked in RA.  Is that a file that you

23   recognize from the hard drives?

24   A    Yes.

25   Q    Can you tell me what hard drive that file was found on?

1    A    That is on C2H2.

2    Q    And that was the other desktop computer?

3    A    Yes.  I'm sorry, correction.  It was C2H1.

4    Q    C2H1.

5    A    Correct.

6    Q    And going back to that prior file, the four-year-old PTHC re

7    gold reel, can you tell me the last date that that file was

8    accessed?

9    A    The last access date was March 13th, 2012.

10   Q    Now for this king pass new file, would you be able to tell

11   me the file path for that file?

12   A    With the notes, I can't off the top of my head.

13        MR. CAYTON:  May I approach the witness again, Your

14   Honor?

15        THE COURT:  Yes, sir.

16   BY MR. CAYTON:

17   Q    Can you tell me when the king pass new, or the file location

18   for the king pass new file?

19   A    So the file location for the king pass new was in C2H1.

20   It's under documents and settings.  In that folder is Thomas'

21   folder, Thomas folder.  Underneath that folder is desktop folder.

22   And then within that folder is shredd spelled S-H-R-E-D-D,

23   exclamation point.  And then underneath that folder is another

24   folder with letters CWVCS.  And then this is the file.

25   Q    Did you view this file?

1    A    Yes.

2    Q    Can you tell me the last date that this file was accessed?

3    A    Last access date was January 14th, 2012.

4    Q    But to be clear, even though the last access date was from

5    2012, that computer was seized from the location and that file

6    was still on the computer when you analyzed it?

7    A    Yes.

8    Q    And I'll direct your attention to a file boy 06.  Can you

9    tell me which drive or which device that file was found on?

10   A    Boy 06 was found on laptop two, hard drive one.

11   Q    And did you view this file?

12   A    I did.

13   Q    Can you tell me the file path for this file?

14   A    File path for this file is Windows, users, Thomas,

15   downloads, BitTorrenting, complete.  And those are all folder

16   names in that file path.

17   Q    Is that a default folder on Windows?

18   A    A default folder?  The downloads folder is a default folder.

19   Q    The BitTorrenting subfolder, is that something that would be

20   created by BitTorrent software, or is that something that someone

21   would create?

22   A    I think that's a folder that someone would create.

23   Q    Okay.  And you have experience analyzing different computers

24   that have used peer-to-peer software?

25   A    Correct.

Yanez - Direct/Cayton                    216

1    Q     Have you ever seen that folder that's created by the

2    software itself?

3    A     Not in the downloads folder.

4    Q     and when was the last date that that file, boy 06, was

5    accessed?

6    A     Last access date was 10/1/2019, October 1st, 2019.

7    Q     When was it created?

8    A     Created date was 9/10/2019.  September 10th.

9    Q     And I'm going to take you back to the prior video, the king

10   pass video.  You said that was found on the second desktop?

11   A     Yes.

12         (Video plays at 5:16 p.m.)

13             MR. CAYTON:  And you can stop it there.

14   BY MR. CAYTON:

15   Q     Is that the file that you know to be the king pass file?

16   A     Yes.

17   Q     And you viewed that file prior to testifying today?

18   A     Yes.

19   Q     And you found that file on the defendant's computer on the

20   C2H1 computer?

21   A     Yes.

22   Q     And that would be the Maxtor hard drive in Count 3?

23   A     Yes.

24   Q     I want to direct your attention to a file titled dad on

25   daughter full penetration sex.  Can you tell me which device that

1    file was found on?

2    A    It was on USB3.

3    Q    And just for clarification sake, USB3 is Count 5.  That's

4    the Seagate hard drive?

5    A    Yes.

6    Q    Can you tell me when -- or what the file path was for this?

7    A    The file path is BitTorrenting folder, completed tech savvy

8    torrents folder, PTHCTIEM folder.

9    Q    Now the prior three files we talked about, they came off

10   computers themselves, correct?

11   A    Correct.

12   Q    This one's off an external hard drive.

13   A    Yes.

14   Q    To get a file from a computer to an external hard drive,

15   does there have to be user manipulation?

16   A    Yes.

17   Q    Specifically how are the different ways a user could get a

18   file off a computer onto an external hard drive?

