```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
                       PECOS DIVISION

UNITED STATES OF AMERICA,     )    Case No. 4:20-CR-000388
                              )
          Plaintiff,          )    Appeal No. 22-50987
                              )
     vs.                      )
                              )
THOMAS SCOTT PERKINS,         )
                              )
          Defendant.          )    Monday, July 19, 2022
_____)    8:20 A.M.


              TRANSCRIPT OF JURY TRIAL, DAY 2
          BEFORE THE HONORABLE DAVID C. COUNTS
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          United States Attorney's Office
                            BY:  SCOTT GREENBAUM, ESQUIRE
                                 KEVIN CAYTON, ESQUIRE
                            2500 North Highway 118, Suite 200
                            Alpine, Texas 79830


For the Defendant:          Office of the Federal Public Defender
                            BY:  ELYSE BATALLER, ESQUIRE
                                 MICHAEL F. GORMAN, ESQUIRE
                            700 East San Antonio, Suite D401
                            El Paso, Texas 79901



Deputy Clerk:               Cristina Lerma
                            United States District Court
                            410 South Cedar Street
                            Pecos, Texas 79772


Transcription Service By:   Dipti Patel, CET-997
                            Liberty Transcripts
                            7306 Danwood Drive
                            Austin, Texas 78759
                            (847) 848-4907
                            www.libertytranscripts.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

2

INDEX

| | PAGE |
|---|---|
| Case called | 4 |
| Government Rests | 71 |
| Defense Rule 29 Motion | 72 |
| Court's Ruling on Defense Rule 29 Motion | 76 |
| Defense Rests | 120 |
| Government Rests | 145 |
| Final Jury Instructions | 163 |
| Closing Statements | |
| By:  Mr. Cayton | 184 |
| By:  Ms. Bataller | 194 |
| By:  Mr. Greenbaum | 201 |
| Verdict | 212 |
| Jury Polled as to Verdict | 213 |
| End of Proceedings | 219 |
| Certificate of Transcriber | 220 |

3

<u>INDEX</u>

                                                      <u>PAGE</u>
<u>WITNESSES</u>:
<u>FOR THE GOVERNMENT</u>:

Antonio Yanez
        Direct Examination by Mr. Cayton              6
        Cross-Examination by Mr. Gorman               24
        Redirect Examination by Mr. Cayton            42
        Recross-Examination by Mr. Gorman             53

David Ferg
        Direct Examination by Mr. Cayton              55

Sean Mullen
        Direct Examination by Mr. Greenbaum           61

Craig Butler
        Direct Examination by Mr. Cayton              132
        Cross-Examination by Ms. Bataller-Schneider   134

Coleman Boring
        Direct Examination by Mr. Cayton              137
        Cross-Examination by Mr. Gorman               141
        Redirect Examination by Mr. Cayton            144

<u>FOR THE DEFENDANT</u>:

James Schutte
        Direct Examination by Ms. Bataller-Schneider   80
        Cross-Examination by Mr. Greenbaum             106
        Redirect Examination by Ms. Bataller-Schneider 118


<u>EXHIBITS</u>:                                    <u>ID</u>     <u>EVD</u>

<u>FOR THE GOVERNMENT</u>:

8 - Curriculum Vitae of Antonio Yanez         7        8
40 - Photos depicting victims                 67       68

<u>FOR THE DEFENDANT</u>:

(None)

1    **Pecos, Texas - Tuesday, July 19, 2022**              **(8:20 a.m.)**

2                      **P R O C E E D I N G S**

3                         ---oOo---

4    (Outside the presence of the jury; defendant present)

5              THE CLERK:  All rise.

6              THE COURT:  Thank you.  Mr. Cayton, anything?

7    Mr. Greenbaum, before we bring the jury in?

8              MR. GREENBAUM:  Judge, I did mention one thing to

9    Ms. Salas.  Defense Counsel was there, Your Honor.  We do have an

10   expert, but we would only call him in rebuttal, Your Honor.

11   That's Dr. Samuel Brown, and he's the BLP doctor that evaluated

12   the defendant, Your Honor.

13             He is actually -- so he's from Dallas/Fort Worth area.

14   He's actually physically in the State of Oklahoma testifying

15   today in federal court, Your Honor.  As soon as he's done, my

16   understanding is he's going to come down here to Pecos.  He

17   should be here first thing in the morning, Your Honor.  And he

18   would only be called potentially in rebuttal.

19             So he may not even be called.  But I just wanted to

20   bring that to the Court's attention that he'll be available first

21   thing tomorrow morning.  He's shooting to get here sometime

22   tonight from Oklahoma, Your Honor.

23             THE COURT:  So if everybody -- if you all rest and --

24   so this is what you're telling me.  If you all rest and the

25   Defense is done today and we still have court time, you want me

5

1    to hold everybody 'til tomorrow morning since one of your

2    witnesses who's required to be here first thing Monday morning

3    when we start to get here?  That's what you're asking.

4            MR. GREENBAUM:  Yes, Your Honor.  And we will talk

5    about that, too.  So we're not -- I mean, I just wanted to bring

6    this up to the Court's attention.  But we'll make that call, Your

7    Honor, because if it's -- yes, Your Honor.  We're going to make

8    that -- have that conversation.  So it may change.  If we're done

9    at say ten, Your Honor, everybody's done at ten or if they don't

10   call that witness, then we --

11           THE COURT:  Y'all decide all that.

12           MR. GREENBAUM:  Yes, sir.

13           THE COURT:  Y'all can talk about all that without me

14   involved.  I'm just saying that's why we require witnesses to be

15   here.  I can't help it that they have -- they're finally having

16   trials in Oklahoma.  Good for them.  Whatever.  That doesn't make

17   it any easier for this jury, these defense attorneys who have I

18   think come from El Paso and are staying overnight, our staff who

19   -- you guys are traveling.

20           You know, it's not like -- anyway.  That's why we have

21   the rule because one of the first trials I ever tried, I forget

22   even where it was, Ms. Lerma might remember, people -- we had --

23           THE CLERK:  It was Pecos.

24           THE COURT:  Was it Pecos, too?  We had people tricking

25   in for days, and you just can't try a case that way.  It's not

6

1   fair, it's not right.  We'll see where we go.  I'll consider any

2   requests you have.

3           MR. GREENBAUM:  Yes, Your Honor.

4           THE COURT:  I mean, I'll make the decision and we will

5   live with that.  I thought the motion to have him appear by Zoom

6   was interesting.  I got a chuckle out of it.  Defense opposed it.

7   I don't know why you would want to present him by Zoom.  I

8   suppose that might have been a last resort.  In late May when

9   Mr. Gorman, and I don't remember who the prosecutor was when we

10  had that hearing, was it Mr. Greenbaum?

11          MR. GREENBAUM:  It was me, Your Honor.

12          THE COURT:  I just remember Weber was on it for a

13  while.

14          MR. GREENBAUM:  Yes.

15          THE COURT:  Right?  Mr. Weber?  I mean, I think we all

16  anticipated at the time that was probably going to be necessary,

17  that psychiatrist was going to be necessary.  We did that by Zoom

18  because it was of course dueling Zoom battles I guess as I

19  recall.  We might have had one live.

20          MR. GREENBAUM:  I had my expert here live, Judge.

21          THE COURT:  So he knows how to get here.  But where's

22  he from?

23          MR. GREENBAUM:  He's from Dallas/Fort Worth area.

24          THE COURT:  He's in the BOP system?

25          MR. GREENBAUM:  Yes, Your Honor.  That's correct.

1          THE COURT:  Okay.  All right.  Mr. Gorman,

2    Ms. Bataller, anything y'all need before we --

3          MS. BATALLER-SCHNEIDER:  No, Your Honor.  Thank you.

4          THE COURT:  Okay.  Very good.  Let's bring the jury in.

5          (Jury in at 8:25 a.m.)

6          THE COURT:  All right.  Let's be seated, please.  Thank

7    you.  Good morning.  Welcome back.  If you can put your tags back

8    on.  If you happened to have left it in the room, you can get it

9    next time during break.

10         I believe, Mr. Cayton, you were conducting direct

11   examination of this witness.  You go right ahead.

12         MR. CAYTON:  Thank you, Your Honor.

13      ANTONIO YANEZ, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

14              DIRECT EXAMINATION  (RESUMED)

15   BY MR. CAYTON:

16   Q    Good morning, Agent Yanez.

17   A    Good morning.

18   Q    I realized that I neglected a little bit yesterday to talk

19   about some of your experience as a computer forensics agent.  And

20   I ask that you -- do you still have that folder up there?  Is

21   there a folder in front of you?

22   A    Yes.

23   Q    Can you flip to Government' Exhibit 8 for identification?

24   A    Okay.

25   Q    Are you there?

1    A    Yes.

2    Q    Can you tell me what this document is?

3    A    It is my curriculum vitae.

4    Q    And --

5    A    Or my resume.

6    Q    Your resume?  And so does this describe your training and

7    experience in the -- your experience being a computer forensics

8    agent?

9    A    Yes.

10   Q    And how do you know that's what your document is?

11   A    Because I prepared it.

12            MR. CAYTON:  Your Honor, at this time, the Government

13   would move Government Exhibit 8 for identification into evidence

14   as Government Exhibit 8.

15            THE COURT:  Mr. Gorman?

16            MR. GORMAN:  No objection, Your Honor.

17            THE COURT:  Government's Exhibit 8 is admitted without

18   objection.

19        (Government Exhibit 8 admitted into evidence)

20            MR. CAYTON:  And, Your Honor, the Government would also

21   ask that Agent Yanez be recognized as an expert in the area of

22   computer forensics.

23            THE COURT:  Mr. Gorman?  Mr. Gorman, do you have any

24   objection?  Did you hear -- Mr. Cayton, say that again.  I think

25   Mr. Gorman was busy, was talking.

1          MR. GORMAN:  Sorry.  Your Honor, obviously we took that

2   matter up.  Obviously we have an opposition to that from the

3   Daubert motion, Your Honor.

4          THE COURT:  Okay.  Thank you.  The Court so finds.

5   BY MR. CAYTON:

6   Q    Agent Yanez, I think when we ended yesterday, we were

7   talking about two videos, one titled awesome preteen compilation

8   two.  Do you recognize that video?

9   A    Yes.

10  Q    And what is of particular significance of that video?

11  A    It's a compilation of numerous videos, or a collection of

12  numerous videos that have been edited and put into one video.

13  Q    and I believe yesterday you testified that that was one of

14  the videos that was a NCMEC video?

15  A    Correct.

16  Q    And just to refresh everyone's recollection, NCMEC is the

17  National Center for Missing and Exploited Children?

18  A    Yes.

19  Q    And they kind of have a clearinghouse of known child

20  pornography?

21  A    Correct.

22  Q    Now can you describe a little bit more about what a

23  compilation is?  You just said it's a collection of videos?

24  A    Yes, a collection of videos that have been edited into one

25  video.

1   Q    So when you're doing an analysis, can you tell who created a

2   compilation video?

3   A    I can't.

4   Q    But this particular compilation was a known nickname?

5   A    Yes.

6   Q    The video?

7   A    Yes.

8   Q    Now when we're talking about a compilation video, you said

9   it's multiple videos edited together?

10  A    Yes.

11  Q    Is it necessarily the same victim or the same child in each

12  one of those videos?

13  A    No.

14  Q    Is it possible that someone collected a bunch of child

15  pornography and made a video with a bunch of different child

16  pornography videos?

17  A    Yes.

18  Q    Does that appear to be what happened in awesome preteen

19  compilation two?

20  A    Yes.

21  Q    And you viewed this video, as well?

22  A    I did.

23  Q    We also talked about a video titled PTHC Kelly 8YO-sucking

24  and trying to fuck.  Did you view that video?

25  A    Yes.

Yanez - Direct(Resumed)/Cayton                    11

1    Q    Was this video also one of the known NCMEC videos?

2    A    Yes.

3    Q    And both of these videos are also on the disc that's

4    Government Exhibit 41 I believe.

5    A    Yes.

6    Q    And can you tell me which -- where these videos were found

7    on the defendant's device?

8    A    So may I refer to my notes?

9    Q    With the Court's permission to refresh your recollection.

10           THE COURT:  Of course.

11           THE WITNESS:  So awesome preteen compilation two was

12   located on USB3 and USB12.  And PTHC Kelly eight-year-old is

13   located on CT -- C2H1, USB3, and USB12.

14   BY MR. CAYTON:

15   Q    Now when we talk about videos being found on more than one

16   device, how would that happen?

17   A    If videos are found on more than one device, it's possible

18   that the videos were copied or cut and pasted into another --

19   another location.  Or moved from one location to another.

20   Q    And I think you talked a little bit about copying and

21   pasting yesterday?

22   A    Yes.

23   Q    In your experience as a computer forensics agent, is it

24   common to find multiple copies of videos or evidence on different

25   devices?

1    A    Yes.

2    Q    And this is specifically in child pornography

3    investigations?

4    A    Yes.

5    Q    And just to refresh the Court, C2H1 was a desktop computer?

6    A    Yes.

7    Q    And then the USB 3 and USB12, they were both external hard

8    drives?

9    A    Yes.

10   Q    I know we were having trouble playing some of the evidence

11   yesterday.  I'd like to -- I think we got through three videos.

12   I'd like to go back to the video I believe we discussed a little

13   bit but we were not able to play.  And that was a video entitled

14   4YO PTHC R@Y gold reel.  Do you recognize that video?

15   A    Yes.

16   Q    And what device was that found on?

17   A    It was on C1H1.

18   Q    So that would relate to the Western Digital hard drive

19   listed in Count 2 ending in 661471?

20   A    Yes.

21        MR. CAYTON:  And at this time, Your Honor, I would like

22   to show a four-second clip.

23        THE COURT:  Yes, sir.

24        (Video played at 8:32 a.m.)

25        MR. CAYTON:  And you can stop it.

1   BY MR. CAYTON:

2   Q    Do you recognize that video?

3   A    I do.

4   Q    And is that the 4YO PTHC R@Y gold reel?

5   A    Yes.

6   Q    And we also talked about for a video entitled boy 06.  And

7   that was located on L2H1?

8   A    Correct.

9   Q    And specifically that's for Count 4, the Seagate hard drive

10  ending in 5QBVZ?

11  A    Yes.

12          MR. CAYTON:  And, Your Honor, at this time I'd like to

13  play a four-second clip from this video.  It would take --

14  there's a particular portion of the video I would play in the

15  middle.  It would take a brief moment to queue up that portion, I

16  believe.

17          THE COURT:  Okay.  Go right ahead.

18      (Pause)

19          THE COURT:  While she's doing that, Mr. Cayton, on

20  Count 2, what was the name of that video?

21          MR. CAYTON:  4YO PTHC R@Y gold reel, three exclamation

22  points.

23          THE COURT:  What's the beginning?  The beginning part

24  is what?

25          MR. CAYTON:  4YO.

1          THE COURT:  Okay.  PTHC?

2          MR. CAYTON:  PTHC R@Y gold reel.

3          THE COURT:  Okay.

4    BY MR. CAYTON:

5    Q    And, Agent Yanez, while that's being queued up, the video we

6    just saw, it's titled 4YO.  Can you tell us what your

7    understanding of that means based upon your experience?

8    A    A four-year-old.

9    Q    And the child in the video, did that appear consistent with

10   what you saw?

11   A    Yes.

12   Q    I believe yesterday we saw a video --

13         MR. CAYTON:  Or is it ready?

14   (Off microphone comment)

15         MR. CAYTON:  It's okay.

16   (Pause)

17         THE COURT:  Let's just move on if it won't play.

18         MR. CAYTON:  That's fine.

19   BY MR. CAYTON:

20   Q    The video that was just a screen shot up on the screen, do

21   you recognize that video?

22   A    Yes.

23   Q    It was a kind of grainy video?

24   A    Correct.

25   Q    Do you remember what is depicted in that video?

1   A     Not -- no.

2   Q     And that video is in evidence and we can try to play that a

3   little bit later.  Count 6?  Moving to a video titled PTHC Tara

4   brand new, do you recognize this video?

5   A     Yes.

6   Q     And that video is related to a Seagate hard drive ending in

7   Q02S9?

8   A     Yes.

9   Q     And that's related to Count 6?

10  A     (No audible response)

11           MR. CAYTON:  Now while it's being queued up and, Your

12  Honor, with the permission, I'd like to play a shirt clip from

13  that.

14  BY MR. CAYTON:

15  Q     But while that's being queued up, yesterday we saw the video

16  titled king pass two 022 Asian PTHC tied 8YO Cambodian boom-boom.

17  Do you remember that video?

18  A     Yes.

19  Q     Was there anything of significance in that video besides any

20  sexual acts being done to the child about the child?

21  A     Yes.

22  Q     What particularly was the significance?

23  A     The child was bound.  Her hands were bound to her legs with

24  appeared grey duct tape.

25  Q     And would that be consistent -- and the title has tied 8YO.

1  Would that be consistent with an eight-year-old and she was tied

2  up?

3  A    Yes.

4           MR. CAYTON:  And at this point, Your Honor, I'd like to

5  play a four-second clip from the PTHC Tara brand new for Count 6.

6           THE COURT:  And this corresponds with which count?

7           MR. CAYTON:  Count 6, Your Honor.

8           THE COURT:  6?  Okay.

9       (Video plays at 8:38 a.m.)

10          MR. CAYTON:  And you can turn that off.

11 BY MR. CAYTON:

12 Q    Do you recognize this video?

13 A    Yes.

14 Q    And this video is long, correct?

15 A    Yes.

16 Q    We just saw a sex act of oral sex being performed?

17 A    Yes.

18 Q    Is that the only sex act that's being preformed on that

19 child?

20 A    No.

21 Q    What other sex acts are on that video --

22 A    Well as far as the sex acts, I'm not familiar with the rest

23 of the video.  I just remembered that part.

24 Q    Okay.  And the next video would be Ulia two seven.  We

25 discussed this yesterday.  And that would be off of USB5?

1   A    Correct.

2   Q    And that would correspond with Count 7?

3   A    Yes.

4          MR. CAYTON:  With the Court's permission, I'd like to

5   play a short clip.

6          THE COURT:  Yes, sir.

7          MR. CAYTON:  And that's enough.

8       (Video plays at 8:39 a.m.)

9   BY MR. CAYTON:

10  Q    Do you recognize that video?  Is that Ulia two seven?

11  A    Yes.

12  Q    And that's one of the videos that you found on USB5?

13  A    Yes.

14  Q    And there was an image that we introduced into evidence, and

15  that's titled $RLISUOD.  Do you recognize that image?

16  A    Yes.

17  Q    And that's from USB8?

18  A    Correct.

19  Q    And that corresponds with the Samsung hard drive ending in

20  0311 or 188?

21  A    Yes.

22  Q    And that corresponds with Count 8?

23  A    Correct.

24          MR. CAYTON:  And, Your Honor, that's a picture.  May I

25  place it up just for a couple seconds?

1          THE COURT:  Sure.

2          MR. CAYTON:  And that's fine.  You can take it off.

3   BY MR. CAYTON:

4   Q    Do you recognize that picture?

5   A    Yes.

6   Q    And that's the picture that we just discussed?

7   A    Yes.

8   Q    And then for Count 9 there's a video titled

9   PTHC!!!new0604!!!11Lily3YO?

10  A    Yes.

11  Q    Do you recognize that video?

12  A    Yes.

13  Q    And that was found on the SimpleTech hard drive?

14  A    Yes.

15  Q    And that's USB12 that corresponds with Count 9?

16  A    Correct.

17          MR. CAYTON:  Your Honor, at this point I'd like to play

18  a short clip of this video.

19          THE COURT:  Yes, sir.

20          MR. CAYTON:  And that's enough.

21      (Video plays at 8:40 a.m.)

22  BY MR. CAYTON:

23  Q    And in the title is 3YO?

24  A    Yes.

25  Q    Does that seem to correspond with the age of the child in

Yanez - Direct(Resumed)/Cayton                    19

1   that video?

2   A     Yes.

3   Q     And that would be a three-year-old?

4   A     Correct.

5             MR. CAYTON:  May I have just a moment, Your Honor?

6             THE COURT:  Sure.  Yes, sir.

7         (Pause)

8   BY MR. CAYTON:

9   Q     And while we're trying to solve the technical difficulty

10  with that, that last one, because I believe it has important

11  evidence in it, I did discuss with you a little bit about VPNs.

12  Do you know what a VPN is?

13  A     Yes.

14  Q     Can you tell the Court what a VPN is?

15  A     It's a virtual private network.  It allows a user to send

16  data to a server or another computer, and the data on -- that is

17  sent is encrypted or scrambled.  So somebody in between can't --

18  or a device in between cannot visually see the data or make out

19  the data.  It's a way to secure data.

20  Q     Now does the U.S. Government use VPNs?

21  A     Yes.

22  Q     In what way?

23  A     For remote working, teleworking.  I can be working from home

24  and connected to a server at the office or another location and

25  access files.

1  Q    And when you're using the VPN, does it make it a more secure

2  way to work on your --

3  A    Yeah.

4  Q    -- Government work?

5  A    Yes.

6  Q    And did you find any evidence on the defendant's computers

7  of VPNs being used?

8  A    I did not.

9  Q    Did you search for that evidence?

10  A    Just in the course of scanning through the evidence, I did

11  not see anything.  But to say that I searched exactly for a VPN,

12  no, I did not.

13  Q    Now I want to go back there and talk about each of these

14  hard drives.  I think yesterday you talked about a very large

15  number of images that you found, correct?

16  A    Correct.

17  Q    For the different hard drives, can you tell us how many

18  videos and images that you found on the drive ending -- or the

19  Western Digital drive C1H1?

20  A    Photographic images, I found 6,026.

21  Q    And what about videos?

22  A    Videos, 17.

23  Q    And those were videos and images that related to child

24  exploitation material?

25  A    Yes.

1    Q    For C2H1 that corresponds to Count 3, how many images and

2    how many videos?

3    A    Images, 6,402.  And videos, 115.

4    Q    For L2H1 that corresponds to Count 4, how many images did

5    you find?

6    A    I'm sorry, for which device?

7    Q    L2H1.

8    A    L2H1 was 92 videos.

9    Q    What about images?

10   A    Images?  No images.

11   Q    For USB3 that corresponds to Count 5, did you find any -- I

12   know that we showed one video.  Did you find any other images or

13   videos?

14   A    Yes, 183 images and 125 videos.

15   Q    For USB number 4, did you find any other videos or images?

16   A    Yes.  Just before I found 396 images and 6 videos.

17   Q    For USB5, besides the video that we saw, did you find any

18   other images or videos?

19   A    Yes, 34 images and 2 videos.

20   Q    For USB8, I know we saw an image for that one.  Did you find

21   any other images or videos?

22   A    Just on that one video.  Or --

23   Q    Just the one --

24   A    -- one image, I'm sorry.

25   Q    And for USB12, we saw a video.  Did you see any other images

1  or videos?

2  A    Yes, 82,274 images and 880 videos.

3  Q    Now USB12, we have it up here in evidence, but it's a little

4  bit bigger than the external hard drives.  Is that correct?

5  A    Correct.

6  Q    And what exactly is USB12?

7  A    Can I refresh my memory in my report?

8  Q    And would you like to see the device?

9  A    Yes, please.

10        MR. CAYTON:  Your Honor, with permission, I'd like to

11  approach?

12        THE COURT:  Of course.

13        MR. CAYTON:  And this is Government Exhibit 30.

14  BY MR. CAYTON:

15  Q    Can you tell me what this device is?

16  A    It is an external USB device.  It's an enclosure that has

17  hard drives in it.

18  Q    You say hard drives.  Is there more than one drive in there?

19  A    There's two hard drives, I believe.

20  Q    And would this be a backup device?

21  A    Correct.

22  Q    That has two drives in it?

23  A    It could be used as a backup, yes.

24  Q    Or for storage?

25  A    Or for storage, yes.

1   Q    Now I believe yesterday when you were talking, you said that

2   this one held a significant number of terabytes in itself.

3   A    Yes.

4   Q    And we talked about how large a terabyte is.  And so when

5   you just listed a number of I believe 82,274 images, this device

6   had a lot of data on it?

7   A    Yes.

8   Q    A lot of images and videos?

9   A    Yes.

10  Q    Now when you're doing the forensic search, are you only

11  looking for images or videos, or are you looking for other

12  objects, as well?

13  A    Also looking for other objects.

14  Q    Are you looking to try to see if you can determine any

15  search terms that were used?

16  Q    Yes.

17  Q    And what specific search terms are you looking for in a

18  child pornography case?

19  A    Well, in this case I -- the forensic software was able to

20  identify certain -- or search terms that were used throughout the

21  devices.  So I sorted the search terms and then just scrolled

22  through and looked for some of the search terms commonly

23  encountered in these cases.  So I found quite a few.

24  Q    And what specific search terms did you find?

25  A    I found -- one of the search terms I found was kiddie porn,

1   naked preteen, naked preteen girls, naked preteen boys.  Would

2   you like me to go through a list of the ones I found?

3   Q    Are there other ones that you found significant for child

4   pornography cases?

5   A    Yes.  There was hope model (phonetic) and laura model

6   (phonetic).  I've seen those in other investigations.

7   Q    And are those known child pornography series?

8   A    Yes.

9   Q    Now are you finding -- where are you finding these search

10  terms on a device?

11  A    On a device, don't believe they would be an internet search,

12  internet browser history search terms.

13  Q    Now we talked a little bit about torrents yesterday.  How

14  does one know what torrent to find if they're looking for

15  something?

16  A    A person -- or a person can search for certain torrents

17  using Google, Google search.

18  Q    So an internet search would be helpful in finding a

19  particular torrent that a person's looking for?

20  A    Yes.

21          MR. CAYTON:  May I have just a moment, Your Honor?

22          THE COURT:  Yes, sir.

23      (Pause)

24          MR. CAYTON:  Your Honor, I'll pass the witness at this

25  time.

1          THE COURT:  Thank you.

2          Mr. Gorman, your witness.

3                    CROSS-EXAMINATION

4    BY MR. GORMAN:

5    Q    Good morning, Agent Yanez.

6    A    Good morning.

7    Q    Agent Yanez, your work is in forensics, correct?

8    A    Yes.

9    Q    And forensics is science?

10   A    Yes.

11   Q    So you more or less follow what they call scientific method?

12   A    Yes.

13   Q    And scientific method involves testing, recording, analyzing

14   information, offering conclusions of that information and then

15   documenting those conclusions in a report, correct?

16   A    Correct.

17   Q    So for example, in high school chemistry with which many

18   would be familiar, we conduct a laboratory experiment and that

19   ends with a report documenting our conclusions, correct?

20   A    Correct.

21   Q    In fact, writing a report allows the judge, the jury,

22   defense, defense counsel to understand the circumstances of the

23   case, the evidence that was found and more or less how the

24   evidence plays into your opinions in this case, correct?

25   A    Correct.

1    Q     Did you do a final report in this case?

2    A     The reports that I have submitted are my reports in the

3    case.

4    Q     But a final comprehensive report and all findings, did you

5    do that?

6    A     Through the dates of the reports, yes.

7    Q     Okay.  But nothing -- so was there a single report that

8    documented all the files, all the information essentially you're

9    discussing now that would produce essentially to the parties, the

10   Court or otherwise, did you do that?

11   A     No.

12   Q     Okay.  So in terms of your analysis, nobody could really

13   review these because you personally possessed them, correct?

14   A     As far as the reports because they weren't created, no.

15   Q     Correct.  Thank you.  In terms of these numbers you just

16   discussed, the substance of those numbers, that again is an

17   opinion, correct?

18   A     The substance of the numbers?

19   Q     So for example when you say there are 10,417, that would be

20   something that you hold personally, correct?

21   A     As far as hold personally, are you saying the files or

22   the --

23   Q     The foundation of that.  I'll try it a different way.  When

24   you're going through your analysis, you select when you say I

25   found this type of file, you call that bookmarking, correct?

1   A    Correct.

2   Q    And these numbers you're giving are more or less the number

3   of bookmarks you had or files contained within those bookmarks,

4   correct?

5   A    Correct.

6   Q    So in this case, when you bookmark something, that is your

7   personal assessment of the contents of that video or image,

8   correct?

9   A    Correct.

10  Q    And in this case, that is not a legal determination.  That

11  is an opinion, correct?

12  A    Correct.

13  Q    Turning to the computers involved in this case, your first

14  step in this, Agent Yanez, was to look at these computers,

15  correct?

16  A    As far as the -- giving an inventory on them and looking at

17  them and -- how would you say looking at them, visually putting

18  eyes on them or --

19  Q    I'll give you a definition.  Your job, and we'll start it up

20  in El Paso where these computers were brought in custody.

21  A    Okay.

22  Q    You start with the physical computer, right?

23  A    Correct.

24  Q    As part of your investigation into those computers, do you

25  search or research the ownership history of those objects?

1    A    I don't.

2    Q    So in terms of defining from the date that was produced to

3    the date somebody purchased it to the date it was seized, you

4    haven't run down that history?

5    A    I do not.

6    Q    So in terms of ownership, you're looking at sort of the last

7    holder of the computer, correct?  The last person that physically

8    possesses this computer.  Would that be correct to say?

9    A    As far as the location, I would say to the location where it

10   was seized, yes.

11   Q    And when you create your working copy of this drive, that's

12   based on that device, correct?  You've taken that out of the

13   physical and brought it into your computer system, correct?

14   A    Yes.

15   Q    And in terms of that ownership history, if a device is

16   handed to you secondhand, thirdhand, or, you know, 100th hand in

17   terms of people passing it along, all that evidence would likely

18   be still sitting on that device, correct?

19   A    Correct.

20   Q    More or less an accumulation of the entire history of that

21   computer device, correct?

22   A    Correct.

23   Q    And many of the objects or pieces of information in that

24   computer cannot be seen by a normal user.  For example, anyone

25   sitting in this court with a computer would not be able to

1   determine what all the files that may be possibly viewable by you

2   through these -- through this expensive forensic software.  Would

3   that be correct to say?

4   A    Can you repeat the question again?

5   Q    So the average user, somebody that bought a computer,

6   plugged it in and turned it on, the files you can see may not be

7   visible to the person that buys a computer.  Is that correct?

8   A    Correct.

9   Q    Because some of these things, and I think you've discussed

10  it a little bit, deleted files that may be resident in some of

11  these files, they call them carving, that the forensic software

12  pulls it out and makes it visible to you.  That's not a process

13  that's sort of normal to most regular computers, correct?

14  A    Correct.

15  Q    Now yesterday you discussed a number of items about file

16  histories and details on files that I think many people probably

17  get a little bleary-eyed when they're looking at all these dates

18  and times and all that sort of thing on the screen.  But when you

19  look at that, those dates and times, and this is at a forensic

20  level, those aren't set in stone, correct?  Those can be

21  modified.

22  A    Yes, they can be modified.

23  Q    Sometimes they're modified by a system, correct?

24  A    Modified by a system as far as system files, yes.

25  Q    Yeah.  For example, and I'll try not to get too in the weeds

Yanez - Cross/Gorman                          30

1    on the computer details.  But Microsoft Windows, most people

2    understand Microsoft Windows just comes with the computer, but a

3    lot of what's happening when you see that information is from

4    Microsoft Windows, correct?

5    A    Correct.

6    Q    But are there programs out there that can change those

7    details, for example dates, times?  Are there programs that are

8    able to access that and twist those dates to something they're

9    not?

10   A    Yes.

11   Q    And in terms of that, that can affect your reviews, correct?

12   It can be more challenging because some programs are capable of

13   operating these -- of operating on those sort of fundamental

14   details you have to work with.  Would that be correct to say?

15   A    True.  Yes.

16   Q    So when we look at this, that could be a user that does it.

17   It could be a human person that sits on a program just deciding

18   to corrupt a file to change it to make it look like it's 1990

19   instead of 2022.  That can happen with a user, correct?

20   A    A user can do that, yes.

21   Q    And in terms of things that are not users, for example a

22   virus or what they call malware, these bad programs that invade

23   our computer, they can do that too, correct?

24   A    I'm not aware of viruses that can change time stamps.

25   Q    So have you as a forensic expert, have you heard of anti-

1    forensic measures?