19   A    They can cut and paste it, or select it by right-clicking on

20   the file or folder, right clicking and selecting copy, and then

21   copy it, move it over to the other -- other computer or other

22   hard drive, the USB, and selecting a location and right-clicking

23   and pasting.  They could cut it and paste it.  Or they can select

24   the file and then drag it over to the other location.

25   Q    If someone plugged in a USB hard drive onto a computer,

1  could they set up files to automatically dump into that hard

2  drive?

3  A    Yes.

4  Q    Would -- if files were set to dump to a particular hard

5  drive, for example this external, the file path you read off that

6  had completed tech savvy downloads, PTHC, who would create that

7  file path?

8  A    The user would create it.

9  Q    Do you know what PTHC stands for?

10 A    Yes.

11 Q    What does PTHC stand for?

12 A    Preteen hardcore.

13 Q    Is that a common title that you see when you're doing child

14 pornography investigations?

15 A    Yes.

16 Q    I'll go on to the next file.  That would be title

17 parentheses PTHC, end parentheses, tara brand new, parentheses,

18 two, end parentheses.  Does that file -- do you recognize that

19 file name?

20 A    Yes.

21 Q    What device was that file found on?

22 A    USB4.

23 Q    And that would be the Seagate hard drive, serial number

24 NA9Q02S9 in Count 6?

25 A    Yes.

Yanez - Direct/Cayton                                       219

1    Q    Did you view this file?

2    A    I did.

3    Q    Can you tell me what the file path was for this file?

4    A    It was new folder, PTHC folder.

5    Q    That's it?

6    A    Yes.

7    Q    And so that would be found on the external hard rive that's

8    USB4?

9    A    Yes.

10   Q    And how would that folder or that file path have been

11   created?

12   A    Either by the user.

13   Q    When was the last time that file was accessed?

14   A    It was accessed August 2nd, 2018.

15        (Counsel confer)

16            MR. CAYTON:  I'm going to show you a short clip from

17   the dad on daughter video which I believe came from USB3

18   previously testified to.

19            THE COURT:  And this goes to Count 4?

20            MR. CAYTON:  This goes to Count 5, Your Honor.

21            THE COURT:  5.

22            MR. CAYTON:  Yes.

23        (Pause)

24            MR. CAYTON:  That's probably better.  I'll move on a

25   little bit further while we're loading that up.  File titled Ulia

Yanez - Direct/Cayton                    220

1   -- oh there we go.

2        (Video plays at 5:22 p.m.)

3              THE COURT:  Off.  Off.  Off.

4              MR. CAYTON:  Just turn it off.  That's enough.

5              THE COURT:  Turn it off.

6   BY MR. CAYTON:

7   Q    There's a file titled Ulia 2-7.  Do you recognize that file

8   name?

9   A    Yes.

10  Q    And can you tell me what device that file was found on?

11  A    USB5.

12  Q    And that would be Count 7, a Western Digital hard drive,

13  serial number ending in 961NE27?

14  A    Yes.

15  Q    Did you view this video?

16  A    Yes.

17  Q    Can you tell me what the file path was for this video?

18  A    File path is my hard drive -- hard drive backups folder, my

19  hard drives folder from current laptop hard drive, PC8YPDHL1

20  folder, users folder, other folder, appdata folder, local folder,

21  delete folder, freenet folder, downloads folder, XLOLA-

22  ULIA(2).rar.

23  Q    Can you tell me when the last time that file was accessed?

24  A    Last time the file was accessed is 1/1/0001.

25  Q    Now obviously this file was not last accessed on January 1st

1   of 0001.

2   A   Correct.

3   Q   Why the date range that way?

4   A   I'm not sure.  I'm not sure why the date ended up like that.

5   Q   Is it possible a file system may be corrupted and may modify

6   those dates?

7   A   Possibly.

8   Q   But you were able to view that file on the forensic image

9   that you created from that device?

10  A   Yes.

11  Q   Moving on to Count 8, a picture, a jpeg image that's titled

12  $RLISUOD, do you recognize that image?

13  A   Yes.

14  Q   And that image was found on the Samsung hard drive, serial

15  number ending in 503188?

16  A   Yes.

17  Q   And what was your USB title for that?

18  A   USB8.

19  Q   And this is just a still image.

20  A   Correct.

21  Q   And do you remember -- did you look at this image prior to

22  testifying in court today?