2    A    Yes.

3    Q    Have you heard of about time stomping?

4    A    Time stomping, yes.

5    Q    Isn't time stomping essentially a virus's ability to change

6    the details in terms of file properties to make it look like it

7    was there before the virus activity?

8    A    My understanding of time stomping is a user actively going

9    in and using software to change it, to change times.

10   Q    Are you acquainted with that showing up in the context of

11   malware or viruses?

12   A    Personally I'm not aware of it, no.

13   Q    Okay.  And we go to some of these file properties.  We talk

14   about file names, we talk about dates created, modified, whatever

15   that date information is.  How valuable, when you look at

16   something like file name, is that in terms of it being set in

17   stone?  Or better stated, how easy it is for any normal user to

18   change a file name on a file?

19   A    It's not hard at all, no.

20   Q    You just hit rename on the file, that gives it a different

21   name.

22   A    You can click, right-click it and then select rename.

23   Q    And that will still show up as a renamed file to you,

24   correct?

25   A    Correct.

Yanez - Cross/Gorman                                          32

1    Q    And when you look at that information, and you've done a lot

2    of these searches in the context of this case, a lot of these

3    file names don't reflect the contents.  Would that be correct to

4    say?

5    A    I would say that there would be files in a system that do

6    not have -- might have a file name that doesn't correspond to

7    this type of content, yes.

8    Q    So taking these sort of the terrible files that we've viewed

9    here in terms of that, you -- changing that to the Avengers does

10   not make the content change, correct?  It's just --

11   A    Correct.  It just changes the name.  That's all.

12   Q    Okay.  So in that sense, you focus more on content, correct?

13   A    Correct.

14   Q    And through content you're able to assess or compare files.

15   For example, when you're doing your searches, there's a way of

16   identifying files without regard to name, correct?

17   A    Correct.

18   Q    So that avoids the problem of saying somebody named these

19   files a common movie, you're not deceived by that, correct?

20   A    Correct.

21   Q    Now there's a concept, and you are acquainted with

22   computers, that pretty much you can program a computer to do

23   anything a user will do.  Do you believe that?

24   A    Can you explain the concept?

25   Q    Okay.  So let's put it -- let's try it this way.  Could I

Yanez - Cross/Gorman                                    33

1    script something in a computer when it starts up to cause actions

2    that the computer will take without my intervention?

3    A    Yes.

4    Q    They call them start up scripts, right?

5    A    Yes.  Or batch scripts.

6    Q    So scripts aren't necessarily designed by the person sitting

7    at the computer, correct?

8    A    It could be a user that places that -- those scripts on the

9    computer, correct.

10   Q    Okay.  And in terms of how those scripts can act, the

11   computer can have -- if it believes that it's been allowed to do

12   so is going to carry out those steps, correct?

13   A    Correct.

14   Q    And if something in Microsoft Windows that pretty much says

15   do you allow this computer or this program to change the contents

16   of this computer, that's something users, when they download a

17   program, are generally doing, correct?

18   A    Correct.

19   Q    More or less we're saying hey, whatever this program is, go

20   ahead and do what you want, I give you permission.

21   A    Permissions, yes.

22   Q    So when we were discussing yesterday how something might go

23   to a file or how something might be moved, ultimately you're

24   using more or less an assumption that says I would assume the

25   user would do this, not that you're saying no program could move

Yanez - Cross/Gorman                                    34

1   something, do something, or otherwise.  It was more or less in my

2   history I haven't seen something specifically move a file this

3   way.  So when I say it would be a user, that doesn't mean there's

4   no possibility it wasn't a user, correct?

5   A    User interaction.  So a batch script would have to have --

6   be placed on a computer by a user, or another individual.  So I

7   meant that as a user needed to interact with the computer to move

8   those files.

9   Q    So specifically one of the questions posed to you was would

10  a user have to put this on an external hard drive, that if it's

11  on an external drive, it must be a user.  Do you stand by that

12  statement?

13  A    Yes.

14  Q    So is there a way of making an external drive the primary

15  computer drive, meaning more or less when the computer starts up,

16  it goes to an external hard drive?

17  A    Yes.

18  Q    How do you do that?

19  A    That is booting.  Like it's like a boot.  You would go into

20  the BIOS and set up the startup drive as a USB.

21  Q    And that's more or less the computer, the system you see

22  sitting there, the hardware telling Microsoft Windows what to do,

23  correct?

24  A    Where to start, where to look for an operating system, yes.

25  Q    All right.  So if you -- if you were telling that external

1   drive to do all the work of that computer, is that really

2   something that requires any sort of conscious act by the user at

3   that point to do anything?  That's going to run that like it's

4   the main computer, right?

5   A    You would need the user to go into the settings for the

6   computer and select the external drive as the operating system.

7   Q    Correct.  But in that sense, if the computer, secondhand or

8   otherwise, somebody set it up that way but you really don't know

9   that the person holding it did that, correct?

10  A    I wouldn't know.  No.

11  Q    Right.  Just we'd know somebody would have to change some

12  default setting somewhere --

13  A    Yes.

14  Q    -- on that computer to make it do that.  But to say that we

15  know by virtue of it being external hard drive, this user did

16  this, we don't know that answer, correct?

17  A    Correct.

18  Q    Okay.  And in the course of your searches through these

19  computers, did you run a search for viruses or trojans or those

20  sort of things?

21  A    I ran the viruses on the devices themselves, the images.  I

22  would run them through I believe it was AVS.  AVG I believe.

23  AVG.  I'm sorry.  And I'd found some viruses, but I don't think

24  they were the type of viruses that would select or actually make

25  changes to the devices and download files.

Yanez - Cross/Gorman                                  36

1    Q    And what type of virus activity do you see?  Like, what type

2    of virus?  And refer to your notes if you need to.

3    A    I didn't put it in my notes.

4    Q    But were they trojans?

5    A    I can't recall.

6    Q    What is a trojan?

7    A    A trojan is software that will run certain programs on a

8    computer.

9    Q    And is that at the request of the owner of that computer?

10   A    No.

11   Q    And what can a trojan do to a computer?

12   A    It can delete files.

13   Q    Can it add files?

14   A    I'm not sure.  I'm not sure if it can add files.

15   Q    Okay.  And did you search for malware, as well?

16   A    No.  Well, it would be the virus I believe searches for

17   malware.  I'm not sure if I did find any malware.

18   Q    And is that virus search a protective measure for you, or is

19   that more of an investigative tool?

20   A    I looked through it just to see if there was any -- any

21   evidence of viruses.

22   Q    Because from your training, there have been computer

23   investigations in the past where measures have been taken more or

24   less to sabotage your forensic investigation, correct?

25   A    I'm not -- I'm not --

Yanez - Cross/Gorman                    37

1    Q    Have you heard of zip bombs, something that you would get

2    into, you would analyze.  When you open it, it releases something

3    into your system to more or less try to take your system down.

4    Have you ever heard of that?

5    A    No, I haven't.

6    Q    You've never encountered one?

7    A    Never encountered one.

8    Q    Okay.  But those programs, those virus programs, if they

9    ever infiltrated your system, if you're not prepared for it, will

10   have a similar damaging effect, correct?

11   A    I would believe so, yes.

12   Q    And that's why most people are advised to have antivirus

13   system, some type of malware system, some type of firewall.

14   That's all a security measure to keep these problems out,

15   correct?

16   A    Yes.

17   Q    Now when you reviewed these computers in this case, did you

18   look to -- did you consider for example a use of counter

19   forensics tools?  Did you look for things, like, things that

20   would write, things that would remove evidence, things of that

21   nature in terms of the programs on the computers?

22   A    I think I did.  I think I found a file or Gutmann I think

23   was a way to delete -- delete files, I believe.

24   Q    And that was discussed previously.  Those type of measures,

25   more or less if you have the ability to delete programs with

Yanez - Cross/Gorman                          38

1   enough essentially they call them overwrites, but more or less,

2   could you explain what a pass or an overwrite is?

3   A   A secured (indiscernible) overwrite, like I was explaining

4   yesterday, a file staying on a computer until it gets

5   overwritten.  And in this case, it either gets overwritten by the

6   system itself or operating system, or by a program or, like, a

7   user that has a program that secure deletes something.

8       So what happens is the location where the files are, or the

9   locations in the file system get overwritten by random numbers or

10  specific numbers until that file no longer exists, or that

11  content no longer exists.

12  Q   And they are commonly available.  Or you commonly encounter

13  them in these investigations, correct?

14  A   Yes.

15  Q   And one of those might be, that's well known, they call it

16  C-cleaner or otherwise known as crap cleaner.  That's a common

17  one, right?

18  A   Yes.

19  Q   And that program has the ability more or less to wipe away

20  everything, correct?  Or most detectible artifacts or evidence of

21  a file, correct?

22  A   Correct.

23  Q   Because they have the highest level of I think it's they

24  call it DOD level.  But there may be even higher than that at

25  this point.  But it's very extensive and over and over.  And

1   eventually there's very little left of a file, correct?

2   A    Yeah.  That's an option.  You can select the number of

3   passes that you make on the software or the file.

4   Q    And when you go through your evidence in this case, Agent

5   Yanez, how many of the -- I guess you may have to give a

6   percentage, but how much of what you saw was deleted or carved or

7   something that had to be pulled from evidence, and how much was

8   sitting in active status that was just sitting on the computer?

9   A    I can give you an estimate but --

10  Q    All right.  Could you give ballpark?

11  A    I would say one percent.

12  Q    Very little?

13  A    Very little.

14  Q    Okay.  So there was not much evidence to try and make these

15  things go away, correct?

16  A    Correct.

17  Q    Or much effort, I mean.  In terms of other measures, now

18  there's a tool that pretty much sits on every -- that comes with

19  every Windows computer sold and has for quite a while called

20  BitLocker.  What is BitLocker?

21  A    BitLocker is a way to -- a software.  In this case it's a

22  Windows capability of encrypting the data on the hard drive

23  whereas once the user signs in, it allows -- it un-encrypts or

24  unscrambles the data on the hard drive.  So if I would get a hard

25  drive that's encrypted, the data would be encrypted until I can

Yanez - Cross/Gorman                                    40

1    get the recovery key for that BitLocker encrypted volume or the

2    hard drive.

3    Q     And frequently, Government workers are told to travel with

4    that enabled, correct, in terms of carrying disc drives or

5    otherwise with sensitive information.  That's an advisory sort of

6    statement to protect the data.  Is that true?

7    A     That's a way of protecting data.  I'm not sure if that's how

8    Government employees are --

9    Q     Okay.

10   A     The protocol, what the protocol is.

11   Q     And if that's turned on, if the drive is encrypted, without

12   that key, how difficult is it to investigate a case?

13   A     Well, it depends.  If the computer is on and the user is

14   signed in, then the data is available.  But if a user is signed

15   in and -- or not signed in and the user profile is locked, then

16   it would be difficult to get access to it without the recovery

17   key.

18   Q     And that's often months and months and months of added

19   effort to get to a drive or a device, correct?

20   A     It would be a wile depending on the encryption key, or we

21   can find the evidence of the recovery key somewhere at another

22   location.

23   Q     And nothing like that was involved in this case, correct?

24   A     Not to my knowledge, no.

25   Q     Now some of the files that -- some of the file path

Yanez - Cross/Gorman                          41

1   discussion, now people saw lengthy paths discussing these hard

2   drives.  Do you recall that discussion yesterday?

3   A    Lengthy paths?

4   Q    File paths.

5   A    Yes.

6   Q    They were discussing the file paths and what that meant and

7   essentially what was shown there.

8   A    Yes.

9   Q    I'm trying to first give a visual when you look at a

10  computer what that file path looks like.  Now when a person turns

11  on their computer, that thing they see on the screen is really a

12  folder, right?  They call it the desktop.  Is that correct?

13  A    Correct, yes.

14  Q    That's a folder, right?

15  A    Yes.

16  Q    So if there -- if somebody puts a folder on that desktop and

17  they were to look at that, then they now are -- it's really a

18  folder under a folder, correct?

19  A    Yes.

20  Q    And if you look at that same -- from Windows, there are a

21  lot of invisible elements leading up to the desktop such as user

22  name that goes to -- you know, that might go to desktop.  That

23  goes to whatever's on the desktop more or less?

24  A    Yes.

25  Q    So as a visual, if you're talking about a file path that has

1   one, two, three, four, five, six different slashes in it, that's

2   a folder buried in a folder, buried in another folder, buried in

3   another folder.  So in terms of what's visible on the desktop,

4   that's fairly buried from the visible eye, correct?

5   A    Correct.

6   Q    So the more -- and the more times you copy something, for

7   example you do a backup, that can double the size.  But if you

8   copy something from one desktop to another, that becomes a very

9   long file name, right?

10  A    It depends on where you copy it to.

11  Q    But it could be very lengthy, correct?

12  A    It could if you keep on nesting folders.

13  Q    Okay.

14  A    Putting them in different nested folders.

15  Q    Okay.  So to the naked eye, these folders, when you talk

16  about very extended file length -- file names with a lot of

17  slashes in it, that's a pretty buried folder, correct?

18  A    Yes.

19  Q    Very hard to find if you're not sitting there.  If you've

20  moved something around, not very easy to see, correct?

21  A    To the naked eye, yes.

22          MR. GORMAN:  Okay.  One moment please, Your Honor.

23          THE COURT:  Yes, sir.

24          MR. GORMAN:  No further questions, Your Honor.  Thank

25  you, Agent.

1          THE COURT:  Thank you.  Redirect?

2          MR. CAYTON:  Thank you, Your Honor.

3      (Pause)

4          MR. CAYTON:  Your Honor, I believe we have queued up

5  the last video that I wasn't able to play earlier.  I'm just

6  going to play from the beginning.  We were trying to play in the

7  middle and that was part of the problem.

8          THE COURT:  Okay.

9          MR. CAYTON:  With the Court's permission.

10          THE COURT:  Sure.

11      (Video plays at 9:13 a.m.)

12                   REDIRECT EXAMINATION

13  BY MR. CAYTON:

14  Q     And, Agent Yanez, this would be Boy06?

15  A     (No audible response)

16  Q     Do you recognize that video?

17  A     Yes.

18  Q     And was that video -- you can stop it.  That video was found

19  on the Seagate hard drive ending in 5QBVZ?

20  A     Yes.

21  Q     And that's L2H1?

22  A     Correct.

23  Q     And that's for Count 4?  That's the laptop?

24  A     Yes.

25  Q     And when the search warrant was being done, that's the

1    laptop that appeared to be connected in front of the computer?

2    A    I'm not sure.

3    Q    By the TV?

4    A    I'm not sure.

5    Q    It's the silver laptop though that we discussed earlier?

6    A    Yes.

7    Q    Now I want to talk to you a little bit about programs like

8    BitLocker the Defense just talked to you about.  You mentioned

9    Gutmann, Secure Delete.  Are these programs that are used by the

10   average user, in your experience?

11   A    I'm not familiar with Gutmann.  Secure Delete, I think it's

12   a Windows internal command line way of deleting files.

13   Q    But in your experience, is this something that the average

14   user would do, or is this a more complex user?

15   A    I believe more complex.

16   Q    What about BitLocker?  I know defense asked you a little bit

17   about government workers.  Is BitLocker something that you

18   commonly would see in an average users usage of the computer?

19   A    No, I wouldn't.

20   Q    And Defense asked you a little bit about programs that can

21   rename files.  Is this something that's commonly used by the

22   average user?

23   A    I believe he mentioned the ease of changing the name.  I'm

24   not sure if he mentioned a program.  I can't remember if he

25   mentioned a program.

1    Q    Well let's talk about changing names of files --

2    A    Okay.

3    Q    -- pretty quickly.  What goes into changing the name of a

4    file.

5    A    Normally you would, like I said, click on the file, right-

6    click on a file.  And you can rename the file using the drop down

7    menu.  Or you can click on the file and it presents the

8    highlighted file name.  And then you can just type it -- retype

9    in the name.

10   Q    So anyone can type in a new file name?

11   A    Correct.

12   Q    Now we saw a number of videos yesterday and today that had

13   long file names that had age ranges of children in them.

14   A    Yes.

15   Q    And did those files appear to be consistent with the file

16   names?

17   A    Yes.

18   Q    That were given for those files?

19   A    Yes.

20   Q    So it did not appear, at least to you, that anyone changed

21   that file name?

22   A    Yes.

23   Q    Now the Defense did ask you about running a script.  You

24   talked about a user running a script.  What is running a script?

25   A    A script is basically a program, a small, coded program that

1   will run certain commands on an operating system.  And running a

2   script would be executing the program to run those commands.

3   Q    So I'm going to date myself a little bit.  Did you ever work

4   with MS DOS back in the day?

5   A    A little bit in high school or middle school.

6   Q    And maybe anyone who's seen MS DOS remembers just seeing,

7   like, a blank screen and it had a little cursor that said, like,

8   C:/ and a little point on it, right?

9   A    Yes.

10  Q    To run a script on MS DOS, do you have to type in a bunch of

11  code?

12  A    No.  I believe, if I remember correctly, you just type in

13  the command.

14  Q    You could type in a command and that would be running a

15  script.  Would that be fair to say?  Or would you call it

16  something different than that?

17  A    I mean, I would say if you -- a script to me is a bunch of

18  commands put together.

19  Q    More like a modern program.

20  A    Correct.

21  Q    So I can go into Windows and I can double-click on say

22  Google Chrome or Internet Explorer, and the Explorer pops up?

23  A    Correct.

24  Q    Is there just one thing happening there, or are there a

25  bunch of things happening to get me to that window?

Yanez - Redirect/Cayton                    47

1    A    A bunch of things I would say, yes.

2    Q    Now someone who's creating a script, and I think Defense

3    gave you an example of a script where one program would

4    automatically dump files into an external hard drive.  Is that

5    something that you, in your experience, an average user would

6    know how to do?

7    A    An average user, no.

8    Q    That would take a more complex user to know how to run those

9    commands to get the computer to do what it wanted to?

10   A    Correct.

11   Q    Now that -- now the Defense also asked you about programs

12   that are able to run scripts.  And we talked just about Google

13   Chrome or Internet Explorer, things like that.  And you have some

14   experience with BitTorrent software.  Is that correct?

15   A    A little experience, yes.

16   Q    Does BitTorrent software automatically run scripts without

17   the user doing something to get files to dump into multiple

18   different drives?

19   A    From my experience, no.

20   Q    So the user would have to tell the program to do that?

21   A    Correct.

22   Q    Now the Defense asked you a little bit about carving or

23   modifying the dates and times of a file in the system.  And they

24   also talked to you about deleting.  And if you find a deleted

25   file, so maybe not a secure deleted file on a computer but a file

1   that someone just hits delete on, are you still able to see the

2   date and time that it was created and modified?

3   A    From my experience, most of the files that are carved out,

4   or deleted and then extracted by the forensic software have most

5   of that information removed.

6   Q    The metadata or the date and time information would be

7   removed?

8   A    Yes.

9   Q    Because your software is going in and finding that file, and

10  not through the normal file system because --

11  A    Correct.

12  Q    -- it's been deleted.

13  A    Correct.

14  Q    Fair to say?  And Defense asked you about how much you saw

15  that was deleted.  You said about one percent?

16  A    From my memory, I believe one percent, yeah.

17  Q    So that means when you're analyzing all these different

18  devices, you're only finding about one percent of items that

19  maybe is missing that data?

20  A    Correct.

21  Q    And therefore you have to carve out?

22  A    Yes.

23  Q    Is that a technical term?

24  A    Carved out, yes.  It's a --

25  Q    And the Defense asked you about a few different ways that

1  maybe someone could go in and change that data --

2  A    Yes.

3  Q    -- so the time data.  So most likely, the file that we saw

4  that was created and modified on January 1st, the year one,

5  that's not accurate?

6  A    Correct.

7  Q    As far as in your expert experience, computers were not

8  invented back then?

9  A    True.

10  Q    To make an external drive a boot drive, is this an easy

11  thing to do?

12  A    As far as making the drive itself boot, or the actual going

13  into the system to --

14  Q    Going into the system so that a computer will boot from an

15  external drive.

16  A    It would be -- to somebody that knows how to do it, it

17  wouldn't be -- wouldn't be difficult.  It's just a matter of I

18  would say googling how to change the boot -- boot menu and

19  getting those instructions and doing it.

20  Q    So it takes a user with some computer knowledge to get the

21  right instructions to go in there and enter that code to do that.

22  A    Correct.

23  Q    Now in regards to the devices that you analyzed, did you

24  find, particularly in the file names, evidence that the defendant

25  Thomas Perkins was the owner and user of these devices?

1  A    The user profile folder, the home folder.

2  Q    And you found that for these devices for the defendant?

3  A    On a few.

4  Q    Did you find any evidence that these were ever owned by

5  anyone else?

6  A    By the profiles of parents, of like their parents, Perkins,

7  John Perkins I believe.  But not in the evidence provided.  I

8  didn't see any -- any user profiles in the files that we reviewed

9  or I've selected.

10 Q    So it appeared to you that all these devices were at least

11 operated by the defendant?

12 A    Defendant or a general owner/user, I believe.

13 Q    And we talked a little bit about folders yesterday and then

14 again today.  And programs can create folders.  Is that correct?

15 A    Programs can create folders?

16 Q    Yes.

17 A    Yes.

18 Q    So I can install a program and it'll say install a certain

19 folder on the drive for that program?

20 A    Correct.  Default folder, is that what you're talking about?

21 Q    Yes.

22 A    Yes.

23 Q    But users can also create folders?

24 A    Yes.

25 Q    And in your forensic review of these devices, did you find

Yanez - Redirect/Cayton                    51

1  what appeared to you to be user-created folders?

2  A    Yes.

3  Q    Did you specifically find user-created folders in relation

4  to child pornography?

5  A    Yes.

6  Q    And folders like PTHC?

7  A    PTHC, TIEM, and CP I believe, or child porn I believe is one

8  of the folders.

9  Q    And I think we asked yesterday, would this be a default

10  folder that would be created?

11  A    True, yes.  No.  It wouldn't be a default folder.

12  Q    Now I want to go back a little bit to your analysis in

13  general.  Of the devices that you analyzed, did you do a full

14  analysis of those devices?

15  A    For the most part, yes.

16  Q    Now you talked about yesterday hooking up your -- the device

17  to your computer and the write blocker and the forensic image and

18  getting your image.  You're able to look at everything on the

19  computer with that forensic image and your software, correct?

20  A    Yes.

21  Q    And you're able to review these files that you listed the

22  numbers for the files?

23  A    Yes.

24  Q    All right.  And what are you looking for when you're trying

25  to determine whether or not a particular file or image is a piece

1    of child pornography?

2    A    I'm looking for file name, names indicative of this type of

3    material.  I'll look through the -- I'll preview the image itself

4    or a thumbnail of the image to ascertain if it's this type of

5    material.  And videos, I can also look at the preview of the

6    video, preview image of a video.

7    Q    Are you looking for young children?

8    A    Yes.

9    Q    Are you looking for nudity?

10   A    Nudity?

11   Q    Yes.

12   A    Yes.

13   Q    Are you looking for sexual acts?

14   A    Yes.

15   Q    And so on the files that you -- you listed a whole lot of

16   them earlier, thousands and thousands of files.  In those files,

17   did you find young children with nudity or sexual acts in those

18   files?

19   A    Most of them, yes.

20   Q    And the Defense asked you about creating a final report.  Is

21   there anything in your final report that would not have been

22   present in the actual analysis you were doing on your computer?

23              MR. GORMAN:  Objection.  Leading, Your Honor.

24              THE COURT:  Overruled.  You may answer that question.

25              THE WITNESS:  Can you repeat the question?

Yanez - Redirect/Cayton                    53

1    BY MR. CAYTON:

2    Q    Is there anything in your final report that would not have

3    been present in the analysis that you have done and that you

4    viewed?

5    A    I'm not quite sure if I understand the question.

6    Q    So the Defense was asking you about a final report --

7    A    Yes.

8    Q    -- that you did not generate in this case, correct?

9    A    Correct.

10   Q    Okay.  So you're doing your analysis.  And you're able to

11   view the data for the files and the files themselves and the

12   videos and all that.  Would you have gotten any more information

13   from your analysis if you had clicked generate report?

14   A    No.

15   Q    And is there anything that you were not able to review by

16   not doing that report?

17   A    No.

18   Q    Is there anything that anyone reviewed your software would

19   not have been able to review because there was not a final

20   report.

21             MR. GORMAN:  Objection.  Leading, Your Honor.

22             THE COURT:  Overruled.  You may answer the question.

23             THE WITNESS:  No.

24   BY MR. CAYTON:

25   Q    So all the data itself was available?

1   A    Yes.

2   Q    Do you know how many known NCMEC images or videos were

3   found?

4   A    No, I don't.

5   Q    Were there more than the two that we talked about?

6   A    Yes.

7              MR. CAYTON:  May I have a moment, Your Honor?

8              THE COURT:  Yes, sir.

9              MR. CAYTON:  No further questions, Your Honor.

10             THE COURT:  Thank you.  Mr. Gorman?

11             MR. GORMAN:  Thank you, Your Honor.

12                      RECROSS-EXAMINATION

13  BY MR. GORMAN:

14  Q    Agent Yanez, DOD is a form of a deletion, correct?

15  A    Correct.

16  Q    It isn't a program, correct?

17  A    Correct.

18  Q    When you're speaking of folders, can you actually download,

19  whether it's by a direct download, BitTorrent, can you download a

20  folder with sub-contents?

21  A    Yes, sir.

22  Q    So that folder taken from somewhere else will retain the

23  name of that, whatever the person named it, correct?

24  A    Correct.

25  Q    And that more or less is the original offer of whatever

1   started the download, correct?

2   A    Correct.

3   Q    So when you have these descriptive like PTHC, that could

4   have been in the contents downloaded itself, correct?

5   A    Correct.

6   Q    So it's not necessarily the individual who owns the computer

7   downloading, renaming the contents of that, correct?

8   A    That is true.

9             MR. GORMAN:  Could I have a moment, Your Honor?

10            THE COURT:  Yes, sir.

11            MR. GORMAN:  No further questions, Your Honor.  Thank

12   you.

13            THE COURT:  Anything further based on those questions?

14            MR. CAYTON:  No, Your Honor.

15            THE COURT:  You may step down.  Thank you.

16        (Witness excused)

17            THE COURT:  Government's next witness?

18            MR. GREENBAUM:  Your Honor, the Government would like

19   to recall Special Agent Ferg.

20            THE COURT:  Ferg?  All right.  Come up, sir.  And you

21   remain under oath, of course.

22            MR. FERG:  Yes, sir.

23            THE COURT:  Have a seat.  You may proceed whenever

24   you're ready.

25            MR. CAYTON:  Thank you, Your Honor.

1    DAVID FERG, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

2                      DIRECT EXAMINATION

3    BY MR. CAYTON:

4    Q    Special Agent Ferg, we talked yesterday about your receiving

5    videos or files that were downloaded by Special Agent Bonneau.

6    A    Yes, sir.  That's correct.

7    Q    And you described a video involving a child male sitting on

8    the lap of an adult male?

9    A    Yes, sir.

10   Q    And yesterday we saw a video entitled Boy05.  Do you

11   remember viewing that in court?

12   A    Yes, sir.

13   Q    Was that the file you were describing?

14   A    Yes, sir.

15   Q    And so, and you reviewed files that you received from

16   Special Agent Yanez --

17   A    Yes, sir.

18   Q    -- that were included in this case.

19   A    Yes, sir.  That's correct.

20   Q    And you can confirm that that was the same video you

21   received at the beginning of the case for distribution?

22   A    By all appearances, it appeared -- it seemed to me to be the

23   same video, yes.

24   Q    And you asked Special Agent Yanez to run the list of videos

25   that you had seen that were downloaded by Agent Bonneau against

Ferg - Direct/Cayton                                      57

1    the videos that were found in the forensic exam?

2    A    Yes.  I had asked Agent Yanez to do that.

3    Q    And how many of those videos were present in the same

4    location?  Or in other computers?

5    A    He stated that he had found 15 of the 17 that I had asked

6    him to search for.

7    Q    Now we also just saw a video titled Boy06.

8    A    Yes, sir.

9    Q    And you had watched that video previously?

10   A    Yes I have, sir.

11   Q    And it's a long video.

12   A    Yes, sir, it is.

13   Q    We saw a very -- it was kind of grainy.  Would that be fair

14   to say?

15   A    Yes, sir.

16   Q    Could you describe a little bit more of what's in the video

17   if we would have continued watching it?

18   A    Sir, based on what I had seen in the video, it appeared to

19   be a young boy under the age of 12 with his hands bound by rope.

20   He's nude, and at least two adult nude males are performing sex

21   acts on him.

22   Q    All right.  Is he orally -- or is he being forced to perform

23   oral copulation?

24   A    Yes, sir.

25   Q    Is he also anally penetrated?

Ferg - Direct/Cayton                                    58

1    A    Yes, sir.

2              MR. CAYTON:  May I have just a moment, Your Honor?

3              THE COURT:  Yes, sir.

4         (Pause)

5              MR. CAYTON:  Pass the witness, Your Honor.

6              MS. BATALLER-SCHNEIDER:  Your Honor, we have nothing

7    further for this witness.

8              THE COURT:  You may step down.  Thank you.

9              The Government's next witness?

10             MR. CAYTON:  Sean Mullen, Your Honor.

11             THE COURT:  Sean Mullen.

12        (Pause)

13             THE COURT:  Is everybody okay?  Anybody need a break?

14   I thought if you had too much coffee or something.

15             MR. CAYTON:  May we approach, Your Honor?

16             THE COURT:  Sure.

17             MR. CAYTON:  Just walking around.  Sorry, Judge.

18             THE COURT:  It's okay.

19             MR. GREENBAUM:  He wanted to do a dance.

20             THE COURT:  He walking a pattern, wearing my carpet.

21        (Bench conference at 9:31 a.m.)

22             MR. GREENBAUM:  I just wanted to --

23             THE COURT:  Outside the presence of the jury.  Yes,

24   sir.

25             MR. GREENBAUM:  Yes, sir.  This witness, it's been

Ferg - Direct/Cayton                    59

1    marked as Government's Exhibit Number 4.  These are the known

2    victims.  There should be two images.  So we just cut it down to

3    two images that do anticipate playing here, Judge.  So this is

4    what this witness is going to testify.

5            THE COURT:  Images or videos?

6            MR. GREENBAUM:  It's actually just images, Judge.

7            THE COURT:  Oh.

8            MR. GREENBAUM:  It was videos, but we cut it down to

9    just two images, Your Honor, from a known series, Your Honor.  So

10   that's what I'm having him testify to.  But I just wanted to

11   bring it to the Court's attention.

12           MR. GORMAN:  I don't object to -- the only

13   (indiscernible), Your Honor, since it's a still frame.  Keep it

14   up there for one or two seconds --

15           THE COURT:  Okay.

16           MR. GORMAN:  -- and then get it off because it's --

17           THE COURT:  Yeah.

18           MR. GORMAN:  Sure.

19           THE COURT:  Listen, I've been watching.  Rosemary's

20   pretty good.

21           MR. GORMAN:  Yes.

22           THE COURT:  Heavy finger, heavy hand to get those off.

23   That's good.

24           MR. GREENBAUM:  Yes.

25           THE COURT:  I know Kevin was telling her, she didn't --

Ferg - Direct/Cayton                          60

1    she was doing it.  Thank y'all.

2                MR. GREENBAUM:  Thank you, Judge.

3                MR. GORMAN:  Oh, Your Honor, in terms of exhibit, I

4    think the question was they need reintroduce the exhibit.  That's

5    your preference, Your Honor.

6                THE COURT:  That's 40.  Is it a separate exhibit?

7                MR. GORMAN:  It's a snapshot of it.  So yeah, I think

8    if it's put up there as a picture, so I think --

9                THE COURT:  It's a snapshot of something that's already

10   been -- it's in evidence?

11               MR. GORMAN:  That's my understanding.  Yes, sir.  It's

12   a frame of a video, Your Honor.  Essentially an image.