23  A   Yes.

24  Q   And did you pull this image off the drive when you were

25  doing your analysis of the drive?

1    A    Yes.

2    Q    Do you remember what this still image is?

3    A    Of a nude prepubescent female.

4    Q    And we'll move onto USB12, a file titled PTHC, three

5    exclamation points, new0604, three exclamation points,

6    11lilly3y01 -- or parentheses 1, end parentheses.  Can you tell

7    me which device this was found on?

8    A    USB12.

9    Q    Can you tell me what the file path was for this video?

10   A    This one had three file paths.  It was the first one is

11   Thomas' stuff folder, BitTorrent downloads folder, web video

12   collection folder, (PTHC)!!!new0604!!!loveandlily3YO(1).avi is

13   the file name.

14   Q    You said it was -- there's three different file paths.  Does

15   that mean there's three different copies on the same drive?

16   A    Correct.

17   Q    Does the computer automatically make multiple copies of an

18   image or a video?

19   A    A user could copy the file.

20   Q    Can you tell me when this file was last accessed?

21   A    The file, first file was last accessed on June 26, 2011.

22   Q    Did you view this file before testifying today?

23   A    Yes.

24   Q    It says 3YO in the video title.  Can you tell us why?

25   A    That stands for -- I've known that to stand for three-year-

1   old.

2   Q    Do you remember viewing this video and what it depicts?

3   A    I do not remember specifically what it depicted.

4   Q    There's also two more videos on the disc.  Is that correct?

5   A    Correct.

6   Q    And one of those videos is entitled awesome preteen

7   compilation 2, and the second one is entitled PTHC Kelly 8YO -

8   sucking and trying to F.  Why -- where did those videos come

9   from?

10  A    The first video, awesome preteen compilation, came from USB3

11  and USB12.  And the second video, PTHC Kelly 8YO came from C2H1,

12  USB 3, and USB12.

13  Q    USB3 is Count 5, the Seagate ending in EYNL7.  And USB12 is

14  the SimpleTech hard drive ending in 206005?

15  A    Yes.

16  Q    So there was -- you found multiple copies of these two

17  videos?

18  A    Yes.

19  Q    And what is the significance of these two videos?

20  A    They were videos provided -- we were notified by NCMEC that

21  these videos had identified victims associated with them.

22  Q    and just to be clear, for all of the videos and images that

23  we had just gone through and described that are on that disc, you

24  viewed them all?

25  A    Yes.

224

Q    And each of them came off the drives as you described?

A    Yes.

         THE COURT:  Mr. Cayton?

         MR. CAYTON:  Yes, Your Honor.

         THE COURT:  Let's break for the evening.

         MR. CAYTON:  Yes, Your Honor.

         THE COURT:  So remember where you are, okay?  I'm
cutting you off at a bad time.

         MR. CAYTON:  It's fine, Your Honor.

         THE COURT:  It should be good, right?

         MR. CAYTON:  Yes, Your Honor.

         THE COURT:  Okay.  Ladies and gentlemen of the jury, I
want you to leave your notebooks here.  You're going to lave your
badges here.  You can leave them here or in the jury room.
Anything in the jury room will be secure.  Pocketbooks, wallets,
cash, anything you want to leave will be fine.  It also will be.

         Before we recess for the night, I remind you again that
you must decide this case based solely on the evidence presented
here within the four walls of this courtroom.  That means you
must not discuss the case in any manner among yourselves or with
anyone else until you retire to deliberate.

         You may inform your family, friends, and employer that
you're serving jury duty.  You must not go into any details of
the case.  Do not conduct any independent research into the case
or the people involved.  In addition, avoid reading any articles

225

1    or watching or listening to any local broadcasts in the event the

2    case may be mentioned.

3          You're not to have any conversation whatsoever with the

4    lawyers or other persons connected with the case.  Again, the

5    reason for these cautions lies in the fact that it will be your

6    duty to decide this case solely on the basis of the testimony and

7    evidence presented at jury trial without consideration of any

8    other matters whatsoever.

9          Here's the deal I will make you.  I'm going to have the

10   lawyers, I'm going to keep the lawyers while you leave because we

11   got other work to do that we can do outside of your presence.

12   I'm also going to have them come back in before y'all come in in

13   the morning.  So we'll be here no later than 8:00 a.m.  You all

14   be here no later than 8:30.