13               MR. GREENBAUM:  Yes.

14               THE COURT:  You can go on up here, Mr. Mullen.

15               MR. CAYTON:  I'm sorry, Your Honor.

16               THE COURT:  It's all right.  I just want to make sure

17   everybody's on the same page.  So we've got two images coming in

18   as 40, you know, if they come in.  And they're images taken from

19   I guess other videos that are already in evidence.

20               MR. GORMAN:  That's correct, Your Honor.

21               MR. CAYTON:  Yes.

22               THE COURT:  Okay.  And 41?

23               MR. CAYTON:  They're in -- they're on the disc in 41.

24   They're the two videos I have not played.  Part of the problem

25   is --

1           THE COURT:  Oh, I see.

2           MR. CAYTON:  The compilation --

3           THE COURT:  Because that one's a --

4           MR. CAYTON:  Well, no.  This one, it'll play but it's a

5    compilation video.  Because we've been having trouble starting

6    the video in the middle, one of the victims, she's not seen

7    until, like, halfway through the video.  And for him to see it

8    and confirm it, it was just easier to just do a screenshot and

9    put up the image.  And it's also going to save having to play

10   part of the video, just do a quick screenshot and we can take it

11   down.

12          THE COURT:  Okay.

13          MR. GORMAN:  So it's a picture representing essentially

14   a frame from that moving picture.

15          MR. CAYTON:  Correct.

16          THE COURT:  Okay.  It's actually already in evidence.

17          MR. CAYTON:  But the exhibit itself is already in

18   evidence.

19          THE COURT:  Okay.

20          MR. GORMAN:  But for your records, Your Honor, I didn't

21   know if you want that offered as a separate exhibit because it's

22   a picture.

23          THE COURT:  Well --

24          MR. CAYTON:  We have --

25          THE COURT:  I'm thinking --

1          MR. GORMAN:  I'm fine as-is.

2          THE COURT:  Yeah.  You can do it six different ways.

3          MR. CAYTON:  Thank you, Your Honor.

4     (Bench conference ends at 9:34 a.m.)

5          THE COURT:  Have you been sworn?

6          MR. MULLEN:  No, I have not.

7          THE COURT:  If you'd raise your right hand, please,

8     we'll have you sworn.

9             SEAN MULLEN, GOVERNMENT'S WITNESS, SWORN

10         THE CLERK:  Thank you.

11         THE COURT:  You may have a seat.

12         THE WITNESS:  Thank you, sir.

13         THE COURT:  Adjust the microphone.

14         Mr. Greenbaum, you may proceed whenever you're ready.

15                    DIRECT EXAMINATION

16    BY MR. GREENBAUM:

17    Q    Sir, can you introduce yourself to the jury, please?

18    A    Sure.  My name is Sean Mullen.  I'm a Special Agent with the

19    Federal Bureau of Investigation.

20    Q    Thank you, Special Agent.  And can you spell out your last

21    name for the record?

22    A    Sure.  M-U-L-L-E-N.

23    Q    Thank you, sir.  And how long have you been a special agent

24    with FBI?

25    A    Almost 18 and a half years now.

1   Q    Yes, sir.  Can you tell us what your current assignments

2   are?

3   A    Yes.  I'm currently assigned to the Austin Resident Agency

4   in Austin, Texas.

5   Q    And at that -- as part of your assignments, can you tell us

6   what are some of the things you do for the Austin Residency in

7   Texas?

8   A    Yes.  I transferred there in 2007 and began working crimes

9   against children cases.  We call them violent crimes against

10  children.  Initially it was the Innocent Images National

11  Initiative Program which is the online child exploitation cases.

12  I also work child abductions.

13       I'm a member of the child abduction rapid deployment team

14  for the FBI.  Human trafficking, child sex trafficking primarily.

15  And then also assist in violent crimes and other technical

16  assistance to other squads in the RA.

17  Q    And is there something called VCAC Unit that's in Austin,

18  Texas?

19  A    Yes.  That's the Violent Crimes Against Children squad in

20  Austin.

21  Q    Okay.  And did you have any duties and responsibilities with

22  that unit in Austin, Texas?

23  A    I did.  From 2007 until 2020, minus a year and a half where

24  I did a TDY in Washington, D.C., I was the Child Exploitation

25  Task Force coordinator.  And my primary duties were leading that

1    task force and conducting investigations on online job

2    exploitation cases.

3    Q    Yes, sir.  And what did you do at FBI headquarters in

4    Washington, D.C.?

5    A    I was a supervisor special agent responsible for the

6    Innocent Images National Initiative program.  My specific

7    responsibilities were providing support to the 13 field offices

8    in the Southeast United States and Puerto Rico, and also had

9    responsibility for our legal attache offices in Eastern Europe.

10   Q    You may have touched a little bit on this, but can you tell

11   us some of your duties and responsibilities as program manager

12   for the FBI's National CE program?

13   A    Well, the Innocent Images National Initiative program was

14   our Child Exploitation program.  As part of those

15   responsibilities, any time a field office would need assistance

16   or a finance or just guidance or training, our job was to provide

17   that to them and assist them in any way possible.

18   Q    And at times have you actually provided training for other

19   law enforcement entities?

20   A    I have.  I had the fortune of teaching twice at the

21   International Law Enforcement Academy in Budapest, Hungary,

22   teaching child pornography investigations to members of

23   approximately six countries in those two trips.

24   Q    And I know we covered a little bit about this, but can you

25   tell us some of your training and experience as related to child

1   exploitation investigations?

2   A    Yes.  I've received online undercover training, training in

3   interviewing, training in all the different platforms that are --

4   that the child exploitation material is traded on, some training

5   in digital forensics, as well.

6   Q    Thank you, sir.  Are you familiar with a child pornography

7   series known as cbaby?

8   A    Yes, I am.

9   Q    And what is this cbaby child pornography series?

10  A    It is a series of videos and images that depict the sexual

11  exploitation or the sexual assault of four minor victims ranging

12  in ages from three to eight.

13  Q    And can you describe to the jury how you're familiar with

14  this series, this cbaby series?

15  A    Yes.  I was the case agent on the investigation in Austin.

16  Q    And it's involved four different children.  Is that correct?

17  A    That is correct.

18  Q    And can you tell -- let me go back a little bit.  When did

19  this alleged assault or child pornography series, the cbaby

20  series occur at?

21  A    The sexual assault occurred from February of 1999 to

22  November of 2000.

23  Q    And in regards to did you actually apprehend a person or

24  defendant in that case in regards to that cbaby series, and can

25  you tell us a little bit about that?

1    A    Yes, I did.   In 2009, I was contacted by the Maine State

2    Police.   Their Internet Crimes Against Children squad there, they

3    spent a lot of time looking at child pornography series that have

4    unknown victims.   So through that, they analyzed the videos and

5    images from background, stuff in the background that would help

6    them locate where those victims are.

7         They had identified a novelty million dollar bill, and did

8    really good research, and determined that it was produced for a

9    specific event at the Star Ranch Nudist Camp in Bastrop County,

10   Texas.   From that -- and this was a different series outside of

11   cbaby.   We went out there and was able to identify that victim

12   who, through the investigation, then identified the cbaby victims

13   and the offender whose name was David Diehl.

14   Q    Yes, sir.   And was that Mr. Diehl subsequently at some point

15   arrested and convicted?

16   A    Yes.   He was arrested in April of 2010, convicted at trial

17   in February of 2011, and then sentenced to 50 years in federal

18   prison in October of 2011.

19   Q    And the children that are depicted in this cbaby series, did

20   you determine what ages they were at the time that they were

21   created back in from February two thousand -- I'm sorry, 1999

22   through November of 2000?

23   A    Yes.   The victims, cbaby one would have been between the

24   ages of three and four depending on when exactly the abuse

25   occurred.   Cbaby two, each victim has a cbaby one, two, three,

1   four.  That's how they delineate which one it is.  Cbaby two

2   would have been eight.  Cbaby three would have been eight.  And

3   cbaby four would have been three to four years old, as well.

4   Q    And when was the first time that this series, this cbaby

5   series of child pornography was actually seen or distributed to

6   the FBI's knowledge?

7   A    To my knowledge, based on working with the National Center

8   for Missing and Exploited Children, it was first reported in late

9   2000 in the United Kingdom found it.  And then they notified

10  through the International Center for Missing and Exploited

11  Children.  They notified the National Center here in the United

12  States.

13  Q    Yes, sir.  And did you personally meet the victims in

14  regards to the children that are depicted in the cbaby series?

15  A    I have, yes.

16  Q    Okay.  And did you confirm the ages at the -- let me ask

17  this.  When did you meet those victims?

18  A    I met those victims in 2010.

19  Q    Okay.  And what ages were they at that point in time?

20  A    They would have been 14 and 19.

21  Q    Okay.

22  A    Eighteen, nineteen.

23  Q    And once you confirmed these were the same individuals, what

24  were their ages again been back in 1999 or 2000?

25  A    The youngest would have been between the ages of three and

1    four or the ages of three and four throughout the abuse.  And

2    then the older one was eight at the time.

3    Q    Okay.  Now yesterday you and I met, correct?

4    A    That is correct, yes.

5    Q    And we showed you I believe two images from that cbaby

6    series.  Is that right?

7    A    That was correct.

8    Q    Did both those images, did they both fairly and accurately

9    depict the victims as they appeared during the time of the sexual

10   abuse back when these images were produced?

11   A    Yes, it does.

12   Q    Okay.  And to the best of your recollection, is that a fair

13   and accurate depiction that of those two images from that cbaby

14   series?

15   A    Yes, they are.

16              MR. GREENBAUM:  At this time, Your Honor, Government

17   would move to admit Government's, I believe it's going to be

18   Government's Exhibit Number 40, the two images from the cbaby

19   series, Your Honor.

20              THE COURT:  Mr. Gorman?

21              MR. GORMAN:  No objection, Your Honor.

22              THE COURT:  Government's Exhibit 40 is admitted without

23   objection.

24        (Government's Exhibit 40 admitted into evidence)

25              MR. GREENBAUM:  Permission to publish.

1          THE COURT:  Yes, sir, you may.

2          MR. GREENBAUM:  Rosemary, if you could just start with

3   the first image just for, like, one second, two seconds.

4          THE COURT:  You want the other one, Mr. --

5          MR. GREENBAUM:  Yes, Your Honor.  Okay.

6          THE COURT:  And so, Mr. Greenbaum, just for my

7   clarification, these are two images.  They're actually already

8   admitted because they were on the videos that were admitted, just

9   not played?

10         MR. GREENBAUM:  That's correct, Your Honor.  We just

11  didn't play the whole video, Your Honor.  They're just one --

12  they're two still images from those videos.

13  BY MR. GREENBAUM:

14  Q    Sir, can you tell us, starting with the description of what

15  the first image is showing, sir?

16  A    Yeah.  The first image shows the defendant, Mr. Diehl, he

17  was forcing the three-year-old, cbaby one, to perform oral sex on

18  him.  And then he ejaculated in her mouth.

19  Q    And how old, again, was this child, sir?

20  A    She would have been three or four at this time.

21  Q    And this was the actual child that you actually met with

22  later on in life?

23  A    That's correct.  Yes.

24  Q    Going to the second exhibit, can you explain to the jury

25  what that depicts?

Mullen - Direct/Greenbaum                    70

1    A    Yes.  That depicts cbaby two who was eight years old at the

2    time who was performing oral sex on Mr. Diehl.

3    Q    Okay.  And that's also a child that you met as well.  Is

4    that correct?

5    A    That is correct, yes.

6    Q    And you confirmed that age as well.  Is that right?

7    A    Yes, I did.

8    Q    Sir, have you had to testify in other jurisdictions

9    regarding this -- the identification of these children?

10   A    Yes, I have.

11   Q    And can you tell us what other jurisdictions that you had to

12   testify in regards to this cbaby series and these children?

13   A    Yes.  I've testified several times in the State of Texas,

14   State of Kansas, State of New York, Georgia, Alabama, Oklahoma,

15   and in Germany.

16            MR. GREENBAUM:  If I may have just a brief moment, Your

17   Honor.

18       (Pause)

19   BY MR. GREENBAUM:

20   Q    And, sir, we just saw basically a still of an actual video.

21   Is that correct?

22   A    That is correct, yes.

23   Q    So there's an actual longer video?

24   A    Yes, there is.

25   Q    And in regards to cbaby one, have you heard it referred to

1    as awesome preteen compilation number two?

2    A    No, I've never heard of it with that name, no.

3    Q    And for cbaby two, have you had it referred to as PTHC Kelly

4    8YO sucking and trying to "f", I'm not going to say the word.

5    A    Yes, I've seen that file name before.

6    Q    And that would be in regards to cbaby two.  Is that right,

7    sir?

8    A    It's cbaby two is an internet video when it was that file

9    name before.  But it's a compilation video of a myriad of child

10   sexual abuse images and videos.

11              MR. GREENBAUM:  Thank you, sir.  I pass the witness.

12              THE COURT:  Mr. Gorman?

13              MR. GORMAN:  No questions, Your Honor.

14              THE COURT:  Thank you.  You may step down.  Thank you.

15         (Witness excused)

16              THE COURT:  Government's next witness?

17              MR. CAYTON:  Your Honor, at this time, the Government

18   rests.

19              THE COURT:  I'm sorry?

20              MR. CAYTON:  The Government rests.

21              THE COURT:  Thank you.

22              Ladies and gentlemen of the jury, the Government's

23   rested their case.  That doesn't mean you've got the case yet for

24   deliberation.  We've still got more to go.  We're going to take a

25   short break.  I've got some business I've got to take up.  It's a

1　good time for our morning, midmorning break anyway.  And y'all

2　can snack hopefully a little bit.

3　　　　　You're going to leave your notebooks here.  Remember

4　your instructions.  You're still not talking about the case.  And

5　we'll have you back in here as soon as we can.  Let's take 20

6　minutes.  I know that's a little long.  But if it were 10:30, I'd

7　be giving you that much time anyway.

8　　　　　Let's do that and then we can come back in a relatively

9　short time.  I want to make sure that lawyers get a break as

10　well.  And I want to make sure the judge gets a break.  So let's

11　rise for the jury, please.  We'll see y'all in just a little bit.

12　Thank y'all.

13　　　　(Jury out at 9:48 a.m.)

14　　　　　THE COURT:  All right.  Please be seated.  Outside the

15　presence of the jury.  The Government having rested, does the

16　Defense have a motion?

17　　　　　MR. GORMAN:  I'm sorry?

18　　　　　THE COURT:  Does Defense have a motion?

19　　　　　MR. GORMAN:  Oh, we do, Your Honor.  Your Honor, at

20　this time we would like to move for a judgment of acquittal under

21　Rule 29 on all counts.

22　　　　　I would ask the Court to consider that the Government

23　has not presented sufficient evidence to determine all elements

24　beyond a reasonable doubt and, therefore, merit presentation of a

25　jury.

1          Specific to the distribution count, Your Honor, in

2     addition to this general presentation, I would ask the Court to

3     consider the evidence in this case involves a digital system.

4     Agent Bonneau testified this computer, he was a passenger of this

5     system.  It generated information.  He said the information

6     generated included internet information that was specific to the

7     transaction.

8          That's not in evidence, Your Honor, in terms of what

9     that presentation was documenting the actual internet address in

10    this case.  That is the evidence of the address, Your Honor.

11         In terms of the video itself, there's been discussion

12    of the video name.  But as Agent Yanez himself pointed out, names

13    aren't significant in terms of the contents of those videos.  I

14    think what we just saw was Agent Ferg step up and attempt to say

15    by all appearance that could be the same video.  He said it's

16    essentially a visual on it.

17         But Agent Yanez didn't offer testimony specific to the

18    video he received that was supposedly distributed that would

19    essentially establish that that video and the video on the

20    computer system in this case, and the evidence seized on this

21    case are the same video.  So essentially we're left without that

22    evidence.

23         And with that, Your Honor, I don't know what the jury

24    would be basing it on other than essentially items that would not

25    be considered the best evidence or even competent evidence of the

1  contents of that information.  I would ask the Court to consider

2  that does support a judgment of acquittal on that count.

3          THE COURT:  Thank you, Mr. Gorman.

4          MR. GORMAN:  Thank you, Your Honor.

5          THE COURT:  Does Government have a response?

6          And you can, Mr. Gorman, you're specifically speaking

7  of Count 1, the distribution count?

8          MR. GORMAN:  That would be correct.  It's a general --

9  obviously a general --

10          THE COURT:  Sure.

11          MR. GORMAN:  Thank you, Your Honor.

12          MR. CAYTON:  And, Your Honor, in regards to the

13  general, the Government believes we have proven each and every

14  element beyond a reasonable doubt at this point.  The defendant

15  was in possession of multiple devices in this case, eight

16  different devices.  All of them possessed child pornography.

17          He knowingly possessed all of the child pornography.

18  He discussed with the special agents the fact that he knowingly

19  possessed that child pornography.  He specifically searched

20  specific search terms.  He was very coy with the initial

21  interview.  At the second interview, he was a lot more specific

22  on the search terms.

23          And Agent Yanez also testified to several search terms

24  that he found that were specifically looking for child

25  pornography.  And obviously, based upon what we have previewed in

court, we know it is in fact child pornography.  Agent Yanez also testified regarding the manufacture location of all of those hard drives.  All of them involved interstate commerce.  They all came from outside of the country.

In regard specifically to the distribution count, the internet address was discussed where it came from.  Agent Ferg testified that he received the videos that were sent from Agent Bonneau that he reviewed all 17 videos.  And then he also testified that those videos were found on the defendant's devices, 15 of them were found on the defendant's devices.

And one in particular was played here in court, and he confirmed that it was the same video or substantially the same video.  But he did see the video that came from the distribution. The fact that 15 out of 17 files were found on the defendant's devices that had been downloaded from the defendant is clear that the defendant was distributing and sharing.

The defendant tried to deny that he was sharing his own files, but he did admit that the system was set up to share, specifically saying multiple times I should have turned off that feature.  He knowingly knew he was sharing.  And as Agent Yanez also testified, the defendant was not passenger.  Agent Bonneau was a passenger.

The defendant was -- I'm sorry, I think it was Agent Bonneau's testimony.  The defendant was the driver.  He was the one in control of what his computer was doing and what his

1   computer was sharing, which allowed Agent Bonneau to get the

2   downloads.

3          THE COURT:  Thank you.

4          The Court, reviewing the evidence in the light most

5   favorable to the Government, and taking all inferences in favor

6   of the Government, and resolving all issues of credibility in

7   favor of the Government, which is the standard of proof required

8   in a Rule 29 motion at this time finds that a reasonable and

9   rational juror could find the defendant guilty of each of the

10  counts beyond a reasonable doubt of each of the elements set

11  forth in the indictment and respectfully denies the motion.

12         Mr. Perkins, if you and your counsel would come up to

13  the podium for me real quick.  We'll get this very quickly.  You

14  are -- I'm going to get you on the microphone.  So, Mr. Gorman,

15  would you pull the mic?  There you go.

16         So you're Thomas Scott Perkins, correct?

17         THE DEFENDANT:  Yes.

18         THE COURT:  You're the defendant in this case, and

19  you've been here for the entire trial, right?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Just as you have the right to do.  Every

22  criminal defendant, Mr. Perkins, is privileged to testify in his

23  own defense.  Even though you have competent counsel, I advise

24  you that the law provides that you as the accused in this case do

25  not have to testify.

1          If you choose not to testify, no one can or will hold

2     it against you.  Likewise, you have a right to testify and no one

3     can keep you from testifying if you want to do that.  Do you

4     understand?

5               THE DEFENDANT:  Yes.

6               THE COURT:  Okay.  And if you choose to testify, the

7     Government's allowed to cross-examine you just the same as any

8     other witness, of course, just like you've seen that happen over

9     the past day or so.  Do you understand that?

10              THE DEFENDANT:  Yes.

11              THE COURT:  If you have previous convictions in the

12    nature of a felony of misdemeanor involving oral turpitude that's

13    not remote, the Government would be entitled to ask you about

14    those convictions and in effect disclose the convictions to the

15    jury.  Do you understand?

16              THE DEFENDANT:  Yes.

17              THE COURT:  If in the event that you choose to testify

18    and you have previous convictions that are made known to the

19    jury, I'll instruct the jury they're not to consider those

20    convictions for any purpose except as they may bear on your

21    credibility as a witness.  Do you understand that, sir?

22              THE DEFENDANT:  Yes.

23              THE COURT:  Likewise, you have the right to remain

24    silent.  In other words, you do not have to testify if you don't

25    want to.  If you choose to remain silent, the Government cannot

1    make you testify.  They cannot call you as a witness or in any

2    way force you to bear witness against yourself, nor can they do

3    anything to call upon you to account for your failure to testify.

4    Do you understand?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Now if you choose not to testify, I'll

7    instruct the jury that they cannot use that against you in any

8    way, and they cannot speculate as to why you did not testify or

9    what you might have said had you chosen to do so.  Do you

10   understand?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Now having gone over this right with you,

13   do you have any questions concerning your right to testify or

14   remain silent?  Any question for me?  If you have questions for

15   your attorneys, certainly you can do that privately.  But if you

16   have questions for me, that's what I'm asking you.

17           THE DEFENDANT:  No.

18           THE COURT:  No, you're good?  Okay, thank you.  You may

19   return to your seat, sir.  Thank you.

20           Mr. Gorman, Ms. Bataller, I want us all to take a

21   break.  But once we bring him back in, you're -- if you have

22   whatever witness you're going to call first up here, we'll get

23   going, okay?  And let's come back at ten after.

24           MR. GORMAN:  And, Your Honor, housekeeping question

25   just because I discussed this with the Government.  I think the

1   parents are in the sensory deprivation tank next door.  We're not

2   going to use them as witnesses.  The conference room.

3            THE COURT:  Mr. Perkins --

4            MR. GORMAN:  Yeah, his parents.  They were on the

5   witness list for both.  The Government was going to call them.

6   We're not going to call them.  Would it be okay if they --

7            THE COURT:  Any objection to them coming back in?

8            MR. GREENBAUM:  No, Judge.  And that's what I was --

9            THE COURT:  As long as they'll sit in the second row

10  back.  And it's not the first row.  So the copy room is the

11  sensory deprivation room?

12           MR. GORMAN:  I need to --

13           MS. BATALLER-SCHNEIDER:  That's what he calls it.

14           MR. GORMAN:  I was just pointing out the walls, there's

15  no noise, TV, or otherwise.  Yeah, I could see that.  So yes, I

16  think they'll be happy to be liberated, Your Honor.

17           THE COURT:  I have no problem with that.

18           MR. GORMAN:  Thank you.

19           THE COURT:  Let's come back at ten after and we'll get

20  rolling, okay?

21           MR. CAYTON:  Your Honor, is it okay if I retrieve the

22  exhibits?

23           THE COURT:  Oh, sure.

24           MR. CAYTON:  I accidentally left them.

25           THE COURT:  Yeah, whatever you need.

Schutte - Direct/Bataller-Schneider                    80

1       (Recess at 9:57 a.m./Reconvened at 10:26 a.m.)

2       (Outside the presence of the jury; defendant present)

3              THE CLERK:  All rise.

4              THE COURT:  You can come on up here.  You can stand

5       there.  All right.  Government, anything before we --

6              MR. GREENBAUM:  No, Your Honor.

7              THE COURT:  -- bring the jury in?

8              MS. BATALLER-SCHNEIDER:  No, Your Honor.

9              THE COURT:  All right.  So we'll all bring in everybody

10      else, have everybody sit down.  You stay standing though, please.

11      And I'll ask, who's going to -- Ms. Bataller?

12             MS. BATALLER-SCHNEIDER:  I will be, Your Honor.

13             THE COURT:  I'll ask her who her first witness is, and

14      then we'll have you sworn once she announces your name.  Okay?

15             DR. SCHUTTE:  Understood, Judge.

16             THE COURT:  Very good.  Let's bring the jury in,

17      please.

18         (Jury in at 10:27 a.m.)

19             THE COURT:  All right.  Let's be seated, please.  Thank

20      you.  Ms. Bataller, your first witness, please?

21             MS. BATALLER-SCHNEIDER:  Yes, Your Honor.  The Defense

22      calls Dr. James Schutte.

23             THE COURT:  Dr. Schutte, if you'd raise your right hand

24      please to be sworn.

25             JAMES SCHUTTE, DEFENDANT'S WITNESS, SWORN

1          THE CLERK:  Thank you.

2          THE COURT:  You can have a seat ad adjust yourself to

3     that microphone.  Ms. Bataller, you may examine him whenever

4     you're ready.

5          MS. BATALLER-SCHNEIDER:  Thank you.

6                         DIRECT EXAMINATION

7     BY MS. BATALLER-SCHNEIDER:

8     Q    Good morning, Dr. Schutte.  Can you please state your name

9     for the record and spell your last name?

10    A    Certainly.  It's James William Schutte, S-C-H-U-T-T-E, Ph.D.

11    Q    And where are you from?

12    A    Originally from Pennsylvania, but I've lived more than half

13    of my life in El Paso, Texas.

14    Q    And is that where you currently live?

15    A    Yes, it is.

16    Q    What do you do for work?

17    A    I'm a licensed psychologist.

18    Q    Do you work for the federal government?

19    A    No, I'm not an employee of the federal government.

20    Q    Are you an employee of my office?

21    A    No, I'm not.

22    Q    Where do you work?

23    A    I have my own private practice over by Basset Center Mall in

24    El Paso, Texas.  And I've been there for more than 20 years.

25    Q    Do you have an undergraduate degree?

Schutte - Direct/Bataller-Schneider                    82

1    A    Yes, I do.

2    Q    And where did you get that from?

3    A    I got my undergraduate degree in psychology from Brigham

4    Young University.

5    Q    And when was that?

6    A    That was in 1992.

7    Q    And do you have a graduate degree?

8    A    Yes, I have two of them.

9    Q    Where did you get those from?

10   A    From the University of Texas at El Paso.

11   Q    And when did you get those?

12   A    I got my masters degree in psychology in 1994, and my

13   doctorate degree in psychology in 1996.

14   Q    Are you licensed as a psychologist?

15   A    Yes.  I'm licensed in the State of Texas, and also in the

16   State of New Mexico.  And I do work in both states.

17   Q    How long have you been licensed as a psychologist?

18   A    I got licensed at the pre-independent level starting in

19   1995.  And my first independent licensure was in 1999.

20   Q    And since you became licensed, or since school actually, can

21   you tell us what you've done professionally?

22   A    Certainly.  I have a board certification in psychometry

23   which is psychological testing from the Board of Certified

24   Psychometrists.  I have my private practice in which I do

25   evaluations or psychological assessments for different government

1    agencies such as Social Security Disability, Child Protective

2    Services, Local Community and Mental Health Center which is

3    Emergence Health Network.

4         I do evaluations for the Texas Workforce Commission, for the

5    University of Texas at El Paso Police Department, for the Diocese

6    of El Paso for individuals seeking to become priests to rule out

7    issues of pedophelia or sexual abuse tendencies or other mental

8    health issues.  I also do evaluations for the El Paso County

9    Attorney, as I mentioned, Child Protective Services, the family

10   courts in El Paso.

11        I do evaluations of juvenile offenders to determine issues

12   of essentially insanity or competency.  I also do evaluations for

13   state and federal courts.  And I testify on a regular basis in El

14   Paso, Texas.

15   Q    And you said that you testified before in federal courts.

16   About how often have you done that?

17   A    About five times, I believe.

18   Q    And have you published anything to do with your psychology

19   degree?

20   A    Yes, I have.

21   Q    Do you specifically focus on Autism Spectrum disorders in

22   your work?

23   A    That's a frequent area of assessment that we do.  I see

24   individuals for autism assessments basically on a daily basis in

25   my office.  These are the individuals who are referred by

Schutte - Direct/Bataller-Schneider                    84

1    pediatricians, bu the local school districts, sometimes by our

2    community mental health center or one of the psychiatric

3    hospitals in town.  They'll send either a child or an adult over

4    to see if this person has autism spectrum disorder.

5         I also often see individuals with Autism Spectrum disorder

6    for Social Security Disability evaluations, and also for

7    vocational assessments.  Also, oftentimes juvenile offenders that

8    I assess for the 65th District Court in El Paso have Autism

9    Spectrum disorder.  So that's a condition I come across very

10   often in my practice.

11   Q    And do you also specifically focus on psychiatric disorders

12   such as schizophrenia and schizoaffective disorder?

13   A    Those are very common conditions that I see in my practice,

14   and primarily through assessments for Social Security Disability,

15   but also for individuals referred by the Courts who are sent to

16   me through the courts, or from the El Paso Psychiatric Center, or

17   Emergence Health Network.

18   Q    Have you had an opportunity to meet with Thomas Perkins in

19   your professional capacity?

20   A    Yes, I have.

21   Q    And when was that?

22   A    That was on September 4th, 2021.

23        MS. BATALLER-SCHNEIDER:  Your Honor, at this time, we'd

24   move to have Dr. Schutte deemed an expert or qualified as an

25   expert.

1          MR. GREENBAUM:  No objection, Your Honor.

2          THE COURT:  The Court so finds.

3    BY MS. BATALLER-SCHNEIDER:

4    Q    And before you met with Thomas, what did you review?

5    A    I reviewed a prior psychological assessment that had been

6    done at the Federal Medical Center.  And that gave a description

7    of his history, medical history, prior diagnoses that he

8    received.  It had some test results in there, and a diagnosis at

9    the end.

10   Q    And what were those prior diagnoses that you saw?

11   A    There was diagnoses including schizoaffective disorder.

12   There was a mention of a history of autism, and a final diagnosis

13   of Autism Spectrum Disorder.

14   Q    And after you met with Thomas, what did you personally

15   believe that he should be diagnosed with?

16   A    I believe he has a number of diagnoses, most important ones

17   being Schizoaffective Disorder, Bipolar Type, and Autism Spectrum

18   Disorder.

19   Q    Now when you say Autism Spectrum Disorder, can you explain

20   to the jury what that is?

21   A    Certainly.  It's the current term we use to describe autism.

22   It also describes other terms that have been used in the past

23   such as Asperger's disorder.  Autism Spectrum Disorder is a

24   lifelong developmental condition in which an individual has

25   problems developing and maintaining social relationships.

1      They have difficulty interacting socially with others.  For
2  example, their speech may be odd or unusual.  They have trouble
3  maintaining eye contact or understanding social cues.  So they
4  tend to be awkward in social interactions.
5      They also tend to exhibit a number of unusual behaviors such
6  as oftentimes being fascinated or fixated on one topic to the
7  exclusion of others.  They may become fascinated with parts of
8  objects or parts of ideas to the exclusion of others.
9      They may engage in unusual motor or body movements such as
10 walking back and forth or flapping their hands.  And so it's a
11 lifelong condition which impairs a person's -- basically their
12 ability to socialize and relate to others.
13 Q    Thank you.  What did you see specifically in Thomas that
14 made you diagnose him with Autism Spectrum Disorder?
15 A    Well, aside from the fact that that diagnosis had been made
16 previously by another professional, I observed a number of
17 autistic behaviors in my interaction with him.  His eye contact
18 was poor.  In other words, he didn't hold my gaze.  His speech
19 was very monotone.  Generally, when we speak we tend to show a
20 change in emotion depending on the topic we're talking about, and
21 his emotion was very flat.
22     His affect or his overall emotional presentation was very
23 constricted or flat, as well.  He had difficulty keeping on
24 topic, and oftentimes I had to redirect him back to what we were
25 talking about because he would start talking about something

1    else, or even give sometimes an irrelevant answer to the question

2    I had.

3         His descriptions of some of his behaviors and the things

4    that he's done in the past such as being fixated on an idea that

5    he wanted to research, or being fascinated with one aspect of

6    something were all consistent with Autism Spectrum Disorder.

7    Q    Did you do any tests on Thomas?

8    A    I did.

9    Q    Which tests did you do?

10   A    I did a number of them.  The first one was the REY 15 items

11   test.  This is essentially a test to check if someone is trying

12   to fake memory problems.  Our concern oftentimes is

13   psychologists, when we evaluate people in the criminal justice

14   system, is we want to see if they're being open and honest with

15   us when they're describing their problems.

16        Sometimes in certain settings, there can be a motivation to

17   fake something you don't have, or exaggerate a condition that you

18   do have.  And so I wanted to administer some tests to rule out

19   that possibility to make sure that he was being up-front with me

20   when he was describing the issues that he has.  And on that test,

21   there was no indication that he was trying to fake a memory

22   problem.