15         And here's the deal I'll make you.  Once we have all 14

16   of you, any time after eight, we're going to start.  Okay?  So I

17   had one jury come in at ten after eight and we started.  I had

18   another jury come in at five after eight.  Those are the two so

19   far.  Everybody else has gone right up to the wire and we started

20   at 8:30.  Doesn't matter to me.

21         We're going to start no later than 8:30.  We've got to

22   have all of you to start.  But if you get here earlier and ready,

23   we'll start earlier than that.  We'll start between eight -- we

24   won't start earlier than eight.  So don't break your neck getting

25   here earlier than eight.

1        You can get here, though, as early as 7:30, I think.  I

2   think the building's open at 7:30.  You're welcome to bring

3   coffee.  We'll have those snacks.  You can tell there's nothing

4   great in there, but it's okay.  It's up to you.

5        We'll probably have some coffee made also, but you're

6   welcome to bring your own.  Who's making the coffee, do you know?

7        UNIDENTIFIED SPEAKER:  Not me, sir.

8        THE COURT:  Not you?  Okay.  If I know who it is, I'll

9   tell you whether to make your own -- bring your own or not.  But

10  I don't know who it is, so you're taking your life into your own

11  hands.  It will be good I bet.

12       With that, have a great evening.  We'll see you in the

13  morning.  Remember your instructions.  Let's rise for the jury,

14  please.

15     (Jury out at 5:31 p.m.)

16       THE COURT:  Let's be seated, please.  Outside the

17  presence of the jury.  Mr. Greenbaum, Mr. Cayton, anything more

18  you'd like to take up today outside the presence?

19       MR. CAYTON:  Your Honor, I just wanted to apologize to

20  the Court.  I got carried away reading a file name and I dropped

21  the F-bomb, and I apologize.

22       THE COURT:  I think you're supposed to.  I think you

23  have to.  That's the way I always do it.  You're not supposed to

24  curse on your own, which Mr. Weber liked to do.

25       MR. CAYTON:  I've heard stories, Your Honor.

1          THE COURT:  But I think something like that, you know,

2     the way I was trained 30-something years ago is you have to do it

3     in instances like that.  So no apologies necessary.

4          Anything --

5          UNIDENTIFIED SPEAKER:  Sorry it wasn't working.

6          THE COURT:  I'm sorry?

7          UNIDENTIFIED SPEAKER:  I'm sorry it wasn't working.

8          THE COURT:  I know.  That's going to be cantankerous.

9     And wouldn't you know it will be -- because we probably could

10    have gotten through those and been done with them.  I don't know.

11    But work on that tonight obviously.  You've got nothing else to

12    do, right?  You were going to sleep.  You were going to sleep.

13         MR. CAYTON:  Type of material you want to work on.

14         THE COURT:  So, Mr. Gorman, Ms. Bataller, anything

15    you'd like to take up outside the presence?

16         MS. BATALLER-SCHNEIDER:  No, Your Honor.

17         THE COURT:  All right.

18         MS. BATALLER-SCHNEIDER:  Thank you.

19         THE COURT:  I hope y'all get some rest, everybody.  And

20    we'll be here no later than eight o'clock.

21         If you think of something tonight, all of you, if you

22    think of something tonight that you're like you know what, when

23    we get here at eight we need to take this up, email Ms. Salas.

24    Copy each other so that we all know.  And she'll tell me ahead of

25    time okay, we're going to take this up.

228

1          And we'll know because if they get here at 8:05 or

2    8:10, I'm going to feel horrible if we have something to take up

3    outside the presence and they have to wait in there.  They'll

4    just keep drinking coffee and have to go to the bathroom early.

5    It's going to be a mess.

6          All right.  We'll get Mr. Perkins some rest and some

7    grub, and I'll see y'all in the morning.  Thank you, all.

8        (Proceedings adjourned at 5:34 p.m.)

9                            ---OOO---

10

11                    **C E R T I F I C A T E**

12      I, DIPTI PATEL, court-approved transceriber, certify that

13    the foregoing is a correct transcript from the official

14    electronic sound recording of the proceedings in the above-

15    entitled matter.

16

17    *Dipti Patel*

18    _____

19    DIPTI PATEL, CET-997

20    LIBERTY TRANSCRIPTS                    Date: January 3, 2023

21

22

23

24

25