23   Q    And if I could just sort of follow up on that.  As far as

24   what you reviewed, have you seen any evidence that any doctor has

25   ever found that Thomas is making these symptoms up or what you

1  might call malingering?

2  A     No.  He's been administered numerous tests by different

3  processionals, and there's never been any indication that he was

4  trying to fabricate or malinger or fake or exaggerate his

5  problems.

6  Q     Were any of the tests that you did that stood out to you as

7  far as the significance for Autism Spectrum Disorder?

8  A     Certainly.  One of the tests I administered is called the

9  SRS-2, or the Social Responsiveness Scale, Second Edition.

10  That's a test which measures different characteristics of autism.

11  And his responses to that test were consistent with a diagnosis

12  of Autism Spectrum Disorder.

13       So to me as a psychologist, it's not just what I'm observing

14  which is of course part of the evaluation.  It's not just what

15  I've read that other professions that I've seen, but also I have

16  another source of information which are these objective tests.

17  And these are all consistent in telling me that this is a person

18  with Autism Spectrum Disorder.

19  Q     And what did you find about those tests that made you

20  believe that he was -- that it was consistent with Autism

21  Spectrum Disorder?

22  A     His responses to the SRS-2.  There was also some other

23  psychological testing that I did.  And his responses to those

24  measures as well were consistent with autism.

25  Q     And when you're doing these tests, is there a scale that you

Schutte - Direct/Bataller-Schneider                    89

1    look at as far as whether someone performs low on the scale or

2    high on the scale as far as ability?

3    A    Sure.  As far as ability, there is intelligence testing.

4    There's also neuropsychological testing where we can see how a

5    person's functioning in different areas of cognition such as

6    their memory or their language skills or their verbal fluency.

7    Q    Did Mr. --

8    A    When they create these tests, they give them to a group of

9    normal people to see how normal people answer these questions, or

10   how many correct answers the average person can provide.  Someone

11   who is missing a lot of items or is endorsing a lot of symptoms,

12   those can be considered an abnormal performance.  And so that's

13   an indication that there's something abnormal in this person

14   because they're not responding like the average person does.

15   Q    Did Thomas score below average on any of these tests?

16   A    He did.

17   Q    And can you tell me which tests those are?

18   A    One is the COWA which is the Controlled Oral Word

19   Association.  This is a measure of verbal fluency and verbal

20   problem solving.  And he scored in the severely impaired range on

21   that measure.

22        Also there's the Neuropsychological Assessment Battery, the

23   judgment sub-test which is a measure of social judgment and

24   social intelligence.  And he scored in the mildly to moderately

25   impaired range on those measures.

Schutte - Direct/Bataller-Schneider                    90

1    Q    Thank you.  Now I want to turn to the other diagnosis of

2    schizoaffective disorder.  Can you tell the jury what that is?

3    A    Schizoaffective disorder is a combination of two mental

4    health conditions, the first being schizophrenia and the other

5    being a mood disorder which can be depression or bipolar

6    disorder.

7         Taking those one-by-one, schizophrenia is a severe mental

8    illness in which a person loses contact with reality.  They

9    oftentimes experience what we call hallucinations which means

10   that they hear things that aren't there, usually voices.  They

11   may see things which are not there.  They may smell or feel

12   things that are not actually there.

13        Oftentimes, people with a schizophrenia disorder experience

14   delusions which means they have irrational and very unusual ideas

15   about things such as feeling that they're being watched or

16   they're being followed, or thinking that they're being monitored

17   through their television, or that they have special powers, or

18   that they have greater importance, they're actually a famous

19   person with more importance than they actually have.

20        So it's this combination of delusions and hallucinations

21   which causes someone to have a schizophrenia-type diagnosis.

22        On the other hand, in order to have schizoaffective disorder

23   you have to have a mood disorder which can be depression which

24   are things like fatigue, suicidal ideation, low motivation, sleep

25   problems, or it can also be bipolar disorder where you have what

Schutte - Direct/Bataller-Schneider                91

1   we used to call mood swings where you go from being depressed to

2   being very happy, very energetic, very irritable oftentimes to

3   the point of needing to be hospitalized.  So that's what

4   schizoaffective disorder is.

5   Q    And you said that you specifically diagnosed Thomas with

6   schizoaffective disorder.  What sort of things did you see in

7   Thomas that made you believe that was the correct diagnosis?

8   A    Well, not just the prior psychological evaluation, but also

9   his reported history of mood disturbance and irritability

10  including being hospitalized for that.  He described

11  hallucinations and delusions in the form of hearing angels,

12  feeling that there is a sex demon, a female sex demon which comes

13  and has sexual intercourse with him.

14       These beings that he hears and perceives and sees he feels

15  are going to influence his legal case.  He feels that they have

16  provided him with information on how to behave in his life such

17  as whether to take a COVID vaccine or not.

18       And so that combination of those delusions and

19  hallucinations combined with this mood disorder are what justify

20  a diagnosis of schizoaffective disorder.

21  Q    Thank you.  Now you touched on this a little bit, but would

22  hearing voices and believing or actually feeling a sex demon have

23  any effect on Thomas' ability to perceive reality?

24  A    Certainly.

25  Q    How so?

1   A     Because schizophrenia is a detachment or a break from

2   reality, you know, we are in touch with reality because of what

3   we sense, what we see, what we hear, what we touch and also what

4   we think about the world.  And if we have a severe mental illness

5   that impairs our ability to understand what's really going on in

6   the world, that can certainly have an impact on our behavior.

7         Oftentimes, people with a schizophrenic or psychotic

8   disorder act in very unusual ways because of voices that they

9   hear, things that they see, or odd ideas that they have in their

10  head.  And so they're not thinking clearly or rationally when

11  they engage in certain behavior.

12  Q     Now I want to turn to Autism Spectrum Disorder again.  Is it

13  easy for your average person to tell if someone has ASD just by

14  watching them?

15  A     Well, there's certainly levels of ASD, level one, two, and

16  three.  And some of level three Autism Spectrum Disorder, this

17  may be an individual who doesn't speak at all, who sits in the

18  corner and rocks back and forth or flaps his or her hands.  And

19  in those cases it would be very easy perhaps for the average

20  person to say well that person obviously has something wrong with

21  them.  And if the average person knows a little bit about autism,

22  they might be able to say okay, well this is a person who may be

23  autistic.

24        With other levels of autism, say level one or level two, it

25  would be very difficult for the average person to identify this

Schutte - Direct/Bataller-Schneider                    93

1  person as having that characteristic because again, these people
2  are generally able to speak but their speech is a little odd.  So
3  you'd have to talk with them for an extended period of time.

4      Their emotions are constricted.  They talk in a monotone.
5  They have unusual eye contact or unusual interests.  And so
6  that's not something that would be readily identifiable by the
7  average person.  It would require a professional.

8  Q   And as you said, does that change the fact that they still
9  have an inability to interact with others the way that your
10 neurotypical person would?
11 A   Yeah, that still means that they have an impaired ability to
12 interact with others.  Their social skills are still impaired.
13 It's just not readily observable to the average person who's not
14 trained in psychology or psychiatry.

15 Q   And in your experience with people with ASD, what do these
16 -- what kind of problems are caused by a person with ASD maybe
17 having a more subtle version of it but still having these
18 difficulties in interacting with others?
19 A   Those individuals tend to have very few if any friends, very
20 few if any romantic relationships.  They may be uninterested in
21 having relationships with others.  They may have an interest in
22 having relationships with others but they're very anxious about
23 interacting with people.  And so they tend to be more solitary.

24     When they do interact with people, they may perceive
25 rejection because of their unusual behavior.  And so they don't

1    have the opportunity to develop the kinds of friendships or

2    social relationships or romantic or sexual relationships that the

3    average person does.  And it's in having these relationships and

4    maintaining them, as all of us grow up, that we learn how to

5    interact with others.  That's how we learn our social skills,

6    through trial and error.

7         If we go and behave in a certain way at a party and people

8    respond positively to that, then we get good feedback.  If people

9    respond negatively to what we do, then the average person will

10   say okay, I need to change what I say or how I dress or how my

11   mannerisms are.  And individuals with autism have a great deal of

12   difficulty with that.

13   Q    And I want to touch specifically on sexuality related to

14   what you just testified to.  Do you find that people with Autism

15   Spectrum Disorder are able to explore their sexuality like a

16   neurotypical person would?

17   A    They have a great deal of difficulty, again for the same

18   reasons I just mentioned.  They may have a lack of interest in

19   sexual relationships, or may be very anxious about approaching

20   someone to start a romantic or sexual relationship.  Again,

21   there's oftentimes a lot of rejection that they experience

22   growing up because of their unusual behavior.  And they don't

23   have the opportunity to develop those normal and healthy

24   relationships that most of us have.

25   Q    As far as you're aware, was Thomas ever able to explore his

1  sexuality with anyone?

2  A    No.

3  Q    As far as you're aware, has he ever even kissed anyone?

4  A    No.

5  Q    I'm turning to a different aspect of ASD.  Is it an aspect

6  of ASD for someone with that disorder to be brutally honest?

7  A    Yes.

8  Q    And why is that?

9  A    One of the aspects of Autism Spectrum Disorder is a lack of

10  awareness of social norms, social rules, how to behave in social

11  settings.  And so it's not uncommon for individuals with autism

12  to simply say what's on their mind without realizing that that's

13  not always an appropriate thing to do.

14      A typical example would be going to a party and telling

15  someone that they look ugly in that dress, or that they don't

16  like their haircut.  Now that may be completely accurate, but

17  that's not something that's socially appropriate.

18      And individuals with Autism Spectrum Disorder may focus on

19  the telling the truth part without appreciating the fact that

20  it's not always socially acceptable to tell the truth in every

21  setting.  And so that's an area in which they struggle.

22  Q    And before testifying today, you were able to view or listen

23  to the interrogation of Thomas by Agents Ferg and Butler.  Is

24  that right?

25  A    That's correct.

Schutte - Direct/Bataller-Schneider                    96

1    Q    And do you think, after viewing that, that Autism Spectrum

2    Disorder played a role in that interaction?

3    A    Certainly.

4    Q    And how so?

5    A    Well, I observed the same characteristics of Autism Spectrum

6    Disorder in that interview as I did in my own evaluation of him.

7    Again, this monotone speech, this flat affect, this obsessive

8    preoccupation with certain ideas.  There's certainly some

9    indication of difficulty following directions and following a

10   course of thought during the interrogation.  And so that's very

11   consistent with that diagnosis.

12   Q    Do you think it would have been a different situation if the

13   agents had been trained to speak with people with Autism Spectrum

14   Disorder or schizophrenia?

15   A    It's possible.

16   Q    Now I want to talk about the idea of people with ASD

17   parroting ideas.  Can you explain to the jury what that is?

18   A    Oftentimes, individuals with Autism Spectrum Disorder have

19   difficulty grasping the reasons behind social behaviors.  And so

20   they may simply repeat things that they've heard or things that

21   they've seen on TV without understanding the reason for them.

22   And that can oftentimes cause them difficulty in social settings.

23   Q    Do you see any evidence of that in the interrogation that

24   you reviewed?

25   A    Certainly.  I mean, individuals with autism tend to be what

1  we call suggestible, subject to being influenced or directed by

2  those around him.  And I certainly observed that, as well.

3  Q    Is it a common aspect of ASD to get frustrated easily in

4  social situations?

5  A    Yes.

6  Q    And why is that?

7  A    Individuals with Autism Spectrum Disorder, again because of

8  their limited social skills, tend to get very frustrated when

9  having to deal with others.  They also tend to get very

10  frustrated if their routine is disturbed.  They like to do things

11  in a certain pattern day after day.  And if there's some change

12  in their schedule or change in their routine, they tend to get

13  agitated by that.

14      Again, it's the fact that they like predictability.  They

15  like to do the same thing over and over again because it gives

16  them some reassurance that they know how the world is going to

17  turn out.  So they like things to be the same.

18  Q    Now because of their deficits in social understanding, are

19  people with ASD naturally able to understand right and wrong in

20  social situations?

21  A    In social situations, they're going to have a great deal of

22  difficulty with that.  Again, they may observe how people

23  interact, you know, from a distance or possibly on TV or in

24  movies.  But they have difficulty understanding why certain

25  behaviors are inappropriate in certain settings.  And they might

1    seize on one simple idea such as well always tell the truth when

2    people ask how they look without understanding why that's not

3    always a good idea.

4    Q    Did you see any evidence of that happening in the social

5    situation that was the interrogation?

6    A    Yeah, I think certainly there was an eagerness to argue the

7    same idea over and over again without really responding to the

8    change in the question.  I also observed difficulty following

9    instructions during the interrogation.

10   Q    And moving on to a different aspect of ASD, you touched on

11   this briefly about collecting and maybe in an obsessive way.  Can

12   you talk about that a little bit more in the context of ASD?

13   A    Certainly.  It's a frequent characteristic of people with

14   Autism Spectrum Disorder that they like to collect things.  As

15   children they often collect, you know, toy cars or inanimate

16   objects such as pieces of string or rocks or dirt, or even pieces

17   of trash.

18        And they like to organize them in certain fashion such as

19   lining them up by size or by color, or by some other

20   characteristic.  And they get very upset when their collection is

21   disturbed.

22        That abnormal fixation with an idea or with an activity is

23   seen also in adults with Autism Spectrum Disorder where they may

24   collect things for no apparent reason other than the fact that

25   they want to have a collection of something, and they want to

1    organize it by some characteristic.

2         You know, we can certainly understand individuals who may

3    want to collect coins or stamps or antique cars.  But individuals

4    with autism will often collect things that seem to be of no value

5    to the average person.

6    Q    And does this collection always represent an obsession with

7    the subject matter of what they're collecting?

8    A    Not always.  They can certainly be collecting for the sake

9    of collecting something.  It becomes a repetitive behavior.  Like

10   I mentioned earlier some individuals with autism may walk back

11   and forth or, you know, flap their hands because it soothes them

12   in some way.

13        By the same measure, individuals with autism may collect

14   items because it reduces their anxiety, not because they have

15   some sort of interest in, you know, collecting pieces of trash or

16   string or whatever they're collecting.  It becomes a repetitive

17   behavior sort of detached from the subject matter.

18   Q    Do you have any thoughts on the part of the interrogation

19   where Thomas talked about doing research, Supreme Court research?

20   Do you have any thoughts on that?

21   A    Yeah.  I know there were several mentions that he made of

22   experimentation or doing research based on what he interpreted

23   the Supreme Court as having said.

24   Q    And do you think that's informed in any way by his Autism

25   Spectrum Disorder or schizophrenia?

Schutte - Direct/Bataller-Schneider                    100

1    A    Certainly it is, yes.  I mentioned earlier, individuals with

2    Autism Spectrum Disorder often develop unusual fixations with

3    things or with ideas without seeing the entire picture.  And so

4    it's not unreasonable to see that an individual with autism may

5    decide to do experiments or do research which involves a lot of

6    repetitive behavior such as collecting a large amount of material

7    and looking for some characteristic in it which is not readily

8    important to the average person.  So that's very consistent with

9    autism.

10   Q    And with the social deficits that people with ASD have,

11   would they be able to understand the feelings of the children in

12   those videos just by looking at their faces and seeing facial

13   expressions?

14   A    No.  Individuals with Autism Spectrum Disorder have a great

15   deal of difficulty interpreting emotional expressions from facial

16   expressions.  And so that's not something I would expect the

17   average person with autism to be able to do.

18   Q    Would you expect Thomas to be able to do that?

19   A    No.

20   Q    With Thomas' ASD symptoms and his schizoaffective disorder

21   framing his reality as you've testified to, do you believe he

22   could knowingly possess or distribute child pornography as the

23   Government alleges?

24        MR. GREENBAUM:  Judge, I have an objection to that.  We

25   had --

1          THE COURT:  Sustained.

2          MR. GREENBAUM:  -- pretrial hearings on this.

3          THE COURT:  Sustained.

4          MS. BATALLER-SCHNEIDER:  Your Honor, if we could

5   approach, please?

6          THE COURT:  Sure.

7          MS. BATALLER-SCHNEIDER:  Thank you.

8     (Bench conference at 10:59 a.m.)

9          THE COURT:  Outside the presence of the jury.

10          MS. BATALLER-SCHNEIDER:  So I was --

11          THE COURT:  How does that not invade the province of

12   the jury.

13          MS. BATALLER-SCHNEIDER:  That I understand.

14          THE COURT:  Is the ultimate issue.

15          MS. BATALLER-SCHNEIDER:  We did put in notice --

16          THE COURT:  Softer.

17          MS. BATALLER-SCHNEIDER:  I apologize.  We did put in

18   notice of a 12.2(b) argument that we would be trying to negate

19   the mens rea by through psychological evidence.  In the notes of

20   that, and we put this in our motion, the notes of that, that is

21   one area where you can get to the final issue.

22          Now as far as I'm not going to be asking anything about

23   the final issue of insanity.

24          THE COURT:  You just asked him if he felt like he could

25   do it as been charged, that he could do it.

1          MS. BATALLER-SCHNEIDER:  That he could knowingly.

2          THE COURT:  Mr. --

3          MR. GREENBAUM:  Judge, it's clear 704(b), Your Honor.

4    That's going to the ultimate issue.  That's for the trier of fact

5    to decide, Your Honor, not for an expert to decide.  It's clearly

6    codified in that statute, Your Honor, which we brought up in

7    pretrial, Judge.

8          MS. BATALLER-SCHNEIDER:  But just to be clear, 704(b)

9    does not apply to 12.2(b).

10         THE COURT:  So you're saying that when their expert

11   comes in tomorrow and says (indiscernible), you're not objecting

12   to that.  There's no problem with him answering that.

13         MS. BATALLER-SCHNEIDER:  I would have to look at the

14   12.2(b) statute to know exactly whether that's just for the

15   person offering the evidence.  But I would imagine it would be

16   the same for both parties.

17        (Bench conference ends at 11:00 a.m.)

18         THE COURT:  Can we have the jury -- I'm going to have

19   y'all step out for a few minutes, let me talk to the lawyers

20   alone.  Remember your instructions.  You'll leave your notebooks

21   here.  We'll see you all back here in a few minutes.  Thank you.

22         Let's rise for the jury, please.

23        (Jury out at 11:00 a.m.)

24         THE COURT:  Y'all go ahead and go back.

25         MS. BATALLER-SCHNEIDER:  Okay, thank you.

1          THE COURT:  We'll discuss it.

2          MS. BATALLER-SCHNEIDER:  Okay.  Thank you so much.

3          THE COURT:  Let's be seated, please.  And you can sit

4    down in the gallery if you'd like, Dr. Schutte, for a few

5    minutes.  Take a break.

6          All right.  So, Ms. Bataller, tell me where your -- you

7    gave notice on what document?  What's the document number?  Let

8    me pull it up.

9          MS. BATALLER-SCHNEIDER:  I'm looking right now at

10   Document 136.

11         THE COURT:  136.

12         MS. BATALLER-SCHNEIDER:  I don't believe this is the

13   first time that we brought this up.

14         THE COURT:  No, I think it was mentioned briefly in our

15   final pretrial conference.

16         MS. BATALLER-SCHNEIDER:  Yes.  But it does mention that

17   for 12.2(b), if I understand, you can get to the final issue.

18   And I'm just trying to find where that is, Your Honor.  I know

19   that it is in one of our motions.  And I apologize for not having

20   this.  It might be in our original motion, or jury instructions.

21         So this Document 136 just talks about how it is

22   relevant evidence to negate mens rea.  But it's -- the notice is

23   77.  And then we're, I believe in our original jury instructions,

24   and I'm not sure if it's clear in any of those, Your Honor, that

25   we can't -- that we can get to the final issue.

Schutte - Direct/Bataller-Schneider                104

1          But I believe if we look at 12.2(b), the statute

2   itself, it's very clear from there that we can ask the final --

3   as him to opine as to the final issue, that 704(b) does not come

4   into play.  So I believe we'd have to look to the statute for

5   that, Your Honor.

6          And we also mention it in Document 113 in our requested

7   instructions, 12.2(b) mental health evidence.  We mention it as

8   explaining Thomas' behaviors, but we also mention it as something

9   separate from the insanity defense where we could bring in the

10  psychological information.

11     (Pause)

12          THE COURT:  Mr. Greenbaum, your response?

13          MR. GREENBAUM:  Yes, Your Honor.  I'm looking at

14  12.2(b).

15          I don't see anything where it allows you to give the

16  ultimate issue in regards to sanity, Your Honor.  I still believe

17  that 704(b) completely applies in this case, Your Honor, which

18  prohibits an expert from testifying about whether the defendant

19  did or did not have a mental state or condition that constitutes

20  an element of a crime or of a defense.

21          Those matters are for the trier of fact alone, Your

22  Honor, and I believe that's what applies in this case, Judge.

23          THE COURT:  Ms. Bataller, looking at your footnote on

24  Document 112, Footnote 1 on Page 2, so the very last sentence, if

25  you're there.

Schutte - Direct/Bataller-Schneider                    105

1          MS. BATALLER-SCHNEIDER:  Your Honor, I am so sorry.

2   I'm trying --

3          THE COURT:  That's all right.

4          MS. BATALLER-SCHNEIDER:  -- to find --

5          THE COURT:  That's okay.  It's Document --

6          MS. BATALLER-SCHNEIDER:  It's 112 or 113?

7          THE COURT:  112.  The notice of expert evidence.

8          MS. BATALLER-SCHNEIDER:  Oh, the notice.  Okay.  Found

9   it.  Thank you for your patience.

10          THE COURT:  Okay.  So read that to yourself, and I'm

11   going to ask you a question.

12          MS. BATALLER-SCHNEIDER:  Yes, Your Honor.  I apologize.

13   I think I misunderstood that 12.2(b).  There was something in the

14   commentary that would allow us to ask the ultimate question.

15          THE COURT:  Right.  So while it goes to negate, it can

16   go to negate Andrea --

17          MS. BATALLER-SCHNEIDER:  Yes.

18          THE COURT:  I still don't think you can invade the

19   providence of the jury the ultimate issue that they're going to

20   decide.  Obviously a rephrasing of some kind, possible.  But I

21   just want to make sure we're -- I mean, I'm not trying to keep

22   you from asking what you ought to ask.  But I think I should

23   bring the jury back in, have them disregard the --

24          MS. BATALLER-SCHNEIDER:  The question?

25          THE COURT:  -- the question, and you keep going with

1    whatever you'd like and we'll see if we go --

2              MS. BATALLER-SCHNEIDER:  Okay.  I think that's my last

3    question.  I think that would be my last question.  So I can just

4    say nothing further.

5              THE COURT:  Do you agree -- I mean, do you agree with

6    the Court?

7              MS. BATALLER-SCHNEIDER:  The more I see in that

8    footnote, yes.

9              THE COURT:  Okay.

10             MS. BATALLER-SCHNEIDER:  I did have a --

11             THE COURT:  That's the footnote you provided to me.

12             MS. BATALLER-SCHNEIDER:  Yes, absolutely.  Absolutely.

13             THE COURT:  I knew I had seen that.

14             MS. BATALLER-SCHNEIDER:  There has been a lot of --

15             THE COURT:  I knew I had seen somewhere --

16             MS. BATALLER-SCHNEIDER:  Right.

17             THE COURT:  I knew it -- Ms. Salas actually found it

18   because she had seen it as well.

19             MS. BATALLER-SCHNEIDER:  Oh, okay.  I knew that there

20   was some idea that it didn't apply to that, but I don't have it

21   right in front of me, Your Honor.

22             THE COURT:  Okay.

23             MS. BATALLER-SCHNEIDER:  But --

24             THE COURT:  Thank you.

25             MS. BATALLER-SCHNEIDER:  -- I will refrain from asking

Schutte - Cross/Greenbaum                    107

1    that question.

2              THE COURT:  Let's rise for the jury, please.

3              And, Dr. Schutte?

4              THE WITNESS:  Sorry.

5              THE COURT:  I was trying to give you a mental break by

6    letting you step down.

7              And, Mr. Greenbaum, you're going to cross?

8              MR. GREENBAUM:  Yes, Your Honor.

9         (Jury in at 11:08 a.m.)

10             THE COURT:  All right.  Let's be seated, please.  Thank

11   you.  All right.  So this is the objection is sustained.  The

12   witness is instructed not to answer.  And the question -- the

13   jury is instructed to disregard the question.

14             Your next question.

15             MS. BATALLER-SCHNEIDER:  We have no further questions

16   at this point.  Thank you.

17             THE COURT:  Thank you.  Mr. Greenbaum, your witness,

18   sir.

19             MR. GREENBAUM:  Thank you, Your Honor.

20                       CROSS-EXAMINATION

21   BY MR. GREENBAUM:

22   Q    Dr. Schutte, good morning, sir.

23   A    Good morning.

24   Q    You and I have talked once before, correct?

25   A    Yes.

Schutte - Cross/Greenbaum                        108

1    Q     Okay.  Let's first talk about this evaluation, or this when

2    you met with Thomas.  When did this meeting occur that you're now

3    testifying to?

4    A     September 4th, 2021.

5    Q     So approximately a year ago, correct?

6    A     Coming up on a year.

7    Q     Yes, sir.  And since then, have you met with him at any time

8    whatsoever?

9    A     No, I have not.

10   Q     Okay.  And how long was this discussion or meeting that you

11   had with Thomas that time back on September 4th of 2021, about

12   almost a year ago?

13   A     About two and a half hours.

14   Q     Sir.  So from that two and a half hour discussion, you came

15   up with the conclusion that he suffers from autism.  Is that

16   correct?

17   A     Autism Spectrum Disorder.

18   Q     Yes, sir.

19   A     Amongst other conditions, yes, sir.

20   Q     And then Schizoaffective Disorder.  Is that correct?

21   A     That's correct.

22   Q     Okay.  And so just so the record's clear, who is paying for

23   your testimony today, sir?

24   A     The Federal Public Defender.

25   Q     Okay.  So the Defense team is paying for your testimony,

1  correct?

2  A    The Federal Public Defender is paying for it.

3  Q    Yes, sir.  And how much are you getting paid to come here to

4  testify today?

5  A    $300 per hour.

6  Q    Okay.  And is that from, because you're out of El Paso,

7  correct?

8  A    Correct.

9  Q    So from the time you're leaving your office in El Paso,

10 you're getting $300 from the time you're testifying, $300 an

11 hour.  Is that correct?

12 A    That's correct, for time spent on this case.

13 Q    Yes, sir.  And the two and a half hours that you spent

14 talking to Thomas, you also -- did you also get $300 there as

15 well, or was it a different fee?

16 A    It was a different fee.

17 Q    Okay.  And how much was that fee, sir?

18 A    I believe that was $1,200 which included the evaluation and

19 also the travel time.

20 Q    So, so far in this case you've made $1,200 and depending on

21 I guess how long this lasts, $300 per hour, correct?

22 A    Correct, for my time spent on the case.

23 Q    Yes, sir.  Now you're aware that Mr. Thomas Scott Perkins,

24 he graduated from high school, correct?  Right?

25 A    Yes, he did.

Schutte - Cross/Greenbaum                           110

1   Q    And isn't it true during high school he actually made As to

2   Cs, correct?  He passed?

3   A    Yes.  He earned passing grades and was in special education

4   at times.

5   Q    Yes.  But my question is that he actually made As in classes

6   that he took in high school?

7   A    In some classes, that's correct.

8   Q    Okay.  And as a matter of fact, is it true that Thomas

9   completed three years of college?

10  A    Yes.

11  Q    And as part of this, did you review his college transcripts

12  or anything like that?

13  A    I did not.  But I did see that he completed several years of

14  college but with no college degree.

15  Q    And what are some of the classes he took in college?

16  A    I didn't ask him which classes he took.

17  Q    Wouldn't it be important to know if you're evaluating

18  somebody to see if they're low-functioning, they have autism, if

19  they're on schizophrenia and spectrum, if they had -- how they

20  got through three years of college?

21  A    Well, looking at his history of IQ scores, what he reported

22  about his educational history was consistent with that.

23  Q    Okay.  So you never looked at one college class that he may

24  have taken?

25  A    I did not, because it was not relevant to determining --

Schutte - Cross/Greenbaum                    111

1  Q     I --

2  A     -- which --

3         MR. GREENBAUM:  Judge --

4         THE WITNESS:  -- diagnoses he had.

5         MR. GREENBAUM:  -- non-responsive, Your Honor.  My

6  objection is non-responsive.

7         THE COURT:  Sustained.  If you'll just respond to the

8  question that's asked, sir.

9         THE WITNESS:  Certainly.

10         THE COURT:  You can ask your next question.

11         MR. GREENBAUM:  Yes, Your Honor.

12  BY MR. GREENBAUM:

13  Q     And the problem -- so you're relying on what Mr. Thomas

14  Perkins told you, correct?

15  A     In addition to the testing and the review of records.

16  Q     Right --

17         THE COURT:  So the answer, sir, would be yes.

18         THE WITNESS:  Yes, Judge.

19         THE COURT:  Okay.  Thank you.  You can go on to the

20  next.

21  BY MR. GREENBAUM:

22  Q     And depending on what somebody tells you, if they're telling

23  you the truth, that might be good.  But if they're not telling

24  the truth, if you're relying solely on the word, that might

25  affect your findings, correct?

Schutte - Cross/Greenbaum                    112

1    A    Correct, if you're relying solely on their word as you put

2    it.

3    Q    Okay.  And here really what other records did you -- let me

4    ask it this way.  Did you look at the case report in this case,

5    like the offense reports, before you talked to Mr. Perkins?

6    A    No, I did not.

7    Q    Okay.  Don't you think that would be important to find out

8    what exactly happened in this case?

9    A    I was interested in finding out his story of it and what

10   conditions if any he might have had.

11   Q    Okay.  And I think Defense Counsel asked you in regards to

12   did you look at one interview with special Agent Ferg.  Is that

13   correct?

14   A    Yes, that was one of the interviews I reviewed.

15   Q    Okay.  And you reviewed that interview, correct?

16   A    That's correct.

17   Q    Okay.  And you reviewed that at $300 an hour.  Is that

18   right?

19   A    That is the fee I charge for work on this case.

20   Q    Yes.  Okay.

21              THE COURT:  So yes.  So the answer is yes.

22              THE WITNESS:  Yes, Judge.

23              THE COURT:  Let's just be more direct.  Go ahead.

24              MR. GREENBAUM:  Thank you, Your Honor.

25   BY MR. GREENBAUM:

Schutte - Cross/Greenbaum                        113

1    Q    And at any time did you review the second interview?  That

2    was Michelle Wilson from DPS.

3    A    I believe that was the polygraph evaluation.

4    Q    Again, did you review the second interview with Michelle

5    Wilson?  Yes or no.

6    A    Yes.

7    Q    Okay.  And when somebody says they use VPNs for risky

8    downloads, wouldn't that go potentially to knowing their -- state

9    of mind of knowing right from wrong, state of mind if they're

10   using VPNs for risky downloads?

11   A    That has a potential --

12   Q    Sir.

13   A    -- contributing factor --

14   Q    And if they --

15   A    -- that's correct.

16   Q    I'm sorry?

17   A    I'm sorry.  That's a potential contributing factor.  That's

18   correct.

19   Q    Yes, sir.  Thank you for that.  And what if they're using

20   multiple VPNs?  Would that show some level of sophistication?

21   A    That is something to be considered as well.  Yes, sir.

22   Q    And you had said that some people with autism, they collect

23   certain things like car toys, et cetera.  Is that correct?

24   A    That's correct.

25   Q    Maybe baseball cards.  Is that right?

1   A    Yes.

2   Q    But you're not saying that all people with autism collect

3   child pornography, correct?

4   A    That's not something that I've said.

5   Q    So is that -- so my answer is not all people with autism

6   collect child pornography.  Yes or no, sir.

7   A    That's correct.

8   Q    Okay.  And not all people with autism search terms such as

9   PTHC, Lolita, preteen hardcore, preteen softcore.  Is that

10  correct?

11  A    That's correct.

12  Q    And not all people tell law enforcement that their favorite

13  groups of child porn to look up is going to be eight, nine, ten

14  years old.  Is that correct?

15  A    That's correct.

16  Q    And not all people with autism say they use multiple VPNs to

17  make sure there wasn't any leaks.  Is that correct?

18  A    That's correct.

19  Q    And, sir, are you familiar with BitTorrent software?

20  A    Very superficial.

21  Q    Okay.  Is that something that someone like you would use,

22  BitTorrent?

23          MS. BATALLER-SCHNEIDER:  Your Honor, I'm going to

24  object to the relevance of this line of questioning.

25          THE COURT:  Overruled.  You can answer the question if

1   you use it or not.

2            THE WITNESS:  No.

3   BY MR. GREENBAUM:

4   Q    Okay.  Is that something somebody with some sort of computer

5   sophistication that would know what BitTorrent or would be able

6   to use BitTorrent.  Would you agree with me on that?

7            MS. BATALLER-SCHNEIDER:  Your Honor, I'm going to

8   object again.  There's no foundation that he would have that

9   information.

10           MR. GREENBAUM:  If he knows, Judge.

11           THE COURT:  I'll overrule the objection.  You may

12  answer that if you know.

13           THE WITNESS:  I can't speak to the level of

14  sophistication you would need to use that program.

15  BY MR. GREENBAUM:

16  Q    And wouldn't that be important in your evaluation if

17  somebody's using sophisticated computer software to know how --

18  if they know how to operate that in regards to, you know, what

19  level they are on the autism spectrum.  So if you're using

20  sophisticated computer software, wouldn't that be important to

21  know when you're doing your report?

22  A    No.

23  Q    And, sir, did you state that you interviewed this person in

24  regard to Mr. Thomas Scott Perkins, and had the issue of

25  malingering?  I'm sorry if I'm misstating things.  I had four

Schutte - Cross/Greenbaum                                116

1    hours of sleep last night.  Malingering, did you review that with

2    him, or did you evaluate him if he was malingering at all?

3    A    Yes.

4    Q    Okay.  And did you find that he was malingering?

5    A    No, he was not malingering.

6    Q    Okay.  And this issue of malingering has come up in your

7    testimony before, correct?

8    A    Correct.

9    Q    And as a matter of fact, I think on a case in Odessa with

10   Fabian Pavlan (phonetic), this issue of malingering came up.  Is

11   that right?

12   A    Polvon.

13   Q    Polvon, yes.  And you testified as an expert in that case,

14   right?

15   A    That's correct.

16   Q    And can you tell the jury what your expert testimony in a

17   nutshell was in Fabian Polvon?

18           MS. BATALLER-SCHNEIDER:  Your Honor, I'd object to the

19   relevance of this question.

20           THE COURT:  Overruled.

21   BY MR. GREENBAUM:

22   Q    Go ahead, you can answer, sir.

23   A    That was a capital murder case.  I rendered the opinion that

24   due to severe major depressive disorder that he was insane at the

25   time of the offenses.

1   Q    And the jury disagreed with you, correct?

2   A    Correct.

3   Q    And they sentenced him to life without parole back in 2019.

4   Is that right?

5   A    Incorrect.

6   Q    What did they sentence him to?

7   A    They didn't sentence him in 2019.

8   Q    Okay.  I'm sorry, back in 2021.  But the offense occurred in

9   2019.  But in 2021, the jury disagreed and sentenced him to life

10  without parole, correct?

11  A    That's correct.

12  Q    Thank you for that correction.  As a matter of fact, you've

13  testified in other cases, correct, other big cases such as

14  Stephanie Fernandez.  Is that right?

15  A    I don't know how I would categorize that as being big or

16  small, but --

17  Q    Okay.  Well --

18  A    -- I did --

19  Q    -- did you testify --

20  A    -- testify in that case.

21  Q    -- in that case with Stephanie Fernandez, a capital murder

22  case?

23  A    I did.

24  Q    Okay.  And that was an El Paso, Texas.  Is that right?

25  A    That's correct.

1   Q    And what were you going to testify to in that case?

2   A    That she had Post Traumatic Stress Disorder or PTSD which

3   influenced her behavior in that case.

4   Q    And did the judge in that case rule that you couldn't

5   testify in that capital murder case?

6   A    In the case in chief, correct.

7   Q    And why was that?

8   A    He felt that the testimony I think was more relevant to the

9   punishment phase rather than determining guilt or innocence.

10  Q    And furthermore, let me talk about another case that you

11  had.  You also testified in regards to a case with a person by

12  the name of Alberto Mendiola.  Is that correct?

13  A    That's correct.

14  Q    And what did you testify to in there?

15  A    That was that the defendant had Post Traumatic Stress

16  Disorder, and as a result was insane at the time of the alleged

17  offense.

18  Q    Okay.  So in saying so, in other words he couldn't have

19  known what he was doing, so that would basically let him go out

20  the door, not guilty by reason of insanity, correct, if they were

21  to believe you?

22        MS. BATALLER-SCHNEIDER:  Your Honor, I'm going to

23  object to the way he's characterizing the insanity defense.

24        THE COURT:  And I'll sustain.

25  BY MR. GREENBAUM:

Schutte - Redirect/Bataller-Schneider                  119

1    Q    So in regards to your sanity defense, did the jury agree
2    with it?
3    A    They found him guilty of manslaughter rather than murder.
4    Q    Okay.  So they didn't find him insane, correct?
5    A    Correct.
6    Q    And as a matter of fact, he got 20 years in prison for that,
7    correct?
8    A    I believe so, yes.
9    Q    And certainly you're not telling this jury that this -- you
10   testified that the defendant told you he had a sex demon.  Is
11   that right?
12   A    Correct.
13   Q    And, sir, you're not telling this jury that this sex demon
14   caused him to download over 100,000 images of child porn or a
15   combination of videos, correct?
16   A    Correct.  That was not my testimony.
17              MR. GREENBAUM:  I pass the witness, Your Honor.
18              THE COURT:  Redirect?
19              MS. BATALLER-SCHNEIDER:  Just briefly, Your Honor.
20                         REDIRECT EXAMINATION
21   BY MS. BATALLER-SCHNEIDER:
22   Q    Are people with ASD intelligent in some aspects, or can they
23   be?
24   A    Certainly.
25   Q    Does that mean that they're intelligent in all aspects of

120

1    their lives?

2    A    Absolutely not.

3    Q    Does their intelligence in some areas have anything to do

4    with their understanding of reality or their perspective which is

5    based on ASD?

6    A    Not necessarily.  A person can have an average IQ, and yet

7    still have Autism Spectrum Disorder and still have social

8    limitations.  A person can have an average IQ or an average

9    intelligence and still suffer from a Schizophrenic Disorder.

10   Those two aren't mutually exclusive.

11            MS. BATALLER-SCHNEIDER:  One moment, please.  Nothing

12   further.  Thank you.

13            THE COURT:  Anything further, Mr. Greenbaum?

14            MR. GREENBAUM:  Nothing further, Your Honor.

15            THE COURT:  You may step down, sir.  Thank you very

16   much for being with us.  Safe travels.

17            THE WITNESS:  Thank you, Judge.

18       (Witness excused)

19            THE COURT:  Next witness for the Defense?

20            MS. BATALLER-SCHNEIDER:  Your Honor, at this time the

21   Defense would rest.

22            THE COURT:  All right.  Very well.  May I have the

23   attorneys approach, please?

24       (Bench conference at 11:24 a.m.)

25            THE COURT:  All right.  Outside the presence of the

1   jury.  Defense has rested.  Does the Government plan to put on a

2   rebuttal witness or --

3           MR. GREENBAUM:  We may, Your Honor.  We just need to

4   briefly discuss.

5           THE COURT:  You still need to talk?

6           MR. GREENBAUM:  Yes, sir.

7           THE COURT:  So my question would be -- well, why don't

8   I send them out here for five minutes and y'all discuss it.  If

9   you have other witnesses besides this expert Browning, I'll let

10  those on today.

11          MR. GREENBAUM:  Yes, sir.

12          THE COURT:  And he really can't be here?  I mean, he's

13  really not going to be here 'til tomorrow?

14          MR. CAYTON:  He currently is in Oklahoma.

15          MR. GREENBAUM:  Testifying, Your Honor, is my

16  understanding.

17          THE COURT:  And the Defense objected to the testimony

18  by Zoom on Friday when I saw it.  Does the Defense continue to

19  oppose that?  Y'all talk about that.

20          MS. BATALLER-SCHNEIDER:  Okay.

21          THE COURT:  Okay?

22          MS. BATALLER-SCHNEIDER:  We'll talk about that.

23          THE COURT:  Because we can maybe stop him in Altus,

24  Oklahoma or whatever and --

25          MR. CAYTON:  Altus Air Force Base, yeah.

122

1          THE COURT:  If you think you need to.  If you think you

2     need or want to.  I'm going to give y'all five minutes.  We can

3     cool our heels, and then y'all let me know before I bring them

4     back in.

5          MR. GREENBAUM:  Okay.

6          MS. BATALLER-SCHNEIDER:  We will.

7          THE COURT:  Okay.  Thank you, all.

8     (Bench conference ends at 11:25 a.m.)

9          THE COURT:  All right.  Ladies and gentlemen of the

10    jury, I'm going to have you step out for about five minutes.

11    This is how every case goes toward the end.  It's more

12    dysfunctional, stopping and starting and whatnot.  What I'm

13    trying to do is be as efficient with your time as I possibly can.

14    It's fine your frustration with that.  I know it's frustrating.

15         And so you're going to leave your notebooks here.

16    You'll remember your instructions.  This is likely going to be

17    five to seven minutes of a break, and then we'll come right back

18    in and go forward with the rest of the trial.  Remember your

19    instructions.  Let's rise for the jury, please.  I'll see y'all

20    in just a few minutes.

21         (Jury out at 11:26 a.m.)

22         THE COURT:  All right.  Outside the presence of the

23    jury.

24         Just so we're clear, you all need to discuss with each

25    other and together kind of.  And then I'm going to come back in

123

1  five minutes and y'all -- and Government needs to give me a plan.

2  Okay?

3            MR. GREENBAUM:  Yes, Your Honor.

4            THE COURT:  Going forward.

5            MR. GREENBAUM:  Yes, Your Honor.  Thank you.

6            THE COURT:  Perfect.  Thank y'all.

7       (Recess at 11:26 a.m./Reconvened at 11:33 a.m.)

8       (Outside the presence of the jury; defendant present)

9            THE CLERK:  All rise.

10           THE COURT:  All right.  Let's be seated, please.

11  Outside the presence of the jury.

12           Mr. Greenbaum, Mr. Cayton, what's the Government's plan

13  going forward, having spoken I assume with yourselves and among

14  yourselves with the attorneys for the Defense.

15           MR. CAYTON:  Your Honor, we've discussed with the

16  Defense.  They are allowing our expert to testify via Zoom.

17  However, we do not intend on calling the expert at this point.

18  We would, however, call two rebuttal witnesses.  The first one is

19  Coleman Boring, the HSI trainee.  We do believe, based upon the

20  testimony that was just presented, Defense --

21           THE COURT:  And who's your second?

22           MR. CAYTON:  It would be Special Agent Craig Butler

23  from the Department of Agriculture.

24           THE COURT:  Okay.  And so you're not going to -- your

25  plan right now is not to call your expert?

124

1          MR. CAYTON:  That's correct, Your Honor.

2          THE COURT:  Okay.  All right.

3          MS. BATALLER-SCHNEIDER:  Your Honor, I would just ask

4   what Agent Boring is going to testify to.  If he's going to

5   testify to that VPN statement, I don't know how that's -- any

6   door was open to that.

7          MR. CAYTON:  So, Your Honor, the Defense witness just

8   testified, and the Defense Attorney I felt did a very good job

9   about talking about suggestibility and parroting and

10  agreeability, things like that.

11         The spontaneous statement that Agent Boring will bring

12  up and talk about is as soon as the defendant was pulled out of

13  the house, before any statements were ever made to him, before he

14  was told what was going on, he made a statement regarding there's

15  no way you guys -- I'll have to find the exact statement.

16         THE COURT:  Well we won't hold you to the --

17         MR. CAYTON:  But essentially there's no way you guys

18  could have found what you found legally, I was using two

19  different VPNs.  I believe based upon the Defense testimony, the

20  Defense expert testimony, that that is now relevant for the trier

21  of fact to hear that he knew what he was doing was wrong.

22         And the fact that agents came into his house, he

23  already had an idea of what they were looking for, something that

24  was illegal that he possessed.  And he was using multiple methods

25  to try to get around it.  And I think that that definitely cuts

125

1    against the Defense expert testimony that, you know, this

2    interview wasn't really saying what it was saying.

3            THE COURT:  Ms. Bataller, what would your response to

4    that --

5            MS. BATALLER-SCHNEIDER:  Yes.

6            THE COURT:  There was direct -- I mean, Dr. Schutte is

7    a good witness, he's an expert.  And he did give testimony as to

8    mens rea, the defendant's mens rea.  I mean, that is the purpose,

9    right?

10           MS. BATALLER-SCHNEIDER:  I understand that, Your Honor.

11   Yes, it's the purposes under 12.2(b) and for the insanity

12   defense.  What I would say is that we didn't specifically mention

13   anything to do with VPN and explaining away why he would have

14   mentioned the VPN.

15           I would also say that it's extremely cumulative at this

16   point.  I believe they've had more than one witness.  They had

17   Agent Ferg and another witness.  And I believe it was two, it may

18   have been more, testify about the VPN issue.  It's just

19   cumulative at this point.  They can still argue that in their

20   closing argument.  They have multiple witnesses they can point

21   to.

22           THE COURT:  I don't find it to be insufficiently or

23   over cumulative from what I've heard.  There's been some VPN

24   testimony, don't get me wrong, mostly just asking witnesses what

25   does that stand for and what does that mean and what does that

126

1  do.

2      I think what Agent Boring -- I think Boring's the one

3  you all have called, and I wouldn't allow certain testimony at

4  the time.  I believe that door has been opened now.  I do believe

5  this will be new evidence.  This is something nobody else has

6  said or been able to testify to, I suspect.  And I don't know if

7  there's somebody else who heard it as well.  But it was a

8  statement by the defendant not in response to any question.

9      I do believe that while there likely is some

10  prejudicial effect to the defendant, I don't think it

11  substantially outweighs the probative value of this jury to hear

12  it under Rule 403.  So I'll allow that testimony.

13      MS. BATALLER-SCHNEIDER:  Could I just have some

14  clarification on that for the record, Your Honor?  You did

15  mention opening the doors, and just in general the mens rea

16  testimony opened the door.

17      THE COURT:  No.  Definitely the mens rea.  The overall

18  tenor of the Defense has been mens rea, has been --

19      MS. BATALLER-SCHNEIDER:  Correct.

20      THE COURT:  -- that issue.  And I think that

21  Dr. Schutte, in discussing that, was talking about well he's --

22  you know, this level of sophistication, the fact that he has

23  gone, you know, he's had actually some three years of college

24  that I guess Dr. Schutte knew about some of the college but not

25  all of it.  Talked about the social awkwardness and the

127

1    collection of things, and this does go, as Mr. Cayton said, I

2    think it goes to show that what, you know, the intent of

3    Mr. Perkins in doing this.

4         I mean, he -- sounds like to the Court that Mr. Perkins

5    did -- took several measures and steps to try to ensure -- first

6    of all, I mean, he had done some Supreme Court case law research,

7    you know, as to what was legal and what was not legal.  Or at

8    least he said he did.

9         MS. BATALLER-SCHNEIDER:  Seems maybe --

10        THE COURT:  He may not have done that.  It's a good --

11        MS. BATALLER-SCHNEIDER:  -- incorrect.  Maybe incorrect

12   research.

13        THE COURT:  No, I see it in your face.  You're right.

14   No, that's a good point.  That's the way my wife looks at me when

15   I'm making a point that there's a better point.  He may not have

16   done it -- you know, he kind of led with that, that he had done

17   it, that research.

18        I think it goes to show the different steps Mr. Perkins

19   went to, and the mere fact that he has a VPN, maybe that's sort

20   of neutral.  But the fact that he -- it occurs to him to mention

21   that, and I'm not trying to make the Government's argument for

22   you.

23        It's just to me it seems like the fact that he goes to

24   the lengths of mentioning even I don't see how you could have

25   gotten past, you know, my VPN, that says a level of

128

1  sophistication above what I have, above probably what Dr. Schutte

2  -- I think it's what Dr. Schutte was trying to say was, you know,

3  that's above my level of expertise in that.

4       And I think that would go to show the mens rea element.

5  And if you're stating the mens rea element, if the Defense says

6  the mens rea element can't be met, I thin the Government's

7  allowed to put on evidence that sure enough it is being met here.

8       MS. BATALLER-SCHNEIDER:  Thank you for the

9  clarification.

10      THE COURT:  That would be my -- I mean, I know that's

11  kind of all over the place.  But just a general tenor of the

12  Defense, not necessarily just the mens rea.  I mean, it's

13  everything that the Defense has done since we started the trial

14  which I think is an effective defense, frankly.

15      MR. CAYTON:  And, Your Honor, I'm happy to point to a

16  specific part in the testimony that I felt we got to.  It was

17  when the Defense attorney was asking the witness regarding the

18  interview and repeating things that they had a hard time

19  understanding the meaning, suggestible or influenced by those

20  around him, that type of testimony.

21      THE COURT:  Could you just speak up a little?

22      MR. CAYTON:  I'm sorry, Your Honor.  Repeating things

23  that they had heard without understanding the meaning, and being

24  suggestible or influenced by those around him.  And I think that

25  that testimony particularly was going towards the defendant not

129

1    understanding and just trying to kind of go along with what the

2    investigators were saying, and the fact that he is making the

3    statement prior to ever being talked to by investigators --

4            THE COURT:  Well, they --

5            MR. CAYTON:  -- specifically is where I feel like --

6            THE COURT:  And I think also -- I agree with that.  It

7    also tends to make you wonder, I sit here and wonder as not a

8    judge of the facts in this case, as someone who's not a judge of

9    the facts, I'm sitting here thinking through this thing okay, he

10   collects things, those things repeatedly.  There's a comfort

11   level with even clapping hands.  I mean, I get all that.

12           But there would tend to be a difference in someone

13   collecting bottle caps, as I show you my bottle cap, versus

14   something most of us know to be wrong.  And that's what the

15   jury's trying to decide.  There's little -- excuse me.  There's

16   little dispute I think that it was collected.

17           The dispute would be, and the defense seems to be did

18   he even really know that was wrong.  Did he know it was wrong

19   that he did it.  I think that goes to the very heart.  I think

20   I'm going to allow the rebuttal testimony.  I don't think it is

21   -- I do think, I frankly do think it is adequately new.  And even

22   though the term VPN has been discussed during the trial, that

23   doesn't mean it's just repetitive and would be prejudicial for

24   that effect.  It's prejudicial because of what it likely will say

25   to the jury about his understanding of it, the defendant's

130

1    understanding of it.

2              Mr. Cayton, you have somebody that's Butler?

3              MR. CAYTON:  Yes, Your Honor.  Special Agent Craig

4    Butler.

5              He was also present during the interview of the

6    defendant with Special Agent Ferg.  Specifically, I intend to ask

7    him a few questions about in rebuttal to the expert's testimony

8    regarding the defendant's mannerisms at the time, the defendant's

9    understanding of what was going on, whether or not the defendant

10   was -- seemed to be led, whether or not he was demonstrating that

11   he understood that it was wrong to have child pornography, things

12   to that respect.

13             THE COURT:  Like what?  I mean, I'm a little --

14             MR. CAYTON:  Specifically, did he mention whether or

15   not he knew what he was doing was wrong.

16             THE COURT:  Did he make a statement like that?

17             MR. CAYTON:  That's what Andrew Butler has told me,

18   yes.

19             THE COURT:  It's on the recording?

20             MR. CAYTON:  I believe so, Your Honor.  I mean, I know

21   it was back and forth a lot.  But they had acknowledgments from

22   him regarding collecting underage children videos, things like

23   that.

24             MS. BATALLER-SCHNEIDER:  Your Honor, if I could?

25             THE COURT:  Sure.

1          MS. BATALLER-SCHNEIDER:  I think the best evidence here

2     is the recording.  The Government can certainly point to that.

3     We don't need to hear Agent Butler, and I don't think it's

4     admissible, his interpretation of what was happening during that

5     interview when the jury can just listen to the recording.

6          THE COURT:  I agree with that.  I don't think he should

7     testify, I don't think I should allow him to testify that he

8     thought, that the agent thought that the defendant knew, you

9     know, it was wrong.  Can you queue that up for me on the audio?

10         MR. GREENBAUM:  I would not be able to off the top of

11    my head, Your Honor.

12         THE COURT:  Well, I think the question that could be

13    asked would be did he state that he knew it was wrong or whatever

14    it may be.  Whatever the question is, it goes directly to what

15    you're trying to get him to say.  But his impression of what the

16    defendant was thinking is certainly speculative and would be

17    inadmissible anyway on a case in chief or rebuttal.

18         MR. CAYTON:  I understand that point, Your Honor.

19         I guess what I'm interested in eliciting from Agent

20    Butler is that, you know, we're only listening to an audio

21    recording.  And we have an expert who just testified about the

22    mannerisms, about the understanding, the uncomfortableness, a lot

23    of things that are not visible on an audio recording only.  And

24    that's what I would like to use Agent Butler to rebut.

25         THE COURT:  Okay.  Tell you what let's do.  Have Agent

Butler - Direct/Cayton                    132

1    Butler come in and put him on the stand outside the presence, and

2    ask him your questions.  Let's do that.  Let's just, let's be

3    better safe than sorry.

4        (Pause)

5        THE COURT:  Agent Butler, if you'd come on up.  I'm

6    going to have you take the stand over here.

7        MR. BUTLER:  Yes, sir.

8        THE COURT:  We'll -- before you have a seat, let me --

9    if you'll raise your right hand.

10        CRAIG BUTLER, GOVERNMENT'S WITNESS, SWORN

11        THE COURT:  Thank you very much.  You may have a seat.

12        And, Mr. Cayton, you may proceed whenever you're ready.

13    This is, just for the record, outside the presence of the jury as

14    a preview of the rebuttal, of the very brief rebuttal testimony

15    that the Government wishes to elicit from Special Agent Butler.

16        MR. CAYTON:  I don't know if I promised it was very

17    brief, Your Honor, but I'll try.  And would the Court like me to

18    go through all my regular opening questions, or just kind of cut

19    to the chase?

20        THE COURT:  No, no.  Just ask him his name and let's --

21    you're OIG Special Agent, right, for Department of Agriculture?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Okay.  And it's Craig Butler, B-U-T-L-E-R?

24        THE WITNESS:  That's correct.

25        THE COURT:  Go right ahead.

1          MR. CAYTON:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3     BY MR. CAYTON:

4     Q    Agent Butler, you were present during the interview with

5     Thomas Perkins?

6     A    Yes.

7     Q    and that was also with Special Agent Ferg?

8     A    Yes.

9     Q    And without getting into the substance of the conversation

10    you had with the defendant, were you able to observe his

11    mannerisms during that conversation?

12    A    Yes.

13    Q    Did he appear to you to be uncomfortable?

14    A    Uncomfortable?

15    Q    Yes.

16    A    Yes.

17    Q    Did he appear to you to --

18          THE COURT:  Now don't lead him.

19          MR. CAYTON:  Thank you, Your Honor.

20          THE COURT:  It would be how did he appear to you,

21    comfortable or uncomfortable.

22          MR. CAYTON:  Yes, sir.

23          THE COURT:  It's all right.

24    BY MR. CAYTON:

25    Q    Did he ever give the indication to you he did not know what

Butler - Cross/Bataller-Schneider                134

1    was going on?

2    A    No.

3    Q    Was he willing to talk to you?

4    A    Yes.

5    Q    Was he, as has been previously described, brutally honest

6    with you?

7    A    Brutally honest, no.

8              MS. BATALLER-SCHNEIDER:  Your Honor, I'm going to

9    object to that.  I don't know how he would know whether or not --

10             THE COURT:  Yeah, I'm not --

11             MS. BATALLER-SCHNEIDER:  -- Thomas was --

12             THE COURT:  Well, and see --

13             MS. BATALLER-SCHNEIDER:  -- honest or not.

14             THE COURT:  -- what Mr. Cayton's doing is he's taking

15   your phrase because you asked the word was he brutally honest.  I

16   can't remember who --

17             MS. BATALLER-SCHNEIDER:  Right.

18             THE COURT:  Okay.

19             MS. BATALLER-SCHNEIDER:  And that's an okay --

20             THE COURT:  At the time I'm thinking --

21             MS. BATALLER-SCHNEIDER:  -- phrase to use.

22             THE COURT:  -- whether it's kind of brutal or not.

23             MS. BATALLER-SCHNEIDER:  Right.  Well sometimes it's

24   kind of mean is what I meant.  You know?

25             THE COURT:  I know.  I know.  And bottom line,

Butler - Cross/Bataller-Schneider                    135

1   regardless of your feelings, I'll go ahead and tell you.  So

2   let's rephrase that question.  I don't like that question either.

3   She and I don't like that question.

4           MR. CAYTON:  Two out of three, Your Honor.

5   BY MR. CAYTON:

6   Q    Did he appear evasive in answering your questions?

7   A    Yes.

8   Q    Did he acknowledge to you that he understood the questions

9   that were being asked?

10  A    Yes.

11          MR. CAYTON:  That's about all I would ask, Your Honor.

12          THE COURT:  All right.  Ms. Bataller?

13                   CROSS-EXAMINATION

14  BY MS. BATALLER-SCHNEIDER:

15  Q    Are you trained in dealing with people with Asperger's

16  Spectrum Disorder or Schizoaffective Disorder?

17  A    No, ma'am.

18  Q    And you are a -- you work for the USDA?

19  A    Correct.

20  Q    You don't typically do child pornography investigations I

21  would imagine?

22  A    I do not.

23  Q    And your interview with Thomas was recorded.  Is that right?

24  A    Yes.

25  Q    Did you listen to the recording?

136

1    A    I did.

2    Q    And is that a true and accurate representation of what

3    happened in that interview?

4    A    Yes.

5    Q    And that -- you and the other agent were the ones who

6    decided to record that, correct?

7    A    Yes.

8    Q    And you decided to do a voice recording, correct?

9    A    Yes.

10   Q    And not a video recording?

11   A    Correct.

12            MS. BATALLER-SCHNEIDER:  Nothing further.

13            THE COURT:  Mr. Cayton, any redirect?

14            MR. CAYTON:  No, Your Honor.

15            THE COURT:  All right.  You still want to offer him?

16            MR. CAYTON:  Yes, Your Honor.

17            THE COURT:  All right.  Go ahead and sit down.  If

18   you'll go on back outside.  We'll -- thanks.

19       (Witness excused)

20            THE COURT:  So we'll come back in.  I'm going to allow

21   you to call Agent Boring.  I'm not going to allow you to call

22   Agent Butler unless I hear something more --

23            MR. CAYTON:  Yes, Your Honor.

24            THE COURT:  -- on rebuttal.  I think that's repetitive.

25   I don't think it adds anything.  Frankly now I find the Defense,

1    I might want to call him myself.  She kind of makes more points

2    than you do I think on that.  But -- and you can still argue.

3    And, you know, I'd save that for argument.  That's just my

4    thought.

5              So you're going to have one witness, and that's Butler.

6              MR. CAYTON:  Boring, Your Honor.

7              THE COURT:  I'm sorry.  Boring.  Boring.

8              MR. CAYTON:  We can go back and forth, Your Honor.

9              MS. BATALLER-SCHNEIDER:  A lot of B last names in this

10   case.

11             THE COURT:  A lot of Bs.  Boring.  And then don't be

12   boring with him, though.  Be dynamic.

13             MR. CAYTON:  He's a very exciting person, Your Honor.

14             THE COURT:  So, very exciting.  So then you don't have

15   any other witnesses, right?

16             MR. CAYTON:  Correct, Your Honor.

17             THE COURT:  That will be it.  You'll rest and you'll

18   close then.  The Defense, will you have anything more or will you

19   close?

20             MS. BATALLER-SCHNEIDER:  We will close, Your Honor.

21             THE COURT:  Okay.  All right.  Let's bring the jury in.

22   Let's rise for the jury, please.

23        (Jury in at 11:52 a.m.)

24             THE COURT:  All right.  Let's be seated, please.  Thank

25   you.  Thanks for bearing with us.  The Defense having rested

1  their case, Mr. Cayton, does the Government have any rebuttal

2  witnesses?

3          MR. CAYTON:  Yes, Your Honor.  The Government would

4  call HSI Trainee Coleman Boring.

5          THE COURT:  Coleman Boring.  And somebody's on the way

6  to get them, right?

7          MR. CAYTON:  Yes, Your Honor.

8          THE COURT:  All right.  Thank you.

9          Sir, if you'd come on up.  You were up here yesterday I

10  think.  Maybe not.  Come on up.

11          THE CLERK:  Could you stop right there?

12           COLEMAN BORING, GOVERNMENT'S WITNESS, SWORN

13          THE COURT:  Go ahead and have a seat.  Adjust yourself

14  to that microphone.  Mr. Cayton, you may proceed whenever you and

15  Agent Boring are ready.

16          MR. CAYTON:  Thank you, Your Honor.

17                       DIRECT EXAMINATION

18  BY MR. CAYTON:

19  Q    Could you please introduce yourself to the Court?

20  A    My name is Coleman Boring.  Last name's spelled B-O-R-I-N-G.

21  Q    And where are you currently employed?

22  A    I'm currently employed as an HSI Special Agent.

23  Q    And have you had training yet?

24  A    No.  Currently pending going to training.

25  Q    And I want to direct your attention back to 2020 in January

1   of that year.  Where were you employed at that point?

2   A    At that time I was employed by a Border Patrol agent

3   assigned as a task force officer to Homeland Security

4   Investigations.

5   Q    Now on January 9th, 2020, did you have an opportunity to

6   assist with a search warrant?

7   A    Yes, sir.

8   Q    And where was that search warrant?

9   A    I don't recall the specific address, but it was in Fort

10  Stockton, Texas.

11  Q    And were you -- what was your participation in the search

12  warrant?

13  A    I was assigned to assist the case agent, David Ferg, on a

14  child pornography search warrant on the entry team to conduct the

15  search of the home.

16  Q    So when you're talking about a search warrant, what does an

17  entry team do?

18  A    The entry team on a search warrant is the law enforcement

19  personnel that will actually make contact with the home, make

20  entry into the home, and secure the residence or whatever

21  establishment the warrant is for so that the search teams can

22  properly search the place, the residence.

23  Q    And did you in fact go into the residence for the search

24  warrant?

25  A    Yes, sir, I did.

Boring - Direct/Cayton                    140

1   Q     And did you encounter anyone in the residence?

2   A     Yes, sir, I did.

3   Q     And is that person in court today?

4   A     Yes, sir, he is.

5   Q     Can you please identify him?

6   A     He's the gentleman sitting at the defense table with the

7   black suit, white shirt, wearing glasses.

8           MR. CAYTON:  May the record reflect an identification

9   of the defendant, Your Honor?

10          THE COURT:  The record shall so reflect.

11  BY MR. CAYTON:

12  Q     And when you're conducting a search warrant, do you allow

13  people inside the residence to stay in the residence, or do you

14  remove them?

15  A     We remove any persons that are found to be inside the

16  particular occupancy, the residence in this case.

17  Q     And did the defendant -- was the defendant removed from the

18  residence while the search warrant was being conducted?

19  A     Yes, sir, he was.

20  Q     And what was done with the defendant after he was removed

21  from the residence?

22  A     Initially after the subject was removed from the home, he

23  was sat down on a chair just outside the home so that we could

24  securely place him inside of a vehicle.

25  Q     While he's sitting in this chair, do you start interviewing

Boring - Cross/Bataller-Schneider                    141

1    him?

2    A    No, sir.

3    Q    While he is in the chair, did the defendant make any

4    statements related to the purpose of the search warrant?

5    A    Yes, sir, he did.

6    Q    And was he asked any questions prior to making this

7    statement?

8    A    No, sir.

9    Q    What if anything did the defendant say?

10   A    The defendant had first looked at me and asked why Border

11   Patrol was there because there were no illegals in the home.  And

12   then --

13   Q    Let me take a step back.  Was that his statement, there's no

14   illegals in the home?

15   A    Yes, sir.

16   Q    Did he make any other statements?

17   A    Yes, sir.  A few moments later he was inquiring as to what

18   was going on at the home.  And he stated what's going on.

19   Anything that you got, you had to have gotten illegally because

20   there's no way you got passed my VPNs.

21             MR. CAYTON:  Pass the witness, Your Honor.

22             THE COURT:  Thank you.  Ms. Bataller, your witness.

23             MS. BATALLER-SCHNEIDER:  Thank you.

24                       CROSS-EXAMINATION

25   BY MS. BATALLER-SCHNEIDER:

Boring - Cross/Bataller-Schneider                    142

1   Q    Morning.  It's still morning.  Now when Thomas was sitting

2   outside the home, was it just you outside with him?

3   A    No, ma'am.

4   Q    Who else was out there?

5   A    I don't recall who was there.  I was brand new to being a

6   task force officer and there were multiple agencies there.  So I

7   don't recall specifically who.

8   Q    Can you give us a ballpark number of how many people were

9   there with you?

10  A    Standing outside at that moment, maybe two other law

11  enforcement officers that were in the vicinity and maybe four

12  more out on the perimeter.  But I don't -- I can't tell you for

13  sure if any were standing right next to me.

14  Q    And as law enforcement officers, and Border Patrol as well,

15  you learn early on that it's important to write down records of

16  what you -- of important details in a case, correct?

17  A    Depending on the specific case, yes, ma'am.

18  Q    And you write down those records because you want to make

19  sure -- you know that these cases go to trial sometimes, correct?

20  A    I have since learned that, yes.

21  Q    And as a Border Patrol agent, you understood that cases go

22  to trial, correct?

23  A    I understood they went to trial.  I had in fact never been

24  in court as a Border Patrol agent.

25  Q    Okay.  But you're trained to do -- to be a Border Patrol

1  agent, correct?

2  A    Yes, ma'am.

3  Q    And part of your training is, and in training you learn that

4  recording important aspects of a trial is something that you need

5  to do.  Is that right?

6  A    Yes, ma'am.

7  Q    And most law enforcement agents are trained to do that,

8  correct?

9  A    Yes, ma'am.

10  Q    That's because you want to have a full record what actually

11  happened in a case?

12  A    Yes.

13  Q    To do that case well?

14  A    Yes.

15  Q    You never made any report mentioning this comment about the

16  VPN, did you?

17  A    At the time, no.

18  Q    You never wrote this down anywhere?

19  A    I can't say that I did, no.

20  Q    And as far as you're aware, no agent whatsoever in this case

21  wrote down this statement about a VPN outside the home?

22  A    I can't say.  It's not my case.

23  Q    You've talked to the prosecutors in preparation for this

24  case, correct?

25  A    Yes, ma'am.

1  Q    And you, up until last Friday I believe, did not tell them

2  about this statement.  Is that right?

3  A    Yes, ma'am.  That was actually my first opportunity to speak

4  with the prosecution about this case.

5  Q    But that was just this last Friday, correct?

6  A    Yes, ma'am.

7  Q    And you had an opportunity before that to write a report,

8  correct?

9  A    Yes.  And I did write a report.

10  Q    You did a report --

11  A    Yes.

12  Q    -- in this case?

13  A    Yes, ma'am.

14          MS. BATALLER-SCHNEIDER:  Your Honor, may we approach?

15          THE COURT:  No.  Let's just go forward.

16  BY MS. BATALLER-SCHNEIDER:

17  Q    Did you give that report to the prosecutor?

18  A    Yes, ma'am.  That report of investigations is submitted in

19  the case file.  That should have been turned over in discovery I

20  imagine.

21  Q    And nowhere in your report did you mention anything about

22  VPNs, did you?

23  A    No, ma'am.

24          MS. BATALLER-SCHNEIDER:  Nothing further.

25          THE COURT:  Any redirect?

145

1          MR. CAYTON:  Thank you, Your Honor.

2                    REDIRECT EXAMINATION

3   BY MR. CAYTON:

4   Q    Agent Boring, do you remember this statement being made?

5   A    Yes, I do.

6   Q    You said you had just gotten on to the task force as a TFO?

7   A    Yes, sir.

8   Q    Was this your first search warrant with the task force?

9   A    This was my first search warrant in my career by actually

10  participating and having a major involvement in.

11  Q    Was it surprising to you that this statement was made?

12  A    Yes, it was.

13  Q    Is the statement still clear in your mind today that that's

14  the statement that was made by the defendant?

15  A    Yes, sir.

16          MR. CAYTON:  Pass the witness, Your Honor.

17          THE COURT:  Anything further?

18          MS. BATALLER-SCHNEIDER:  Nothing further.

19          THE COURT:  You may step down.  Thank you very much.

20       (Witness excused)

21          THE COURT:  Government's next witness?

22          MR. CAYTON:  The Government would rest, Your Honor.

23          THE COURT:  Government close?

24          MR. CAYTON:  Yes, Your Honor.

25          THE COURT:  Defense?

146

1          MS. BATALLER-SCHNEIDER:  Your Honor, we close, as well.

2     We have nothing further.

3          THE COURT:  Great.

4          Ladies and gentlemen of the jury, you've now -- both

5     sides have rested and closed.  That means that you have received

6     all the evidence you're going to receive in the case.  That does

7     not mean I've given you the case to deliberate.  I'll let you

8     know when that is.

9          So what we're going to do is I'm going to have you go

10    to lunch.  I'm going to give you a little bit longer lunch than

11    you would care to take, probably, but not too long because we

12    have some work to do.

13         When you come back, you'll find in your chair, along

14    with your notebook because you'll leave it here still, a copy of

15    the Court's instructions to the jury.  That's what we call the

16    Court's charge.  And you'll have your own copy.

17         I am required to read it to you.  I know you know how

18    to read.  But I am required to read it to you.  I'll do the best

19    I can and you can follow along and test me like a reading test

20    for me.  But the main thing is that you comprehend what's in

21    there.

22         And so some people read along with me.  Some people set

23    it aside and just listen and look at me, stare, whatever.

24    Whatever you want to do is how -- you have your copy though so I

25    tell you that because you can make marks on it, you can highlight

147

1    things, circle things, underline them.  You don't have to do any

2    of that.

3           You can take that instruction, that Court's charge back

4    to the jury room with you when you do retire to deliberate.  And

5    you don't have to do that either.  You can leave it here and just

6    go back.  Whatever you want to do, it's totally up to you.  I'll

7    take -- we'll take up all the notebooks and the Court's charge

8    copies before you all leave when this whole thing's over so we

9    can shred all that and make sure no sensitive information gets

10   out.

11          And so you'll read along with me or listen to me read

12   the charge.  Once I do that, the parties have an opportunity to

13   then make their final summations or arguments, final arguments.

14   As opposed to the opening statements which is just really to tell

15   you what they expect the evidence will be, the summation is to

16   try to persuade you and talk to you, you know, talk to you about

17   what they think is important, the attorneys think you should

18   think is important.

19          And so that's their opportunity.  The Government, by

20   reason of having the burden of proof, is allowed to open and then

21   also close.  So they get to split their time up even though it's

22   front-loaded with a lot more time up front because the Defense

23   has a right to rebut, and then the government has a little bit of

24   time when they come back to rebut the closing argument of the

25   Defense.

1          So even though the Government gets to split up their

2     time, each side gets the same amount of time.  The Government

3     just chooses to split theirs up typically so that they can give

4     you a final -- the final words, their final few minutes of theirs

5     because they have the burden of proof.

6          And so that's what we'll do.  Once they do that, then

7     I'll let you know what we do after that.  So what I'm going to do

8     is it's 12:05-ish.  12:03 by my watch.  But I'm going to give you

9     a couple of hours for lunch.  You'll remember your instructions.

10    You'll leave your notebooks here.  You'll leave your badges here,

11    either here or in the jury room.

12         You're welcome to go to lunch together if you want.

13    Doesn't mean you have to.  If you do, talk about anything but the

14    trial or the facts of the case.  And we'll have you back at two

15    o'clock.  What we're going to do is we're going to stay and work.

16    And we're working on that charge that we're going to present to

17    you.

18         We're going to make sure that everybody's good with it

19    and all that, and it's in the best and most appropriate form for

20    you and we'll have them -- once we all agree, we'll print out

21    copies and leave them on your chairs for you.  Okay?  Any

22    questions?  So that's where we'll go.

23         So once we do that, then after all the arguments, I'll

24    tell you that you're retiring to deliberate and that's when

25    you'll take your notebooks if you want to, and take your charge

149

1    if you want to, and you'll go back to the jury room and

2    deliberate.  All right?  Very well.

3             With that, have a great lunch.  Let's rise for the

4    jury.

5         (Jury out at 12:05 p.m.)

6             THE COURT:  Be seated, please.  Outside the presence of

7    the jury.

8             So the charge, we're going to print the latest and

9    greatest charge for you in a moment.  One question I had.  I know

10   that the Defense stipulated that this was child pornography.

11   Right?  But there's no written stipulation that was entered.

12            MR. GORMAN:  That's correct, Your Honor.

13            THE COURT:  Okay.  So on the stipulation evidence, I'm

14   sorry, the instruction, do the parties want the Court to include

15   that stipulation?  I think it's in -- is it already in there?

16            THE CLERK:  It's in red.

17            THE COURT:  Yeah, it's in red.  It's in here.  Y'all

18   tell me if you want it to go -- if you want it in or not.

19            MR. CAYTON:  Yes, Your Honor.

20            THE COURT:  You do?  The Government does.

21            MR. CAYTON:  Yes, Your Honor.

22            MR. GORMAN:  The red is in terms of the --

23            THE COURT:  We're going to take the red out.

24            MR. GORMAN:  Oh, no.  Not that, Your Honor.  But in

25   terms of the stipulation --

1          MS. BATALLER-SCHNEIDER:  Trying to find it.

2          MR. GORMAN:  -- I didn't know if the Court was -- what

3  page is this on?

4          THE COURT:  Page -- oh.  You didn't print it with a

5  color printer, did you?

6          MR. GORMAN:  I did, Your Honor.

7          UNIDENTIFIED SPEAKER:  It should be at the end of Page

8  2.  But some of it continues to Page 3.

9          THE COURT:  I mean, unless I said something about a

10  stipulation was introduced.

11          UNIDENTIFIED SPEAKER:  It's just evidence is the sworn

12  testimony of the witnesses, including stipulations and exhibits.

13          THE COURT:  Oh, is it just the wording?  Oh, we'll

14  leave that.  We'll leave that in there.

15          MR. GORMAN:  I have no problem with that, Your Honor.

16          THE COURT:  There's no instruction though, right, about

17  the stipulation as to child pornography.  Okay.

18          MR. GORMAN:  But I assume the Court would add the

19  specific stipulation, correct, in terms of that?

20          UNIDENTIFIED SPEAKER:  They have been provided.

21          THE COURT:  We can.  Why don't y'all write it down for

22  us.  And I think we should.

23          UNIDENTIFIED SPEAKER:  It's really just straight to the

24  element, Your Honor.  The jury has to find that the materials in

25  fact, and I think just the parties stipulate that the material --

1          MR. CAYTON:  Meet the designation of child pornography.

2          THE COURT:  Okay.  We'll just add that in there.

3          MR. GORMAN:  That works.

4          THE COURT:  Okay.  And then, Mr. -- so what we're going

5     to do is I'm going to print this off, have her print it.  It's

6     about 23 pages long, or thereabouts.  We'll of course tweak it so

7     that Mr. Perkins did not testify.  We'll make sure that language

8     is in there.  I sustained some objections to questions.  I will

9     make sure that's in there.

10          Mr. Cayton, what -- before we print this and let y'all

11     look at it, we'll go back on the record, of course.  Was there

12     something specific you wanted to discuss?

13          MR. CAYTON:  No, Your Honor.  I just was standing and I

14     forgot to sit down.

15          THE COURT:  Oh.  Mr. Gorman?

16          MR. GORMAN:  I didn't know in terms of the instructions

17     I guess the Court is going to include the expert opinion

18     testimony?

19          THE COURT:  So our experts were Dr. Schutte, we had

20     Mr. Yanez.  Was there somebody else?

21          MR. CAYTON:  I think that was the only --

22          MR. GORMAN:  I think that was it, Your Honor.

23          THE COURT:  Oh, I'm thinking about Browning that didn't

24     get called.  Has he been called off?

25          MR. GREENBAUM:  Judge, I'm going to call them.  He

152

1    just --

2              THE COURT:  Okay.

3              MR. GORMAN:  He'll be here tomorrow, Your Honor, if you

4    want to --

5              THE COURT:  I'd be pretty mad.  What else, Mr. Gorman?

6              MR. GORMAN:  The other two, Your Honor, were 128 which

7    was the confession statement, voluntary, introduce his statements

8    in that turns in, you know, with the jury assessing the,

9    essentially the contents of that confession, the voluntariness of

10   it.  That's a standard once the statement's introduced.

11             THE COURT:  Is that already in there?

12             MR. GORMAN:  I did not see it, Your Honor.

13             MS. BATALLER-SCHNEIDER:  I don't believe it is.

14             MR. GORMAN:  I don't believe it was.

15             THE COURT:  And that's 128?

16             MR. GORMAN:  That's 128, Your Honor.

17             THE COURT:  One point two-eight, right?

18             MR. GORMAN:  That's correct, Your Honor, 1.28.

19             THE COURT:  Okay.

20             MR. GORMAN:  And the last is the insanity instruction,

21   Your Honor, 1.36.

22             THE COURT:  1.36.  Government's response?  Any

23   objection to the voluntariness of the confession instruction?

24   Ms. Martinez, do you want to argue this?

25             MR. CAYTON:  To the voluntariness of the confession,

1    Your Honor, no objection.  I think that's appropriate for the

2    jury to assess.

3           THE COURT:  Okay.

4           MR. CAYTON:  To the insanity, the Government does not

5    believe that the Defense has met its burden to earn that defense.

6           THE COURT:  All right.  And so I'm going to overrule

7    the objection.  I'll include the insanity instruction.

8           MS. BATALLER-SCHNEIDER:  Thank you.

9           THE COURT:  We will include the voluntariness of

10   confession instruction by agreement.  What about, there was

11   something -- oh, I saw something from the Government early on,

12   last week, about unanimity of -- was there some objection to

13   that?

14          MR. GREENBAUM:  We would withdraw that, Your Honor.  If

15   you want to have the discussion, but I think on that one I think

16   it was a nice concept, but I think we would withdraw that one,

17   Your Honor.

18          THE COURT:  Okay.

19          MR. CAYTON:  And I think we figured out why it was

20   coming up.

21          THE COURT:  So it's out.

22          MR. CAYTON:  It was there's two different ways you can

23   do child pornography for the interstate commerce.

24          THE COURT:  Right.  That was --

25          MR. CAYTON:  We just deleted one of those so that we

154

1    don't have to worry about the unanimity and make it a log cleaner

2    I think.

3              THE COURT:  Okay.

4              MR. CAYTON:  Because that's just one of the most

5    confusing instructions ever.

6              THE COURT:  Is there any questions left as far as how

7    they're -- if they're abandoning anything?

8              THE CLERK:  The instruction on the autism.  And then

9    there was another instruction.

10             MR. GREENBAUM:  Oh, that was -- that was a preliminary

11   instruction.  We resolved that, Your Honor.

12             THE COURT:  Oh, okay.  Okay.  So what I want her to do

13   is print y'all copies of this, and then I'll come back and give

14   you ten minutes.

15             It's not going to be much different than what you

16   already had, and have had.  So I'll give you about ten minutes to

17   review it.  And I'll come back in and we'll put on the record,

18   we'll have a formal charge conference.  Yes, sir?

19             MR. GORMAN:  I'm sorry.  I didn't want to interrupt

20   you.

21             The one objection we did raise and the Court did write

22   the instruction.  If the Court's going to go with it, I just

23   wanted to put on the record, I think the proof of intent

24   instruction that the Court typically uses in the context of a

25   complex computer case can invite a jury to sort of assume

155

1   components of this.

2         And there would be a concern that that's essentially

3   evading the presumption of innocence.  I also didn't think it was

4   tied specifically to a definition of the case.  It more seems to

5   be a stand-alone instruction.

6         THE COURT:  And the Defense objects to its inclusion?

7         MR. GORMAN:  It would, Your Honor.  Same objection we

8   originally offered.

9         THE COURT:  What's your thought, Mr. Cayton?

10         MR. CAYTON:  Do you have a copy of it?

11         MR. GREENBAUM:  I do.

12         THE COURT:  Yeah.  I can take a look at it myself.

13         MR. GORMAN:  It's not a pattern instruction.

14      (Pause)

15         THE COURT:  Mr. Cayton, your response?

16         MR. CAYTON:  Your Honor, the Government has no

17   objection to the instruction being included.  I think that it

18   does have some relevance for the jury to understand this is a

19   general intent crime.

20         It's not a specific intent crime.  But it does discuss

21   knowing and that generally someone is expected to know the

22   consequences of their actions.  Knowing is a very specific

23   element of all these crimes.  They had to knowingly distribute or

24   knowingly possess.

25         So the Government believes that the instruction is

156

1   okay.  I understand the Court's opinion and the Defense opinion,

2   as well.

3          THE COURT:  Mr. Gorman, I typically include it.  It's

4   not a pattern.  You don't want it in?

5          MR. GORMAN:  I do not, Your Honor.

6          THE COURT:  Government wants it in.  All right.  Let me

7   go back and look at it.  I'll read it and reread it a couple of

8   times.  And we typically allow it.  I've allowed it over

9   objection several times.  Not a child pornography case.  So I'll

10  take a look at it.

11         So stand fast, and we'll get you a copy of what we're

12  going to --

13         MS. BATALLER-SCHNEIDER:  Thank you.

14         MR. GREENBAUM:  Thank you, Your Honor.

15     (Pause)

16         THE COURT:  Oh, Mr. Cayton, Mr. Greenbaum?

17         MR. CAYTON:  Yes, sir?

18         THE COURT:  How much time do y'all want?

19         MR. GREENBAUM:  There is a lot of counts, Judge, a lot

20  of counts, Your Honor.  Thirty minutes, Judge, for closing, if

21  possible

22         THE COURT:  The Defense okay with 30, or do you want

23  less or what?

24         MS. BATALLER-SCHNEIDER:  30 is fine, Your Honor.  I

25  think it will probably be less.  But just in case I need to

157

1    respond to something.

2              THE COURT:  Is the -- are y'all splitting the time up?

3              MR. GREENBAUM:  Yes, Your Honor.  I was going to give,

4    Mr. Cayton is going to do the first half.  It's going to be 16

5    minutes.  I was going to do 14 minutes, Your Honor.

6              THE COURT:  Okay.  So, Mr. Cayton, you know you got to

7    go at least 15:01 or he starts losing time off of his, right?

8    You go tot go half.

9              MR. CAYTON:  Your Honor, I just got told 16 for the

10   first time.  But I've gone over an hour and a half on closing

11   before, if the Court is willing to give me the time.

12             THE COURT:  We will not be doing that here.  All right.

13   So knowing that 15 is your, sort of your mark, do you want a

14   warning at 13 or 14?

15             MR. CAYTON:  One hundred percent, Your Honor, yes.

16             THE COURT:  What time?

17             MR. CAYTON:  Probably 13.

18             THE COURT:  Thirteen?

19             MR. CAYTON:  Give me a few minute warning.

20             THE COURT:  A two minute warning there.  And you can

21   keep going.  Just because I warn you it's 13, I'll just tell you

22   you're taking 13 minutes, you keep going and take all of his

23   time.  That's up to you all.  That will be y'all's decision.

24             MR. CAYTON:  Maybe people like to hear me talk, Your

25   Honor.  I'm not sure.

158

1           THE COURT:  No, no.  But I'm just saying --

2           MR. GREENBAUM:  Your Honor, can I get a two-minute

3    warning and a one-minute warning?  I just, I don't ever want to

4    go over my time.

5           THE COURT:  You're so needy.  So you want what?

6           MR. GREENBAUM:  A two-minute warning and a one-minute

7    warning so I know I have one minute to --

8           THE COURT:  So you want one at 28 and another one at

9    29.

10          MR. GREENBAUM:  Yes, ma'am.  I mean yes, sir.

11          THE COURT:  And then I get the hook.

12          MR. GREENBAUM:  Yes.  Yes, Your Honor.

13          THE COURT:  Are y'all splitting your time up or --

14          MR. GORMAN:  Your Honor, Ms. Bataller has wisely told

15   me to stop talking at this point.  So she's taking it on herself.

16          MS. BATALLER-SCHNEIDER:  I was going to blame it on

17   you, but.

18          THE COURT:  What kind of warning do you want?  If

19   you're still talking at 28 minutes, do you want me to --

20          MS. BATALLER-SCHNEIDER:  That would be fine, Your

21   Honor.  I'd be shocked if I'm still talking at 28 minutes.  But

22   yes.

23          THE COURT:  Okay.  All right.  Give us just a few

24   minutes.  She's almost got them ready.  I'll be back in ten and

25   we'll go -- and I left in the proof of intent for now.  I think I

159

1    may take it out.  We'll talk.

2              MS. BATALLER-SCHNEIDER:  Thank you.

3         (Recess at 12:19 p.m./Reconvened at 12:50 p.m.)

4         (Outside the presence of the jury; defendant present)

5              THE COURT:  Please be seated.  Thank you.  All right.

6    Outside the presence of the jury.

7              Everybody's received a copy of the Court's proposed

8    final -- I guess final draft of the proposed instructions.

9              For the Government, who wants to -- Mr. Greenbaum, are

10   there objections to the charge as it's proposed?

11             MR. GREENBAUM:  No, Your Honor.  No objection, Your

12   Honor.  Thank you.

13             THE COURT:  Any additional requests?

14             MR. GREENBAUM:  Not at this time, Your Honor.  Thank

15   you.

16             THE COURT:  So the Government's happy with the Court's

17   charge as it exists?

18             MR. GREENBAUM:  Yes, Your Honor.  That's correct.

19             THE COURT:  Mr. Gorman, same questions of you.  Any

20   objections to the instruction, the Court's charge as proposed?

21             MR. GORMAN:  None, Your Honor.

22             THE COURT:  Any additional requests?

23             MR. GORMAN:  No, Your Honor.

24             THE COURT:  All right.  Very well.  Interesting verdict

25   form.  You know, it's different than probably one most of us have

160

1   seen most of our careers.  So, and I'll just -- just so you know,

2   you have the verdict form, copy of the verdict form.  The jury

3   will have only the charge.  They won't have the verdict form.

4           Ms. Lerma will take in the one verdict form that

5   they'll end up with.  We won't let them have numerous verdict

6   forms.  No reason to.  I'll go through it very briefly and

7   explain to them, but nothing more than that.

8           Toward the end of my instructions, and I'll read down

9   to -- well, the next to last, I'll read through the next to last

10  page.  When I get to Page 20, I'll just save that for when y'all

11  are done arguing and then we'll go from there.

12          Mr. Greenbaum, Mr. Cayton, anything further from you

13  all?

14          MR. GREENBAUM:  No, Your Honor.

15          THE COURT:  Ms. Bataller, Mr. Gorman?

16          MR. GORMAN:  No, Your Honor.

17          THE COURT:  We're good?  Okay.  If y'all would be back

18  here at five 'til two, we'll make it work.  Mr. Perkins, did you

19  get to eat?

20          THE DEFENDANT:  Not yet.

21          THE COURT:  Okay.  Not yet.  We'll get you fed, and

22  make sure everybody gets fed.  Thank y'all.

23          MR. GREENBAUM:  Thank you, Your Honor.

24          MR. GORMAN:  Thank you, Your Honor.

25      (Recess at 12:52 p.m./Reconvened at 1:59 p.m.)

1          (Outside the presence of the jury; defendant present)

2               THE COURT:  Be seated, please.

3          (Pause)

4               THE COURT:  All right.  So we're back on the record

5     outside the presence of the jury.  Mr. Greenbaum, Mr. Cayton, I

6     guess you got the next to last version.  Ms. Salas has told you

7     exactly what we've changed.  Any objections?  We're good?

8               MR. GREENBAUM:  No objection at all, Your Honor.

9               THE COURT:  We're good?

10              MR. GREENBAUM:  Yes, sir.

11              THE COURT:  Okay.  Ms. Bataller?

12              MS. BATALLER-SCHNEIDER:  Yes.

13              THE COURT:  Bataller?

14              MS. BATALLER-SCHNEIDER:  I'll take it.

15              THE COURT:  How do you say it?

16              MS. BATALLER-SCHNEIDER:  Bataller.

17              THE COURT:  Bataller.

18              MS. BATALLER-SCHNEIDER:  So the double-l is like a y.

19    So Bataller.

20              THE COURT:  Bataller.  Okay.  Are you good with the

21    charge?

22              MS. BATALLER-SCHNEIDER:  Yes.

23              THE COURT:  And the verdict form the way I did it?

24              MS. BATALLER-SCHNEIDER:  Yes, Your Honor.

25              THE COURT:  Instead of the circles.  I thought it was

162

1   better to do that.

2          MS. BATALLER-SCHNEIDER:  That's fine, Your Honor.

3   Thank you.

4          THE COURT:  Actually, I have a third version I like

5   better, but I think it kind of conflicts with the pattern, the

6   way I do it.

7          MS. BATALLER-SCHNEIDER:  Oh, okay.

8          THE COURT:  I'll tell you all about that later.

9          MS. BATALLER-SCHNEIDER:  Okay.

10         THE COURT:  All right.  So 30 minutes per side.  I'm

11  sorry?

12         THE CLERK:  We don't have copies of the verdict forms.

13         THE COURT:  Oh, okay.

14         THE CLERK:  I was going to go --

15         THE COURT:  Did you show it to them though?

16         THE CLERK:  Yes.

17         THE COURT:  Okay.

18         THE CLERK:  They did --

19         THE COURT:  So she's going to get you copies of the

20  verdict form the way it actually appears in case you want to show

21  it to them or whatever.

22         MS. BATALLER-SCHNEIDER:  Your Honor, while she's doing

23  that, can I just briefly run to the bathroom real quick?

24         THE COURT:  Yeah, please do.

25         MS. BATALLER-SCHNEIDER:  Thank you.

163

1            MR. CAYTON:  Can I second that?

2            THE COURT:  Wash your hands.

3            MS. BATALLER-SCHNEIDER:  I will.

4            THE COURT:  Wash your hands, everyone.

5            MR. CAYTON:  I will.

6        (Pause)

7            THE COURT:  All right.  I think we're ready.

8    Everybody?

9            MS. BATALLER-SCHNEIDER:  Yes, we're ready.

10           THE COURT:  Let's bring the jury in please.  Let's rise

11   for the jury.

12       (Jury in at 2:04 p.m.)

13           THE COURT:  All right.  Let's be seated, please.

14           Thank you.  Welcome back.  I hope you had a good lunch.

15           You found in your seats, as I promised you, your

16   Court's charge, Court's instructions to the jury.  And you're

17   welcome to read along if you'd like.  Everybody get your juror

18   badge back on if you can.

19           All right.  Members of the jury, in any jury trial

20   there are in effect two judges.  I'm one of the judges; the other

21   is the jury.  It's my duty to preside over the trial and decide

22   what evidence is proper for your consideration.  It's also my

23   duty at the end of the trial to explain to you the rules of law

24   that you must follow and apply in arriving at your verdict.

25           First, I'll give you some general instructions which

164

1    apply in every case, for example instructions about burden of

2    proof and how to judge the believability of witnesses.  Then I'll

3    give you some specific rules of law about this particular case.

4    And finally, I'll explain to you the procedures you should follow

5    in your deliberations.

6         You as jurors are the judges of the facts.  But in

7    determining what actually happened, that is in reaching your

8    decision as to the facts, it's your sworn duty to follow all the

9    rules of law as I explain them to you.  You have no right to

10   disregard or give special attention to any one instruction or to

11   question the wisdom or the correctness of any rule I may state to

12   you.

13        You must not substitute or follow your own emotion or

14   opinion as to what the law is or ought to be.  It's your duty to

15   apply the law as I explain it to you, regardless of the

16   consequences.  It's also your duty to base your verdict solely

17   upon the evidence without prejudice or sympathy.

18        You are to decide this case only on the evidence which

19   has been admitted into court during trial.  That was the promise

20   you made and the oath you took before being accepted by the

21   parties as jurors.  And they have the right to expect nothing

22   less.

23        The indictment or formal charges against the defendant

24   are not evidence of guilt.  Indeed, the defendant is presumed by

25   the law to be innocent.  The defendant begins with a clean slate.

165

1    The law does not require the defendant to prove his innocence or

2    produce any evidence at all, and no inference whatever may be

3    drawn from the election of the defendant not to testify.

4            The Government has the burden of proving the defendant

5    guilty beyond a reasonable doubt.  And if it fails to do so, you

6    must acquit the defendant.  While the Government's burden of

7    proof is a strict or heavy burden, it is not necessary that the

8    defendant's guilt be proved beyond all possible doubt.  It is

9    only required that the Government's proof exclude any reasonable

10   doubt concerning the defendant's guilt.

11           A reasonable doubt is a doubt based upon reason and

12   common sense after careful and impartial consideration of all of

13   the evidence in the case.  Proof beyond a reasonable doubt,

14   therefore, is proof of such a convincing character that you would

15   be willing to rely and act upon it without hesitation in making

16   the most important decisions of your own affairs.

17           As I told you earlier, it's your duty to determine the

18   facts.  To do so, you must consider only the evidence presented

19   during the trial.  Evidence is the sworn testimony of the

20   witnesses including stipulations, and the exhibits.  The

21   questions, statements, objections, and arguments made by the

22   lawyers are not evidence.

23           The function of the lawyers is to point out those

24   things that are most significant or most helpful to their side of

25   the case, and in so doing to call your attention to certain facts

166

1   or inferences that might otherwise escape your notice.  In the

2   final analysis, however, it's your own recollection and

3   interpretation of the evidence that controls in the case.  What

4   the lawyers say is not binding upon you.

5

6          During the trial, I sustained objections to certain

7   questions.  You must disregard those questions entirely.  Do not

8   speculate as to what the witness would have said if permitted to

9   answer the question.  Also, certain testimony or other evidence

10  has been ordered removed from the record, and you have been

11  instructed to disregard this evidence.

12         Do not consider any testimony or other evidence which

13  has been removed from your consideration in reaching your

14  decision.  Your verdict must be based solely on the legally

15  admissible evidence and testimony.

16         Also, do not assume from anything I may have done or

17  said during the trial that I have any opinion concerning any of

18  the issues in this case.  Except for the instructions to you on

19  the law, you should disregard anything I may have said during the

20  trial in arriving at your own verdict.

21         In considering the evidence, you are permitted to draw

22  such reasonable inferences from the testimony and exhibits as you

23  feel are justified in the light of common experience.  In other

24  words, you may make deductions and reach conclusions that reason

25  and common sense lead you to draw from the facts which have been

1 established by the evidence.

2          Do not be concerned about whether the evidence is

3 direct evidence or circumstantial evidence.  You should consider

4 and weigh all of the evidence that was presented to you.  Direct

5 evidence is the testimony of one who asserts actual knowledge of

6 a fact such as an eyewitness.  Circumstantial evidence is proof

7 of a chain of events and circumstances indicating that something

8 is or is not a fact.

9          The law makes no distinction between the weight to be

10 given to either direct or circumstantial evidence, but the law

11 requires that you, after weighing all of the evidence whether

12 direct or circumstantial, be convinced of the guilt of the

13 defendant beyond a reasonable doubt before you can find him

14 guilty.

15          You've heard evidence of acts of the defendant which

16 may be similar to those charged in the indictment but which were

17 committed on other occasions.  You must not consider any of this

18 evidence in deciding if the defendant committed the acts charged

19 in the indictment.  However, you may consider the evidence for

20 other very limited purposes.

21          If you find beyond a reasonable doubt from other

22 evidence in this case that the defendant did commit the acts

23 charged in the indictment, then you may consider evidence of

24 similar acts allegedly committed on other occasions to determine

25 whether the defendant had the state of mind or intent necessary

168

1    to commit the crime charged in the indictment, or whether the

2    defendant committed the acts for which he is on trial by accident

3    or mistake.  These are the limited purposes for which any

4    evidence of other similar acts may be considered.

5         In determining whether any statement claimed to have

6    been made by the defendant outside of court and after an alleged

7    crime has been committed was knowingly and voluntarily made, you

8    should consider the evidence concerning such a statement with

9    caution and great care.  You should give such weight to the

10   statement as you feel it deserves under all the circumstances.

11        You may consider in that regard such factors as the

12   age, sex, training, education, occupation, and physical and

13   mental condition of the defendant, his treatment while under

14   interrogation, and all the other circumstances and evidence

15   surrounding the making of the statement.

16        I'll remind you that it is your job to decide whether

17   the Government has proved the guilt of the defendant beyond a

18   reasonable doubt.  In doing so, you must consider all of the

19   evidence.  This does not mean, however, that you must accept all

20   of the evidence as true or accurate.

21        You are the sole judges of the credibility or

22   believability of each witness, and the weight to be given to each

23   witness' testimony.  An important part of your job will be making

24   judgments about the testimony of the witnesses who testified in

25   this case.  You should decide whether you believe all, some part,

1   or none of what each person had to say, and how important that

2   testimony was.

3          In making that decision, I suggest that you ask

4   yourself some questions.  Did the witness impress you as honest.

5   Did the witness have any particular reason not to tell the truth.

6   Did the witness have a personal interest in the outcome of the

7   case.  Did the witness have any relationship with either the

8   Government or the Defense.

9          Did the witness seem to have a good memory.  Did the

10  witness clearly see or hear the things about which he or she

11  testified.  Did the witness have the opportunity and ability to

12  understand the questions clearly and answer them directly.  Did

13  the witness' testimony differ from the testimony of other

14  witnesses.  These are a few of the considerations that will help

15  you determine the accuracy of what each witness said.

16         Your job is to think about the testimony of each

17  witness you have heard and decide how much you believe of what

18  each witness had to say.  In making up your mind in reaching a

19  verdict, do not make any decisions simply because there were more

20  witnesses on one side than on the other.

21         Do not reach a conclusion on a particular point just

22  because there were more witnesses testifying for one side on that

23  point.  You'll always bear in mind that the law never imposes

24  upon a defendant in a criminal case the burden or duty of calling

25  any witnesses or producing any evidence.

170

1          During the trial, you heard the testimony of Special

2    Agent Antonio Yanez who expressed opinions concerning computer

3    forensics.  You also heard the testimony of Dr. James Schutte who

4    expressed opinions concerning mental diseases and disorders and

5    his evaluation of the defendant.

6          If scientific, technical, or other specialized

7    knowledge might assist the jury in understanding the evidence or

8    in determining a fact in issue, a witness qualified by knowledge,

9    skill, experience, training, or education may testify and state

10   an opinion concerning such matters.  Merely because such a

11   witness has expressed an opinion does not mean, however, that you

12   must accept this opinion.

13         You should judge such testimony like any other

14   testimony.  You may accept it or reject it and give it as much

15   weight as you think it deserves, considering the witness'

16   education and experience, the soundness of the reasons given for

17   the opinion, and all other evidence in the case.

18         You're here to decide whether the Government has proved

19   beyond a reasonable doubt that the defendant is guilty of the

20   crimes charged.  The defendant is not on trial for any act,

21   conduct, or offense not alleged in the indictment.  Neither are

22   you called upon to return a verdict as to the guilt of any other

23   person or persons not on trial as a defendant in this case except

24   as you are otherwise instructed.

25         If the defendant is found guilty, it will be my duty to

171

1    decide what the punishment will be.  You should not be concerned

2    with punishment in any way.  It should not enter your

3    consideration or discussion.

4         You'll note that the indictment charges that the

5    offenses were committed on or about specified dates.  The

6    Government does not have to prove that the crimes were committed

7    on those exact dates so long as the Government proves beyond a

8    reasonable doubt that the defendant committed the crimes on dates

9    reasonably near September 27th, 2019 to October 1st, 2019 and

10   January 9th, 2020, the dates stated in the indictment.

11        A separate crime is charged in each count of the

12   indictment.  Each count and the evidence pursuant to it should be

13   considered separately.  The fact that you may find the defendant

14   guilty or not guilty as to one of the crimes charged should not

15   control your verdict as to any other.

16        The indictment contains multiple counts which reads as

17   follows.  From September 27th, 2019 to October 1st, 2019, within

18   the Western District of Texas and elsewhere, the defendant Thomas

19   Scott Perkins did knowingly distribute child pornography as

20   defined in Title 18 United States Code Section 2256(8)(A), that

21   has been shipped or transported in or affecting interstate or

22   foreign commerce by any means including by computer all in

23   violation of Title 18 United States Code Section 2252A(a)(2).

24        Count 2, on or about January 9th, 2020, in the Western

25   District of Texas, the defendant Thomas Scott Perkins did

172

1   knowingly possess material, specifically a Western Digital hard

2   drive Model Number WD800, Serial Number WD-WCAJ92661471, that

3   contains images of child pornography as defined in Title 18

4   United States Code Section 2256(8)(A) that involved a

5   prepubescent minor under the age of 12 years that had been

6   mailed, shipped, and transported in interstate and foreign

7   commerce, was produced using materials which had been shipped and

8   transported in interstate and foreign commerce by any means

9   including by computer, all in violation of Title 18 United States

10  Code Section 2252A(a)(5)(B).

11         Count 3, on or about January 9th, 2020, in the Western

12  District of Texas, the defendant Thomas Scott Perkins did

13  knowingly possess material, specifically a Maxtor hard drive

14  device model Diamondmax Plus 9, Serial Number Y45BC9XE that

15  contains images of child pornography as defined in Title 18

16  United States Code Section 2256(8)(A) that involved a

17  prepubescent minor under the age of 12 years that had been

18  mailed, shipped, and transported in interstate and foreign

19  commerce, was produced using materials which had been shipped and

20  transported in interstate and foreign commerce by any means

21  including by computer, all in violation of Title 18 United States

22  Code Section 2252A(a)(5)(B).

23         Count 4, on or about January 9th, 2020, in the Western

24  District of Texas, the defendant Thomas Scott Perkins did

25  knowingly possess material, specifically a Seagate hard drive

173

1    device model ST1000LMO49, Serial Number WGS5QBVZ that contains

2    images of child pornography as defined in Title 19 United States

3    Code Section 2256(8)(A) that involved a prepubescent under the

4    age of 12 years that had been mailed, shipped, and transported in

5    interstate and foreign commerce, was produced using materials

6    which had been shipped and transported in interstate and foreign

7    commerce by any means including by computer, all in violation of

8    Title 18 United States Code Section 2252A(a)(5)(B).

9          Count 5, on or about January 9th, 2020, in the Western

10   District of Texas, the defendant Thomas Scott Perkins did

11   knowingly possess material, specifically a Seagate hard drive

12   device model SRDONF2, Serial Number is NA8EYNL7 that contains

13   images of child pornography as defined in Title 18 United States

14   Code Section 2256(8)(A) that involved a prepubescent minor under

15   the age of 12 years that had been mailed, shipped, and

16   transported in interstate and foreign commerce, was produced

17   using materials which had been shipped and transported in

18   interstate and foreign commerce by any means including by

19   computer, all in violation of Title 18 United States Code Section

20   2252A(a)(5)(B).

21         Count 6, on or about January 9th, 2020, in the Western

22   District of Texas, the defendant Thomas Scott Perkins did

23   knowingly possess materials, specifically a Seagate hard drive

24   device model SRDOPV1, serial number NA9QO2S9 that contains images

25   of child pornography as defined in Title 18 United States Code

174

1    Section 2256(8)(A) that involved a prepubescent minor under the

2    age of 12 years that had been mailed, shipped, and transported in

3    interstate and foreign commerce, was produced using materials

4    which had been shipped and transported in interstate and foreign

5    commerce by any means including by computer, all in violation of

6    Title 18 United States Code Section 2252A(a)(5)(B).

7         Count 7, on or about January 9th, 2020, in the Western

8    District of Texas, the defendant Thomas Scott Perkins, did

9    knowingly possess material, specifically a Western Digital hard

10   drive, device model WDBYFT0040BBK-OA, Serial Number WX51D961NE27

11   that contains images of child pornography as defined in Title 18

12   United States Code Section 2256(8)(A) that involved a

13   prepubescent minor under the age of 12 years that had been

14   mailed, shipped, and transported in interstate and foreign

15   commerce, was produced using materials which had been shipped and

16   transported in interstate and foreign commerce by any means

17   including by computer, all in violation of Title 18 United States

18   Code Section 2252A(a)(5)(B).

19        Count 8, on or about January 9th, 2020, in the Western

20   District of Texas, the defendant Thomas Scott Perkins did

21   knowingly possess material, specifically a Samsung hard drive,

22   Serial Number S267J1LZ503188, that contains images of child

23   pornography as defined in Title 18 United States Code Section

24   2256(8)(A) that involved a prepubescent minor under the age of 12

25   years that had been mailed, shipped, and transported in

175

interstate and foreign commerce, was produced using materials
which had been shipped and transported in interstate and foreign
commerce by any means, including by computer, all in violation of
Title 18 United States Code Section 2252A(a)(5)(B).

Count 9, on or about January 9th, 2020, in the Western
District of Texas, the defendant Thomas Scott Perkins did
knowingly possess material, specifically a SimpleTech hard drive
device model 96300-41001-68, Serial Number 09335092000206005 that
contains images of child pornography as defined in Title 18
United States Code Section 2256(8)(A) that involved a
prepubescent minor under the age of 12 years that had been
mailed, shipped, and transported in interstate and foreign
commerce, was produced using materials which had been shipped and
transported in interstate and foreign commerce by any means
including by computer, all in violation of Title 18 United States
Code Section 2252A(a)(5)(B).

Title 18 United States Code Section 2252A(a)(2)(A)
makes it a crime to knowingly distribute any child pornography
that has been mailed or using any means or facility of interstate
or foreign commerce shipped or transported in or affecting
interstate or foreign commerce by any means including by
computer.

If you do find the defendant guilty of Count 1, you
must be convicted that the Government has proved each of the
following beyond a reasonable doubt.  First, that the defendant

176

1    knowingly distributed items of child pornography as alleged in

2    the indictment.  Second, that the items of child pornography had

3    been shipped or transported in, or affecting interstate or

4    foreign commerce by any means including by computer.  And third,

5    that when the defendant distributed the items, the defendant knew

6    the items were child pornography.

7          To distribute something simply means to deliver or

8    transfer possession of it to someone else with or without any

9    financial interest in the transaction.  The term computer means

10   an electronic, magnetic, optical, electrical chemical, or other

11   high speed data processing device performing logical, arithmetic,

12   or storage functions, and includes any data storage facility or

13   communications facility directly related to or operating in

14   conjunction with such device, but such term does not include an

15   automated typewriter or typesetter, a portable hand held

16   calculator, or other similar device.

17         The term child pornography means any visual depiction,

18   including any photograph, film, video, picture, or computer or

19   computer generated image or picture, whether made or produced by

20   electronic, mechanical, or other means by sexually explicit

21   conduct where the production of such visual depiction involves

22   the use of a minor engaging in sexually explicit conduct.  The

23   parties have agreed that the material shown during trial

24   constitutes child pornography as a matter of law.

25         Interstate commerce means the commerce or travel

177

between one state, territory, or possession of the United States and another state, territory, or possession of the United States including the District of Columbia.  Foreign commerce means commerce or travel between any part of the United States including its territorial waters, and any other country including its territorial waters.

Title 18 United States Code Section 2252A(a)(5)(B) makes it a crime to knowingly possess any book, magazine, periodical, film, videotape, computer disc, or any other material that contains an image of child pornography that has been mailed, shipped, or transported using any means or facility of or in or affecting interstate or foreign commerce including by computer.

For you to find the defendant guilty of Count 2, you must be convinced that the Government has proved each of the following beyond a reasonable doubt.  That the defendant knowingly possessed an item, a Western Digital hard drive model number WD800, Serial Number WD-WCAJ92661471, that contains an image of child pornography as alleged in the indictment.

Second, that the material was mailed, shipped, or transported in or affecting interstate or foreign commerce by any means including by computer.  And third, that when the defendant possessed the material, the defendant knew the material contained child pornography.

For you to find the defendant guilty of Count 3, you must be convinced that the Government has proved each of the

1  following beyond a reasonable doubt.  First, that the defendant

2  knowingly possessed an item, a Maxtor hard drive model Diamondmax

3  Plus 9, Serial Number Y45BC9XE that contains an image of child

4  pornography as alleged in the indictment.

5          Second, that the material was mailed, shipped, or

6  transported in or affecting interstate or foreign commerce by any

7  means including by computer.  And third, that when the defendant

8  possessed the material, the defendant knew the material contained

9  child pornography.

10          For you to find the defendant guilty of Count 4, you

11 must be convinced that the Government has proved each of the

12 following beyond a reasonable doubt.  First, that the defendant

13 knowingly possessed an item, a Seagate hard drive device model

14 ST1000LMO49, Serial Number WGS5QBVZ that contains an image of

15 child pornography as alleged in the indictment.

16          Second, that the material was mailed, shipped, or

17 transported in or affecting interstate or foreign commerce by any

18 means including by computer.  And third, that when the defendant

19 possessed the material, the defendant knew the material contained

20 child pornography.

21          For you to find the defendant guilty of Count 5, you

22 must be convinced that the Government has proved each of the

23 following beyond a reasonable doubt.  First, that the defendant

24 knowingly possessed an item, a Seagate hard drive device model

25 SRDONF2, Serial Number NA8EYNL7 that contains an image of child

179

1  pornography as alleged in the indictment.

2          Second, that the material was mailed, shipped, or
3  transported in or affecting interstate or foreign commerce by any
4  means including by computer.  And third, that when the defendant
5  possessed the material, the defendant knew the material contained
6  child pornography.

7          For you to find the defendant guilty of Count 6, you
8  must be convinced that the Government has proved each of the
9  following beyond a reasonable doubt.  First, that the defendant
10  knowingly possessed an item, a Seagate hard drive device model
11  SRDOPV1, serial number NAQO2S9 that contains an image of child
12  pornography as alleged in the indictment.

13          Second, that the material was mailed, shipped, or
14  transported in or affecting interstate or foreign commerce by any
15  means including by computer.  And third, that when the defendant
16  possessed the material, the defendant knew the material contained
17  child pornography.

18          For you to find the defendant guilty of Count 7, you
19  must be convinced that the Government has proved each of the
20  following beyond a reasonable doubt.  First, that the defendant
21  knowingly possessed an item, a Western Digital hard drive, device
22  model WDBYFT0040BBK-O8, Serial Number WX51D961NE27 that contains
23  an image of child pornography as alleged in the indictment.

24          Second, that the material was mailed, shipped, or
25  transported in or affecting interstate or foreign commerce by any

180

1    means including by computer.  And third, that when the defendant

2    possessed the material, the defendant knew the material contained

3    child pornography.

4            For you to find the defendant guilty of Count 8, you

5    must be convinced that the Government has proved each of the

6    following beyond a reasonable doubt.  First, that the defendant

7    knowingly possessed an item, a Samsung hard drive, Serial Number

8    S267J1LZ503188 that contains an image of child pornography as

9    alleged in the indictment.

10           Second, that the material was mailed, shipped, or

11   transported in or affecting interstate or foreign commerce by any

12   means including by computer.  And third, that when the defendant

13   possessed the material, the defendant knew the material contained

14   child pornography.

15           For you to find the defendant guilty of Count 9, you

16   must be convinced that the Government has proved each of the

17   following beyond a reasonable doubt.  First, that the defendant

18   knowingly possessed an item, a SimpleTech hard drive device

19   number 96300-41001-68, Serial Number 09335092000206005 that

20   contains an image of child pornography as alleged in the

21   indictment.

22           Second, that the material was mailed, shipped, or

23   transported in or affecting interstate or foreign commerce by any

24   means including by computer.  And third, that when the defendant

25   possessed the material, the defendant knew the material contained

181

1    child pornography.

2            The definitions of child pornography, computer,

3    interstate commerce, and foreign commerce provided for Count 1

4    apply to Counts 2 through 9 as well.  Possession, as that term is

5    used in these instructions, may be one of two kinds, actual

6    possession or constructive possession.

7            A person who knowingly has direct physical control over

8    a thing at a given time is in actual possession of it.  A person

9    who although not in actual possession knowingly has both the

10   power and intention at a given time to exercise dominion or

11   control over a thing, either directly or through another person

12   or persons, is in constructive possession of it.

13           Possession may be sole or joint.  If one person alone

14   has actual or constructive possession of a thing, possession is

15   sole.  If two or more persons share actual or constructive

16   possession of a thing, possession is joint.  You may find that

17   the element of possession is present if you find beyond a

18   reasonable doubt that the defendant had actual or constructive

19   possession either alone or jointly with others.

20           The word knowingly as that term has been used from time

21   to time in these instructions means that the act was done

22   voluntarily and intentionally, not because of a mistake or

23   accident.  The defendant claims he was insane at the time of the

24   events alleged in the indictment.  If you conclude that the

25   Government has proved beyond a reasonable doubt that the

182

1    defendant committed the crime as charged, you must then consider

2    whether the defendant should be found not guilty only by reason

3    of insanity.

4            For you to find the defendant not guilty only by reason

5    of insanity, you must be convinced that the defendant has proven

6    the following by clear and convincing evidence.  First, that at

7    the time of the crime, defendant suffered from a severe mental

8    disease or defect, and second that because of a severe mental

9    disease or defect, the defendant was unable to appreciate the

10   nature and quality of his acts, or was unable to appreciate that

11   his acts were wrong.

12           Mental disease or defect do not otherwise constitute a

13   defense.  On the issue of insanity, as the defendant who must

14   prove his insanity by clear and convincing evidence.  You should

15   render a verdict of not guilty only by reason of insanity if you

16   are persuaded by clear and convincing evidence that the defendant

17   was insane when the crime was committed.

18           Clear and convincing evidence is evidence that makes it

19   highly probable that defendant had a severe mental disease, and

20   as a result was unable to appreciate the nature and quality and

21   the wrongfulness of his acts.  Such proof must be sufficient to

22   produce a firm belief or conviction as to the truth of both

23   elements of the defense.

24           Remember then that there are three possible verdicts in

25   this case, guilty, not guilty, and not guilty only by reason of

1   insanity.  No matter which verdict you choose, your vote must be

2   unanimous as to this verdict.  To reach a verdict, whether it is

3   guilty or not guilty, all of you must decide.  Your verdict must

4   be unanimous on each count of the indictment.  Your deliberations

5   will be secret.  You will never have to explain your verdict to

6   anyone.

7           It's your duty to consult with one another and to

8   deliberate in an effort to reach agreement if you can do so.

9   Each of you must decide the case for yourself, but only after an

10  impartial consideration of the evidence with your fellow jurors.

11          During your deliberations, do not hesitate to reexamine

12  your own opinions and change your mind if convinced that you were

13  wrong.  But do not give up your honest beliefs as to the weight

14  or effect of the evidence solely because of the opinion of your

15  fellow jurors, or for the mere purpose of returning a verdict.

16          Remember at all times you are the judges of the facts.

17  Your duty is to decide whether the Government has proved the

18  defendant guilty beyond a reasonable doubt.  When you go to the

19  jury room, the first thing you should do is select one of your

20  number as your foreperson who will help to guide your

21  deliberations and will speak for you here in the courtroom.

22          A verdict form has been prepared for your convenience.

23  The foreperson will write the unanimous answer of the jury in the

24  space provided for each count of the indictment, either guilty or

25  not guilty, at the conclusion of your deliberation.  The

184

1    foreperson should date and sign the verdict.

2            Now what you don't have is the verdict form.  And I'm

3    showing that to you now.  It's three pages.  And what'll happen,

4    you've got your own copy of your charge.  Before the door closes

5    after you all go retire to deliberate, Ms. Lerma will hand to

6    you, hand in the verdict form, one verdict form.

7            And it says verdict form.  Check not guilty or guilty,

8    or not guilty by reason of insanity for each count.  You know you

9    have three choices in each count.  You'll pick one that you

10   unanimously agree.

11           Count 1 says we the jury find that defendant Thomas

12   Scott Perkins is, and there's a place beside not guilty, there's

13   a place by guilty, and there's a place by not guilty only by

14   reason of insanity.  The foreperson -- and it says of the offense

15   charged in Count 1 of the indictment.

16           That's the way it is through every count, 1, 2, 3, 4,

17   5, 6, 7, 8, 9.  The foreperson should initial next to whichever

18   verdict is the unanimous verdict in each count of the jury.  At

19   the very bottom there's a place to date, then sign for the

20   foreperson.

21           Then there will be some large envelopes back in the

22   jury room.  The foreperson will then slide the completed verdict

23   form into that envelope and seal it.  Maintain control of it.

24   Foreperson should knock or have someone knock on the door to

25   alert the court security officer that the jury has reached a

1  unanimous verdict.

2       We'll get everybody back in here.  You all will come

3  back out together like you've done so many times already.  The

4  foreperson will come in, walking in carrying that envelope with

5  the verdict form contained in it.  All right?

6       With that, I'm going to recognize Mr. Cayton to open

7  our closing arguments.  Mr. Cayton, you may proceed.

8       MR. CAYTON:  Thank you, Your Honor.

9       THE COURT:  Yes, sir.

10           CLOSING ARGUMENT BY THE GOVERNMENT

11       MR. CAYTON:  Good afternoon, ladies and gentlemen.  At

12  the beginning of this trial, the Defense told you that this was a

13  case about perception.  So I'd like to talk to you a little bit

14  about the defendant's perception when his house was initially

15  searched, or in his words raided.

16       He said what's going on.  Anything you got, you got

17  illegally because there is no way you got past my VPNs.  Officers

18  had just gone into his house.  No one had told him why they were

19  there.  No one had elicited any questions from him.  So his

20  perception was there's officers here, I know I've been doing

21  something wrong, and I finally got caught.

22       He actually tells Agent Wilson when she's interviewing

23  him I've been doing this for so long, I knew eventually I was

24  going to get raided.  Now, that's not the state of mind of

25  someone who doesn't know they're doing wrong.  That's not the

186

1    state of mind of someone who believes that what they're doing is

2    okay.  As much as he wants to say I have a right to delete stuff

3    whenever I want, that's the state of mind of someone who knows

4    that they had been unlawfully possessing and distributing child

5    pornography.

6          Now, the Judge just read you a whole lot of

7    instructions.  I get it.  But I want to focus on the elements of

8    each offense because that's what the Government has to prove.

9    And I would charge to you that the Government has proven each and

10   every element of these offenses beyond a reasonable doubt.

11         But I'd like to start with Count 1.  And Count 1 is

12   distribution of child pornography.  And there's three elements,

13   that the defendant knowingly distributed items of child

14   pornography as alleged in the indictment.  Well, he had VPNs, he

15   knew he was doing illegal stuff on the internet.  But let's talk

16   about that interview with Agent Ferg.

17         We got to listen to the whole thing.  And he told Agent

18   Ferg I should have turned off that setting.  Agent Ferg asked, he

19   said, you know, the defendant said I never shared any of my own

20   stuff.  Well, what about the stuff you've been downloading.  I

21   should have turned off that setting.

22         You heard a lot of testimony about peer-to-peer

23   software, about how it works.  We got to see a little video on

24   BitTorrent.  You also got to hear from Special Agent Bonneau who

25   told you about the BitTorrent software and that the law

1    enforcement software is different.  The law enforcement software

2    doesn't share, so therefore it's a low priority.

3         If you want to get better downloads, if you want to get

4    more downloads, you share.  Law enforcement can't distribute

5    child pornography.  But the defendant could.  And that way he

6    could get more downloads.

7         But you heard from Special Agent Bonneau that he

8    received 17 pieces of child pornography from the defendant.  He

9    was contacted by Special Agent Ferg who reached out and said hey,

10   what's going on with this IP address, with these images, with

11   these videos.  That was sent through secure means, and Special

12   Agent Ferg had a chance to review it.  He reviewed 17 videos

13   containing child pornography.

14        We know those came from the defendant's computer

15   because when the forensic analysis was later done of the laptop,

16   L2H1, and you remember from Government Exhibit 3 when there's

17   some pictures of the search warrant, that silver laptop L2H1 was

18   sitting right in front of the TV in the front living room hooked

19   up to a bunch of drives.

20        So on that laptop, they found 15 of those 17 videos

21   that were downloaded from Special Agent Bonneau.  So we know that

22   there was distribution, and we know it was knowing because he

23   knew he was sharing, he knew what was going on.  While he was

24   trying to get more child pornography, he had it available in his

25   downloads folder until he got a chance to get around to

1    organizing his stuff because he should get to organize his stuff

2    whenever he wants, at least that's what he thinks.  But that's

3    not what the law says.  And you've heard the law from the Judge.

4         Item number two, that the items of child pornography

5    had been shipped or transported in or affecting interstate

6    commerce or foreign commerce by any means including by computer.

7    We know it was done by computer.  We got to hear a lot about

8    BitTorrent.  We all learned a lot this week.

9         But you heard from Special Agent Yanez each and every

10   one of those drives was manufactured outside of this country.

11   Each and every one of those drives that he was storing that

12   information on, that that information was being sent away from

13   came from Asia, actually.

14        The drive for Count 2, the Western Digital hard drive

15   came from Thailand.  Count 3, that drive came from Singapore.

16   Count 4, the drive that was in L2H1 that was distributing the

17   child pornography, that came from China.  Count 5, that drive

18   came from Thailand, Count 6 from China, Count 7, Malaysia, Count

19   8, Korea, and Count 9, China.

20        Interstate commerce was affected by the defendant's

21   distribution and also possession of child pornography.  Count

22   number 2, just think of these as a little checklist you have.

23   Count 1, we checked it off.  We know he was knowingly

24   distributing.  Count 2, checked off because interstate commerce

25   was involved.

1          And Count 3, that when the defendant distributed these

2     items he knew the items were child pornography.  You heard almost

3     an hour on the recorded interview where he talked about he viewed

4     the material.  He had set some aside for deletion.  He would

5     decide when he was going to delete it later.  He had ten years of

6     material, but he looked at it once, at least once.  He knew it

7     was there.

8          He would look at it and decide he was going to organize

9     it at a later time.  He knew that it was child pornography when

10    he allowed it to be distributed, when he distributed it form his

11    computer when he shared it, however you want to phrase it.  Count

12    1, Count 1 has been satisfied.

13         So we go to Counts 2 through 9.  And obviously all of

14    these are very similar.  The difference is the hard drive that's

15    listed because we had eight different hard drives that were

16    analyzed that had child pornography on them.  And we watched that

17    together.  We watched the videos that came from those devices.

18         And this is -- we'll go through the elements, and then

19    we can talk a little bit about those videos.  But Count 1, or

20    sorry, element one, that the defendant knowingly possessed an

21    item, a Maxtor hard drive device model Diamondmax Plus 9, Serial

22    Number Y45BC9XE that contains an image of child pornography.

23         Well we know he possessed the drive.  That came from

24    one of the desktops.  We got to hear a lot of testimony about the

25    desktops being seized from the house, how it was taken to the

190

1    computer forensics analyst.  He removed the hard drive and that's

2    the Maxtor hard drive.  This is Count 3.  Yeah.  So this is

3    Count 3.

4            So this is the Maxtor hard drive.  So this is also

5    desktop.  He removed the hard drive, he subjected it to computer

6    forensic analysis.  He used a write blocker to make sure none of

7    the data was changed.  The analyst was not changing anything on

8    that drive.  Everything that was coming out of there is how it

9    was when the defendant possessed it on January 9th.

10           And what did he find?  Well, for Count 2, and that's

11   the Western Digital hard drive, WD800, but we can use those same

12   elements, that's fine.  He found 6,026 images and 17 videos.  And

13   we had an opportunity to see the video that was shown in Court

14   today for Count 2 was titled four-year-old PTHC re gold reel.

15   And it showed approximately a four-year-old girl being vaginally

16   penetrated by an adult male.

17           For Count 3, that was the Maxdor hard drive, that had

18   6,402 images and 115 videos.  You also had an opportunity to see

19   one of those videos.  That was king pass new 022 Asian PTHC Thai

20   eight-year-old Cambodian boom-boom.  And we got to see an

21   approximately eight-year-old girl who was bound with her wrists

22   to her knees, what appeared to be a man holding a dripping candle

23   over her vagina.

24           Count 4 was the Seagate hard drive Serial Number

25   WGS5QBVZ.  Otherwise the elements are the same.  And that had

1    boy06 and also the boy05 video that we talked about with the

2    distribution.  But it also contained the video of boy06.  And we

3    saw a small clip of that video.  It was pretty blurry, but you

4    heard Agent Ferg testify that it was a bound young man who was

5    being forced to perform oral sex and also anally penetrated.

6           And that's just a few of the counts with the first

7    element.  But let's go to the second element because it's the

8    same as distribution.  That the material was mailed, shipped, or

9    transported in or affecting interstate or foreign commerce by any

10   means including by computer.  The materials the hard drive

11   possesses the child pornography.  And we already talked about

12   where every single one of these hard drives were made.

13   Interstate commerce was involved in this case.

14          Interstate commerce comes into effect because the

15   federal government has jurisdiction over interstate commerce.  So

16   we have to make sure interstate commerce was involved.  But it

17   doesn't mean he has to be mailing this stuff out from his house

18   and charging people money for it and putting stamps on it.  It

19   doesn't have to go there.  It's just the fact that he was using

20   devices that were in interstate commerce when he possessed this

21   material, when he distributed this material.

22          So Count 2 is checked off.  Count 3, this is also the

23   same as distribution, that at the time the defendant possessed

24   the material, he knew it contained child pornography.  And we go

25   back to that interview.  He looked at the stuff.  Yeah, he was

192

1    collecting it.  Yeah, he was organizing it.  Yeah, that was

2    something he wanted to do.

3            But he knew what he was doing.  And he knew what he was

4    doing so much that he was taking measures to ensure that he

5    didn't get caught.  Now we'll talk about that a little bit later,

6    but that first statement out of his mouth, how did you find me,

7    right?  Couldn't have done this because I was using two different

8    VPNs.

9            So we ended on Count 4 for element one, and I'll get

10   through those real quick and we'll talk some more about some

11   different topics.  But for Count 5, that's a Seagate hard drive,

12   NA8EYNL7.  And that was a video titled dad on daughter full

13   penetration sex.  And we all saw a small portion of that video.

14   It's exactly what the title describes.

15           And we heard some testimony on cross that sometimes

16   people can change the titles.  I challenge you after seeing those

17   videos to think that any of these titles are inappropriate.

18           Count 6 was material possessed on a Seagate hard drive,

19   Serial Number NA9QO2S9.  And that was a video.  And we saw a

20   small clip of it's entitled PTHC Tara brand new.  And we saw a

21   small clip of a young girl, definitely under the age of 12,

22   wearing what appears to be a Mardi Gras mask being forced to

23   perform oral copulation on an adult male.

24           That device contained 396 images and six videos.  Count

25   5's device contained 125 videos and 180 images.  Count 4's

193

1   contained 97 videos, no images.  Count 7 was the Western Digital

2   hard drive Serial Number WX51D961NE27.  It contained 34 images

3   and two videos.  Another external hard drive.  That was Ulia 27.

4   That was a little girl under the age of 12 who was naked in what

5   appeared to be in a kitchen with her legs spread open.

6           Count 8, another external hard drive.  It just

7   contained one image.  That image was of a girl under 12 --

8           THE COURT:  Mr. Cayton, it's 13 minutes.

9           MR. CAYTON:  Thank you, Your Honor.  Naked.  And Count

10  9 was the Simple Tech hard drive 09335092000206005 that contained

11  82,274 images and 840 videos.  That's that big brick of a hard

12  drive sitting right there.

13          And we got to see PTHC new06 loving Lily three-year-old

14  with a three-year-old on the bed being raped.  We also talked a

15  little bit about some other videos that were found on the drive,

16  and we heard from the FBI agent who testified that he knew two

17  victims from videos that were found on these drives.

18          And those videos were found on multiple drives, both

19  USB-3 and 12 for awesome preteen compilation and for the video

20  titled PTHC Kelly eight-year-old.  That was on C2H1, USB-3 and

21  USB-12.  And he described to you how these kids ended up in these

22  videos.

23          Now, ladies and gentlemen, like I said, we heard the

24  audio recording of the interview.  The defendant made several

25  statements.  And he tried to be protective with his words.  He

194

told agents I know what you want me to say, but I'm not going to say it.  I'm only going to speak in general terms.

Does that sound like someone who didn't know what they were doing was illegal and wrong?  No.  That's someone who knows that what they did was wrong.  They knew from the very minute the police hit that door that they had finally got caught like he told Agent Wilson.  And he knew he had to be careful.  He had to try to couch his words, make it sound like he wasn't really responsible.

I had a right to delete it.  I was going to get around to it.  I have about ten years worth of material.  And you know, he told agents that he was going to actually get around to deleting it that same day that they hit his house.  He had been possessing it for a long time, but that day was the day he was finally going to decide to go through all those drives and get rid of the child pornography that he knew he possessed.

No.  There's a lot of admissions in there, but there's a lot of also statements where he's trying not to be responsible for what he knows he did.  And that's definitely something that you can consider.

We also heard from the computer forensics analyst.  And you can see, you heard it from some of the file names and the file structure.  He was moving these files around.  He told the agents he was moving them around.  I would sort them and move them around and when I got around to deleting them I decide to do

195

1    it.

2         But he knew he was possessing them when he was moving

3    them around.  He was saving them.  He wasn't trying to delete

4    them, he was trying to save them.  And that's why there's all

5    those devices, all those external drives, 30 terabytes of data,

6    100,000 images or videos.  That's why all of that is on there is

7    because he was saving it because he knew what it was and he

8    wanted to keep it.

9         The Government has proven beyond a reasonable doubt

10   each and every one of these charges, each and every element.

11   Thank you.

12        THE COURT:  Thank you, Mr. Cayton.

13        Ms. Bataller?

14             CLOSING ARGUMENT BY THE DEFENDANT

15        MS. BATALLER-SCHNEIDER:  Thank you.  Sometimes mentally

16   ill people do very unpleasant things, things we don't understand,

17   things we personally would never do.  But sometimes they do them

18   not because they're evil, but because they're mentally ill.

19        As I told you all in my opening statement, Thomas

20   understands the world through a different lense than you and I

21   do.  His reality is informed by both his Autism Spectrum Disorder

22   and his Schizoaffective Disorder.  You must fully understand his

23   unique experiences and challenges to understand this case.

24        When you understand this, it becomes clear that Thomas

25   could not have knowingly possessed or distributed child

196

1    pornography in the way the Government must prove.  But even if it

2    could prove all of the elements of this case, we have shown you

3    that Thomas was insane from a legal standpoint.

4            To prove insanity, we must show that Thomas suffered

5    from a severe mental disease or defect, and that as a result

6    Thomas was unable to appreciate that his acts were wrong.  Let's

7    talk first about Dr. Schutte's testimony that you heard today.

8            You heard evidence from Dr. Schutte that Thomas has a

9    severe mental illness which is Schizoaffective Disorder.  He

10   hears voices, and he thinks that he's regularly having sex with a

11   demon.  He actually feels it.  That is a tactile hallucination.

12   That illness is real.  And there is no expert testimony to

13   dispute it.

14           He also has an Autism Spectrum Disorder in which people

15   tend to have poor social skills, may seem odd to others, collect

16   things without meaning, and engage in repetitive behaviors over

17   and over.  And that's exactly what Thomas did.

18           These mental illnesses are real.  Dr. Schutte testified

19   that Thomas is not faking anything.  And there is no evidence

20   that he's doing this to pretend he has some illness that he does

21   not have.  These are mental illnesses Thomas legitimately has,

22   and they are the reason that he's sitting here today.

23           But it's not just Dr. Schutte's testimony that shows

24   this.  The reality is that Thomas cannot escape his autism or his

25   Schizoaffective Disorder.  It is with him wherever he goes.  And

1     as a result, it informs every aspect of this case.

2           You heard at his interrogation with Agent Ferg, early

3     on in the interrogation, as soon as he was confronted with

4     downloading or questions about downloading, he admits it.  He

5     doesn't try to hide his actions.  He doesn't blame anyone else.

6           And he says he's going to get around to deleting these

7     things, a fact which is actually borne out by the forensic

8     analyst testifying that only around one percent of the things

9     were deleted.  Ask yourself, does that sound to you like someone

10    who understands the wrongfulness of his actions?

11          You heard his obsessive behaviors when he talks about

12    being addicted to the act of downloading things, and watching

13    them upload and download just for the sake of watching it.

14    Obsessively hoarding information just like he hoards devices and

15    YouTube accounts.  Does that sound like someone who understands

16    the wrongfulness of his actions, or knew exactly what he was

17    doing?

18          You heard it when Agent Ferg says he received

19    information that Thomas was living with his parents, staying home

20    and not able to drive or even work because of his disabilities.

21    Does that sound like someone who could understand the

22    wrongfulness of his actions like you and I can?

23          And you heard it in his interrogation with Agent Wilson

24    when he told you that he had a psychological evaluation and was

25    put on disability afterwards, and that he has a sex demon that he

1   can feel actually have sex with him.  Does that sound like

2   someone who can understand reality, let alone understand the

3   wrongfulness of his actions?

4          The Government tries to tell you that Thomas is smart

5   enough to understand what he's doing.  But intelligence is too

6   narrow of an analysis here.  Though people with Autism Spectrum

7   Disorder and Schizoaffective Disorders can be smart in many

8   respects, their disorder directly impacts their ability to

9   understand reality.

10          This becomes apparent when you look more closely into

11  the Government's arguments.  Though Agent Ferg repeatedly tells

12  Thomas that he's tech savvy, Thomas never once uses that word to

13  describe himself.  He doesn't even know how to pronounce the name

14  of the program that he uses.  And he's not able to give more than

15  a basic explanation of what these programs do.  He doesn't have a

16  bitlocker which you've heard testimony that that's something that

17  a more complex user of technology would know how to do.

18          And the Government makes a lot of this evidence about

19  VPNs.  You heard evidence as well that it's very common to have

20  VPNs for privacy, and it is not a crime in itself to have VPNs.

21  Many people, including Agent Ferg, use VPNs regularly.  But even

22  more important than that is the testimony from the only expert

23  that the Government called, Agent Yanez, the computer forensic

24  expert who said that he found no evidence that Thomas was using

25  VPNs on his device.

1          If Thomas thought he was but he wasn't, that's just

2    more evidence that he's not tech savvy.  Or if it's evidence --

3    or it's evidence of his delusion that he's not in contact with

4    reality, of what's actually going on.

5          And though the Government might say that there was

6    evidence that by sharing more things, you can then download more

7    things.  You didn't hear a single time Thomas ever say that

8    himself, or even acknowledge that fact.  There's no evidence that

9    Thomas knew that.

10         Though Thomas often agrees with Agent Ferg and Butler's

11   questions, that is not evidence that he understands everything

12   they're saying.  When you listen to that interrogation, note that

13   he does not elaborate.  He simply parrots back what he thinks

14   they want to hear, much like what Dr. Schutte told you people

15   with Asperger's do.

16         All that said, Thomas' disorders are not the only

17   problem the Government has proving their case to you.  Not by a

18   long shot.  There is more than a reasonable doubt that Thomas

19   actually distributed child pornography to agents as they're

20   required to show in the first count.  Agent Bonneau was the only

21   person who could have actually accessed the files that his

22   program took from the specific internet address at 404 Seals.

23         But he testified to a very hands-off approach.  He

24   described it as being a passenger in a self-driving vehicle.  And

25   as such, he testified that he never even looked at any of the

200

1   items that the program downloaded.  Agents Ferg and Yanez

2   testified that they received files later that they tried to match

3   with what they believe the Government's computer got by using the

4   names of the files.  There is no evidence that they used the

5   content to match those two things.

6        And as you heard from Agent Yanez, it's the content.

7   The content is not the same as the name of a file.  They can't be

8   certain that what they showed you was the image downloaded from

9   the IP address on January 9th, 2020.  And that's what they would

10   need to prove to you to prove the distribution.

11        But that is not all.  Thomas, the guy who never tried

12   to hide his actions from agents from his first interrogation on

13   and was brutally honest said multiple times that he did not

14   intentionally distribute child pornography.  The program that he

15   used had sharing capabilities as a default.

16        You heard that Thomas did not actively send any images

17   or videos to the Government.  Rather, the Government actively

18   retrieved them from his account.  All actions were on the part of

19   the Government, not Thomas.

20        Whether or not Thomas later said I should have disabled

21   that has nothing to do with his intent at the time of the

22   offense.  Those statements were made after agents had already

23   mentioned the sharing feature, and mentioned that by not turning

24   off that default feature, that they believe he shared these

25   files.

1          Could someone like Thomas really knowingly distribute

2     images under these circumstances?  Please keep in mind it is the

3     Government's burden to prove each and every element of the

4     charges against Thomas beyond a reasonable doubt.  That is the

5     highest standard of proof in the land.  It is your sacred duty to

6     hold them to that burden.

7          Our burden, even if they're able to do that, is lower.

8     And you must only find that Thomas was insane by clear and

9     convincing evidence as the Judge described to you.  After hearing

10    all the evidence in this case, these two things are clear, Thomas

11    didn't knowingly possess and distribute child pornography beyond

12    a reasonable doubt.  And even if he could with his mental

13    disorders, he wasn't able to understand the wrongfulness of his

14    actions.

15          We are not here because Thomas personally abused a

16    child.  We are here because he is mentally ill.  So knowing all

17    this, we simply ask that you do justice in this case.  Find

18    Thomas not guilty on all counts.

19          THE COURT:  Thank you, Ms. Bataller.

20          Mr. Greenbaum, you have 13 minutes and 30 seconds

21    should you choose to take it.

22          REBUTTAL CLOSING ARGUMENT BY THE GOVERNMENT

23          MR. GREENBAUM:  Thank you, Your Honor.  May it please

24    the Court, opposing Counsel, my colleague.  First off, I want to

25    thank each and every one of you for your time and attention in

202

1    this matter.  I know you looked at some very difficult material

2    in this case, and I apologize that you had to look at those

3    things as part of the evidence.

4          Now let's talk about what I want to talk to you a

5    little bit about is the charge.  So as we kind of go through it.

6    Let's look at Page 2 of your charge.  And on Page 2 of your

7    charge, you're to render your verdict solely upon the evidence

8    without prejudice or sympathy.  So without sympathy for any party

9    whether that's the defendant or any other party, it's without

10   prejudice or sympathy.  And that's the law that the Court has

11   given you.  Okay?

12         So let's look a little further on your charge, and let

13   me just highlight a few things.  On Paragraph or Page number 6,

14   expert testimony.  Just because, and again merely because such a

15   witness has expressed an opinion does not mean however that you

16   must accept his opinion.  That is talking about an expert

17   opinion, in other words specifically I'm talking about

18   Dr. Schutte.

19         And we're going to go over some of those things where

20   the Government believes Dr. Schutte got it wrong in this case

21   just like you heard testimony on other cases where he got it

22   wrong and juries felt that he also got it wrong.  Now, moving

23   along, let's go ahead and here's really where I want you to pay

24   very close attention, please.

25         On Paragraph, it's going to be Page 18.  And I want to

203

1    read to you insanity.  And I want to read to you the second

2    snippet of insanity.  If we could just pull that up.  This is

3    what they have to meet.

4            The first thing they have to meet, and that's going to

5    be number one, let me go ahead and read it.  At the time of the

6    crime, the defendant suffered from a severe mental disease or

7    defect and, so he has to have two things that he has to meet, and

8    secondly, because of that severe mental disease or defect, the

9    defendant was unable to appreciate the nature and quality of his

10   actions or was unable to appreciate that his actions, or his

11   acts, I'm sorry, were wrong.  Mental disease or defect did not

12   otherwise constitute a defense.

13           So let's look at that.  That he was unable to

14   appreciate that his actions were wrong.  Again, when you're

15   deciding this issue of sanity that the defendant was unable to

16   appreciate his actions were wrong.  And let's look at these

17   things.  Let's just look at a couple of things.

18           And how do we know that he appreciates what he's doing

19   is wrong?  Well, remember the DPS lady, Michelle Wilson, that

20   came and testified?  The defendant in his own words said he uses

21   VPNs, in other words disguised his location for risky downloads.

22   That's the reason why he does that.

23           So again, unable to appreciate his actions were wrong.

24   Well, he knows and he has the smarts to use VPNs so he can

25   disguise his risky downloads.  And he did it well.  We got a

204

1  whole bunch of items right here containing child pornography.

2  Eight-plus items.  Eight items, I believe.  Eight items.

3        And this is not just one oops, I did it.  This is

4  100,000 items, 100,000 images or videos.  So when they say that,

5  you remember that he, in his own words, he was using that for

6  risky downloads.

7        In regards to Defense wanted to talk about knowledge.

8  There was no way, one, he couldn't appreciate what he was doing

9  was wrong.  And the other way, there was no way he would

10  knowingly know how to download or -- download this stuff

11  knowingly.

12        Well, let's look again.  Let's talk about Michelle

13  Wilson.  In regards to the search terms, she asked hey, in

14  regards to search terms, have you searched for PTHC, Lolita,

15  preteen hardcore, preteen softcore, and his answer was he agreed

16  to that.  So that goes to the knowledge, the knowing that you

17  know exactly what you're looking for.

18        This is not I'm looking for the sports news of the

19  Astros score or the Rangers score.  You're looking for specific

20  things, so many specific things that it's lobbed up or jammed up

21  on eight devices that are labeled on not only that table, but now

22  it's on the floor too as you see two desktops there.

23        As I continue on, that he didn't know, he didn't know

24  what -- he couldn't knowingly possess this, he wouldn't have

25  known what he was doing.  Well specifically when Michelle Wilson

1    asked what groups were you interested in, eight, nine, and ten.

2    So that again goes to his knowledge of exactly what he's looking

3    for.

4            And then in regards to knowledge and knowing right from

5    wrong, when talking about the sharing feature, and I'll talk

6    about this BitTorrent software, this complicated software that

7    you heard from Agent Bonneau that had I believe it was, if I

8    remember correct, 40 hours of training to figure out how to use

9    this software, that you have to have some sort of computer savvy

10   or tech savvy to be able to use this software.

11           But in regards to it, the way the software works, and

12   you heard that video, as you're downloading, you're sharing.  And

13   he knew about the feature.  And how do we know he knew about the

14   feature?  Because in his own words to Michelle Taylor he said I

15   should have disabled that feature.  I wasn't worried about it.  I

16   use multiple VPNs to ensure there wasn't any leaks.

17           So again, when you decide whether he knew right or

18   wrong, he knew he didn't have to worry about it because he used

19   multiple VPNs to cover his tracks, to ensure there wasn't any

20   leaks.  And that's his words.

21           And then let's talk about his knowledge.  You know, his

22   knowledge of BitTorrent, BitTorrent, that complicated software

23   that you saw an informational video about, a minute and a half.

24   To be honest, I've been trying to avoid BitTorrent for years

25   because I was afraid that -- I'm sorry.  To be honest, I've been

1   trying to avoid BitTorrent for years because I was afraid this

2   would happen.  I was afraid about being found out and being

3   raided.  I'm just paraphrasing here.  And this is exactly what

4   happened.

5            So he knew right from wrong.  So he knew that

6   potentially he could be found out, and he knew that he could be

7   possibly raided.  And he said that's exactly what happened here.

8   And in regards to defense says well he's just parroting what the

9   agents told him, well we know that's not entirely true because

10  when he met Coleman Boring, the special agent that you heard

11  talk, the agent trainee --

12            THE COURT:  Mr. Greenbaum, back up just a little bit.

13            MR. GREENBAUM:  Yes, Your Honor.  I apologize.

14            THE COURT:  It's all right.

15            MR. GREENBAUM:  He said -- this is his words before

16  (indiscernible) ask questions for Mr. Boring, you got this

17  information illegally.  So he knew that information that he had

18  there was illegal.  So --

19            MS. BATALLER-SCHNEIDER:  Your Honor, I'm going to

20  object to his characterization of what was the evidence.

21            THE COURT:  All right, thank you.  The jury will -- is

22  reminded that what the lawyers say is not evidence.  You'll

23  remember the testimony as you heard it during the trial.

24            Mr. Greenbaum, go ahead.

25            MR. GREENBAUM:  Thank you.  And so you'll see that

1  statement, or you heard that statement yourself.  And there's no

2  way they got past my VPNs.  Again, to cover his tracks because he

3  knew right from wrong.

4          Now let's talk about certain things.  Let's just talk

5  about, let me start off with the defendant.  The defendant asked,

6  Dr. Schutte, were you aware what kind of grades he made in high

7  school?  Oh, yeah.  He made As, Bs, and Cs.  Graduated high

8  school.

9          Oh, what about his college?  Oh, he completed three

10  years of college.  Oh, did you look at a transcript or any kind

11  of, you know, classes?  Maybe that's important to see what kind

12  of technical classes he had.  No, I didn't look at any of that

13  type of stuff.

14          Okay.  But even so, as you kind of went along, Defense

15  Counsel talked to you about this sex demon.  So I asked

16  Dr. Schutte you're not telling us that the sex demon made him

17  download 100,000 images of child porn.  Oh no, I'm not saying

18  that.  That's not my testimony.  That's the way I recalled it.

19          So this thing about a sex demon, even their own expert

20  is saying that didn't cause him to download 100,000 images, even

21  if that was to be true.  And how did Dr. Schutte come to this

22  analysis?  Well he spoke to this gentleman about a year ago for

23  two hours, and then he says okay, he's obviously -- he's got

24  these issues.  You know.

25          But he doesn't look at all the things.  He didn't look

1    at all the reports, he didn't -- he got most of what he came up

2    with from speaking to the defendant.  So the premise is if the

3    information is faulty going in, it's faulty going out.  And here

4    we know even Dr. Schutte's own testimony that he's not saying

5    that this sex demon made him do this.

6            Now let's talk about just a level of sophistication.

7    We're talking about BitTorrent software, Tixati, specialized

8    software that these agents get specialized training to even know

9    how it operates that this defendant, I tender to you and I

10   proffer and argue to you, had very good knowledge, very good

11   knowledge as you see these eight devices laying here.

12           He had very good knowledge of VPNs.  And he didn't just

13   run one VPN.  He ran two VPNs to cover his tracks.  And

14   furthermore, I don't know if you remember the -- when the Butler,

15   the other agent that was there on the recording, he was like hey,

16   explain this to me.  And he gets upset, that being the defendant,

17   with Butler like I already told you, something to that effect,

18   how these computers work.

19           And he was talking about using secure delete.  Not just

20   regular delete like us that go and delete a file.  He wanted to

21   make sure that he could get rid of it permanently.  Secure

22   delete.  Again, this is an extra level of knowledge, an extra

23   level of expertise that this defendant had in regards to

24   computers.

25           And you heard Dr. Schutte.  And obviously this is

1  common sense.  And you guys use common sense when you go back

2  there in the jury room.  He said well, it's kind of like, you

3  know, people with autism.  Sometimes they like to collect cars

4  or, you know, so is that like baseball cards.  You know, some

5  kids like to collect baseball cards.

6          Well, not everybody with autism is collecting 100,000

7  images or videos of child pornography.  That's just not, you

8  know, I think common sense would tell us that.  And I'll let you

9  decide on that.

10         And so to make it sound like it's little toys or doing

11  some research, and speaking of doing research, the defendant

12  himself admitted to agents oh, I looked this up.  I looked up

13  Supreme Court holdings and rulings to see what was legal and not

14  legal.  And in regards to that, oh, I'm at that grey area.  I

15  like to be in that grey area.  And that's what this defendant

16  said.  That's his words.

17         And you have the, you know, you can confirm that.  You

18  can confirm that.  You can take back his statement --

19         THE COURT:  Two minutes.

20         MR. GREENBAUM:  Thank you, Your Honor.  The evidence is

21  overwhelming. It's clear.  So how we get to the distribution

22  count.  Well, by nature of that BitTorrent software.  In other

23  words, when he is downloading, he is distributing.  And so in

24  this case what happened was Agent Bonneau got 17 pieces, 17

25  pieces of child pornography from this defendant.  So that's the

210

1    distribution count.

2            So in other words, it's travel through the computer,

3    got to Agent Bonneau.  And then we're talking about the

4    possession of child pornography.  Well, everybody has stipulated,

5    both the Defense and the Government, you can read that in the

6    charge that this is in fact child pornography.

7            And so that's for the remainder of the counts, the

8    remainder of the counts from 2 through 9.  And those counts, each

9    and every one, unfortunately we had to show you those exhibits.

10   But you even heard from a special agent from Austin that some of

11   those people were living people that still are living to this day

12   that are depicted that this child pornography has gone through

13   the country.

14           So on that, one of the things we have to prove that he

15   had possession of it.  He clearly did.

16           THE COURT:  One minute.

17           MR. GREENBAUM:  It's right in front of you.  And the

18   second thing is that it got -- that it was in interstate

19   commerce.  Well how do we know it's interstate commerce?  Well,

20   that goes back to where the computer or hard drive was

21   manufactured.  And Mr. Cayton has told you that this was from

22   different Asian countries.

23           At the close of this, I would ask that you render the

24   only true and just verdict, and that's guilty on all counts.

25   Thank you very much.

1          THE COURT:  Thank you to the attorneys.  If you need to

2    communicate with me during your deliberations, the foreperson

3    should write the message and give it to the court security

4    officer.  I'll either reply in writing or bring you back in court

5    to answer your message.

6          Bear in mind that you're never to reveal to any person,

7    not even to the Court, how the jury stands numerically or

8    otherwise on any count of the indictment until after you have

9    reached a unanimous verdict.

10          In a moment, you're going to retire.  When you do,

11    we're going to have to say goodbye to our alternates, Mr. Balsher

12    (phonetic) and Mr. Ashburg (phonetic).  When the jury retires, if

13    you'll retire with them and then gather any of your belongings

14    and go out the other door.  I'm going to have the court security

15    officer usher you into the chambers next door.  I want to visit

16    with you just briefly and give you my personal thanks.

17          You may take your notebooks if you want.  You may take

18    your Court's charge to the jury if you want.  You can leave them

19    here if you want.  Let's rise as this jury retires to deliberate.

20    Thank you.

21          (Jury retires to deliberate at 3:17 p.m.)

22          THE COURT:  All right.  Outside the presence of the

23    jury.  Government have anything you need to take up?

24          MR. GREENBAUM:  No, Your Honor.

25          THE COURT:  Defense?

1            MS. BATALLER-SCHNEIDER:  No, Your Honor.

2            THE COURT:  All right.  We'll be in recess.  Stay

3    close, please.

4        (Recess at 3:18 p.m./Reconvened at 4:07 p.m.)

5        (Outside the presence of the jury; defendant present)

6            THE CLERK:  All rise.

7            THE COURT:  All right.  I'm told that we have a

8    verdict.  Does the Government have anything we need to take up

9    before we bring the jury in?

10           MR. GREENBAUM:  No, Your Honor.  Thank you.

11           THE COURT:  Defense?

12           MS. BATALLER-SCHNEIDER:  No, Your Honor.

13           THE COURT:  Okay.  So we'll bring the jury in.  We'll

14   have everybody sit.  And then I'll have the defendant rise with

15   Counsel.  No matter -- I don't know what the verdict is, I have

16   no idea.  Whatever it is, no outward display of emotion, please,

17   I beg you.  And if an attorney does it, there will be

18   consequences.

19           So go right ahead and let's bring the jury in.

20       (Jury in at 4:07 p.m.)

21           THE COURT:  All right.  Please be seated.  Thank you.

22   Speaking through your foreperson, if you would stand, sir.  Has

23   the jury reached a verdict?

24           JURY FOREPERSON:  Yes.  Yes, Your Honor, we have.

25           THE COURT:  If you'd hand that.  If you'll stay where

213

1   you are, the court security officer will come to you.  Thank you

2   very much.  You may be seated.  Thank you, sir.

3          The defendant will please rise.

4          THE CLERK:  In 20-CR-388, United States of America

5   versus Thomas Scott Perkins, verdict form.  Count 1, we the jury

6   find the defendant Thomas Scott Perkins is guilty of the offense

7   charged in Count 1 of the indictment.  Count 2, we the jury find

8   that defendant Thomas Scott Perkins is guilty of the offense

9   charged in Count 2 of the indictment.

10         Count 3, we the jury find the defendant Thomas Scott

11  Perkins is guilty of the offense charged in Count 3 of the

12  indictment.  Count 4, we the jury find the defendant Thomas Scott

13  Perkins is guilty of the offense charged in Count 4 of the

14  indictment.

15         Count 5, we the jury find the defendant Thomas Scott

16  Perkins is guilty of the offense charged in Count 5 of the

17  indictment.  Count 6, we the jury find the defendant Thomas Scott

18  Perkins is guilty of the offense charged in Count 6 of the

19  indictment.

20         Count 7, we the jury find the defendant Thomas Scott

21  Perkins is guilty of the offense charged in Count 7 of the

22  indictment.  Count 8, we the jury find the defendant Thomas Scott

23  Perkins is guilty of the offense charged in Count 8 of the

24  indictment.

25         Count 9, we the jury find the defendant Thomas Scott

214

1  Perkins is guilty of the offense charged in Count 9 of the

2  indictment.  Signed by the foreperson of the jury.

3          THE COURT:  Thank you.  You all may be seated.

4  Ms. Bataller, does the Defense wish the Court to poll the jury?

5          MS. BATALLER-SCHNEIDER:  Yes, Your Honor.  Please.

6          THE COURT:  Absolutely.  So here's what we're going to

7  do.  You have a number on your juror badge.  And you have that

8  number for this reason.  Ms. Lerma is going to stand in a moment

9  and call you by number, and you'll just answer.  Your answer is

10  going to be yes or no.  You stay seated, you don't have to stand

11  up.  She'll stand.  You just say yes or no.

12          The question is this.  She's not going to repeat the

13  question each time.  I'm going to tell you this one time.  The

14  question is, is your personal verdict reflected by the verdict of

15  the jury, yes or no.  Ms. Lerma?

16          THE CLERK:  Juror number 1?

17          JUROR NO. 1:  Yes.

18          THE CLERK:  Juror number 2?

19          JUROR NO. 2:  Yes.

20          THE CLERK:  Juror number 3?

21          JUROR NO. 3:  Yes.

22          THE CLERK:  Juror number 4?

23          JUROR NO. 4:  Yes.

24          THE CLERK:  Juror number 5?

25          JUROR NO. 5:  Yes.

215

1          THE CLERK:  Juror number 6?

2          JUROR NO. 6:  Yes.

3          THE CLERK:  Juror number 7?

4          JUROR NO. 7:  Yes.

5          THE CLERK:  Juror number 8?

6          JUROR NO. 8:  Yes.

7          THE CLERK:  Juror number 9?

8          JUROR NO. 9:  Yes.

9          THE CLERK:  Juror number 10?

10         JUROR NO. 10:  Yes.

11         THE CLERK:  Juror number 11?

12         JUROR NO. 11:  Yes.

13         THE CLERK:  Juror number 12?

14         JUROR NO. 12:  Yes.

15         THE COURT:  Thank you all.  I get to be the first to

16    thank you after the verdict.  We obviously can't do this without

17    you.  We have to have you.  And we truly appreciate you stepping

18    up and doing this.

19         You're now released from your oath which means that you

20    can speak with anybody you want to about the case.  It also means

21    you don't have to speak with anybody if you don't want to talk to

22    anybody about the case.

23         I am going to ask you to retire one last time and wait

24    for me to come join you in the jury room.  I'd like to speak with

25    you privately for just a few minutes.  I need to do about two to

216

1    three minutes or so business with the attorneys and the

2    defendant, and then I'll come right back in there with you.

3           With that, let's rise for the jury as they retire one

4    last time.  Thank you all very much.

5           (Jury excused at 4:12 p.m.)

6           THE COURT:  All right.  Please be seated.

7           All right.  The jury having returned a verdict of

8    guilty in Counts 1 through 9, the Court will refer your case, Mr.

9    Perkins, to the U.S. Probation Office for the preparation of the

10   presentence investigation report.  You'll have input into the

11   making of that report.  Your attorneys are going to guide you

12   through that process.

13          Your attorneys then will receive a copy of the report

14   well before your sentencing hearing.  They'll file objections if

15   there are objections they're able to file on your behalf.  The

16   Government has the same opportunity to file objections.

17          If there are any objections, oftentimes those are

18   resolved prior to trial.  If there are any objections that remain

19   outstanding at the time of your sentencing hearing, excuse me,

20   then we'll take those up after sentencing hearing.  Typically

21   that means there will be argument of the attorneys.  Sometimes

22   even there's some testimony.  But then I'll make the decision on

23   any outstanding objections.

24          One of your attorneys will speak on your behalf, and

25   then you have the right and will have the opportunity to speak to

217

1    me before I sentence you on that date.  It's going to be, I'm

2    going to set sentencing for October 24th, 2022.  It's at 8:00

3    a.m.  That will be in Alpine.

4           And that can move.  Sometimes we can move it up, it can

5    move back.  But October 24th is what we're going to shoot for.

6    And probation will be in touch with your attorneys.

7           With that, Mr. Greenbaum, Mr. Cayton, anything further

8    on behalf of the Government?

9           MR. GREENBAUM:  No, Your Honor.  Thank you.

10          THE COURT:  Ms. Bataller, Mr. Gorman, anything?

11          MS. BATALLER-SCHNEIDER:  No, Your Honor.  Thank you.

12          THE COURT:  Thank you.  If you could, I'd ask the

13   marshals to take the defendant and then I'd like to speak with

14   the attorneys for, like, one minute.  So, Mr. Perkins, I'll

15   remand you to the custody of the United States Marshals pending

16   your sentencing hearing.  Thank you.

17          Y'all can have a seat.  I just wanted to tell all of

18   you on the record without Mr. Perkins here, I don't want to

19   embarrass him, but I thought it was as well tried a case as I've

20   seen in a long time.  It's a very difficult subject matter.  I

21   just didn't want to embarrass him with talking about the subject

22   matter.

23          It's just a difficult topic.  Nobody likes that sort of

24   thing.  What each and every one of you did though in prosecuting

25   or defending, paralegaling for the Government, paralegaling for

1   the Defense is an honorable thing.  And I think the Constitution

2   was upheld.  And we'll see, I guess.

3        But I hope Ms. Bataller and Mr. Gorman, that you all

4   will come back often.  And Ms. Williams is always welcome.  And I

5   don't know about y'all.  Y'all are always here whether I want you

6   to be here or not.  But I was real proud of you all.

7        And I think every time we try a case, we become sort of

8   an icon for what somebody knows as the criminal justice system.

9   That's what, you know, they'll think of you, your picture, your

10  face.  And that's what they'll think of.

11        And so difficult case.  Honestly, no matter how it

12  turned out, that's the way I felt.  I was thinking through it

13  last night and this morning.  I thought it was tried honorably,

14  and I wish, I hope that we can, you know, our courts throughout

15  the nation are filled with lawyers like you all to try cases like

16  this.  They're cases of importance.  It's important to everyone,

17  the least of which is certainly not Mr. Perkins.  It's very

18  important to him.  It's very important to others, as well.

19        And so I thank you all for the -- I know it was a lot

20  shorter than we all thought.  I thought it would be Thursday or

21  so.  I think, you know, the lawyers were using their judgment.

22  And I'd say this even if it took us all week or two weeks.  I'd

23  still say this.

24        I think that the way you all interacted with each

25  other, the way you all worked together to try to come up with

219

1  agreements.  If you couldn't, you couldn't because you have to

2  represent your clients.  But the fact that you all worked

3  together, you know, shows me sort of the best of what our

4  industry has to offer.  And it's kind of exciting, frankly, to

5  see.

6          With that, there are real consequences, I know.  And

7  those are never easy to take.  So with that, anything more for

8  the Government?

9          MR. GREENBAUM:  No, Your Honor.  Thank you.

10         THE COURT:  Ms. --

11         MS. BATALLER-SCHNEIDER:  No, Your Honor.  Thank you.

12         THE COURT:  Y'all be safe.  Everybody be safe.  I know

13  everybody's traveling, so y'all be careful.

14         MR. GORMAN:  Thank you, Your Honor.

15         THE COURT:  And we'll be adjourned.

16         MR. CAYTON:  Thank you, Your Honor.

17     (Proceedings adjourned at 4:17 p.m.)

18                            ---OOO---

19

20

21

22

23

24

25

220

# **C E R T I F I C A T E**

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

DIPTI PATEL, CET-997

LIBERTY TRANSCRIPTS                    Date: January 3, 2023